## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| **AKRUM WADLEY, JONATHAN PARKER, MARCEL JOLY, AARON MENDS, MAURICE FLEMING, REGGIE SPEARMAN, KEVONTE MARTIN-MANLEY, DARIAN COOPER, LARON TAYLOR, BRANDON SIMON, JAVON FOY, ANDRE HARRIS, and TERRENCE HARRIS,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**UNIVERSITY OF IOWA, BOARD OF REGENTS FOR THE STATE OF IOWA, GARY BARTA, KIRK FERENTZ, BRIAN FERENTZ, CHRISTOPHER DOYLE, and RAIMOND BRAITHWAITE,**<br><br>    **Defendants.** | **Case No. 4:20-CV-366**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(Jury Demand)** |

**NOW COME** the Plaintiffs, Akrum Wadley, Jonathan Parker, Marcel Joly, Aaron Mends, Maurice Fleming, Reggie Spearman, Kevonte Martin-Manley, Darian Cooper, LaRon Taylor, Brandon Simon, Javon Foy, Andre Harris, and Terrence Harris (hereinafter collectively "**Plaintiffs**"), and file their *First Amended Complaint* complaining of the acts of the University of Iowa, the Board of Regents for the State of Iowa, Gary Barta, Kirk Ferentz, Brian Ferentz, Christopher Doyle, and Raimond Braithwaite (hereinafter collectively "**Defendants**"). Plaintiffs respectfully report their causes of action to this Honorable Court as follows:

## INTRODUCTION

*"Only a dumb ass black player would do it like that!"* [1]

1.      This action arises out of years of targeted discriminatory behavior the University of Iowa's Football Coaching Staff and Administration directed at African-American student-athletes within the football program ("**Program**").  Since 1998, African-American student-athletes in the Program have been victims of pervasive harassment, bullying, policies causing disparate treatment, and race-based threats perpetrated by the Iowa football coaching staff.  The illegal and unjust actions described herein adversely impacted the Plaintiffs' ability to receive and fully take advantage of the high-quality education and experience the Defendants promised each of them.

2.      Allegations of continuous racial discrimination against the Program began to resurface in the wake of the atrocious murder of George Floyd by Minneapolis, Minnesota police officers.  Seizing the opportunity to finally be heard, millions of Black people from all walks revealed painful stories of racism and discrimination that they were too fearful to discuss before.[2]

3.      On June 5, 2020, James Daniels, a current National Football League player and former University of Iowa football player, tweeted that "[t]here are too many racial

---

[1] Iowa Football Coach Brian Ferentz made this statement to Plaintiff Jonathan Parker in front of the entire team and coaching staff during an open football practice during the Fall of 2016.

[2] *See e.g.*, Jessica Guynn, *George Floyd protests lead to reckoning as Black employees speak out on racism and discrimination in the workplace*, USA Today (updated June 18, 2020), https://www.usatoday.com/story/money/2020/06/17/george-floyd-protests-black-lives-matter-employees-corporate-america-racism/3195685001/.

disparities in the Iowa football program Black players have been treated unfairly for far too long."[3]

4.     Following Mr. Daniels' comments, more than sixty (60) former Iowa football athletes, including Plaintiffs, have come forward thus far with their racially biased experiences while playing football at Iowa.

5.     Each former Iowa football player described bullying, disparate treatment, discrimination, and threats made by the Iowa football coaching staff under the direction of Head Coach Kirk Ferentz.

6.     Under the watchful eye of Kirk Ferentz, Iowa football coaching staff utilized racially discriminatory and punitive means to force African-American athletes into strict compliance with the Program's racist philosophy that effectively stripped away every cultural aspect of being an African-American.

7.     Not only was Kirk Ferentz aware of players' concerns of discriminatory treatment of African-American athletes within his Program, he also witnessed, tolerated, and enabled most, if not all, instances of race discrimination against African-Americans. For instance, Kirk Ferentz heard his son, Coach Brian Ferentz, call Plaintiff Jonathan Parker a "dumbass black player" in front of the entire team and coaching staff during an open football practice.  Yet when Jonathan complained, Kirk Ferentz told Jonathan he was aware of and heard the racist comment made by Brian Ferentz, but would not side with an athlete over his coaches and ordered Jonathan to apologize to Brian Ferentz.

---

[3]     James     Daniels     (@jamsdans),     TWITTER     (June     5,     2020,     7:08     PM), https://twitter.com/jamsdans/status/1269058668663844864.

8.      Despite actual and constructive knowledge of race discrimination within the Program, on June 11, 2020, Coach Kirk Ferentz publicly stated he had a "blind spot"[4] when referring to the racial disparities and bullying in the Program for which he has been responsible for over twenty (20) years.

9.      A July 2020 investigation Iowa sanctioned and paid for -- conducted by the law firm Husch Blackwell, LLP ("**Law Firm**") -- found "in sum, the program's rules perpetuated racial and culture biases and diminished the value of cultural diversity.  The program over-monitored players to the point that they experienced heightened anxiety and maintained a culture that allowed a small group of coaches to demean players."[5]

10.      In response to a previously secret 2019 internal report, on July 20, 2020 Coach Kirk Ferentz admitted he "dropped the ball"[6] by failing to make necessary and effective changes to correct the culture of "racial or cultural biases"[7] against African-American players described in the *Report of External Review: Football Program Culture, University of Iowa* ("**Law Firm Report**").

---

[4] Adam Rittenberg, *Iowa's Kirk Ferentz admits 'blind spot' on black players' issues, vows to improve environment*, ESPN (June 12, 2020), https://www.espn.com/college-football/story/_/id/29304234/iowa-kirk-ferentz-admits-blind-spot-black-players-issues-vows-improve-environment.

[5] Husch Blackwell, LLP, *Report of External Review – Football Program Culture, University of Iowa* (July 30, 2020).

[6] Adam Rittenberg, *Internal report alleges racial discrimination against Black athletes at Iowa*, ESPN (July 20, 2020), https://www.espn.com/college-football/story/_/id/29502876/internal-report-alleges-racial-bias-black-athletes-iowa.

[7] Husch Blackwell, LLP, *Report of External Review – Football Program Culture, University of Iowa* (July 30, 2020).

11.     The daily grind of enduring targeted negative and discriminatory treatment, comments, and threats made it virtually impossible for African-American athletes to focus on their education and, thus, African-American athletes were denied the benefits of a high-quality education and subjected to continuous discrimination at Iowa based on their race. Numerous African-American football athletes fled Iowa and transferred to other less prestigious institutions of higher learning where many ultimately graduated. However, if they remained at Iowa, they were unfairly demeaned, humiliated, and dehumanized.

12.     The Program, through its coaches and administrators, maintained complete control over the Plaintiffs while they were athletes on campus and also maintained a foothold in their careers after college football.  Dr. Robert W. Turner II, a former college and professional football and current professor at George Washington University, explained in his book, *Not for Long: The Life and Career of the NFL Athlete*, that college football athletes are heavily under the control and scrutiny of college coaches as a result of what he calls a  "total institution".  Under a "total institution", there is a "deterioration of the kinds of boundaries that ordinarily separate where individuals sleep, play, and work…. [A] total institution commands control over every aspect of a subject's life [and, thus, the] institution coerces an individual into surrendering that control."[8]  Dr. Turner further explains as follows:

> The casual observer may not classify NCAA Division I football programs as total institutions but consider that all aspects of elite college football players' lives are conducted under a single authority. Coaches and athletic support staff have significant influence over the

---

[8] Turner II, Robert W., *Not for Long: The Life and Career of the NFL Athlete*, at 71 (Oxford Univ. Press 2018).

players' schedules, where they sleep, their transportation, when to eat, what to eat, workout routines, class schedules, homework schedule, academic majors, and social circles.   They set behavioral guidelines and team rules for players, and coaches and institutional enablers take the steps necessary to confirm that the athletes comply with the increasingly stringent rules….

\*\*\*

I can only recall one time that I witnessed a college teammate challenge the system, and things deteriorated rapidly.  Our starting safety at [James Madison University] refused to heed the head coach's demands, even as the other defensive backs complied.  A few days later, his locker was empty….  Several of my teammates and I pleaded with him to suck it up and acquiesce to the coach's demands for the good of the team….

\*\*\*

Athletes are keenly aware that they must do everything they possibly can to stay in the coach's favor….   Athletes and coaches alike recognize that the *threat* of losing a scholarship combined with the overabundance of high school players who didn't make it to college and college players in lower divisions who dream of playing major college football are strong incentives for current players to conform to team and NCAA rules.[9]

When Plaintiffs reached out to assistant coaches and administrators about the Program's culture of disparate treatment and racial harassment, they were uniformly told not to step forward out of fear that the athletes would be "blackballed", "runoff", and "sent back to the ghetto".  Facing the loss of coveted playing time and a scholarship at a top academic institution, the Plaintiffs were forced to endure and shoulder the burden of the daily discriminatory actions of the coaches and administrators within the Program.  The control the Program's coaches and administrators extended well beyond the playing field and into

---

[9] *Id.* at 72, 73, 80 & 81.

the Plaintiffs' professions.   The Plaintiffs recognize the Program's coaches and administrators, through their words and actions, had the ability to harm their transfer prospects, potential professional football playing careers, coaching careers, or both.   The Plaintiffs feared stepping forward while playing for the Program because the Program's coaches and administrators could disparage them to professional scouts reducing their opportunity to play professionally and speak ill of them when seeking to obtain competitive coaching positions.   Any such comment by a coach or administrator is a death knell in the sports community when seeking a finite number of positions.

## JURISDICTION AND VENUE

13.     This court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This court has supplemental jurisdiction to hear and decide the pendent state law claims under 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because some or all violations giving rise to the claims herein occurred in this District.

## PARTIES

*"Being an Iowa football player was a daily struggle for black players.  We were punished for no apparent reason, singled out by coaches, and threatened and ridiculed every day.  It is hard to explain how difficult it was.  Think about being under pressure every day for 4 years solely because of your race.  That is how it was for me and my black teammates."*[10]

A.     *Named Plaintiffs.*

---

[10] Husch Blackwell, LLP, *Report of External Review – Football Program Culture, University of Iowa* (July 30, 2020).

7

15.     Plaintiff, Akrum Wadley ("**<u>Akrum</u>**"), is a former member of the University of Iowa football team.  Akrum matriculated at the University of Iowa in 2013 and was a member of the football team from 2013 through 2017.  Akrum resides in Lawrenceville, Georgia.

16.     Plaintiff, Jonathan Parker ("**<u>Jonathan</u>**"), is a former member of the University of Iowa football team.  Jonathan matriculated at the University of Iowa in 2013 and was a member of the football team from 2013 through 2016 before transferring to Northern Illinois University.  Jonathan resides in Florissant, Missouri.

17.     Plaintiff, Marcel Joly ("**<u>Marcel</u>**"), is a former member of the University of Iowa football team.  Marcel matriculated at the University of Iowa in 2014 and was a member of the football team from 2014 through 2017.  Marcel resides in Laurel, Maryland.

18.     Plaintiff, Aaron Mends ("**<u>Aaron</u>**"), is a former member of the University of Iowa football team.  Aaron matriculated at the University of Iowa in 2014 and was a member of the football team from 2014 until December 2018 before transferring to Illinois State University.  Aaron resides in Kansas City, Missouri.

19.     Plaintiff, Maurice Fleming ("**<u>Maurice</u>**"), is a former member of the University of Iowa football team.  Maurice matriculated at the University of Iowa in 2012 and was a member of the football team from 2012 through 2015 before transferring to West Virginia University.  Maurice resides in Chicago, Illinois.

20.     Plaintiff, Reggie Spearman ("**<u>Reggie</u>**"), is a former member of the University of Iowa football team.  Reggie matriculated at the University of Iowa in 2013 and was a

member of the football team in 2013 before transferring to Illinois State University and then to Grand Valley State University.  Reggie resides in Burnham, Illinois.

21.     Plaintiff, Kevonte Martin-Manley ("**Kevonte**"), is a former member of the University of Iowa football team.  Kevonte matriculated at the University of Iowa in 2010 and was a member of the football team from 2010 through 2015.  Kevonte resides in Phoenix, Arizona.

22.     Plaintiff, Darian Cooper ("**Darian**"), is a former member of the University of Iowa football team.  Darian matriculated at the University of Iowa in 2011 and was a member of the football team from 2011 through 2016.  Darian resides in Burtonsville, Maryland.

23.     Plaintiff, LaRon Taylor ("**LaRon**"), is a former member of the University of Iowa football team.  LaRon matriculated at the University of Iowa in 2012 and was a member of the football team from 2012 through summer 2014 before transferring to Youngstown State University.  LaRon resides in Detroit, Michigan.

24.     Plaintiff, Brandon Simon ("**Brandon**"), is a former member of the University of Iowa football team.  Brandon matriculated at the University of Iowa in 2016 and was a member of the football team from 2016 through January 2019 before transferring to Illinois State University.  Brandon resides in Normal, Illinois.

25.     Plaintiff, Javon Foy ("**Javon**"), is a former member of the University of Iowa football team.  Javon matriculated at the University of Iowa in 2019 and was a member of the football team from 2019 through January 2020 before transferring to Iowa Central Community College.  Javon resides in Fort Dodge, Iowa.

26.     Plaintiff, Andre Harris ("**Andre**"), is a former member of the University of Iowa football team.  Andre matriculated at the University of Iowa in 2013 and was a member of the football team in 2013 before transferring to Eastern Illinois University. Andre resides in Olathe, Kansas.

27.     Plaintiff, Terrence Harris ("**Terrence**") is a former member of the University of Iowa football team.  Terrence matriculated at the University of Iowa in 2014 and was a member of the football team from 2014 through June 2016 before transferring to Lackawanna College and ultimately enrolling at Rutgers University to finish his higher education.

### B.     Named Defendants.

28.     Defendant, University of Iowa ("**Iowa**"), is an institution of higher learning in Iowa City, Iowa, established and operated in accordance with Iowa Code Chapter 263.

29.     Defendant, Board of Regents for the State of Iowa ("**Board**"), governs the university and has a principal place of business in Polk County, Iowa, and operates in accordance with Iowa Code Chapter 262.

30.     Defendant, State of Iowa, maintains its principal place of business in Des Moines, Polk County, Iowa.

31.     Gary Barta ("**Barta**"), is an individual and the athletics director for the University of Iowa.  Barta has been the athletics director for the University of Iowa from August 2006 to present. At all times material hereto, Barta acted and continues to act under color of state law. Barta is sued in his individual capacity.

32.     Defendant, Kirk Ferentz ("**K. Ferentz**"), is an individual and the head football coach for the University of Iowa.  K. Ferentz has been the head football for the University of Iowa from December 2, 1998 to present.  At all times material hereto, K. Ferentz acted and continues to act under color of state law.  K. Ferentz is sued in his individual capacity.

33.     Defendant, Brian Ferentz ("**B. Ferentz**"), is an individual and the offensive coordinator and assistant football coach for the University of Iowa.  B. Ferentz has been an assistant football coach for the University of Iowa from 2012 to present. At all times material hereto, B. Ferentz acted and continues to act under color of state law.  B. Ferentz is sued in his individual capacity.

34.     Defendant, Christopher Doyle ("**Doyle**"), is an individual and the former head strength and conditioning coach for the University of Iowa.  Doyle served as the head strength and conditioning coach for the University of Iowa from 1999 to June 15, 2020. At all times material hereto, Doyle acted under color of state law.  Doyle is sued in his individual capacity.

35.     Defendant, Raimond Braithwaite ("**Braithwaite**"), is an individual and current interim strength and conditioning coach for the University of Iowa.  Braithwaite was a member of Iowa's strength and conditioning team in 2002-2004. Braithwaite returned to the Program in or about 2008 and remains as of the date of the instant filing. At all times material hereto, Braithwaite acted and continues to act under color of state law. Braithwaite is sued in his individual capacity.

## **COMMON FACTUAL ALLEGATIONS**

*"A number of African American student-athletes interviewed reported that they did not see the 'Iowa culture' (i.e., the difference in treatment between African American and White student-athletes or the inability for African Americans to be themselves) on their recruiting trip and if they had, they would have never committed to [Iowa]."[11]*

36.     Iowa is a public research institution in Iowa City, Iowa founded in 1847. Iowa is often recognized as one of the top institutions of higher learning in the United States and is one of only sixty-five (65) elected members of the Association of American Universities.  In addition to offering more than two hundred (200) areas of study and seven (7) professional degrees, Iowa offers twenty-two (22) intercollegiate athletic teams competing in Division I of the National Collegiate Athletic Association ("**NCAA**") and is a member of the Big Ten Conference ("**Conference**").

37.     The Iowa athletics department ("**Iowa Athletics**"), through their affiliation with the Conference, competes among the highly lucrative and competitive Power 5, which is a group of colleges and universities with the most prestigious and lucrative athletics departments in the United States.

38.     Iowa first played football as a club sport in 1872, but it was not until 1889 that Iowa first recognized a varsity football team. Today, the Iowa football team competes in the West Division of the Conference and plays its home games in Iowa City, Iowa, at Kinnick Stadium.

---

[11]     University      of      Iowa      Diversity      Task      Force      Report      (2018–19), https://www.hawkeyenation.com/app/uploads/2020/07/Full-UI-Diversity-Task-Force-Report.pdf.

39.     The Iowa football team is coached by K. Ferentz, who has been the head football coach for twenty-one (21) seasons.  K. Ferentz's is the longest current tenured head coach in NCAA Division I Football Bowl Subdivision.

40.     K. Ferentz was hired as the head football coach of Iowa on December 2, 1998.  Since that time, he has amassed a record of 162-104, won two Conference championships (2002 and 2004), and has been named Conference Coach of the Year four times (2002, 2004, 2009, 2015), AP College Football Coach of the Year (2002), Walter Camp Coach of the Year (2002), Bobby Dodd Coach of the Year (2015), and Eddie Robinson Coach of the Year (2015).

41.     As a result of K. Ferentz's success as the head football coach at Iowa, Iowa Athletics and Iowa administrators, including Barta, turned a blind eye to the known discriminatory culture and systematic racism occurring within the Program.

42.     In 1999, K. Ferentz hired Christopher Doyle ("**Doyle**") to serve as the Head Strength and Conditioning Coach for Iowa Athletics.  Doyle oversaw the training of the Iowa football team and associated athletes.  Doyle quickly ascended to be K. Ferentz's "right hand man"[12] and chief confidant.  In highlighting the influence of Doyle within the

---

[12] Articles from numerous sports media outlets extensively described Doyle as K. Ferentz's "right-hand man" and noted Doyle's influence within the Program. *See e.g.*, Matt Howe, *Chris Doyle releases statement after departure from Iowa*, 247SPORTS (June 15, 2020, 11:21 AM), https://247sports.com/Article/Chris-Doyle-Iowa-Hawkeyes-football-releases-statement-after-separation-agreement--148187938/.

Program, former Iowa safety Diauntae Morrow explained, "[i]f Kirk is the CEO, Chris Doyle is the COO."[13]

43.     As strength and conditioning coach, Doyle played an integral role in the development of student-athletes and had access to athletes when coaches on the Iowa football staff were not permitted to work with athletes per NCAA rules.

44.     Under the watch and blessing of K. Ferentz, Doyle racially harassed, unnecessarily demeaned, and relentlessly bullied African-American football athletes at Iowa under the guise of asserting the "Iowa Way."

45.     The "Iowa Way" was a "dog whistle" code word for a racially discriminatory program that singled out African-American athletes and forced them to conform to White culture, norms, and customs or suffer harsh punishment. African-American athletes were ridiculed, threatened, and bullied as a result of having common African-American hairstyles, dictation, dress, and customs.   All the while, White student-athletes were permitted to have long hair, long beards, and other styles commonly associated with White culture and dress.

46.     As aptly explained in the text of the CROWN Act of 2020, H.R. 5309, society has historically used hair texture and hairstyle, in conjunction with skin color, to classify and discriminate against individuals on the basis of race, and, notably, that people of

---

[13] Teddy Greenstein, *What's next for Iowa football?*, CHICAGO TRIBUNE (June 09, 2020, 9:35 AM), https://www.chicagotribune.com/sports/college/ct-iowa-football-kirk-ferentz-chris-doyle-20200609-v354a53pi5eedk4hf4du4y4lqa-story.html.

African descent are deprived of educational opportunities for wearing Black hairstyles such as afros, braids, twists, and locks.[14]

47.     African-American athletes were more harshly, if not exclusively, punished or reprimanded for menial "disruptions" like singing, dancing, or "looking funny."

48.     K. Ferentz further exacerbated racial disparities within the Program by installing his son, B. Ferentz, as offensive line coach and offensive coordinator in 2012 and 2017, respectively. He was only thirty-three (33) years old when he was promoted to offensive coordinator over more senior and qualified African-American coaches on K. Ferentz's staff at the time.

49.     B. Ferentz discriminated against, bullied, demeaned, and harassed African-American football athletes almost daily.

50.     Being an African-American athlete in the Program was a daily struggle that put immense pressure and trauma on African-American student-athletes merely to survive each day. Doyle and B. Ferentz would commonly say things like:

- "n*****",
- "what gang is he in" when referring to African-American athletes,
- "dumbass black player",
- "you are not smart at all",
- "stupid motherfucker",
- "go back to the ghetto", and

---

[14] CROWN Act of 2020, H.R. 5309, 116th Cong. (2020);  *see also* Corinn Jackson, *You Can't Touch My Hair: California Bans Racial Discrimination Based on Hairstyle with CROWN Act*, Littler (July 12, 2019) (explaining that "the legislation stems from America's history of laws and societal norms that considered 'blackness' to be unprofessional and instead linked professionalism to European features and mannerisms. . . . [And] while American society has made progress, African-American hair and the styles associated with black hair can still often be a focus of discrimination and therefore, a proxy for racial discrimination.").

- stating an African-American athlete looked like he was going to "rob a liquor store" while wearing Iowa football team issued apparel.

51.    In a heated verbal exchange with Plaintiff Maurice Fleming, Doyle repeatedly said with a smirk on his face "this n*****, this n*****, this n*****," to the shock of Mr. Fleming.

52.    B. Ferentz openly told Plaintiff Akrum Wadley and other African-American running backs  of Ferentz's recruiting trip to visit Ihmir Smith-Marsette, then a highly-touted receiver out of the same Newark, New Jersey high school attended by Wadley.  B. Ferentz recounted that while his brother-in-law (who had accompanied B. Ferentz on the trip) expressed nervousness about the high number of African-Americans around the high school, B. Ferentz was not nervous at all and affirmed his belief that no African-Americans would bother him because he "looked like a cop."

53.    African-American athletes were commonly referred to as "stupid" "hood" and "dumb."

54.    These comments were made in open forums during team meetings and at practice regularly, if not daily, in the presence of K. Ferentz, other coaches, and teammates.

55.    If African-American student-athletes experiencing or witnessing discrimination chose not to "turn the other cheek," they were punished, threatened with losing their scholarships, and told racist comments like "go back to the ghetto."

56.    Per a White football player's account, African-American football players were disproportionately targeted for "random" drug tests in comparison to their White teammates.

57.     Per a current African-American player's account to the investigators in the Law Firm Report, African-American players are treated differently than White players. Said player described "an incident where he was yelled at extensively, kicked out of training, and required to do ten (10) hours of community service for spitting on the turf— whereas he indicated White players did not receive this response to spitting. According to the player, White players have spit 'plenty of times' on the turf and not been 'cussed at' or thrown out of a weight training. This player's recollection was supported by a former coach and two current players who witnessed the incident and observed White players engaging in similar behavior without punishment."

58.     African-American players, in contrast to their White teammates, were disproportionately subjected to a form of punishment in which coaches commanded African-American players to repeatedly run a drill requiring them to run, full-speed, right at one another and collide.

59.     Moreover, members of the coaching staff refused to address instances of racially-derogatory statements, including the use of the word "nigger" by White players while in the presence of coaches and African-American players, let alone address racially-derogatory statements made by other coaches.

60.     While White teammates were permitted to rest, recover, and heal, African-American players were ridiculed for their injuries and pressured to play while injured under explicit threats by coaches, including threats of loss of individual scholarships. White players, however, were not subject to similar threats by the coaching staff.

61.     During the years in which the Program permitted players to have active social media profiles, African-American athletes' posts were unequally scrutinized by coaching staff in comparison to White football athletes. Coaches frequently displayed African-American players' social media posts and humiliated them for how "stupid" they sounded for their use of non-White vernacular.

62.     While White players, for example, were never prohibited from or reprimanded for posting pictures featuring firearms to social media, African-American players were instructed by K. Ferentz and other coaches to take down similar photos. In at least one instance in which K. Ferentz instructed an African-American athlete to take down a social media post, he told said African-American player, "What would an eighty-year-old white man think of this photo?" K. Ferentz and other coaches and administrators within the Program never offered the same or similar statements to White football players.

63.     At all times material hereto, K. Ferentz, citing team rules, prohibited Iowa football players from publicly expressing their political views and ordered players to "stick to football." K. Ferentz and other coaches and staff within the Program more frequently referenced these team rules in light of athletes kneeling during the National Anthem, a silent protest in opposition to police brutality of unarmed Black persons across America.

64.     Per the aforementioned team rules, African-American football players were prohibited from kneeling during the playing of the National Anthem before Iowa football games, both home and away.

65.     However, White football players were not subject to the same treatment with respect to certain political views. In one instance, despite the Program's use of the rules

prohibiting political expression to suppress potential demonstrations by African-American football players and their allies in protest of police brutality, a group of White teammates created and personally delivered a custom-made Iowa football jersey to President Donald J. Trump at a political rally in Iowa while holding signs identifying the team moniker in support of the President:



[15]

66.     In response, many African-American football athletes decried the double standard in enforcement of team rules regarding political expression, particularly in light of President Trump's vitriolic statements in opposition to player-protests over police brutality, including reference to NFL player-protesters as "son[s] of . . . bitch[es]."

67.     K. Ferentz and other coaches and administrators, however, never addressed, let alone reprimanded, the clear violation of team rules by said group of White players. Doyle and B. Ferentz, through instructions from K. Ferentz, harassed and discriminated against African-American athletes continuously.  African-American athletes were made to

---

[15] https://khak.com/trump-gets-support-from-iowa-football-players/

feel like second-class citizens and widgets that were easily pushed out of the Program without issue.

68.     African-American student-athletes, including Plaintiff Akrum Wadley, were made to drink protein shakes and electrolyte drinks until they vomited by the Iowa football coaching staff in order "to make weight."

69.     The daily grind of enduring negative treatment, comments, and threats made it virtually impossible for African-American athletes to focus on their education and, thus, African-American athletes were denied the benefits of a high-quality educational experience from an elite academic institution as they were promised.

70.     K. Ferentz, with the help of Doyle and B. Ferentz, created and perpetuated a pervasive and severe systemic culture intended to (and did) treat African-American student-athletes differently than their White teammates.

71.     The Program's culture of disparate treatment of African-Americans caused and perpetuated a racial divide between African-American and White teammates. Said divide was apparent to Plaintiffs during their time at Iowa, as the following photograph taken by Plaintiff Aaron Mends pointedly shows.



72.     On several occasions, African-American student-athletes, their parents, and Leadership Group, approached K. Ferentz about the racial injustices within the Program.

73.     Per the Law Firm Report, one of the football coaches, who confirmed the existence of disparate treatment within the Program, told K. Ferentz of the discriminatory culture within the Program on at least two (2) separate occasions over the last four (4) years with no resulting change.

74.     K. Ferentz allowed comments and discriminatory treatment to occur day-to-day for over twenty (20) years.

75.     Multiple coaches and staff during K. Ferentz's tenure, consisting of African-Americans and Whites, have privately acknowledged to African-American players,

including Plaintiffs, the repeated instances of disparate treatment and racially-charged hostile environment. However, wary of K. Ferentz's power within the landscape of collegiate and professional football, few, if any, openly repudiated the Program's discriminatory culture for fear of being blackballed from coaching opportunities.

76.     The coaching staff's fears of being blackballed for speaking out against the Program's discriminatory culture, in turn, discouraged African-American players from doing the same. As best explained by an anonymous Power 5 player quoted in an article by The Guardian over player opt-outs at the beginning of the COVID-19 pandemic:

> "[I]f a coach wants to, they can find ways to push players out of the program. Even if you were planning to transfer afterwards, you have to ask yourself how coaches at other universities might view you. You risk being blackballed as a player. Everybody knows everybody in the coaching industry, and all it takes is one call for your chances to be ruined at a potential program [unless you're a star]."[16]

77.     For Plaintiffs, speaking publicly against the discriminatory practices in K. Ferentz's Program not only meant risking opportunities for renewed careers at transferee schools, but post-college professional opportunities as well, whether football-related or otherwise. Thus, due to their legitimate fear of retribution, Plaintiffs chose not to speak out publicly, some for years after their college playing careers, until the summer of 2020 in the wake of George Floyd's murder and Iowa own admission of having a racially biased football environment.

---

[16] Nathan Kalman-Lamb, et al., *'We are being gaslit': College football and Covid-19 are imperiling athletes*, The Guardian (Aug. 3, 2020), https://www.theguardian.com/sport/2020/aug/03/college-football-coronavirus-athletes.

78.     Immediately following the university's release of Plaintiffs' demand letter in late October,[17] a former Iowa coach sent one Plaintiff a text message (see below) suggesting that said Plaintiff's life related to football, whether concerning professional aspirations as a player or future coaching opportunities, would end as a result of his involvement in the instant case.



---
[17] Chad Leistikow, *Eight former University of Iowa football players seek $20 million, Kirk Ferentz's firing over racial discrimination*, Des Moines Register (Oct. 18, 2020, updated Oct. 20, 2020), https://www.desmoinesregister.com/story/sports/college/iowa/football/2020/10/18/eight-former-hawkeyes-demands-letter-seeks-kirk-ferentz-firing-racial-discrimination-gary-barta/3697431001/.

79.     During Kirk Ferentz's tenure, there have existed gross statistical disparities in graduation and transfer rates between African-American football student-athletes and White football student-athletes. Said statistical disparities are the consequences of the Program's racially-charged hostile education environment, wherein African-American football student-athletes, including Plaintiffs, were subjected to severe, pervasive, and objectively offensive acts of intentional discrimination on the basis of race.

80.     According to a 2018 study by the USC Race and Equity Center, graduation rates for African-American male student-athletes at Iowa rank near the bottom among its Big Ten peers when compared to the graduation rates of all athletes and the entire student body at those institutions. The study indicated that only forty-one percent (41%) of African-American male student-athletes graduated from Iowa, in stark contrast to the seventy-seven percent (77%) graduation rate for all student athletes.

81.     In 2018, in response to Iowa ranking at the bottom of the Conference in graduation rates amongst African-American athletes (*i.e.,* forty-two percent (42%)), Barta directed Iowa Athletics to form the *UI Athletics Diversity Task Force* ("**Task Force**"), which was an internal group of people who interviewed athletes, administrators, and coaches and, ultimately, drafted a written report.

82.     Although the *UI Athletics Diversity Task Force Report*[18] ("**Report**") was prepared and disseminated internally sometime in 2019, it was not until mid-July 2020 that such report was made publicly available.

---

[18]     University     of     Iowa     Diversity     Task     Force     Report     (2018–19), https://www.hawkeyenation.com/app/uploads/2020/07/Full-UI-Diversity-Task-Force-Report.pdf.

83.    The Report confirms the circumstances described by Plaintiffs.  In pertinent part, the Report states as follows:

- "African American **student-athletes do not feel comfortable being their authentic selves**…."

- "I was told by my coach to change my hairstyle because it did not fit the Iowa culture.  I can't be free.  I feel like a slave to the system."

- "Nearly all African American student-athletes interviewed used the term "double-standard" to describe  **the difference between how African American student-athletes are treated in relation to their White peers**."

- "Nearly all of the African American student-athletes interviewed believe that one of the predominant reasons that African America student-athletes leave is because of the way they are talked to by coaches and some support staff while their White peers are not subjected to the same negative interactions."

- **One White student-athlete mentioned that African American athletes are 'tested more for drugs'** than White student-athletes, and 'White student-athletes stay off the radar.'"

- "Many student-athletes, both White and Black, believe there is **a short period of time to make a good impression and that the margin of error is perceived to be much smaller for African American student-athletes.**"

- "'[P]unishments are not equal based on race'."

- "White student-athletes were more likely to be described as being from a 'two parent home', 'good upbringing', 'smart', 'tough', 'talented', whereas African American student-athletes were described by their "socio-economic background', 'tough upbringing', or 'at risk'…. [C]oaches were more likely to discuss what African American athletes can do for the University, and less about what the institution, Athletics, and their team can do to help the student-athlete."

84.    Despite the Report, Defendants did little, if anything, to address rampant discrimination, racial inequality, and systematic harassment and bullying.

85.     K. Ferentz operated a football program found to be undisputedly "culturally biased" and "unfair" towards African-American student-athletes with no effective oversight from anyone including his superior, Barta.

86.     K. Ferentz, Doyle and B. Ferentz, were left to continue to wreak havoc on the lives of young African-American men who were seeking a world-class educational experience and the opportunity to compete at the highest level of intercollegiate football.

87.     Numerous athletes have come forward and publicly stated they met with K. Ferentz to address the racial inequities in the Program, to which K. Ferentz shrugged and moved forward without change.

88.     After numerous former Iowa athletes came forward and explained the pain and emotional and mental trauma they felt and continue to feel as a result of their time as student athletes at Iowa, Iowa moved quickly to find a "scapegoat."

89.     On June 14, 2020, Iowa and Doyle entered into the *Separation Agreement and General Release* ("**Separation Agreement**") in which Iowa agreed to pay Doyle $1,112,499.00 and permitted Doyle to continue health and dental benefits for fifteen (15) months.

90.     Despite having extensive evidence of Doyle's abuse of athletes, violations of Plaintiffs' civil rights and violations of Iowa policies, Iowa chose to pay Doyle the full value of his contract and further agreed that his resignation was "not a resignation in lieu of termination".

91.     K. Ferentz and B. Ferentz have never been held accountable for their extensive roles in creating, developing, and participating in a culture that has extensively

and negatively impacted numerous African-American athletes under their control.  In fact, in September 2020, after B. Ferentz's discriminatory conduct became public, he received a $75,000 pay raise!

92.     In or about July 2020, Iowa retained the Law Firm to "conduct an external review of alleged racial inequities with in the [Iowa] football program, including mistreatment of Black student-athletes and a racially charged climate."

93.     The Law Firm's findings as issued on July 30, 2020 do not address many of the volatile public reports (including those made by Plaintiffs), but nevertheless conclude that Barta and K. Ferentz should "create action steps aimed at improving the culture of the program" after twenty (20) years of disparate treatment towards African-Americans.

94.     The Law Firm Report concludes as follows:

> In sum, the program's rules perpetuated racial and culture biases and diminished the value of cultural diversity.  The program over-monitored players to the point that they experienced heightened anxiety and maintained a culture that allowed a small group of coaches to demean players.  We have separately provided four personnel reports to the University summarizing allegations of mistreatment made against current and former employees so that they may be addressed, as appropriate, pursuant to the institution's personnel policies and procedures.

95.     The Law Firm Report further revealed that "[m]any current and former players told investigators that three members of the coaching staff abused their power and verbally abused and bullied players." The Law Firm provided the "specific allegations" to Iowa separate and apart from the Law Firm Report.

96.     The Law Firm Report described the very same issues that have permeated the Program since K. Ferentz's arrival and as described by Plaintiffs in their publicly issued statements and further described in the Report:

- "Being an Iowa football player was a daily struggle for black players. We were punished for no apparent reason, singled out by coaches, and threatened and ridiculed every day. It is hard to explain how difficult it was. Think about being under pressure every day for 4 years solely because of your race. That is how it was for me and my black teammates."

- "Echoing the sentiments of many current and former players, this coach explained that it is harder to be a Black player in the program because of the player 'mold.'"

- "A different former player said the environment was 'hard to take' on a daily basis, hurt his self-esteem, and made it difficult to focus on receiving a quality education."

- "Several former players commented that Coach Doyle should not be a 'scapegoat' for the systematic issues in the program."

- "[T]he Iowa Way requires players to fit a 'mold' that discourages self-expression and is not inclusive of Black players."

- "One coach agreed that the concept [of the Iowa Way] has not been inclusive and can 'very much alienate individualism.' A second coach states that players have told him the Iowa Way means 'you act like a White person and cannot be yourself.'"

- "A different former player said he was required to drink excessive Powerade and shakes to gain weight, which made him sick daily."

- "[I]t 'seemed like every Black player had two strikes the day we entered Iowa… I was either a criminal or a dumb motherfu**** to these guys.'"

97.     Two (2) weeks before the Law Firm Report was released, K. Ferentz publicly commented about the "investigation" and number of individuals interviewed and his

excitement about the upcoming Law Firm Report that ultimately detailed the extensive racism within the Program under K. Ferentz's control and guidance.

98.    Despite the Report and numerous individual reports made to K. Ferentz and other Iowa Athletics administrators and coaches, Defendants utterly and completely ignored Iowa's policies and procedures that denounce harassment, bullying, and discrimination based on race.

99.    Although the Law Firm Report is replete with instances where the Iowa Football staff, including Doyle and B. Ferentz, committed unlawful and public acts of racism, bullying, and intimidation with impunity, Braithwaite, in consultation with other Defendants, has launched an effort to deny a racially biased culture and commended Doyle.

100.    Specifically, during an October 9, 2020 press conference, Braithwaite announced "…I have never witnessed or heard [Doyle] ever make a racial comment."[19]

101.    Braithwaite's feigned ignorance defies reason and serves as an attempt to contradict the countless instances of discrimination African-American players complained about and experienced for approximately twenty (20) years.

102.    Mentioned *supra*, the Program implemented a Leadership Group ("**Leadership Group**") comprised of rostered football players typically elected by other members of the football team during times material hereto.

---

[19] Mark Emmert, *Raimond Braithwaite keeps Iowa football strength program on same path as 'close friend' Chris Doyle*, Hawk Central (Oct. 9, 2020), https://www.hawkcentral.com/story/sports/2020/10/09/iowa-football-raimond-braithwaite-replaces-friend-chris-doyle-hawkeye-strength-coach-kirk-ferentz/5930925002/.

103.    One purpose of Leadership Group was to act as a conduit for players to present K. Ferentz with any grievances or complaints they had with the Program.

104.    Another function of the Leadership Group was to assist coaching staff in formulating policies and participate in decision-making matters.

105.    Additionally, the Leadership Group was to weigh-in on disciplinary matters concerning their fellow teammates. However, K. Ferentz and other coaches disproportionately restricted opportunities for the Leadership Group to recommend punishments for African-American players in comparison to White players. For instance, coaches required the Leadership Group to provide disciplinary recommendations for a White player's sexual assault allegations and drunk driving, but unilaterally kicked an African-American player off the team for failed drug tests without the Leadership Group's input.

106.    Leadership Group specifically expressed to K. Ferentz the systemic racism African-American student-athletes experienced on a regular basis.

107.    The complaints were met with a constant refrain – Coach K. Ferentz would 'handle the problems' and 'address the issues with the coaching staff'.

108.    However, the ongoing racism and discrimination were never resolved and African-American student-athletes continued to be subjected to disparate treatment and racially derogatory comments from the members of the coaching staff.

109.    Iowa's Anti-Harassment policy states Iowa "is committed to maintaining an environment that recognizes the inherent worth and dignity of every person, and that fosters

tolerance, sensitivity, understanding, and mutual respect."[20] According to Iowa policies and procedures, "harassment" includes "intentional conduct, including speech, directed toward an identifiable person or persons that is sufficiently severe, pervasive, or persistent that it interferes with work, educational performance, on-campus living, or participation in a University activity on or off campus."[21]   Additionally, the Iowa Non-Discrimination Policy "prohibits discrimination in employment, educational programs, and activities on the basis of race…."[22]

110.    Oddly, despite the alarming number of reports and discriminatory comments being made in front of numerous athletes, coaches, and administrators, Defendants did nothing to enforce Iowa's non-Discrimination and anti-Bullying policies being openly and blatantly violated. In fact, on July 31, 2020, during a press conference, Barta confirmed the Program had a "culture that was not fair"[23] towards African-American student-athletes.

111.    Iowa and Iowa Athletics are no stranger to litigation.  In fact, it appears Iowa and Iowa Athletics have made a practice of discriminating against people of all walks of life.

112.    In 2017, Iowa Athletics found itself embroiled in heated litigation with two (2) former employees where a jury awarded damages in relation to gender and sexual orientation discrimination, which Iowa ultimately settled for approximately $6,500,000.00.

---

[20] University of Iowa, Operations Manual: Community Policies § 14.1 (amended July 2015).

[21] University of Iowa, Operations Manual: Community Policies § 14.2(a) (amended Jan. 2020).

[22] University of Iowa, Operations Manual: Community Policies § 6 (amended May 2015).

[23] John Bohnenkamp, *Within Iowa's Program, The Ball Has To Keep Moving Forward*, SPORTS ILLUSTRATED (July 30, 2020), https://www.si.com/college/iowa/football/column-ferentz-073020.

113.    Iowa Athletics has also settled or paid separation payments to multiple coaches and athletics administrators who complained of discriminatory treatment.

114.    Iowa's extensive history of discrimination and ongoing, severe, and pervasive acts constitute intentional discrimination where Defendants intended to treat African-Americans differently.

115.    The Plaintiffs identified herein are African-American males who were subjected to the racially discriminatory behavior described within this Petition.

116.    For the reasons set forth above and below, Plaintiffs have been damaged as a result of the acts and omissions of the Defendants.

## SPECIFIC FACTUAL ALLEGATIONS

*"[It] seemed like every Black player had two strikes the day we entered Iowa… I was either a criminal or a dumb motherfu\*\*\*\* to these guys."* [24]

117.    Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-107 of this Petition as though fully set forth herein.

### A.    Akrum Wadley

118.    In 2013, Akrum was an enthusiastic young football player in Newark, New Jersey who pursued his goal of getting a college educational experience and degree from one of the top universities in America and playing Division I football by signing with the University of Iowa on February 4, 2013.

---

[24] Quote attributed to a former African-American UI football player. *See* Husch Blackwell, LLP, *Report of External Review – Football Program Culture, University of Iowa* (July 30, 2020).

119.    Akrum arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

120.    Akrum, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.

121.    While at Iowa, Akrum developed into one of the most prolific running backs in Program history.  By graduation, Akrum ranked fifth in all-time rushing yards and fourth in touchdowns.

122.    Akrum's success on the field did not insulate him from continuous racial discrimination off the field.

123.    For instance, the Program distributed black wool Nike hats to each player on the team.  One winter day Akrum chose to jog to the practice facility with his team issued Nike wool hat.  B. Ferentz spotted Akrum and yelled out, "Hey, Akrum, are you going to rob a gas station?!?", but said nothing similar to White players who wore the same wool hat.  Although clearly upset by the comment, Akrum ignored him.  However, Coach B. Ferentz persisted, repeatedly asking Akrum things like, "Are you going to rob a liquor store?!?"  Fearing retaliation, the best response Akrum could offer was to simply shake his head as he walked away.

124.    B. Ferentz continued targeting Akrum.   One morning right before an important exam, Akrum drove to the practice facility to retrieve a protein shake to help him

make weight before practice.  Akrum pulled into an unmarked, unoccupied parking spot knowing he would only be there momentarily.  It was not uncommon for student-athletes to momentarily utilize such parking spots.  After returning from the facility, B. Ferentz saw him while jogging and yelled, "You dumb mother fucker, who the fuck do you think you are!? I will get you when I get back."

125.    Rattled, Akrum got in his car and went to his exam, but with his spirit broken he could not properly concentrate on the test.

126.    Making weight for African-American players was imperative.  Should an African-American football student- athlete fail to make weight, he was targeted.

127.    The pressure of making weight to avoid discriminatory punishment caused Akrum to vomit and ache weekly and, eventually, daily.

128.    While Akrum played at Iowa, several African American athletes elected to transfer out of the Program.

129.    Akrum outwardly supported their decisions.

130.    Akrum's support of his former Black teammates caught the ire of K. Ferentz, who threatened to revoke Akrum's meal card and prevent him from dining with his teammates.

131.    When Akrum continued supporting the transferring athletes, K. Ferentz followed through on his threat and Akrum's meal card privileges were denied at dinner.

132.    Akrum took his grievances to the staff and administration.

133.    Akrum's complaints were never remedied, even after he conveyed his desire and intent to transfer from the Program.

34

134.    At one point, Akum approached Coach Broderick Binns and enlisted his assistance in scheduling mental health counseling sessions.

135.    Akrum met with the arranged therapist on one occasion.

136.    After that initial session, the therapist inexplicably disappeared and Akrum was never provided another counselor.

### B.    *Jonathan Parker*

137.    A native of St. Louis, Missouri, Jonathon decommitted from another collegiate football program to commit to the University of Iowa in February of 2013.  He was enthused by the prospect of playing NCAA Division I football in a Power 5 conference.

138.    Jonathan, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.

139.    Jonathan arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

140.    During practice, Jonathan was the victim of racism perpetrated by Coach B. Ferentz.  On one occasion, B. Ferentz began yelling and screaming at Jonathan. B. Ferentz kicked a garbage can and exclaimed in front of all the other players and coaches, **"Only a dumb ass *black player* would do it like that!"**  Later, another coach approached Jonathan after practice and advised him he did nothing wrong.

141.    But even though Jonathan did nothing wrong, he was still directed by K. Ferentz to apologize to Coach B. Ferentz!

142.    When Jonathan objected to Coach K. Ferentz about the directive, K. Ferentz advised him he would be siding with the coaches.

143.    After experiencing daily ridicule and bullying at the hands of the Iowa coaching staff, Jonathan decided to pursue his education elsewhere.  While at Iowa, Jonathan often felt unsettled, nervous, and anxious while thinking of or competing in football.

144.    The Iowa coaching staff made Jonathan feel unimportant, which scared Jonathan.  After transferring to a new institution that did not treat African-American players like second-class citizens, Jonathan started loving football again and his anxiety subsided.

### C.    *Marcel Joly*

145.    Like the other plaintiffs, Marcel too aspired to play football at a major collegiate program.  Although born in Haiti, Marcel was raised in Maryland.  Marcel garnered the attention and interest of several powerhouse programs during high school but committed to play football for the University of Iowa on September 24, 2013.

146.    Marcel arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

147.    Marcel, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the

opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.

148.   The coaching staff subjected Marcel to disparate treatment because he was an African American.

149.   Once in the Program, the coaching staff unfairly and needlessly criticized Marcel for his tattoos and his appearance simply because he did not assimilate into a culture premised upon white stereotypes.

150.   The type and extent of criticism Marcel received was not made of Caucasian team members who had tattoos or "looked the part."

151.   On another occasion, Marcel drove his BMW, a vehicle he had then-recently purchased with his girlfriend, to the Program's workout facility.  Once coaches learned of his new vehicle, Marcel was questioned about the legitimacy of his purchase.  Through the express and implied nature of the inquiry, his coaches made it clear to Marcel they believed he acquired the vehicle through illegal or nefarious means.

### D.   *Aaron Mends*

152.   As a high school student, several NCAA Division I schools recruited Aaron to their enroll in their programs.  However, Aaron committed to playing for Iowa on August 18, 2013, his junior year of high school.  Following a successful high school senior season, the Missouri native traveled to Iowa City to begin his freshman year.

153.   Aaron arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

154.    Aaron, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.

155.    Although red shirted in 2014, Aaron saw playing time in his 2015, 2016, and 2017 seasons.

156.    During his tenure at Iowa, Aaron was exposed to painful and discriminatory comments and treatment.  Aaron observed countless acts of racial discrimination at the hands of the Program's coaches and associated staff.

157.    During his tenure at Iowa, the Program started "Between the Hawks," a YouTube series filed by the Program's camera crew. The series aimed to promote individual players and showcase their respective hobbies and interests outside of football.

158.    The camera crew answered to K. Ferentz, who, upon information and belief, stressed that all filming and/or photography of African-American players conform to the "Iowa Way." However, this meant that African-American players were subject to unfair double-standards with respect to common hobbies and interests shared by African-American players and their White teammates.

159.    During a team event at a player's home, the camera crew photographed Aaron, a firearms enthusiast, holding a shotgun over his shoulders (see below, left). No other players were featured in the photograph. When Aaron asked for the pictures, he was told that K. Ferentz and other coaches and administrators within the Program would not

allow Aaron to post the pictures to social media because "it would be a bad look." Conversely, White players were never prohibited from or reprimanded for posting similar pictures while at Iowa. For instance, at around the same time Aaron's picture was taken, four of his White teammates held shotguns and AR-15-style rifles in a photo posted to social media (see below, right). None of these players were reprimanded or instructed to take the photo down.



160.    Prior to the 2018 football season, Aaron experienced a season ending injury and, thus, was unable to compete.

161.    During his tenure at Iowa, Aaron served on Leadership Group for the football team and often met with K. Ferentz to address issues inside within the Program, including

systematic racism, double standards, and the gross disparities between African-American transfers and White transfers.

162.    Aaron was disappointed in K. Ferentz's response to the concerns and complaints of African-American players. In one instance, Aaron and the other members of the Leadership Group complained of an incident in which a group of White players created and personally delivered a custom-made Iowa football jersey to President Donald J. Trump. Although K. Ferentz and other coaches prohibited potential demonstrations by African-American football players and their allies in protest of police brutality by referencing team rules against public declarations of political views, K. Ferentz refused to address the incident or reprimand said group of White players for the clear violations of team rules.

163.    After numerous meetings with K. Ferentz and observing no changes to the Program's system and culture, despite K. Ferentz's assurances of change, Aaron decided it was in his best interests to leave the program and pursue his education elsewhere.

164.    Ultimately, Aaron transferred from Iowa in or about December of 2018, because of the Program's racially discriminatory culture.

165.    In late October 2020, the Iowa football coaching staff directed one of Aaron's former teammates at Iowa, and the son of a member of the coaching staff, to contact Aaron to persuade him not to file suit against the Defendants herein.  Defendants sought to tamper with Aaron and indicated that if he filed suit the Iowa football coaching staff would be terminated.

**E.    *Maurice Fleming***

166.    Maurice Fleming committed to playing football for the University of Iowa on June 24, 2011.  Before then, he played high school football in Illinois and received offers and interests from several other programs.

167.    Maurice, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete. Maurice arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation. Maurice joined the Program in or about 2014.

168.    On arrival, Maurice wore his hair in a braided fashion known as dreadlocks, often associated with African American culture.

169.    Coach Doyle would regularly antagonize and ridicule Maurice's hairstyle as not being part of "the Iowa Way."

170.    Under mounting pressure, Maurice eventually relented and cut his hair to satisfy the coaching staff.

171.    Coach Doyle responded by saying "now it looks like you're ready to play some football!"

172.    Coach Doyle would use the word "n*****" in Maurice's presence.  When Maurice confronted Coach Doyle about this, Maurice's teammates reminded him of Coach Doyle's influence in the Program and the retaliatory consequences for challenging a coach like Doyle.

173.     Eventually, Maurice transferred to another NCAA Division I Program as a graduate transfer.  Maurice later signed an NFL contract in 2017.

###     F.     *Reggie Spearman*

174.     An Illinois native, Reggie was a first team all-state football player named to Team USA.  Reggie received numerous offers and attention from over a dozen schools, including several in NCAA Division I, Power 5 conferences.

175.     In 2013, Reggie committed to Iowa.

176.     Reggie, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.

177.     Reggie arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

178.     While at Iowa, Reggie was one of a few true freshmen who received playing time.  He started at the linebacker position as a true sophomore until sustaining a season ending knee injury.

179.     Even while injured, Reggie remained committed to his teammates, appearing for team practices and meetings, and participating in the Leadership Group.

180.     In October of 2014, Mr. Spearman was charged by criminal complaint with operating while intoxicated, first, offense, in violation of Iowa Code Section 321J.2.

181.   Law enforcement initiated this charge before receiving the chemical testing results from a urine specimen Reggie voluntarily provided.

182.   Reggie declared he was innocent and maintained his innocence through the pendency of the criminal case.

183.   Results from a urine test can often take several weeks to receive from laboratory testing.

184.   Once Reggie's urine test was returned, the State of Iowa moved to dismiss the OWI charge.

185.   On March 2, 2015, the court dismissed the charge and assessed all costs to the State of Iowa.

186.   Despite being exonerated in a court of law, however, Reggie was subjected to different punishment over the incident than similarly situated white student-athletes.

187.   Eventually, Reggie transferred away from the University of Iowa to continue his education and football endeavors.

### G   *Kevonte Martin-Manley*

188.   Kevonte's high school football prowess earned him the attention of several universities, including Iowa.  By high school graduation, Kevonte established new records for, *inter alia*, career touchdown receptions and career receiving yards.

189.   Iowa relied heavily on its wide receiver coach, Erik Campbell, to recruit Kevonte to the Program.  Kevonte developed a good relationship with Coach Campbell and eventually accepted Iowa's offer to play football at Iowa, receive a high-quality educational experience and college degree from one of the top Tier I public research

institutions, and to join a family atmosphere that permitted him to grow as a person and an athlete.

190.    Kevonte received a full athletics scholarship and arrived in Iowa City for freshmen enrollment in 2010.

191.    In or about March of 2013, Kevonte had a meeting with Coach Doyle. Although the meeting was ostensibly a strength and conditioning meeting, Coach Doyle appeared to indicate that he had an issue with Kevonte being a "leader" among his Black peers who caused problems within the Program.

192.    At this point, Kevonte suspected the coaching staff was targeting him due to his race.

193.    On September 21, 2013, Iowa hosted Western Michigan University for a non-conference football game.

194.    Kevonte was the starting punt returner for Iowa.  During the Western Michigan game, Kevonte returned several punts, notably two for 83 yards and 63 yards.

195.    Once Kevonte amassed 184 punt return yards, bringing him within 17 yards of breaking the (then) Big Ten and school record set by the legendary Heisman trophy winner and stadium namesake, Nile Kinnick, the coaching staff pulled Kevonte from returning any more punts.

196.    The coaching decision was designed to prevent Kevonte from breaking Kinnick's 1939 record.

197.    Even Coach K. Ferentz's post-game comments revealed his desire for Kinnick's record to remain intact, stating, "With all due respect to Kevonte, I love the guy,

he's a great young man, but I think it's OK if that one stayed right where it's at.  Not that we would have held him back, but maybe would have thought about it, actually.  That's one that needs to stay."

198.   Kevonte requested the opportunity to attempt to break the record, but was told he would not be permitted to return anymore punts.

199.   After graduation, Kevonte met with Coach K. Ferentz to discuss the ongoing racial discrimination African American athletes experienced within the Program.  Kevonte echoed concern the coaching staff merely swept the complaints of African-American student-athletes under the rug.

### H.    Darian Cooper

200.   Like the other plaintiffs, Darian too aspired to play football at a major collegiate program.  Darian was raised in Maryland.  Darian was a four-star recruit and garnered the attention and offers of several powerhouse programs during high school, but committed to play football for the University of Iowa on February 2, 2011.

201.   Darian arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

202.   Darian, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.  Darian favored Iowa's "business oriented" approach and believed playing football for Iowa would allow him to further his dreams.

203.   The coaching staff subjected Darian to disparate treatment because he was an African-American.

204.   Once in the Program, the coaching staff unfairly and needlessly criticized Darian about his appearance and demanded that he assimilate into a culture premised upon White society and culture—The Iowa Way.

205.   On one occasion, Doyle physically assaulted Darian by elbowing him in the stomach in front of a crowd of people during an event hosted by Iowa football.  Darian was extremely embarrassed by the way he was treated by Doyle.  Darian had to physically remove himself from Doyle's presence.

206.   Darian's weight struggles were also unfairly scrutinized by coaches, particularly Doyle.  Darian even privately expressed to Doyle that he could not financially afford to eat enough in order to meet and maintain his weight goal; however, Doyle continued to ridicule Darian for his weight struggles.

207.   Darian was made to play while injured despite multiple complaints by Darian.  While White teammates were permitted to rest, recover, and heal, Darian was ridiculed and mocked mercilessly for his injuries and told he had to continue to play while injured if he wanted to retain his scholarship.  Ultimately, Darian's career ended due to injuries.

### I.   *LaRon Taylor*

208.   Like the other plaintiffs, LaRon too aspired to play football at a major collegiate program.  LaRon was raised in Michigan.  LaRon was a three-star recruit and

garnered the attention and offers of several powerhouse programs during high school, but committed to play football for the University of Iowa on August 5, 2011.

209.    LaRon arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

210.    LaRon, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.  LaRon also noticed that Iowa had several players drafted by NFL teams and believed Iowa provided a program where he could fulfill his dreams of being an NFL player.

211.    The coaching staff subjected LaRon to disparate treatment because he was an African-American.

212.    Once in the Program, the coaching staff unfairly and needlessly criticized LaRon and accused him of "gangbanging" and referred to him as a "gangster".  Doyle was particularly merciless in his treatment of LaRon and consistently made references to LaRon being in a gang merely because LaRon is African-American. LaRon's White teammates were not subjected to similar treatment, ridicule, or accusations of gang membership.

213.    LaRon was disproportionately tested under Iowa's drug testing program in comparison to his White teammates.  LaRon was tested so often that it became a running joke with the drug testing administrator that LaRon was being tested yet again.  LaRon never failed a drug test administered by Iowa.

214.   Due to the racist treatment LaRon received while at Iowa, he has sought the care of medical professionals in hopes of rebuilding his confidence that was destroyed by the Iowa coaching staff.

### J.   *Brandon Simon*

215.   Like the other plaintiffs, Brandon too aspired to play football at a major collegiate program.  Brandon was raised in New Jersey.  Brandon was a three-star recruit and garnered the attention and offers of several powerhouse programs during high school, but committed to play football for the University of Iowa on June 26, 2015.

216.   Brandon arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

217.   Brandon, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete. Brandon also believed that Iowa had an inclusive environment with a great opportunity to achieve his goals as an athlete and a student.

218.   The coaching staff subjected Brandon to disparate treatment because he was an African-American.

219.   Once in the Program, the coaching staff unfairly and needlessly criticized Brandon about his physical appearance and the way he walks.  Doyle would often perform racist imitations of Brandon and said, "stop walking with so much swagger before we send you back to the streets".  When Doyle made this comment, Brandon made eye contact with

Braithwaite who was in close proximity with Doyle when the comments were made, but Braithwaite did nothing.

220.    On another occasion, Doyle approached Brandon and Doyle pulled down his pants, to appear to be "sagging", and turned his hat backwards and proceeded to refer to Brandon as a "thug".  Brandon's White teammates were not subject to similar treatment or comments by Doyle.

221.    Doyle constantly bullied Brandon merely because Brandon is African-American.  Doyle was also overheard saying "Simon is dumb and too short to be here." Doyle also consistently said to Brandon, "you are just dumb" and "you are a bitch."

222.    Brandon complained about the way he was treated to the Iowa athletic academic advising staff and asked that they instruct Doyle not to treat him in a racially discriminatory fashion.  Sadly, nothing changed and caused Brandon to transfer from Iowa.

### K.    *Javon Foy*

223.    Like the other plaintiffs, Javon too aspired to play football at a major collegiate program.  Javon was raised in Illinois.  Javon garnered the attention and offers of several smaller programs during high school, but committed to play football for the University of Iowa on January 28, 2019.

224.    Javon arrived on campus as a preferred walk-on.

225.    Javon, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the

opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.

226.    The coaching staff subjected Javon to disparate treatment because he was an African-American.

227.    Once in the Program, the coaching staff unfairly and needlessly criticized Javon about his physical appearance including his hair.  Javon wears his hair in a traditional African-American hairstyle known as braids.  Doyle bullied Javon calling his hair a "mess" and instructed him not to wear fashion and style that is commonly associated with African-American culture.  Doyle bullied and ridiculed Javon merely because he is an African-American.

228.    In 2019, Javon was suspended indefinitely from the Iowa football team after he was pulled over in a routine traffic stop by local police.  No tickets or citations were issued to Javon.  However, the Iowa football coaching staff learned that he was stopped and suspended him indefinitely.  A few weeks later, some of Javon's White teammates were caught drinking alcohol in the Iowa dormitories.  Javon's White teammates were not suspended and were merely required to do extra physical conditioning after practice.  The Iowa football coaching staff punished African-American athletes more harshly than White teammates in a discriminatory fashion.

229.    On the day Javon was to return from his suspension, K. Ferentz told Javon, who had been dealing with football-related injuries, that Javon had suffered a career-ending injury.  Bewildered, Javon sought second opinions from multiple doctors, all of whom informed Javon that his injury was not career-ending whatsoever.  Having lost all trust in

the Program, and fearful he would continue to be subjected to racially-motivated disparate treatment if he declined to be pushed out of the Program by K. Ferentz and others, Javon decided to transfer from Iowa.

### L.    *Andre Harris*

230.    The University of Iowa recruited Andre, a speedy wide receiver, out of his hometown of Kirkwood, Missouri.

231.    Andre arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

232.    Andre, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted him to grow as a person and an athlete.

233.    The coaches involved in Andre's recruitment left shortly before Andre arrived on campus for his summer workouts in 2013.

234.    Andre also noticed several other Program differences from the recruiting promises.  For example, Andre arrived with aspirations to pursue a degree in engineering. The coaching staff, however, did not approve of Andre's intent and forced him to seek a degree in something "easier."

235.    The coaching staff did not take the same approach with White players who pursued engineering degrees.

236. The coaching staff also subjected Andre to disparate treatment by imposing harsher punishments on him than White players who violated the same or similar team rules.

237. Coaches also told Andre he did "not smile enough" and portrayed him as a stereotypical "angry black man."

238. White players were not subjected to this type of stereotyping.

239. Andre presented his complaints to Coach K. Ferentz.

240. Coach K. Ferentz failed to address these problems.

241. In 2016, Andre chose to transfer from Iowa to Eastern Illinois University to complete his academic and athletic careers.

### M. Terrence Harris

242. Like the other plaintiffs, Terrence too aspired to play football at a major collegiate program. Terrence was raised in New Jersey. Terrence was a three-star recruit and garnered the attention and offers of several powerhouse programs during high school, but committed to play football for the University of Iowa on or about July 16, 2013.

243. Terrence arrived on campus with a full athletics scholarship, which included aid for tuition, fees, room & board, and books as permitted by NCAA legislation.

244. Terrence, like many of his African-American teammates, selected Iowa over other offers based on the promise of receiving a high-quality college educational experience and degree from one of the nation's top Tier I public research institutions, the opportunity to compete in the Conference, and to join a family atmosphere that permitted

him to grow as a person and an athlete. Terrence also believed that Iowa had an inclusive environment with a great opportunity to achieve his goals as an athlete and a student.

245.   The coaching staff subjected Terrence to disparate treatment because he was an African-American.

246.   Once in the Program, Terrence quickly learned of a double standard the staff concealed during the recruiting process.  Like Brandon Simon, Maurice Fleming, and others, the coaching staff unfairly and needlessly criticized Terrence about his physical appearance, including his hairstyle, because it did not represent the "Iowa Way."

247.   During a summer camp, Doyle targeted Terrence and began to criticize his appearance.  Doyle approached Terrence and, while gesturing to a White teammate's hairstyle, asked Terrence why his hair did not look like that.  Doyle continued, telling Terrence the White teammate's hair was all nice and clean.  Doyle would continue to ridicule Terrence over his hairstyle, referring to it as a "mess" and stating it made Terrence look like a "barbarian."

248.   Comments about Terrence's hairstyle were not limited to Doyle; other coaches on staff would also criticize Terrence's hair.

249.   The coaches' constant scrutiny ultimately forced Terrence to ask a teammate to cut his hair in a hotel room during camp.

250.   Another current Iowa coach frequently referenced the physical attributes of African-Americans, including Terrence, in a racially-derogatory manner. Said coach's comments to Terrence included, "I know you're used to running from the police, the way you get off the ball!"

251.   The coaching staff would also use Terrence's impoverished upbringing as a source of ridicule, threatening to send him back to the "ghetto" if he did not settle his weight struggles.

252.   When Terrence would talk, K. Ferentz expressed frustration with his enunciation, referring to it as "broken English."

253.   Terrence frequently spoke with his academic advisor at Iowa about the emotional toll he incurred from the racial harassment and disparate treatment. Terrence continues to struggle with the resulting trauma to this day.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. Section 2000d, *et seq.* (a/k/a, "Title VI")
### Racially Hostile Educational Environment
### (Against Defendants University of Iowa and Board of Regents for the State of Iowa)

**"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."**

254.   Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-253 of this Petition as though fully set forth herein.

255.   Title VI prohibits discrimination on the grounds of, *inter alia*, race in activities and programs receiving federal financial assistance.

256.   Iowa and Iowa Athletics are a program or activity receiving Federal financial assistance under 42 U.S.C. § 2000d, et seq.

257.   Plaintiffs Mends, Simon, and Foy, as students at Iowa and participants in the Iowa Athletics program, were the intended beneficiaries of those funds.

258.    As stated *supra,* individual Defendants have continuously and intentionally discriminated against and harassed African-American student-athletes in the Program at Iowa during K. Ferentz's tenure, including Plaintiffs Mends, Simon, and Foy.

259.    Plaintiffs Mends, Simon, and Foy, as African-Americans, are members of a protected class under federal law.

260.    Plaintiffs Mends, Simon, and Foy were treated less favorably than others similarly situated on account of their race.

261.    Defendants University of Iowa and Board of Regents for the State of Iowa knowingly maintained and subjected Plaintiffs Mends, Simon, and Foy to a hostile education environment, wherein Plaintiffs experienced severe, pervasive, and objectively offensive acts of racial discrimination from Program coaches and administrators on account of their race.

262.    Said acts and environment had and continue to have a systemic effect on the Program and substantially interfered with Plaintiffs' ability to participate in or benefit from the Program and greater university experience.

263.    Said Defendants were deliberately indifferent to the Program's known severe, pervasive, and objectively offensive acts of race discrimination against Plaintiffs. Defendants were deliberately indifferent to Plaintiffs', and even Plaintiffs' parents', good-faith complaints of the Program's severe, pervasive, and objectively offensive acts of racial discrimination against Plaintiffs.

264.    Defendants possessed the power to correct the severe, pervasive, and objectively offensive discriminatory acts and overall hostile education environment known

to Defendants, but failed to do so.

265.   The Defendants' conduct was a cause of harm to Plaintiffs Mends, Simon, and Foy, including emotional pain and suffering, mental anguish, loss of enjoyment of life and attorney fees and costs associated with prosecuting this action.

266.   As a direct and proximate result of Defendants illegal and unjustified conduct, Plaintiffs Mends, Simon, and Foy were injured and are entitled to recover for what they have suffered in the past and will suffer in the future, including:

  a.  Deprivation of constitutional and civil rights;

  b.  Humiliation, degradation, public ridicule, and past and future emotional distress;

  c.  Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

  d.  All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

  e.  Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiffs and on behalf of those similarly situated, pray for Judgment against Defendants as follows:

  a.  Compensation for violation of constitutional and civil rights, compensatory damages for pain, suffering, mental anguish, and humiliation;

  b.  Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988; and

c.   Such relief as the Court deems just and equitable.

## COUNT II
## 42 U.S.C. Section 2000d, *et seq.* (a/k/a, "Title VI")
## Retaliation
## (Against Defendants University of Iowa and Board of Regents for the State of Iowa)

267.   Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-266 of this Petition as though fully set forth herein.

268.   Plaintiff Aaron Mends engaged in protected activities under Title VI by making complaints and/or supporting other teammates' complaints of Defendants' racially discriminatory conduct and deliberate indifference to the known, racially-charged hostile education environment within the Program.

269.   Plaintiff's protests and complaints against the Defendants' racially discriminatory conduct and deliberate indifference to the known, racially-charged hostile education environment within the Program were made in good-faith and with the reasonable belief that Defendants engaged in unlawful, discriminatory conduct.

270.   In response to Plaintiff's protests and complaints, Defendants committed materially adverse acts designed to dissuade Plaintiff from making or supporting good-faith, reasonable complaints of discrimination. Said acts include, but are not limited to, playing restrictions, excessive conditioning drills, public humiliation, slander to NFL scouts, and loss of their scholarship.[25]

271.   Said acts would have dissuaded a reasonable person from making or

_____

[25] It should be noted but-for an athleticly scholarship none of the Plaintiffs could afford to attend college.

supporting complaints of discrimination.

272.   Said adverse acts were committed with the intent to perpetuate a hostile education environment in order to injure complainants and supporters thereof.

273.   The Defendants' conduct was a cause of harm to Plaintiff Mends including emotional pain and suffering, mental anguish, loss of enjoyment of life, and attorney fees and costs associated with prosecuting this action.

274.   As a direct and proximate result of Defendants' illegal and unjustified conduct, Plaintiff Mends was injured and is entitled to recover for what he suffered in the past and will suffer in the future, including:

    a.  Deprivation of constitutional and civil rights;

    b.  Humiliation, degradation, public ridicule, and past and future emotional distress;

    c.  Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

    d.  All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

    e.  Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiffs and on behalf of those similarly situated, pray for Judgment against Defendants as follows:

    a.  Compensation for violation of constitutional and civil rights, compensatory damages for pain, suffering, mental anguish, and humiliation;

b. Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988; and

c. Such relief as the Court deems just and equitable.

**COUNT III**
**42 U.S.C. Section 2000d,** *et seq.* **(a/k/a, "Title VI")**
**Violation of Title VI — Systemic Pattern and Practice of Discrimination**
**(Against Defendants University of Iowa and Board of Regents for the State of Iowa)**

275.   Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-274 of this Petition as though fully set forth herein.

276.   Defendants created and maintain a systemic pattern and practice of unlawful race discrimination within the Program affecting African-American football student-athletes, including Plaintiffs Mends, Simon, and Foy.

277.   Defendants' pattern and practice of intentional race discrimination is so pervasive so as to constitute the Program's regular policy of intentional race discrimination.

278.   Said pattern and practice of intentional discrimination is backed by statistical disparities showing gross racial imbalances between African-American football student-athletes and the general population of football student-athletes with respect to data that includes, but is not limited to, graduation rates, transfer rates, and, upon information and belief, drug testing.

279.   The Defendants' conduct was a cause of harm to Plaintiffs Mends, Simon, and Foy, including emotional pain and suffering, mental anguish, loss of enjoyment of life and attorney fees and costs associated with prosecuting this action.

280.   As a direct and proximate result of Defendants illegal and unjustified conduct, Plaintiffs Mends, Simon, and Foy were injured and are entitled to recover for what they have suffered in the past and will suffer in the future, including:

   a.   Deprivation of constitutional and civil rights;

   b.   Humiliation, degradation, public ridicule, and past and future emotional distress;

   c.   Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

   d.   All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

   e.   Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiffs and on behalf of those similarly situated, pray for Judgment against Defendants as follows:

   a.   Compensation for violation of constitutional and civil rights, compensatory damages for pain, suffering, mental anguish, and humiliation;

   b.   Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988; and

   c.   Such relief as the Court deems just and equitable.

**COUNT IV**
**42 U.S.C. § 1983**
**Deprivation of Rights Under 42 U.S.C. § 1981 By Persons Acting Under Color of State Law**
**(Against Defendants Barta, K. Ferentz, B. Ferentz, and Doyle)**

**Plaintiffs "have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."**

281.   Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-280 of this Petition as though fully set forth herein.

282.   Plaintiffs Wadley, Parker, Joly, Cooper, Mends, Simon, and Foy, as African American individuals, are members of a class protected by the provisions of 42 U.S.C. Section 1981.

283.   Said Plaintiffs were all finely tuned athletes possessing a high degree of physical ability and football talent.

284.   The University of Iowa offered Plaintiffs Wadley, Parker, Joly, Cooper, Mends, Simon, and Foy full athletic scholarships to attend the University of Iowa, recognized as one of the top Tier I public research institution in the nation.

285.   Plaintiffs Wadley, Parker, Joly, Cooper, Mends, and Simon accepted their scholarship offers by signing the NCAA National Letter of Intent and entered contractual relationships with the Defendants.

286.   The University of Iowa offered Plaintiff Foy the opportunity to join the Program as a preferred walk-on student athlete, whereby Foy would devote his athletic talents and resources to the Program in exchange for a high-quality educational and athletic experience, family-like atmosphere free from discrimination, bullying, and harassment, and opportunity to earn a full college athletic scholarship.

287.   By committing to Iowa, Plaintiffs Wadley, Parker, Joly, Cooper, Mends, Simon, and Foy declined other similar collegiate offers and agreed to provide their athletic

talent to Iowa in exchange for Iowa providing a high-quality educational and athletic experience, college degree, and a family-like atmosphere free from discrimination, bullying, and harassment.

288.    Defendants Barta, K. Ferentz, B. Ferentz, and Doyle acted under color of state authority as school officials for the University of Iowa in intentionally discriminating against the Plaintiffs on the basis of race.

289.    Said Defendants exercised a substantial amount of control over the Plaintiffs' athletic, academic, and personal lives while they were members of Iowa's football team and students at the University of Iowa.

290.    The Defendants received considerable financial profit and gain by recruiting and utilizing the Plaintiffs' exceptional athletic talents and abilities.

291.    The Defendants maintained control over the athletic facilities, equipment, supplies, etc. the Plaintiffs utilized while participating in training and football for the Defendants.

292.    The Defendants possessed the ability to impose and/or influence reprimands, punishments, and sanctions against the Plaintiffs.

293.    The Defendants exercised control over each Plaintiffs' respective schedule and playing time within the Program.

294.    While at Iowa, the Plaintiffs were exposed to disparate treatment while attempting to fulfill their contractual obligations for Defendants since the Plaintiffs were treated differently than White athletes.

295.     The Defendants' continuous intentional discrimination against the Plaintiffs and African-American student-athletes on the basis of their race impaired the Plaintiffs' ability to make and enforce contracts, including the enjoyment of all the benefits, privileges, terms, and conditions of the contractual relationship.

296.     The Defendants refused to remedy the complaints of systemic racism raised by student-athletes, parents, the Report, the Law Firm Report, and Leadership Groups during K. Ferentz's tenure as the head football coach at Iowa.

297.     The Defendants' conduct was a cause of harm to the Plaintiffs, including inability to enjoy the educational experience they were promised and/or obtain the degree they were promised, emotional pain and suffering, mental anguish, loss of enjoyment of life, loss of earning capacity, and attorney fees and costs associated with prosecuting this action.

298.     The individual Defendants' actions were willful, wanton, unlawful, and in gross disregard of the Plaintiffs' civil rights, thereby entitling the Plaintiffs to punitive damages.

299.     Defendant coaches K. Ferentz, B. Ferentz, and Doyle engaged in a discriminatory practice with malice or a reckless or deliberate indifference the Plaintiffs' federally protected rights, thereby entitling the Plaintiffs to punitive damages against said defendants.

300.     Agency Defendants' (namely, University of Iowa, Board of Regents for the State of Iowa, and State of Iowa) Management officials, namely Defendants Barta, and K. Ferentz, personally acted with malice or a reckless or deliberate indifference to the

Plaintiffs' federally protected rights, thereby entitling the Plaintiffs to punitive damages against said Defendants Barta and K. Ferentz.

301.    As a direct and proximate result of Defendants' illegal and unjustified conduct, the Plaintiffs were injured and are entitled to recover for what they have suffered in the past and will suffer in the future, including:

     a.  Deprivation of constitutional and civil rights;

     b.  Humiliation, degradation, public ridicule, and past and future emotional distress;

     c.  Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

     d.  Punitive damages;

     e.  All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

     f.  Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiffs and on behalf of those similarly situated, pray for Judgment against Defendants as follows:

     a.  Compensation for violation of constitutional and civil rights, pain, suffering, mental anguish, and humiliation; and

     b.  Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988;

     c.  Punitive damages; and

     d.  Such relief as the Court deems just and equitable.

## COUNT V
## 42 U.S.C. § 1983

**Conspiracy to Deprive Persons of Equal Protection Violative of 42 U.S.C. § 1985(3)
(Against Defendants K. Ferentz, B. Ferentz, Barta, Doyle, and Braithwaite)**

**"If two or more persons in any State or Territory conspire… for the
purpose of depriving either directly or indirectly, any person or class of
persons of the equal protection of the laws or of equal privileges and
immunities under the laws;…the party so injured or deprived may
have an action for the recovery of damages, occasioned by such injury
or deprivation, against any one or more of the conspirators."**

302.     Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-301 of this Petition as though fully set forth herein.

303.     Defendants Barta, K. Ferentz, B. Ferentz, Doyle, and Braithwaite reached an agreement amongst themselves to deprive all named Plaintiffs of their rights and privileges to equal protection of the laws.

304.     Defendants Barta, K. Ferentz, B. Ferentz, Doyle, and Braithwaite acted under color of state authority as school officials for the University of Iowa in conspiring to deprive all named Plaintiffs of their rights and privileges to equal protection of the laws.

305.     Defendants' conspiracy was motivated by racial animus towards African-American football players.

306.     As stated *supra,* Defendants have continuously and intentionally discriminated against and harassed African-American student-athletes in the Program at Iowa during K. Ferentz's tenure, including all named Plaintiffs.

307.     All named Plaintiffs, as African-American individuals, are members of a protected class under federal law.

308.    All named Plaintiffs were treated less favorably than others similarly situated on account of their race.

309.    Defendants failed to remedy the complaints of systemic racism raised by individuals and Leadership Groups during K. Ferentz's tenure as the head football coach at Iowa.

310.    K. Ferentz was well aware of the racially discriminatory culture existing within his football program at Iowa during all times material hereto.

311.    K. Ferentz repeatedly advised players he would address their complaints of ongoing racism and discrimination.

312.    K. Ferentz ignored the complaints and took no adequate measures to rectify the ongoing discriminatory behavior of members of his staff, including B. Ferentz and Doyle.

313.    Braithwaite, an African-American[26], is using his new position as interim strength and conditioning coach to publicly disavow the Plaintiffs' discriminatory experiences with Doyle's pervasive racist behavior.

---

[26] As the legendary Civil Rights Attorney and U.S. Supreme Court Justice Thurgood Marshall explained in a powerful concurring opinion in *Casteneda v. Partida*, 430 U.S. 482, 503 (1977):

> "Social scientists agree that members of minority groups frequently respond to discrimination and prejudice by attempting to disassociate themselves from the group, even to the point of adopting the majority's negative attitudes towards the minority. Such behavior occurs with particular frequency among members of minority groups who have achieved some measure of economic or political success and thereby have gained some acceptability among the dominant group."

*Id*. (footnotes omitted).

314.    Braithwaite's actions undermine the veracity of Doyle's racist behavior and serve to conceal Plaintiffs' discrimination claims.

315.    Braithwaite's actions represent an ongoing conspiracy and concerted effort within the Program to deprive the Plaintiffs of their rights and privileges to equal protection of the laws.

316.    Additionally, Defendants directed and conspired with one of Plaintiff Aaron Mends' former teammates, the son of a current Iowa coach, to tamper with Plaintiff Aaron Mends after Iowa publicly released Plaintiffs' demand letter.   Plaintiff Aaron was instructed not to file suit.

317.    The purpose of the Defendants' ongoing conspiracy is to deprive the Plaintiffs of their civil rights and privileges.

318.    The Defendants' conduct was a cause of harm to the Plaintiffs, including emotional pain and suffering, mental anguish, loss of enjoyment of life and attorney fees and costs associated with prosecuting this action.

319.    Defendants' actions were willful, wanton, unlawful, and in gross disregard of the Plaintiffs' civil rights, justifying an award of punitive damages.

320.    As a direct and proximate result of Defendants' illegal and unjustified conduct, the Plaintiffs were injured and are entitled to recover for what they have suffered in the past and will suffer in the future suffer, including:

    a.   Deprivation of constitutional and civil rights;

    b.   Humiliation, degradation, public ridicule, and past and future emotional distress;

c. Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

d. Punitive damages;

e. All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

f. Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiffs and on behalf of those similarly situated, pray for Judgment against Defendants as follows:

a. Compensation for violation of constitutional and civil rights, pain, suffering, mental anguish, and humiliation; and

b. Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988;

c. Punitive damages; and

d. Such relief as the Court deems just and equitable.

### COUNT VI
### 42 U.S.C. § 1983
**Conspiracy to Deprive Persons of Equal Protection Violative of 42 U.S.C. § 1985(3) (Against Defendants K. Ferentz, B. Ferentz, and Doyle)**

321. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-320 of this Petition as though fully set forth herein.

322. Defendants K. Ferentz, B. Ferentz, and Doyle reached an agreement amongst themselves to deprive African-American football players at Iowa, including Plaintiffs Mends, Simon, and Foy, of their rights and privileges to equal protection of the laws.

323.    Defendants Barta, K. Ferentz, B. Ferentz, and Doyle acted under color of state authority as school officials for the University of Iowa in conspiring to deprive African-American football players at Iowa, including Plaintiffs Mends, Simon, and Foy, of their rights and privileges to equal protection of the laws.

324.    Defendants' conspiracy was motivated by racial animus towards African-American football players.

325.    As stated *supra,* Defendants have continuously and intentionally discriminated against and harassed African-American student-athletes in the Program at Iowa during K. Ferentz's tenure, including Plaintiffs Mends, Simon, and Foy.

326.    Plaintiffs Mends, Simon, and Foy, as African-American individuals, are members of a protected class under federal law.

327.    Plaintiffs Mends, Simon, and Foy were treated less favorably than others similarly situated on account of their race.

328.    Defendants refused to remedy the complaints of systemic racism raised by individuals and Leadership Groups during K. Ferentz's tenure as the head football coach at Iowa.

329.    K. Ferentz was well aware of the racially discriminatory culture existing within his football program at Iowa during all times material hereto.

330.    K. Ferentz repeatedly advised players he would address their complaints of ongoing racism and discrimination.

331.    K. Ferentz effectively ignored the complaints and took no adequate measures to rectify the ongoing discriminatory behavior of members of his staff, including B. Ferentz and Doyle.

332.    The Defendants' conduct was a cause of harm to the Plaintiffs, including emotional pain and suffering, mental anguish, loss of enjoyment of life and attorney fees and costs associated with prosecuting this action.

333.    The Defendants' actions were willful, wanton, unlawful, and in gross disregard of the Plaintiffs' civil rights, justifying an award of punitive damages.

334.    As a direct and proximate result of Defendants' illegal and unjustified conduct, the Plaintiffs were injured and are entitled to recover for what they have suffered in the past and will suffer in the future suffer, including:

a.  Deprivation of constitutional and civil rights;

b.  Humiliation, degradation, public ridicule, and past and future emotional distress;

c.  Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

d.  Punitive damages;

e.  All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

f.  Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiffs and on behalf of those similarly situated, pray for Judgment against Defendants as follows:

      a. Compensation for violation of constitutional and civil rights, pain, suffering, mental anguish, and humiliation; and

      b. Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988;

      c. Punitive damages; and

      d. Such relief as the Court deems just and equitable.

### COUNT VII
### CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C § 1983
**(Against Defendants K. Ferentz and Barta)**
**(Failure to Train and Supervise)**

335. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-334 of this Petition as though fully set forth herein.

336. Defendants K. Ferentz and Barta are persons for the purposes of a Section 1983 action for damages.

337. At all times material hereto, Barta served as B. Ferentz's direct supervisor due to the university's nepotism policy.

338. At all times material hereto, Defendants actions and/or omissions were made under the color of authority.

339. Defendants K. Ferentz and Barta are charged with the duty to ensure that its staff and employees are properly trained and supervised.

340. Defendants K. Ferentz and Barta are ultimately responsible for the training and supervision of the Program's coaching staff.

341.    Defendants K. Ferentz and Barta failed to train and/or supervise properly staff including, but not necessarily limited to, Doyle and B. Ferentz when they engaged in pervasive racial discriminatory behavior against African American players.

342.    The circumstances and consequences described *supra* were foreseeable.

343.    Defendants failed to investigate and respond to complaints of racial discrimination from Plaintiffs.

344.    Defendants' systematic failure to train and/or supervise properly demonstrated a reckless disregard and deliberate indifference to the rights of Plaintiffs Mends, Simon, and Foy.

345.    Defendants authorized the actions of its staff including, but not necessarily limited to, Doyle and B. Ferentz by failing to train and/or supervise them in a manner which preserves the rights of Plaintiffs.

346.    As a direct and proximate result of Defendants' illegal and unjustified conduct, the Plaintiffs were injured and are entitled to recover for what they have suffered in the past and will suffer in the future suffer, including:

    a.  Deprivation of constitutional and civil rights;

    b.  Humiliation, degradation, public ridicule, and past and future emotional distress;

    c.  Actual and compensatory damages, including but not limited to past, present and future pain and suffering, mental anguish, loss of enjoyment of life and other economic losses;

    d.  Punitive damages;

    e.  All litigation expenses associated with the prosecution of the instant action, including, but not limited to, court costs, anticipated discovery

expenses, anticipated expert expenses, and the maximum legally allowable judgment interest; and

f. Any other expenses allowed by federal or state law, including but not limited to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE** the Plaintiffs and on behalf of those similarly situated, pray for Judgment against Defendants as follows:

a. Compensation for violation of constitutional and civil rights, pain, suffering, mental anguish, and humiliation; and

b. Plaintiffs' cost in this action, including reasonable attorney fees, interest, and costs pursuant to 42 U.S.C. § 1988;

c. Punitive damages; and

d. Such relief as the Court deems just and equitable.

## COUNT VIII
## <u>Breach of Contract</u>
**(Against Defendants University of Iowa, Board of Regents for the State of Iowa, State of Iowa, Barta, K. Ferentz, B. Ferentz, and Doyle)**

347.    Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-346 of this Petition as though fully set forth herein.

348.    All named Plaintiffs are persons legally capable of entering into contracts.

349.    The University of Iowa is an entity legally capable of entering a contract.

350.    Barta, K. Ferentz, B. Ferentz, and Doyle are persons legally capable of entering into contracts.

351.    Plaintiffs formed contractual relationships with the Defendants that touched on every aspect of their life at Iowa, including their participation in Iowa Athletics in

exchange for a high-quality educational experience at a top Tier I public research institution and college degree free from discrimination and bullying.

352.   Plaintiffs and the University of Iowa were under obligations to each other arising from the contract.

353.   Plaintiffs and the University of Iowa provided consideration for the contracts.

354.   Plaintiffs performed all obligations under their respective contracts including presenting their complaints and grievances to the coaching staff, namely K. Ferentz, both personally and through Leadership Group.

355.   Defendants breached these contracts by, *inter alia*, failing to expel the systemic plague of racial discrimination and disparate treatment occurring within the Program during K. Ferentz's tenure.

356.   Plaintiffs have incurred significant damages as a direct and proximate result of Defendants breaches of contract in an amount to be determined at trial.

357.   Defendants' conduct in breaching the contract constitutes a willful and wanton disregard for the rights of another and has caused actual damage to Plaintiffs.

**WHEREFORE,** the Plaintiffs pray for judgment against Defendants in an amount representing full and fair compensation for damages under their respective contract, for incidental damages, for punitive damages in an amount which will punish Defendants and deter others, for such attorneys' fees, interest, and costs as allowed by law, and for such other relief as may be just under the circumstances.

## V. NOTICE OF CLAIMS

1.      Defendants are hereby advised Plaintiff Foy filed a complaint with the Iowa Civil Rights Commission to pursue administrative remedies pursuant to Iowa Code Chapter 216 for the racially discriminatory experiences he endured while with the Program.

2.      Defendants are hereby advised Plaintiffs Mends, Simon, and Foy are filing claims with the State of Iowa in accordance with the Iowa State Tort Claims Act to pursue recovery for damages on account of personal injury and loss of property.

3.      Plaintiffs reserve their rights to remove their claims from administrative investigation and request a "right-to-sue" letter thereby effecting closure of the administrative process and exhausting those administrative remedies.

## VI.     PRAYER FOR RELIEF

Plaintiffs pray this Court will grant the following in favor of them and those similarly situated:

1.      Judgment for all actual and compensatory damages, including those emanating from mental anguish and emotional distress, pecuniary loss, loss of reputation, and other economic damages;

2.      Judgment as damages from and declarations of, violations of their constitutional and civil rights committed by Defendants University of Iowa, Board of Regents for the State of Iowa, Barta, K. Ferentz, B. Ferentz, Doyle, and Braithwaite;

3.      Punitive damages to the extent permitted by law;

4.      Equitable damages to the extent permitted by law including, but not necessarily limited to the following:

a.      Completion of mandatory anti-racist training for all athletic department coaches, staff, and personnel on an annual basis;

b.      Establishment of a board of advisors consisting of African-American football student-athletes and experienced anti-racist professionals to monitor the Program and the coaching staff;

c.      Tuition waivers for any African-American athletes who attended Iowa during K. Ferentz tenure and did not graduate with a degree;

d.      Create and support a permanent Senior Black Male Administrator position with similar duties, responsibility, and authority as the Senior Woman Administrator at Iowa for the specific benefit and support of African-American student-athletes at Iowa;

e.      Partner with Dr. Ibram X. Kendi, or a qualified person acceptable to the Athletes, to administer mandatory anti-racist training for all athletic department coaches, staff, and personnel on an annual basis; and

f.      Any other steps necessary or changes to personnel to ensure ongoing discrimination against non-white student athletes ceases immediately.

5.      Injunctive relief requiring the Defendants to promulgate and implement policies and procedures to prevent such deprivations of constitutional and civil rights in the future, and/or ensure that allegations of deprivations of constitutional and civil rights are properly investigated.

6.      An award of attorneys' fees and costs, including expert witness fees, pursuant to 42 U.S.C. § 1988, and any other applicable provisions of law.

*Respectfully submitted*,

**PARRISH KRUIDENIER DUNN GENTRY
BROWN BERGMANN & MESSAMER, L.L.P.**

By: _____

      Alfredo Parrish         AT0006051
      Brandon Brown       AT0001199
      2910 Grand Avenue
      Des Moines, Iowa 50312
      Telephone: (515) 284-5737
      Facsimile: (515) 284-1704
      Email:aparrish@parrishlaw.com
             bbrown@parrishlaw.com

**SOLOMON SIMMONS LAW**

By: *  /s/ Damario Solomon-Simmons  *

      Damario Solomon-Simmons
      601 S. Boulder, Ste 600
      Tulsa, Oklahoma, 74119
      (918) 551-8999 (telephone)
      (918) 582-6106 (facsimile)

**SMILING, SMILING & BURGESS**

By: *  /s/ Kevin McIlwain  *

      M. Kevin McIlwain
      Bradford Place, Suite 300
      9175 S. Yale Avenue
      Tulsa, Oklahoma 74137
      Telephone: (918) 477-7500
      Facsimile: (918) 477-7510
      Email: kmcilwain@smilinglaw.com

**ATTORNEYS FOR PLAINTIFFS**