IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| AKRUM WADLEY, JONATHAN PARKER, MARCEL JOLY, AARON MENDS, MAURICE FLEMING, REGGIE SPEARMAN, KEVONTE MARTIN-MANLEY, DARIAN COOPER, LARON TAYLOR, BRANDON SIMON, JAVON FOY, ANDRE HARRIS, and TERRENCE HARRIS,<br><br>        Plaintiffs,<br><br>vs.<br><br>UNIVERSITY OF IOWA, BOARD OF REGENTS FOR THE STATE OF IOWA, GARY BARTA, KIRK FERENTZ, BRIAN FERENTZ, CHRISTOPHER DOYLE, and RAIMOND BRAITHWAITE,<br><br>        Defendants. | Case No. 4:20-CV-366<br><br><br>**PLAINTIFFS' RESISTANCE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>(Oral Argument Requested) |

**NOW COME** the Plaintiffs, Akrum Wadley, Jonathan Parker, Marcel Joly, Aaron Mends, Maurice Fleming, Reggie Spearman, Kevonte Martin-Manley, Darian Cooper, LaRon Taylor, Brandon Simon, Javon Foy, Andre Harris, and Terrence Harris ("Plaintiffs"), and pursuant to LR 7 (e) hereby submit their resistance to Defendants' Motion to Dismiss ("Motion") (Doc. 16 and 16-1) and request that said Motion be denied. In support of their Resistance, Plaintiffs state as follows:

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 3

REQUEST FOR ORAL ARGUMENT ................................................................................. 4

MOTION TO DISMISS STANDARD ............................................................................... 4

ARGUMENT ...................................................................................................................... 6

    I.     The Claims Held by Plaintiffs Wadley, Parker, Joly, and Cooper under Count IV Are Not Barred by the Statute of Limitations. ................................................................... 6

       a.    Defendants correctly note the applicable statute of limitations for Counts I through VII, except for Count IV. ................................................................................ 6

       b.    The applicable statute of limitations for Count IV is four (4) years; therefore, Plaintiffs Wadley, Parker, Joly, and Cooper's § 1981 claims are not time-barred. ...... 6

II.      Plaintiffs Will Dismiss Counts V and VI. ........................................................... 7

III.     Plaintiffs Will Dismiss All Individual Defendants from Count VIII. ............... 7

IV.     Plaintiffs Will Dismiss Defendant Barta. .......................................................... 7

V.      Plaintiffs Have Stated Plausible Claims Upon Which Relief May Be Granted in Counts I, II, III, IV, VII and VIII. ................................................................................... 8

       a.    Counts I through III – Title VI ....................................................................... 8

       b.    Count IV—42 U.S.C. § 1981 ........................................................................ 16

       c.    Count VII—Failure to Train/Supervise .......................................................... 18

       d.    Count VIII—Breach of Contract .................................................................... 19

CONCLUSION ................................................................................................................ 24

# INTRODUCTION

Defendants' Motion requests dismissal of Plaintiffs' First Amended Complaint, either in part or in whole, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants present a two-pronged argument for dismissal. First, Defendants request dismissal of Plaintiffs' entire action under Fed. R. Civ. P. 12(b)(6) for failure to state a single claim upon which relief may be granted. As explained below, however, Plaintiffs' FAC alleges sufficient facts to state plausible violations of Title VI, 42 U.S.C. §§ 1981 and 1983, and breach of contract under Iowa law. Thus, Counts I, II, III, IV, VII, and VIII should not be dismissed.

Alternatively, Defendants seek dismissal of certain claims—all counts except Count VIII—held by Plaintiffs Wadley, Parker, Joly, Fleming, Spearman, Martin-Manley, Cooper, Taylor, A. Harris, and T. Harris. Defendants assert that said claims are barred by the statute of limitations and require dismissal under Rule 12(b)(6). Defendants are correct as to Counts I, II, III, V, VI, and VII with respect to these Plaintiffs.

However, Defendants are incorrect as to Count IV, the statute of limitations for which is four years, not two. Thus, the claims of Plaintiffs Wadley, Parker, Joly, and Cooper are not statutorily barred under Count IV, though Count IV as to Plaintiffs Fleming, Spearman, Martin-Manley, Taylor, A. Harris, and T. Harris is time-barred. Given that Plaintiffs' FAC also states a plausible claim for relief on Count IV, the Court should deny Defendants' Motion in this respect as to Plaintiffs Wadley, Parker, Joly, and Cooper. Plaintiffs however note that no Plaintiffs are barred from bringing a breach of contract

claim under Count VIII, and that Count VIII states a claim for relief as to all Plaintiffs. Thus, no Plaintiff should be summarily dismissed from this action.

Plaintiffs will dismiss without prejudice Counts V and VI entirely; Count VIII as to all individual Defendants; and Defendant Barta from this action.

## REQUEST FOR ORAL ARGUMENT

Because oral argument on this Resistance will assist the Court in considering the issues presented, Plaintiffs seek the opportunity to be heard orally, and good cause is thereby presented for this request.

## MOTION TO DISMISS STANDARD

Rule 8 of the Federal Rules of Civil Procedure's requirement of a short and plain statement is designed to "give defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Brooks v. Roy*, 776 F.3d 957, 960 (8th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss [based on Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Asking for plausible grounds . . . simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the claimed violation. *Twombly*, 550 U.S. at 556. In contrast, requiring the plaintiff to allege the 'who, what, when, where, and how' of the misconduct alleged is "tantamount to imposing Rule 9(b)'s heightened pleading standards," and is not required

under Rule 8. *See Abikar v. Bristol Bay Native Corp.*, 300 F. Supp. 3d 1092, 1106 (S.D. Cal. 2018) (citing `U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)`).

A court "review[s] the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010). In considering a motion to dismiss for failure to state a claim, a court must accept as true all allegations contained in the complaint, construe the pleading in the light most favorable to the party opposing the motion, and resolve all doubts in the pleader's favor. *Murphy v. Aurora Loan Servs., LLC*, 699 F.3d 1027, 1033 (8th Cir. 2012); *see Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.").

Further, while courts primarily consider the allegations in the complaint in assessing the plausibility of a plaintiff's claims under a 12(b)(6) motion, the court may additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record, . . . [the] authenticity [of which] is unquestioned," without converting the motion to dismiss to a motion for summary judgment. *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed.)). For purposes of assessing the plausibility of Plaintiffs' claims, Plaintiffs have attached for the Court (1) the University of Iowa Diversity Task Force Report, (2) the Husch Blackwell Report, and (3) Chapter 14 of the University of Iowa's Operation Manual

as Exhibits 1 through 3, respectively. All three are matters of public record, referenced in

Plaintiffs' FAC, and whose authenticity is unquestioned. *See* (Doc. 15, *e.g.*, ¶¶ 82, 9, 109).

## ARGUMENT

I.   **The Claims Held by Plaintiffs Wadley, Parker, Joly, and Cooper under Count IV Are Not Barred by the Statute of Limitations.**

   a.   Defendants correctly note the applicable statute of limitations for Counts I through VII, except for Count IV.

Plaintiffs agree that the statute of limitations for claims brought under Title VI

(Counts I through III) and 42 U.S.C. §§ 1983 and 1985 (Counts IV through VII) are

generally two years. However, as explained below, Plaintiffs submit that Count IV contains

a statute of limitations of four years.

   b.   The applicable statute of limitations for Count IV is four (4) years; therefore, Plaintiffs Wadley, Parker, Joly, and Cooper's § 1981 claims are not time-barred.

Pursuant to Congress's 1990 enactment of 28 U.S.C. § 1658 and 1991 amendment

of 42 U.S.C. § 1981, the statute of limitations for claims arising under § 1981 is four years.

Importantly, this is the case even where a § 1981 claim is brought under 42 U.S.C. § 1983.

*See Williams v. Hawkeye Cmty. College*, 494 F. Supp. 2d 1032, 1039-42 (N.D. Iowa 2007).

In *Williams*, plaintiff brought a § 1981 against a state actor, alleging racial discrimination,

harassment and retaliation. *Id.* at 1035. The court granted dismissal on this count, reasoning

that § 1981 against a state actor must be brought under § 1983 consistent with *Jett*. *Id.*

Plaintiff subsequently filed an amended complaint which presented a § 1981 claim brought

under § 1983. *Id.* at 1038. Defendant again sought dismissal based on conduct occurring

outside of the supposed two-year statute of limitations governing plaintiff's claim, but the

court, consistent with 28 U.S.C. § 1658 and the Supreme Court's holding in *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369 (2004) (applying a broad interpretation to § 1658 in holding that the catch-all statute governed plaintiff's § 1981 claim), concluded that a four-year statute of limitations applied to § 1981 claims brought under § 1983. *Williams*, 494 F. Supp. 2d at 1041-42. In light of the foregoing authority, a four-year statute of limitations governs Count IV of Plaintiffs' FAC and, thus, Plaintiffs Wadley, Parker, Joly, and Cooper's § 1981 claims are not time-barred.

## II.   Plaintiffs Will Dismiss Counts V and VI.

Defendants' Motion asks the Court for dismissal of Plaintiffs' conspiracy claims under 42 U.S.C. § 1985(3) (Counts V and VI). By voluntary dismissal under Fed. R. Civ. P. 41(a)(1)(i), Plaintiffs will dismiss these claims without prejudice. As such, Defendants' argument is moot.

## III.   Plaintiffs Will Dismiss All Individual Defendants from Count VIII.

Defendants' Motion asks the Court to dismiss Count VIII of Plaintiffs' FAC. By voluntary dismissal under Fed. R. Civ. P. 41(a)(1)(i), Plaintiffs will dismiss all individual Defendants under Count VIII, but not Defendants University of Iowa, Board of Regents for State of Iowa, and State of Iowa.

## IV.   Plaintiffs Will Dismiss Defendant Barta.

Defendants' Motion asks the Court for dismissal of certain counts in which Defendant Barta is a named defendant (Counts IV, VII, and VIII). By voluntary dismissal under Fed. R. Civ. P. 41(a)(1)(i), and without dismissing these counts in their entirety, Plaintiffs will dismiss Defendant Barta from Counts IV, VII and VIII without prejudice for

the time being.

## V. Plaintiffs Have Stated Plausible Claims Upon Which Relief May Be Granted in Counts I, II, III, IV, VII and VIII.

### a. Counts I through III – Title VI

Title VI of the Civil Rights Act of 1964 contains a broad prohibition on the use of

federal dollars to subsidize racial discrimination in educational programs or activities:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity[1] receiving Federal financial assistance.

42 U.S.C. § 2000d.

Congress passed Title VI "to accomplish two related, but nevertheless somewhat

different, objectives. First, Congress wanted to avoid the use of federal resources to support

discriminatory practices; second, it wanted to provide individual citizens effective

protection against those practices." *Cannon v. University of Chicago*, 441 U.S. 677, 704 n.

36 (1979). Title IX, enacted eight years after Title VI, was modeled after Title VI and bans

sex discrimination in educational programs receiving federal funds, and courts thus

interpret these kindred statutes in same fashion. *Id*. at 696.

### i. Hostile Environment – Count I

When a Title VI claim against an educational institution is based on conduct by a

person within the institution's control (*i.e.*, a hostile environment claim), the plaintiff must

---

[1] The Civil Rights Restoration Act of 1987 makes clear that the term "program or activity" includes all of an entities' operations—thus, any university receiving federal funds may not discriminate against any person in any of its programs on the basis of race, color, or national origin. *See e.g., DeVargas v. Mason & Hanger–Silas Mason Co., Inc.*, 911 F.2d 1377, 1383–84 (10th Cir. 1990); *Radcliff v. Landau*, 883 F.2d 1481, 1483 (9th Cir. 1989).

show that "an official of the [university] who at a minimum has authority to institute corrective measures . . . has actual notice of, and is deliberately indifferent to, the [person's] misconduct." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998) (addressing teacher-on-student harassment under Title IX). "[T]he deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017) (quoting *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644-45 (1999)) (internal quotation marks omitted); *see also Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001) ("[D]eliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse."). Further, the discriminatory harassment must be "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.

Here, Plaintiffs' FAC alleges sufficient facts to plausibly state a hostile education environment under Title VI. Focusing first on the severity and pervasiveness of the conduct itself, Plaintiffs' FAC specifically alleged, *inter alia*, that:

- Coaches, chiefly Defendants Christopher Doyle and Brian Ferentz (and some White players), openly used racial epithets such as "nigger" and other racially derogatory language like "dumbass black player" in front of players and coaches. (¶ 50, 54, 59). *See also* ¶ 7 (Plaintiff Parker), ¶ 51 (Plaintiff Fleming).

- African-American players were referred to as "gangsters" (¶¶ 50, 212 (Plaintiff Taylor), "hood" (¶ 53), and "thugs" (¶ 220, Plaintiff Simon), and were told they would lose their scholarships and be sent "back to the ghetto" if they did not comply with coaches' demands or attempted to curb racial harassment in the program. (¶¶ 12, 50, 55). *See also* ¶ 251 (Plaintiff Terrence Harris).

- African-American players were ridiculed for wearing African-American dress and hairstyles (whereas White players were not with respect to White dress and long hairstyles), and coaches described African-American players' appearance as a "mess" and akin to a "barbarian". (¶¶ 45, 227 (Plaintiff Foy), 247 (Plaintiff Terrence Harris)).

- Team rules were disproportionately enforced against African-American players. In one instance, African-American players were prevented from kneeling for the national anthem in protest of police brutality based on team rules and Defendant Kirk Ferentz's demand to "stick to football." However, white players were not subject to the same standard and, in one instance, a group of white players were not reprimanded for creating and delivering a personalized Iowa jersey to former President Donald J. Trump at a rally. (¶¶ 64–67).

- African-American players were disproportionately or exclusively reprimanded for singing, dancing, or "looking funny." (¶ 47).

- African-American players' social media posts were unequally scrutinized in comparison to White players. (¶ 61-62). *See also* ¶ 159 (Aaron Mends).

- African-American players were openly humiliated as "stupid" for their use of non-White vernacular and their dialects and dictation were referred to as "broken English." (¶ 61). *See also* ¶ 252 (Plaintiff Terrence Harris).

- African-American players were pressured to play by coaches through injuries, whereas White players were permitted to rest, recover, and heal from injury. (¶ 60). *See also* ¶ 207 (Darian Cooper).

- African-American players were disproportionately if not exclusively punished for instances of spitting on turf. (¶ 57).

- African-American players were disproportionately subjected a form of punishment requiring them to collide full-speed into one another. (¶ 58).

- African-American players, per a White player's account, were disproportionately targeted for "random" drug tests. (¶ 56). *See also* ¶ 213 (LaRon Taylor).

Plaintiffs further alleged that racial harassment occurred on a regular, if not daily, basis. (Doc. 15, *e.g.*, ¶¶ 49, 50, 54, 96). Importantly, Defendants erroneously contend that acts of harassment constituting the alleged hostile environment may only involve acts directed towards a particular plaintiff. *See* (Doc. 16-1, at 10) (applying the respective individual allegations of Mends, Simon, and Foy to elements of a hostile environment claim). Whether a hostile environment exists "depends upon facts relative to **that environment**" rather than facts involving a particular plaintiff. *Lang v. Kansas City Power & Light Co.*, 199 F.R.D. 640, 647 (W.D. Mo. 2001) (emphasis added); *see also Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir. 1997) (involving a Title VII hostile

environment claim)[2] ("A workplace permeated with discriminatory intimidation, ridicule, and insult is sufficiently severe to establish a hostile work environment."). Failing to report, investigate, or punish known racist remarks of others, can  make up an "accumulation of abusive conduct" which poisons an environment. *Hathaway v. Runyon*, 132 F.3d 1214, 1222 (8th Cir. 1997). This is particularly true when the known racist remarks are produced by an authority figure (Defendant Doyle and Brian Ferentz) and condoned by an even higher authority (Defendant Kirk Ferentz).

Furthermore, Plaintiffs' specific allegations cannot be carved into discrete incidents and viewed as an exhaustive list of all racially discriminatory conduct in the football program.

> In deciding whether there was an objectively hostile . . . environment, the evidence must be examined as a whole. A hostile . . . environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents. Specific examples cited as discriminatory and alleged to be part of a pattern of hostile treatment are to be viewed as examples of the offensive racial incidents experienced by the black officers, not as an exhaustive litany of every offensive racial slur or incident which occurred.

*Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014) (discussing hostile work environment under section 1981) (quotations and alterations adopted) (citations omitted). The Court should properly disregard Defendants' attempts to carve Plaintiffs' hostile environment claim into discrete incidents of a single coach's harassing conduct towards a single Plaintiff. "[W]hen a pattern of discriminatory conduct is alleged, specific individual

---

[2] Titles VI relies on Title VII case law. *See e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (relying on Title VII hostile environment case law in assessing Title VI claim).

acts should be viewed as illustrative rather than as isolated incidents." *Id*. Accordingly, in view of the litany of specific instances backing the accounts of over sixty (60) former players (*see* Doc. 15, ¶ 4), Plaintiffs have put forth allegations that plausibly illustrate a hostile environment.

With respect to the remaining elements, Defendant University of Iowa is a recipient of federal funding and thus may not discriminate on the basis of race. (Doc. 15, ¶ 256). The individual Defendants are employees of the University of Iowa and thus are within the university's control. (Doc. 15, ¶¶ 32–35). Moreover, the court can reasonably infer that Defendant Kirk Ferentz, as head coach, maintained authority to institute corrective measures against the acts of his subordinate coaches-defendants.

Furthermore, the FAC alleges that Defendant Kirk Ferentz knew of instances of racial harassment against African-American players based on reporting by players, their parents, the team's Leadership Group, and at least one coach. (Doc. 15, ¶¶ 72–73, 106). The court can reasonably infer from the totality of the complaint that Ferentz was notified of at least some of the specific instances alleged in the complaint involving Defendants Doyle and Brian Ferentz, in addition to allegations common to African-American players during his tenure. Inferences aside, Defendant Kirk Ferentz personally witnessed his son openly call Plaintiff Parker a "dumbass black player" in front of the entire team and coaching staff, (Doc. 15, ¶ 7), and Plaintiffs alleged that racist remarks and comments were made openly in front of players and coaches, including Kirk Ferentz. (Doc. 15, ¶ 54). The FAC further alleges that Defendant Kirk Ferentz instructed Defendants Doyle and Brian Ferentz to harass African-American players in the program. (Doc. 15, ¶ 67).

And as to deliberate indifference, the FAC alleged that no corrective actions were taken against coaches who subjected African-American players to racial discrimination. (Doc. 15, ¶¶ 108, 84, 87). In the case of Plaintiff Parker, Kirk Ferentz acknowledged he heard Brian Ferentz's comment but nevertheless instructed Parker to apologize to Defendant Brian Ferentz. (Doc. 15, ¶ 7). In one case, a teacher's tacit acceptance of student-on-student harassment via a single racially derogatory comment was found to establish a prima facie hostile environment under Title VI. *See L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017) (unpublished). Defendant Kirk Ferentz's conduct in this single instance exceeds the *Evesham* case, however. Instead, his conduct may aptly be characterized as a supervisor's tacit acceptance of *teacher-on-student* harassment in the presence of the entire faculty (coaching staff) and student body (players). This single incident alone is sufficient to plausibly state a hostile environment claim under Title VI, and given the wealth of allegations provided in the FAC, Count I cannot be dismissed.

### ii.   *Retaliation – Count II*

It is well-settled that Title VI supports retaliation claims. *See, e.g., Peters v. Jenney*, 327 F.3d 307, 318 (4th Cir. 2003); *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 83 (D.D.C. 2003); *Gutierrez v. Wash. Dep't of Soc. & Health Servs.*, CV-04-3004-RHW, 2005 WL 2346956, at  *5 (E.D. Wash. Sept. 26, 2005). To establish such a claim, a plaintiff must show that he is engaged in a protected activity, such as making complaints of discriminatory conduct, and (2) that he suffered an adverse action by the defendant as a result of the protected activity. *Brine v. Univ. of Iowa*, 90 F.3d 271, 273 (8th Cir. 1996). A plaintiff must prove that a reasonable person would perceive as retaliatory the actions he

finds offensive. *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007). The Supreme Court has stated that an employee is not protected "from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

Here, Plaintiffs' FAC alleges that Aaron Mends complained to Defendant Kirk Ferentz of discrimination within the program. (Doc. 15, *Aaron Mends*). And while this section of the FAC omitted a materially adverse action, ¶¶ 268-270 provide the factual allegations sufficient to state a plausible claim for retaliation. Plaintiffs further submit that even the mere act of restricting coveted playing time would be perceived as objectively offensive and injurious to a reasonable person in Plaintiff Mends' position, as it would effectively chill the protected act of African-American players submission of good faith complaints of unlawful discrimination. Accordingly, Plaintiffs' FAC states a plausible claim of retaliation with respect to Plaintiff Mends.

### iii.   Systemic Pattern or Practice – Count III

Defendants contend that Count III fails because it fails to plead its cause of action with sufficient specificity. This is misguided—Count III of Plaintiffs' FAC concerns disparate treatment (intentional discrimination), which Defendants correctly note is only available to Plaintiffs (as opposed to disparate impact as well). Plaintiffs' styling is to emphasize the widespread nature of the discriminatory acts towards African-American players, including Plaintiffs.

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), a

case brought under the "pattern or practice" provision of Title VII,[3] the Court stated that "statistics showing racial or ethnic imbalance are probative … because such imbalance is often a telltale sign of purposeful discrimination." *Id*. at 339 n. 20. Accordingly, statistical evidence of a sufficiently "gross disparity" between the affected population and the general population may establish an inference of intentional discrimination. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."). This is such a case. Plaintiffs have alleged that Defendants intentionally discriminated against them and created a hostile education environment, all of which created the statistical disparities alleged in the FAC. (Doc. 15, ¶¶ 79-81).

Given the sheer number of reports of widespread discrimination in the program (Doc. 15, ¶ 4) across multiple recruiting classes (Plaintiffs include members of recruiting classes from 2010 to 2019), combined with the allegations which include the open use of epithets and racially derogatory comments by coaches, the tacit acceptance of the same by Defendant Kirk Ferentz, and the disproportionate and worse treatment of African-American players in areas like drug testing and enforcement of team rules, the FAC plausibly states a claim under Title VI for intentional discrimination.

b. Count IV—42 U.S.C. § 1981

42 U.S.C. §§ 1981 and 1983 reflect congressional resolve to enforce the rights granted in the Thirteenth and Fourteenth Amendments to the United States Constitution.

---

[3] Again, Title VII case law may be used to interpret Title VI claims. *Supra*, n. 2.

Section 1983 provides a cause of action to any person deprived of a federal right by someone acting under color of law. 42 U.S.C. § 1983. One such right is the ability of all persons, regardless of race, "to make and enforce contracts." 42 U.S.C. § 1981. The Supreme Court has held that the protections offered by § 1981 include the right to be free from racial harassment. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004) (employment context).

While section 1981 claims are generally raised in the employment context, the statute applies in the context of colleges and students. *See e.g.*, *Miller v. Thomas Jefferson University Hospital*, 908 F. Supp. 2d 639, 650 (E.D. Pa. 2012) ("§ 1981 applies to the Plaintiff's claims because the relationship between university and student is contractual in nature."); *Boyd v. Feather River Community College District*, Docket No. 2:11CV0231 JAM-EFB, 2011 U.S. Dist. LEXIS 121683 (E.D. Cal. October 20, 2011) (holding that "contract for purposes of Section 1981 for services exists between schools and the students" and that plaintiffs plead plausible 1981 claim) (citing *Gratz v. Bollinger*, 539 U.S. 244, 275 n. 23 (2003); *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)). Courts have additionally found that protections under § 1981 encompass college athletics. *See e.g.*, *Pryor v. National Collegiate Athletic Ass'n.*, 288 F.3d 548 (3rd. Cir. 2002)).

Plaintiffs' FAC alleges that each and every plaintiff was a student-athlete at the University of Iowa. This alone is sufficient to establish a contract for purposes of § 1981.[4]

---

[4] Moreover, the FAC alleged that all Plaintiffs other than Foy signed letters of intent with the University of Iowa in exchange for full athletics aid scholarships; Foy committed as a preferred walk-on and, as alleged, devoted his athletic talents to the program in exchange for the opportunity to earn a full scholarship. (Doc. 15, ¶ 284–287). Notably, the court in *Boyd* found that the plaintiffs' allegations of a denial of contractual benefits and equal opportunity was sufficient to withstand a 12(b)(6) motion to dismiss, *even though none*

*See Boyd*, *supra*. By extension, the statute afforded Plaintiffs the right to be free from racial harassment. *Jones*, *supra*.

Plaintiffs alleged that their ability to obtain the full benefits and privileges afforded in the contractual relationship was impaired. (Doc. 15, ¶ 295). And as highlighted above with respect to Count I, Defendants Brian Ferentz and Chris Doyle directly participated in racially harassing acts towards Plaintiffs and African-American players. The fact that these two Defendants were open in their use of racially derogatory language plausibly establishes purposeful discrimination. Moreover, as to Defendant Kirk Ferentz, the same allegations which plausibly establish his own deliberate indifference suffice to state a plausible § 1981 hostile environment claim against him. That the FAC alleges Defendant Kirk Ferentz instructed, knew of and permitted racial harassment to continue for so long of a period, in addition to allegations of his own racially suspect comments and selective enforcement of team rules (Doc. 15, ¶¶ 62, 252, 63-67), is sufficient to overcome dismissal.

The Court should disregard Defendants' arguments with respect to Count IV.

    c.   Count VII—Failure to Train/Supervise

Defendants correctly note that government employees are generally only liable for their own misdeeds, and not those of their subordinates. *Iqbal*, 556 U.S. at 677. And per *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997), Defendants correctly state the requisite elements for a § 1983 failure to train/supervise claim.

Defendants argue that Plaintiffs fail to state a claim under Count VII because

---

*of the plaintiffs in that case held athletic scholarships*. 2011 U.S. Dist. LEXIS 121683 at *13–14.

Plaintiffs fail to allege any underlying constitutional violations by any subordinates. Plaintiffs submit that the Court may properly construe Count VII as a § 1983 claim premised upon deprivations of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

As highlighted above, Plaintiffs' FAC alleges numerous instances in which Plaintiffs and other African-American players were treated less favorably that White players, most notably by Defendants Doyle and Brian Ferentz. Plaintiffs' FAC also alleged that Defendant Kirk Ferentz regularly received notice of race discrimination within the football program (Doc. 15, ¶¶ 72–73, 106) and, in some instances, participated in or directly witnessed and tacitly authorized the same. The FAC alleged that despite notice of complaints levied against the coaching staff, Defendant Kirk Ferentz continually failed to resolve them and, as a result, African-American players continued to be subjected to disparate treatment. (Doc. 15, ¶ 108). Defendant Ferentz's failure to take sufficient remedial actions to curb the racially offensive acts exhibited deliberate indifference (*see supra*, discussion of Defendant Kirk Ferentz in Count I herein) and proximately caused Plaintiffs to be subject to a hostile environment and injured by the same. (Doc. 15, ¶¶ 341–346).

Plaintiffs have stated a plausible claim under § 1983 against Defendant Kirk Ferentz for failure to train/supervise, and the Court should permit Plaintiffs to proceed on said claim under Count VII.

    d.  <u>Count VIII—Breach of Contract</u>

Defendants correctly state the requisite elements to plead a breach of contract claim

under Iowa law. In support of their argument that Plaintiffs' FAC fails to state a claim for breach of contract, Defendants point to the lack of any particular contractual obligation owed to Plaintiffs, and cite to *Gillis v. Principia Corp*., 832 F.3d 865 (8th Cir. 2016), in support of dismissal. However, in *Gillis*, the Eighth Circuit expressly acknowledged that "an educational institution's brochures, policy manuals and other advertisements may form the basis of a legally cognizable contractual relationship between [a university] and its students." *Id*. at 871 (quoting *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 5 (Mo. Ct. App. 2013)).

Plaintiffs submit that the FAC plausibly states contractual obligations owed to Plaintiffs by reference to the University's Operations Manual's harassment policy in paragraph 109 of the FAC. As laid out in the FAC and Exhibit 3, "[h]arassment by any member of the University community is prohibited[,]" *id*. at § 14.2, and includes "intentional conduct, including speech, directed toward an identifiable person or persons that is sufficiently severe, pervasive, or persistent that it interferes with work, educational performance, on-campus living, or participation in a University activity on or off campus." *Id*. at § 14.2(a). Not only is race-based harassment properly considered within the scope of this policy, it is considered an aggravating circumstance warranting enhanced penalty. *Id*. at § 14.2(e).

Plaintiffs recognize and bring to the Court's attention *Petro v. Palmer Coll. Of Chiropractic*, 945 N.W.2d 763 (Iowa 2020), in which the Iowa Supreme Court affirmed summary judgment on a plaintiff's breach of contract claim that arose out of alleged age

and disability discrimination. The plaintiff alleged that statements from the college's online application form and equal opportunity policy were contractual obligations owed to him by the University. *Id*. at 779–80. However, the Iowa Supreme Court ruled that both statements amounted to a notice of compliance, and not a contractual covenant. *Id*. at 780. Although the Iowa Supreme Court declined to determine whether a "student handbook amounts to a binding contract," it noted that "at most Palmer's contractual commitment in the area of nondiscrimination was to follow the identified processes and procedures for addressing discrimination complaints." *Id*. Because the record did not indicate plaintiff had pursued relief under the processes or that Palmer failed to comply with the same, his breach of contract claim failed. *Id*.

Plaintiffs submit that this case, as alleged in their FAC, is distinguishable from *Petro*, and thus the Court should deny Defendants' request to dismiss Count VII, for two reasons. First, unlike *Petro*, the FAC alleges that "[w]hen Plaintiffs reached out to assistant coaches and administrators about the [football program's] culture of disparate treatment and racial harassment, they were uniformly told not to step forward out of fear that the athletes would be 'blackballed', 'runoff', and 'sent back to the ghetto'." Thus, the Court may infer that the "processes and procedures for addressing discrimination complaints" were wholly unavailable to Plaintiffs in the first place and, therefore, the decisions of the Plaintiffs not to pursue formal avenues of relief offered under Exhibit 3 are nonfatal to their breach of contract claims. On the contrary, Plaintiffs submit that the unavailability of these avenues promised under Exhibit 3 demonstrates a breach of contractual obligations owed

to Plaintiffs by Defendant University, and that Count VIII states a claim for breach of contract with respect to all Plaintiffs.

Second, Plaintiffs submit that Defendant Kirk Ferentz's failure to act on known and reported instances of race discrimination breached contractual obligations owed to all Plaintiffs under the informal processes and procedures outlined in Exhibit 3. Specifically, § 14.5(e) of the University Operations Manual provides:

> Any academic or administrative officer of the University who becomes aware of specific and credible allegations of harassment based on a protected classification (race, creed, color, . . . ), whether through the report of an impacted or a reporting party (including a third-party reporter[5]) or otherwise, **shall** report the allegations promptly to the Office of Equal Opportunity and Diversity for assistance in evaluating the situation and determining an appropriate course of action, even if the impacted party has requested that no action be taken.

Under § 14.2(g)(1)(f), an "academic or administrative officer" includes "[d]irectors and supervisors[6] in an employment context, . . . [] in relation to matters involving the employees they supervise."

Accordingly, as it relates to allegations of race-based harassment involving Defendants Doyle and Brian Ferentz received by Defendant Kirk Ferentz, Plaintiffs' FAC plausibly alleges in its totality that Defendant Kirk Ferentz qualified as an "academic or administrative officer" by virtue of his supervisory role over subordinate coaches Doyle

---

[5] Under § 14.2(g)(14), a third-party reporter need not be a faculty member, staff, or student. Thus, allegations of race-based harassment submitted to Defendant Kirk Ferentz, an academic or administrative officer, by parents of African-American players (*see* Doc. 15, ¶¶ 72, 263, 296) triggered Ferentz's obligations to report the matters to the Office of Equal Opportunity and Diversity.

[6] Under § 14.2(g)(13), a supervisor is a person who has the authority to undertake or recommend tangible employment decisions (including hiring, firing, promoting, etc.) or direct the employee's daily work activities.

and Brian Ferentz. Thus, upon becoming aware of race-based harassment, the bulk of which involved Defendants Doyle and Brian Ferentz as alleged in the FAC, against African-American players, including Plaintiffs, Defendant Kirk Ferentz was obligated to report said harassment to the Office of Equal Opportunity and Diversity. As Plaintiffs' FAC alleges, Kirk Ferentz took no action to address racial harassment within the program, and the Court may reasonably infer that this included failures to report under § 14.5(e). The contractual obligations owed by Defendant University to Plaintiffs under § 14.5(e) were thus breached by Kirk Ferentz's failures. Accordingly, Plaintiffs' FAC plausibly states a claim for breach of contract for all Plaintiffs—Count VIII should not be dismissed.

And to the extent it is, somehow, implausible for Defendant Kirk Ferentz to have qualified as an "academic or administrative officer," the FAC plausibly alleges that the same contractual obligations owed to Plaintiffs Brandon Simon and Terrence Harris were breached by Defendant University. The FAC alleges that Plaintiffs Simon and Terrence Harris were subject to race-based harassment by coaches, most notably Defendant Doyle. (Doc. 15, ¶¶ 218-222, 245-253). The FAC further alleges that both men complained to academic advising staff members of racial harassment within the football program (Doc. 15, ¶¶ 222, 253). It is entirely plausible from these allegations, and in light of § 14.2(g)(1)(c),[7] that these particular academic advising staff members were bound to follow § 14.5(e). The FAC alleges that Plaintiffs circumstances went unchanged despite these

---

[7] This provision provides that an academic or administrative officer includes "[a]ny staff member whose primary job responsibility is to provide advice regarding a student's academic pursuits or other University-related activities."

complaints. (Doc. 15, ¶¶ 222, 355). The Court can infer from the allegations within the FAC that no reports of Brandon and Terrence's accounts were made to the Office of Equal Opportunity and Diversity by the aforementioned academic advising staff members, as mandated under § 14.5(e) of the University Operations Manual. Therefore, Plaintiffs' FAC, at the very least, states a plausible claim for breach of contract with respect to Plaintiffs Simon and Terrence Harris.

## CONCLUSION

For the reasons outlined above, the Court should deny Defendants' Motion. Furthermore, to the extent the Court determines that Counts I, II, III, IV, VII, and VIII of Plaintiffs' FAC fails to state a claim under Fed. R. Civ. P. 12(b)(6), Plaintiffs will request leave to amend and submit that amendment of any defective claim is not futile.

*Respectfully submitted*,

**PARRISH KRUIDENIER DUNN GENTRY
BROWN BERGMANN & MESSAMER, L.L.P.**

By: _____
         Alfredo Parrish              AT0006051
         Brandon Brown             AT0001199
         2910 Grand Avenue
         Des Moines, Iowa 50312
         Telephone: (515) 284-5737
         Facsimile: (515) 284-1704
         Email: aparrish@parrishlaw.com
                    bbrown@parrishlaw.com

24

**SOLOMON SIMMONS LAW**

By:____*/s/ Damario Solomon-Simmons*____
        Damario Solomon-Simmons
        601 S. Boulder, Ste 600
        Tulsa, Oklahoma, 74119
        (918) 551-8999 (telephone)
        (918) 582-6106 (facsimile)

**SMILING, SMILING & BURGESS**

By:____*/s/ Kevin McIlwain*____
        M. Kevin McIlwain
        Bradford Place, Suite 300
        9175 S. Yale Avenue
        Tulsa, Oklahoma 74137
        Telephone: (918) 477-7500
        Facsimile: (918) 477-7510
        Email: kmcilwain@smilinglaw.com

**ATTORNEYS FOR PLAINTIFFS**

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause by:

| | | | |
|---|---|---|---|
| ( ) | personal service | ( ) | first class mail |
| ( ) | certified mail, return receipt requested | ( ) | facsimile |
| ( ) | Airborne Express (overnight) | (X) | CMECF |
| | | ( ) | e-mail |

on March 1, 2021.

I declare that the statements above are true to the best of my information, knowledge, and belief.

_____*/s/ Lori Yardley*_____

THOMAS J. MILLER
Attorney General of Iowa
Tjmiller@ag.iowa.gov

JEFFREY S. THOMPSON
Solicitor General
Jeffrey.Thompson@ag.iowa.gov

JEFFREY C. PETERZALEK
CHRISTOPHER J. DEIST
SAMUEL P. LANGHOLZ
WILLIAM A. HILL

Assistant Attorneys General
Department of Justice-Special Litigation
Hoover State Office Building
Des Moines, Iowa 50319
(515) 281-4419/4213
jeffrey.thompson@ag.iowa.gov
jeffrey.peterzalek@ag.iowa.gov
christopher.deist@ag.iowa.gov
sam.langholz@ag.iowa.gov
william.hill@ag.iowa.gov
**ATTORNEYS FOR DEFENDANTS**

**UI Athletics Diversity Task Force Report**

### *Background*

The UI Athletics Diversity Task Force was established in the spring 2018 to address African American male graduation rates. The University of Iowa currently ranks at the bottom of the Big Ten Conference with a graduation rate of 42% for African American male student-athletes. The committee has two primary goals: 1) To be among the top three institutions within the Big Ten Conference with the highest African American male graduation rate by closing the gap between African American male student-athletes (42%) and their White student-athlete male peers (81%). 2) Achieve national recognition for UI Athletic efforts on diversity and inclusion by contending for the Diversity and Inclusion Award through the NCAA.

<u>Committee Members</u>

| | |
|---|---|
| Broderick Binns | UI Athletics |
| John Bruno | Subcommittee Chair, UI Athletics |
| Eddie Etsey | UI Athletics |
| Andrew Francis | UI Athletics |
| Nicole Grosland | Faculty Athletic Representative |
| Raina Harmon | UI Athletics |
| Charles Martin-Stanley | Graduate student representative |
| Jamal Nelson | Office of Student Life |
| Mel Sanders | Subcommittee Chair, UI Athletics |
| Melissa Shivers | Vice President for Student Life, Interim Chief Diversity Officer |
| Liz Tovar | Task Force and Subcommittee Chair, UI Athletics |
| Vacant | Chief Diversity Officer |

### *Process*

The committee proposed a two-year timeline for this project which includes a three-phase process. Phase I was an assessment of UI Athletics to better understand the departmental climate towards diversity and the experiences of African American male student-athletes. Phase II and III will include developing effective strategies and implementation of practices to improve African American male student-athlete graduation rates based upon the recommendations from the assessment.

### *Phase I*

This report includes the findings from the assessment phase which included interviews with student-athletes, coaches, staff, and administrators during the fall 2018 semester.

Areas of assessment were African American male student-athletes reasons for departure prior to graduation; recruitment standards and student-athlete expectations; athletic department

Exhibit 1

and team climate; and the African American male student-athlete experience on campus and in the community.

*Findings*

The Task Force was divided into three subcommittees charged with interviewing student-athletes, sport coaches, staff, and administrators. The following sections summarize prevalent themes from the interviews.

*Student-Athlete Subcommittee*

The student-athlete subcommittee identified 15 current and former African American student-athletes. In addition, 9 White student-athletes were interviewed. Students were identified based on their status as a student-athlete at the University of Iowa and randomly selected within their sports team.

One of the key themes was that African American **student-athletes do not feel comfortable being their authentic selves** (namely around coaches). Many African American students feel as though they have to "put on a mask" or "check their identity at the door" when they walk into athletic related activities (practice, meals, team meetings, etc.). The feeling of the majority of African American student-athletes was that they are not given enough freedom of expression to be themselves. The African American upperclassmen feel a burden to teach the freshmen how to dress, when to remove their earrings, how to do their hair, etc. As one student-athlete indicated, "I was told by my coach to change my hairstyle because it did not fit the Iowa culture. I can't be free. I feel like a slave to the system". Another student followed by saying, "the White student-athletes at Iowa are viewed as the standard that African American student-athletes should strive to mold themselves after". The opportunity for African American student-athletes to be their genuine selves is not given freely. White student-athletes interviewed agreed that there "is a certain mold that students must fit into here at Iowa, and for student-athletes from Iowa it is easier for them to fit the mold". The term mold was defined by students as "tough", "hardworking", "Iowa" or "White". White and African American student-athletes agreed that it is the responsibility of "upperclassmen to teach underclassmen" such standards.

In contrast to the aforementioned theme, a positive theme emerged with regard to student-athletes perceptions of their campus environment. Nearly all student-athletes interviewed reported that **their experiences on campus and with the general student body have been positive.** The vast majority of the African American student-athletes indicated that while they do not get involved in many programs or have many friends outside of athletics, they have not been subjected to any prejudices or overt forms of racism. Most African American student-athletes mentioned that they are often "looked at as celebrities" and are not judged based on their race by the student body but rather their athletic participation. The majority of student-athletes cited time as the limiting factor that keeps them from getting involved on campus and interacting with non-student-athletes.

A few African American student-athletes alluded to the fact that their coaches have discouraged involvement in some campus organizations. One student-athlete went on record saying that,

> "We are told to focus on one thing only, our sport. Everything else is a distraction, even having significant others. We are told to commit to the team first and only be friends with student-athletes."

Student-athletes choose to commit to the University of Iowa based on how they feel throughout the recruiting process. A common theme was that **few African American student-athletes feel like they are connected to the support system (team) that recruited them.** Many feel that coaches don't take the time to understand what is going on in their personal lives, how they are feeling or if they are struggling. One student-athlete said that his coach "brushed off a death in the family", "he was not sympathetic and I did not feel supported". A number of African American student-athletes feel a sense of isolation, which many believe was a key factor in their African American student-athlete peers decision's to transfer. A number of African American student-athletes interviewed reported that they did not see the "Iowa culture" (i.e., the difference in treatment between African American and White student-athletes or the inability for African Americans to be themselves) on their recruiting trip and if they had, they would have never committed to this university. White student-athletes agreed that there is "an Iowa Culture" which they described as being "hardworking", and that "geographical rather than racial differences may cause students not from this area to feel alienated and wanting to leave". In contrast, White student-athletes mentioned that if they want support "they feel comfortable talking to their coaches if they have a problem or concern". White student-athletes from this region mentioned they "have the ability to go home" and find a support system. Also, unlike their African American peers, White student-athletes reported that their experiences during their recruitment was in line with their experiences once on campus. Specifically, their "expectations in the recruiting process matched what they experienced when they arrived on campus". One White student-athlete recommended more diversity in terms of "authority figures" within the department. For example, "when Athletics staff members speak with our team they are generally White men" and that "African American male student-athletes don't see individuals who look like them" within our department.

Nearly all African American student-athletes interviewed used the term "double-standard" to describe **the difference between how African American student-athletes are treated in relation to their White peers**. Nearly all of the African American student-athletes interviewed believe that one of the predominant reasons that African American student-athletes leave is because of the way they are talked to by coaches and some support staff while their White peers are not subjected to the same negative interactions. Many examples were shared of African American student-athletes being cursed at, ridiculed and embarrassed in front of their peers. Some student-athlete interviewed feel that their White peers are not spoken to in such a

disrespectful way. White student-athletes believed some students are treated differently, but they attribute this to "geographical" rather than racial differences. For example, students not from this region may have a difficult time understanding the expectation of "hard work" and "doing things right all the time, both academically and socially".  One White student-athlete mentioned that African American athletes are "tested more for drugs" than White student-athletes, and "White student-athletes stay off the radar".

Many student-athletes, both White and Black, believe there is **a short period of time to make a good impression and that the margin of error is perceived to be much smaller for African American student-athletes.** Many student-athletes spoke about some of their African American peers who have transferred or asked to leave because they were not meeting Iowa's expectations. One student shared an experience of a staff member cursing and degrading an African American student-athlete in front of peers for not doing something the right way. According to the reporting student,

> *"That set the tone for that kid and he left a week later. I personally have experienced this at least once per week since I have been here, but I have thicker skin. This isolates the students of color who may not have the mental fortitude to withstand all of the bullshit by themselves and they don't have someone of the same color to go to. It's hard to be ourselves around coaches. If you are, you are vulnerable and will be taken advantage of".*

Furthermore, many students reported that the African American student-athletes feel that when their White peers commit similar disciplinary infractions, the "punishments are not equal based on race". When students are disciplined for failing to adhere to the expectations coaches have for them, they feel that it is a "death sentence" and then coaches will work to slowly push you out the door and give someone else the scholarship who can live up to the expectations of the "Iowa Way" (i.e., the difference in treatment between African American and White student-athletes and the inability for African Americans to be themselves). The perception of the African American student-athletes is that their White peers miss tutoring, are late to meetings but do not see their playing time diminish or other disciplinary measures that are equitable to what they have experienced for the same offense. Some White student-athletes reported that they do not believe there is a "double standard", however, "there is a very short window of opportunity to prove yourself". If you do not prove yourself you will be "pushed out and that it is hard to recover even for one mistake". One White student-athlete mentioned that African American student-athlete departure is a "recognizable area of concern" especially within the student's cohort and that trend appears to get worse every year.

*Staff and Administrator Subcommittee*

The subcommittee identified 15 staff members who hold either a senior level or mid-level management position within UI Athletics. Ten men and 5 women were interviewed. They were selected because of their interaction with student-athletes and coaches, their ability as a

manager to hire and therefore influence diversity within UI athletics, and the ability to impact departmental policy pertaining to student-athlete persistence and graduation.

Of the key themes was that **staff and administrators lacked awareness of the experiences of African American student-athletes**. Specifically, there is disconnect between the perceptions of staff and administrators and the actual experiences of African American athletes. For example, staff and administrators acknowledged that African American student-athletes have never explicitly approached them with concerns, and additionally staff and administrators have not actively sought out feedback from African American student-athletes about their experiences. There is a belief that if there's a problem or concern students will report them and that staff and administrators believe "student-athletes seem to have a positive experience" at Iowa. When asked about assessing team culture, staff and administrators mentioned they conduct regular performance evaluations and provide feedback to coaches. When asked about accountability on the part of coaches in terms of improving graduation rates, staff and administrators demonstrated a level of concern, but lacked substantive methods for addressing such issues outside of a yearly performance evaluation. It is unclear what, if any, repercussions there are for teams not improving their African American graduation rates. According to one staff member "there is disconnect between the administration and what transpires within certain teams".

**Another theme was the noticeable lack of diversity among non-coaching staff members, including senior administrators, middle level managers, and support staff**. Staff and administrators define diversity as "different identities, thoughts, and opinions that a person holds at any given time", some of which are more salient than others. They believe representation of identities among staff members is important and impacts the experiences for African American student-athletes. For example, it was reported that "athletic department staff should be reflective and representative of the student-athlete population". Unfortunately, African American male student-athletes have few staff members within UI Athletics with whom they can personally identify, resulting in fewer opportunities for mentorship and guidance. Additionally, it was noted that if African American male athletes want a supportive environment "they have to look for resources", unlike their White peers. For example, minorities are underrepresented in key support areas such as mental health, strength and conditioning, athletic training, and student development.

It was reported that while the Athletics Department has "done a good job of emphasizing the importance of diversity", the **department lacks results in achieving diversity among staff members**. There were several explanations including the difficulty of recruiting diverse staff who are not from the region, figuring out how to "sell Iowa" to prospective employees, and not consciously thinking about diversity as a variable when hiring for positions. Although the department has a long standing policy that encourages diversity among prospective candidates, this has not resulted in a more diverse department. When asked about discussing diversity, specifically race, it was reported that as a department individuals are not open to talking about

race, and treat such conversations "as if we were checking a box". One possible explanation for why racial issues are not discussed was staff being "uncomfortable with constructive conflict", which prevents us from addressing our implicit and explicit biases. One staff member suggested that the topic of diversity needs to be "engrained throughout the department and emphasized in the Strategic Plan, as much as winning, graduating, and doing things the right way".

Regarding possible **reasons for African American student-athlete departures, the most common themes were attributed to lack of playing time and lack of belongingness in the community.** Some staff members felt that playing time for African American students who have not established their community outside of athletics may exacerbate the negative perceptions of their experience as a student-athlete. The question of how African American student-athletes adjust to the community and what activities they are engaged in outside of sports is important for retention. For example, if an African American student-athlete struggles athletically and experiences lack of community, they may be less likely to persist at Iowa. Furthermore, if an African American student-athlete is not engaged on campus and in the community, "they have no reason to want to stay at Iowa other than athletic purposes". When asked about whether student-athletes are encouraged to become actively involved in the community, it was reported that some coaches either do not actively encourage or may even discourage student-athletes from becoming a part of the community. There were several explanations including the importance of "controlling messaging to student-athletes" from individuals outside of the program, the "perception that non-student-athlete groups lead to more trouble", and "student-athletes are experiencing greater commitments to their sport".

**Lack of trust between African American student-athletes and their Coaches** also emerged as a key reason for African American student-athlete departure. "African American student-athletes may be distrustful of the people they come into contact with in the Department, because they do not understand our true motivations". Specifically, African American student-athletes may be more distrustful of coaches and administrators, and avoid talking openly about negative experiences because of the authority coaches and administrators have over playing time and scholarships. In addition, there is a belief that there is a "distrustful relationship between some support units who work with specific teams and student-athletes". Staff reported that for all athletes, but specifically African American student-athletes, "performance and trust are interrelated". If a student-athlete trusts his/her coach they are more likely to want to play for them. Staff reiterated the importance of students understanding that coach's care. For African American student-athletes, the need to build a constructive and positive relationship is even more important. The lack of trust between African American student-athletes and coaches may be due to a perceived shift in Athletic Department culture that "our department is more distrustful of student-athletes now then ten years ago". In particular, "we are more likely to question, place blame, or assume guilt, particularly on the part of African American student-athletes". Staff members suggested that the Athletics Department needs to be more cognizant of messaging to African American student-athletes about our culture. Administrators are

responsible for managing an effective departmental culture, but coaches are responsible for establishing an environment where student-athletes know they are valued.

**Student expectations during the recruitment process is another theme that may contribute to the problem with African American male graduation rates.** Although "all students are recruited based on their athletic ability, for African American student-athletes, this may be heightened". It is unknown how honest coaches are with students during the recruitment process, however, African American student-athletes may have greater difficulty adjusting to the "true environment after the recruiting process". Those who are not from this region, may have more challenges adapting to Iowa, similar to non-student-athletes. Staff mentioned African American student-athletes may lack support in the academic setting because faculty, staff, and students question African American student-athletes academic motivations and see their athletic identity more so than their academic identity. As compared to their White male peers who graduate at a 40% higher rate, African American student-athletes are experiencing more academic stereotypes on campus because their identities are more salient than White student-athletes at Iowa.

*Coaching Subcommittee*

The subcommittee identified 11 staff members who hold positions as head coach, assistant coach, Director of Operations, athletic training, or strength and conditioning. Nine men and 3 women were interviewed.

Of the key themes that emerged in the interviews was lacking **knowledge of graduation rates for specific student-athlete groups, especially, African American male student-athletes at Iowa.** Coaches reported being "surprised" to hear such low graduation rates for African American student-athletes. In addition, they reported "not noticing any problems or concerns with any one group of student-athletes". When asked why African American student-athletes are graduating at lower rates than their White peers, coaches associated low graduation rates to academic factors, even though few African American student-athletes have departed the University because of academic eligibility or poor academic standing. In addition, coaches attributed low graduation rates to factors outside of their own personal control or team culture. For example, coaches mentioned "family dynamics", "attitudes toward education" and "student upbringing" as reasons for departure as well as professional opportunities within their sport.

**Regarding the treatment of African American student-athletes** there were several themes, including a sentiment of complacency and low expectations of African American student-athletes. Coaches reported that they treat student-athletes the same. However, how African American and White student-athletes were described by coaches was different. For instance, White student-athletes were more likely to be described as being from a "two parent home", "good upbringing", "smart", "tough", "talented", whereas African American student-athletes

were described by their "socio-economic background", "tough upbringing", or "at-risk". A staff member reported that "student-athletes are more attuned to discriminatory behaviors than what coaches or administrators give them credit". Although some coaches believe that more African American student-athletes were seen as at-risk, they believe every student has the opportunity to get off the proverbial "at-risk list". Finally, coaches were more likely to discuss what African American athletes can do for the University, and less about what the institution, Athletics, and their team can do to help the student-athlete.

**Assimilation** into Iowa culture is a barrier for African American male student-athlete persistence. Some coaches reported that student-athletes of color who "do not assimilate" to the cultural expectations of Iowa are more likely to leave. With regard to student-athletes of color, "assimilation" meant "don't do anything to draw unwarranted attention to yourself athletically or socially". Coaches recognized "differences in needs between students from different groups", and reported having individualized meetings which has been an effective strategy in creating stronger relationships with students. Overall, coaches believed that relationships with student-athletes is based on trust and creating open dialogue.

**Difficulty in recruiting African American student-athletes to the University of Iowa was also a theme among coaches.** Coaches reported the need to educate recruits about the Iowa City community and combatting stereotypes about Iowa. All coaches mentioned the "uniqueness of Iowa" and prospective student-athlete perceptions about the University of Iowa. Our culture is "unique which makes maintaining and graduating African American student-athletes difficult". Some coaches implied that the White culture of Iowa is more unique than that of other predominantly White institutions. Several coaches attributed problems with recruitment and retention of African American student-athletes to "just not liking Iowa". The sentiment about minorities not liking Iowa is prevalent among many members of the Department who have come to accept it, thus giving the impression of lacking a sense of urgency for changing the culture because it is not within their control.

**Demonstrating diversity among student-athletes, coaches, faculty, and staff is critical for the successful recruitment of African American student-athletes**. Although coaches noted the importance of having such resources available during the recruitment process, little insight was given as to how they fostered relationships or the need for such resources after the African American student arrives on campus. Similarly, coaches noted the importance of having African American coaches on staff, but did not mention their strategies for the advancement of African American coaches and maintaining a pipeline for recruiting more minority coaches.

The final theme pertained to the **importance of mentorship for African American students.** Several coaches discussed mentoring programs for African American Student-Athletes in the 80's and 90's. Some suggested bringing back such opportunities. **Coaches described mentoring** and student programming opportunities which involved former African American student-athletes. Less discussed was how or if they utilize campus and community leaders who are not a part of Athletics.

**The following recommendations are based upon the above findings and consistent with the goals of the Diversity Task Force Committee.**

DIVERSITY TASK FORCE AND ADVISORY COMMITTEE

- The Diversity Task Force should continue to function in a consultative role to the senior administration and ensure the recommendations of the review are effectively implemented.
- Establish an African American student-athlete advisory group that reports to the Athletic Director.
- Mandate a yearly meeting between African American student-athletes and the President's Office.

DIVERSIFICATION OF STAFF

- Diversify athletic department staff, specifically, coaches, administrators, and personal support staff.
- Establish a permanent, senior management position that addresses diversity issues.

COMMUNICATION, TRAINING, AND EDUCATION

- Public statement to staff, student-athletes, and coaches, that we are actively addressing student-athlete concerns and graduation rates.
- Develop team specific programs to address issues pertaining to diversity that offer a safe environment to discuss controversial topics.
- Break down barriers for open communication - utilize and promote campus resources such as the Campus Inclusion Team.
- Provide educational opportunities for coaches on effective strategies during the recruiting process, including communication standards for African American parents.
- All staff, including coaches should be trained yearly on community and campus resources that serve African American student populations.

MENTORSHIP AND PARTNERSHIPS

- Establish cross-cultural mentorship opportunities within teams.
- Establish a yearly partnership between the Office of Student Life and Athletics to develop mentorship and social opportunities for African American student-athletes.

**HUSCH BLACKWELL**

# REPORT OF EXTERNAL REVIEW

## Football Program Culture
## University of Iowa

July 2020

Exhibit 2

# TABLE OF CONTENTS

Executive Summary .................................................................................................................. 1

Background Information ............................................................................................................ 2

Scope of Review ........................................................................................................................ 2

    Report Structure ................................................................................................................... 4

Summary of Information Gathered During Review ................................................................. 5

    Overall Program Experiences .............................................................................................. 5

        Player Descriptions of their Experience ........................................................................ 5

    Football Program Racial Climate ......................................................................................... 5

    "The Iowa Way" ................................................................................................................... 7

        Overall Description ........................................................................................................ 7

        Requirement to Fit the "Mold" ..................................................................................... 8

        Recruiting ....................................................................................................................... 8

        Program "Rules" and "Lists" ......................................................................................... 9

    Treatment of Players ........................................................................................................... 12

        Making Weight ............................................................................................................... 12

        Sleep Bands .................................................................................................................... 13

        Differential Treatment of Black Players ........................................................................ 14

            Differential Punishment ......................................................................................... 14

            Verbally Abusive Behavior ...................................................................................... 15

            Drug Testing Concerns ............................................................................................ 15

            Reports of No Experience or Observation of Differential Treatment ..................... 15

            Statements About Prior Reporting .......................................................................... 16

    Allegations Regarding NFL Draft Prospects ........................................................................ 16

    Retention of Black Players ................................................................................................... 17

2018-2019 Diversity Task Force & Equity Concerns ................................................................ 18

    Background and Findings ..................................................................................................... 18

    Player and Coach Perceptions of the 2018-2019 Task Force .............................................. 21

    Recent Changes .................................................................................................................... 22

    Diversity Training and Reporting Avenues for Equity Complaints ...................................... 24

Conclusion ................................................................................................................................ 25

i

Exhibit 2

# REPORT OF EXTERNAL REVIEW

The University of Iowa (the "University") retained Husch Blackwell LLP to conduct an external review of alleged racial inequities within the football program, including mistreatment of Black student-athletes and a racially charged climate.  We recognize that this matter has generated widespread attention and strong emotions have been expressed about the football program on various media platforms.  Our task was to set that aside and impartially examine the football program's culture and perceptions of current and former players with respect to these matters. This report provides a summary of the information gathered during that review.

While our report does recount specific allegations and incidents relayed to us, we recount these allegations and incidents in the context of assessing the program's culture and the perceptions of current and former players.  Some of the specific allegations and incidents we describe were corroborated by numerous witnesses.  Other specific allegations and incidents, however, were disputed and/or were uncorroborated.  We were not asked to determine the veracity of any specific allegation or incident.  Therefore, our reciting of a given allegation or incident in this report is not a determination that the allegation or incident occurred as reported.

Specific allegations of mistreatment made against current and former employees have been summarized and provided to the University in four separate personnel reports from Husch Blackwell so that they may be addressed, as appropriate, pursuant to the institution's personnel policies and procedures.

## Executive Summary

We interviewed 111 individuals, including 45 current and 29 former members of the football team and 36 current and former employees.  While witnesses reported a range of experiences within the football program, we discerned several clear themes from the information we received.

Players and coaches uniformly agreed that the Iowa football program is based on a foundation of discipline and accountability.  Several current and former players shared the view that some coaches have used those values to create and perpetuate an environment that bullies and demeans athletes, especially Black athletes.  Moreover, recognizing that college athletes typically experience some degree of stress associated with their training and performance, several interviewees shared that the program's stringent rules promulgated under the name of discipline place significant, heightened stress on players of all races.

The interviews revealed that the Iowa football program has historically adhered to a philosophy (the "Iowa Way") that mandates uniformity and discourages individualism.  Many Black players expressed difficulty adjusting to the program's culture as a result, explaining that they were required to conform to a "mold" that appeared to be built around the stereotype of a clean-cut, White athlete from a midwestern background.  Numerous rules, both formal and perceived,

1

requiring conformity around hair, clothing, jewelry, and tattoos left many Black players feeling isolated, targeted, and unwelcome in the program.

While many players shared criticisms about the program generally or their personal experiences with certain coaches, most players commented positively about Head Coach Kirk Ferentz and his leadership of the program.  Numerous players also praised their position coaches and described the beneficial impact those coaches have had on both their athletic and personal development.  Players of all races also described forming good relationships with their teammates.

Finally, the current players were uniform in their belief that the environment in the football program has improved significantly since the inception of this review — both in a general sense and through specific attempts to address or prevent racial inequities.  The players expressed hopefulness that these improvements will continue and result in sustained action that will improve the program.

## Background Information

In response to the May 25, 2020 death of George Floyd and the enhanced national focus on racial injustice, Head Football Coach Ferentz shared a statement with the football team on June 1, 2020.  In his statement, Head Coach Ferentz expressed his hope that football team members could help effectuate change by learning to be better listeners, understanding one another's life experiences, and growing as individuals and as a team.  Around the same time, Head Coach Ferentz addressed the issue of players kneeling during the national anthem, telling the media that he wanted the team to make a unified decision about this issue for the upcoming season.

On June 3, 2020, James Daniels, a former University of Iowa football player, tweeted "If the team collectively decides to kneel, this will bring about a cultural change for both Iowa football and the state of Iowa which I believe is long overdue!!!"  Two days later, Daniels followed up with a second tweet asserting: "There are too many racial disparities in the Iowa football program.  Black players have been treated unfairly for far too long."  Numerous former players then took to social media platforms and other media outlets raising allegations of mistreatment and speaking out about the need for cultural change.

On June 6, 2020, the University placed strength and conditioning coach Chris Doyle on administrative leave after numerous former players accused him on social media of mistreatment.  The University announced Doyle's resignation on June 15, 2020.

## Scope of Review

We sent an email to all current players notifying them of this review and providing them with an opportunity to report concerns and speak with the investigators.  We also researched and reviewed the social media posts and media mentions from current and former players that

2

raised relevant allegations about the football program.  We used this information to develop our lines of inquiry and contacted individuals to gather additional information about their experiences at the University and in the football program.  We interviewed the individuals who responded and agreed to participate; their responses are encompassed within this report.

In addition to conducting interviews, we reviewed evidence provided by the University and witnesses, including the 2018-2019 UI Athletics Diversity Task Force Report, the Athletics Department Diversity, Equity and Inclusion Plan, year-end student-athlete survey results, and annual training materials for the football program.  We also reviewed team documents provided by Head Coach Ferentz and transcripts from two media conferences given in advance of the Pinstripe Bowl.

The following charts set forth the racial composition of the individuals who participated in the review:





## Report Structure

This report discusses the information gathered during the review, with detail around common themes and the range of topics covered.  The report does not make findings as to whether specific incidents occurred or did not occur.  Rather, specific incidents and allegations set forth in the report are included to provide examples of the different perspectives of the program culture.

In terms of organization, the report first addresses information gathered about the football program in general, discussing the "Iowa Way" and treatment of players, including information about differential treatment of Black players.  The report then addresses the retention of Black players, the work of a prior Athletics Diversity Task Force, recent changes made in the football program, and University resources aimed at preventing and addressing concerns of race discrimination and harassment.

# Summary of Information Gathered During Review

## Overall Program Experiences

### *Player Descriptions of their Experience*

Current and former players conveyed a substantial range of assessments along a continuum ranging from very positive to very negative.  The majority of current players told investigators they have had a good experience and their interactions with coaching staff have been mostly positive, helpful, and fair.  Most current players have good relationships with their teammates and feel there is a good atmosphere in the locker room.  One current player said he "loves it here.  It is good.  It is unique."  A second current player said he loves the atmosphere and culture.  The majority of former players interviewed also described their overall experience in the football program as positive, although many of them reported having had difficulty adjusting to the program's demands.  One former player said he developed solid friendships with teammates and classmates.

Current and former players were overwhelmingly positive in their evaluation of the coaching staff, with three exceptions.  Many current and former players told investigators that three members of the coaching staff abused their power and verbally abused and bullied players.[1]  Specific allegations about current and former employees have been provided separately to the University.

## Football Program Racial Climate

There were strong disparities in witness perceptions of football program culture, especially with respect to race.  Numerous players told investigators they chose to play at Iowa because of its reputation for being disciplined.  Generally speaking, these players have no concerns with the football program's culture.  Multiple players and coaches said they have never seen or observed anything racially offensive.  Two current White players conveyed to investigators that people have confused a "discipline culture" with a "racist culture."  In contrast, other players of various races expressed serious concerns about the racial climate.  One former player explained: "Being an Iowa football player was a daily struggle for black players.  We were punished for no apparent reason, singled out by coaches, and threatened and ridiculed every day.  It is hard to explain how difficult it was.  Think about being under pressure every day for 4 years solely because of your race.  That is how it was for me and my black teammates."

One coach told investigators that he does not think Iowa football is a racist program; rather, in his view, the problems arose because one or two coaches had too much power.  Echoing the sentiments of many current and former players, this coach explained that it is harder to be a

---

[1] Current and former players did not differentiate between coaching staff and strength and conditioning staff during their interviews.  Thus, their general use of the term "coach" to reflect both categories of employees is reflected in this report.

Black player in the program because of the player "mold." This sentiment is consistent with the views of the current and former players we interviewed who expressed an almost universal feeling that Black players do not feel supported within the program, even if they have not directly experienced negative treatment overtly based on race. According to many of the players, this is due to the program culture and a feeling that Black players cannot be themselves. To some players, this feeling has been created and perpetuated by certain members of the coaching staff.

Former players said the adjustment to Iowa and Iowa football is difficult, especially for those who come from more diverse backgrounds. In one former player's words, White players were "used to being told what to do by White men; Black players were used to Black coaches and being able to be themselves." One current player described having to suppress his personality and individuality in order to improve his experience in the program. Another player stated that the staff would not allow players to show their personalities, and he described that the coaches preferred the players to be "fake" rather than be themselves. That player recalled a coach telling the freshmen players that they needed to "get on a boat and sail away from their old lives" to be successful in the program. A different former player said the environment was "hard to take" on a daily basis, hurt his self-esteem, and made it difficult to focus on receiving a quality education.

Acknowledging extra burdens for Black players, several players and staff alike referred to a saying about the program: "If you make it through the Iowa football program as a Black player, then you can do anything." One former player explained that it is difficult for people who have not been involved with a major football program to understand how Black players are treated. As he described, "I worked hard and helped our team win games. I finished as one of the top XXXs[2] in the program's history, but every single day was a struggle. I felt bad about myself as did many of my Black teammates. We wanted badly to be successful and to help our team and took the abuse to achieve team goals."

Several players, both current and former, also shared their belief that the coaching staff is not as welcoming or friendly to Black players as to their White teammates. According to the players, coaches "only become friendly with the Black players when they are contributing to the team" or if the Black player is a "superstar." One current player, who is White, told investigators he feels supported by the whole staff, yet he acknowledged that his experience has been different than his Black teammates.

Finally, one former player said the culture is one where it is acceptable to demean people due to disability or race. According to several players, issues within the culture were "not just a Chris Doyle problem." Those players said the culture problems are systemic and cannot be fixed simply by getting rid of one coach. Several former players commented that Coach Doyle should not be a "scapegoat" for the systemic issues in the program.

---

[2] The former player's position has been removed to protect his privacy and anonymity.

## "The Iowa Way"

### Overall Description

Every individual we interviewed was familiar with and described the concept of the "Iowa Way." As witnesses explained it to us, the Iowa Way is the phrase used to describe the philosophy instilled in players to guide their actions in all aspects of their participation in Iowa football. Head Coach Ferentz explained that the Iowa Way is the football program's "mode of operation." He has three goals for each player within the program: (1) earn a degree, (2) maximize abilities as a football player, and (3) have a fulfilling college experience.

Head Coach Ferentz also explained that an educational program called the Iowa Way was initiated in 2019 for the incoming freshmen on the team. Six of the position coaches give talks to players about critical elements for success, including academic, athletic, and social success.[3] Coach Doyle also referenced the new educational program, explaining it is used to "teach the values and standards of what makes successful athletes."

While no interviewee provided us with a formal definition of the Iowa Way, current and former players provided the following descriptions of its meaning:[4]



Player comments on the Iowa Way

| | | | |
|---|---|---|---|
| Tough, smart, physical | Disciplined | Regimented | Hardworking |
| "Their way or the highway" | Grind it out, no excuses | Do not speak up about things | Follow the rules and stay in line; don't get in trouble |
| Do things the right way | Put the team before yourself and stay humble | No nonsense | Show up, don't complain, don't have an attitude |
| Be quiet and do what you are told | Fly under the radar and don't be flashy | A way to conform and be "normal" | |

---

[3] Head Coach Ferentz provided investigators with a list of Iowa Way talks scheduled during the 2019 season that included a wide range of topics such as healthy relationships, time management, and social media.

[4] Head Coach Ferentz agreed that the team has a mantra of "tough, smart, and physical." A couple of years ago, they added the word "together" to the mantra to reflect that in any team activity, being together is of primary importance.

7

Current and former coaches used the following descriptions for the Iowa Way:

### Coach comments on the Iowa Way

| | | | |
|---|---|---|---|
| Tough, smart, physical | Discipline | Accountability | Structure |
| Giving great effort | Doing things that are hard | Doing things "the right way" | Showing up and doing your work the best that you can |
| Doing little things right that create a competitive edge to help create success | Being responsible, accountable, caring more about others than yourself. | | |

One former coach explained that the Iowa Way is about more than football, it is "how you live your life."

*Requirement to Fit the "Mold"*

Numerous players and coaches told investigators that the Iowa Way requires players to fit a "mold" that discourages self-expression and is not inclusive to Black players. Many players said that, if players do not fit the "mold," coaches do not want them in the program. Many Black players reported feeling like they cannot be themselves and must "completely change" or "put on an act." Players explained that there is a requirement to be "robotic," in that they are required to look the same, act the same, and say the same things. One former player said that conforming was like putting on a mask. A current player told investigators that constantly needing to conform is "mentally draining." One coach agreed that the concept has not been inclusive and can "very much alienate individualism." A second coach stated that players have told him the Iowa Way means "you act like a White person and cannot be yourself." Indeed, one employee told investigators that White players, as well as one coach, have said that Black players do not fit "the mold."

*Recruiting*

Many current and former players informed investigators that they were told the program has a "family atmosphere" during recruitment but found that to be untrue when they arrived. After arriving on campus, these student-athletes reported quickly learning that the coaching staff and program required them to quickly adapt to the culture of the Iowa football program. Some of the players felt like this culture did not resemble the family structure that was portrayed during the recruiting process. One student stated that immediately upon arrival on campus, freshmen were "secluded from the rest of the team" and told by a coach that the program was "going to

strip who they are and teach them the Iowa Way." Players felt deceived because the coaching staff promoted a family atmosphere throughout the recruiting process yet neglected to inform them of the program's requirement that they conform to a specific mold.

Head Coach Ferentz stated that, during the recruiting process, he personally informs every prospective player that the Iowa football program is not for everyone. Head Coach Ferentz told investigators that every student is told "it's your choice." He tells every player "you have earned a scholarship and the right to make the best choice" for yourself. Head Coach Ferentz encourages prospects to rely on their parents and high school coaches to make the best decision about which university to attend. He encourages prospects to speak with current players to get the best information about the program.

*Program "Rules" and "Lists"*

The emphasis on rules and fear of breaking the rules was a consistent theme throughout the review from both current and former players.[5] Numerous players described not being able to "be themselves" because of the rules and feeling constantly afraid of making a mistake. Numerous current and former players reported that the coaching staff kept "lists"[6] of players who failed to follow the rules or meet expectations. One former player explained that the lists tracked missteps such as missing curfew, not going to a class, missing tutoring, or not following a coach's directions. The general sense among those players was that once a player was labelled or placed on a list, their playing time was negatively affected, and the player was treated like a "bad kid." Almost every player who mentioned the "lists" said it was very hard, if not impossible, to come off the list.[7] The players also reported being treated poorly because of their association with teammates on a list.

One employee confirmed hearing coaches tell players "you don't want to become a 'list guy.'" This employee thought there was just one "list" that encompassed drug issues, attendance, and other issues. A former coach told investigators that there was only one list for players "not doing the right things." According to him, the main purpose of the list was to identify academic issues and sit down with players to understand what was happening in the classroom. Another coach said he was provided a paper list of players who had violated the rules. One of the coaches with information about sleep and weight lists, as discussed more below, said the lists caused players unnecessary stress and added to a culture of fear.

---

[5] Some disagreement exists among those interviewed as to whether the "rules" described to investigators were, in fact, formal team rules; regardless of whether they were formal team rules or not, players perceived many of them to be "rules" that they were expected to follow.

[6] Descriptions of these "lists" encompassed both physical, written lists of names, as well as verbal or mental lists maintained by the coaches.

[7] Coaches had differing perspectives about the ability of players to come off the list, with some saying it was possible and others saying it was difficult.

9

Several coaches acknowledged that the players were subject to "many rules" and opportunities for making mistakes.  One former coach said the program is very demanding, both physically and mentally.  In describing the rule-bound environment, one coach told investigators he believes that "the Iowa program is an out and out abuse of power."  A different coach provided a contrasting perspective, summarizing the rules as "show up on time, have a good attitude, and listen to what you are being told."  Head Coach Ferentz told investigators he expects players to give effort every day, have a good attitude, communicate, and "be where you are supposed to be."



Summary of "Rules" relayed by players and coaches

| Accessories | | Clothing | | Grooming | | Overall appearance | |
|---|---|---|---|---|---|---|---|
| *Players*: Not allowed to wear earrings or other jewelry or have tattoos. | *Coaches*: Two explained jewelry rules were for health/safety reasons; two others did not know the rationale. Several noted that the team's policy changed in 2019 to allow earrings. Staff denied rules about tatoos. | *Players*: Not allowed to wear hats, "do-rags," tank tops, and required to wear only "Iowa-issued gear" while in the football building. | *Coaches*: Acknowledged rules about dress at team functions, while on the road for games, and wearing Iowa-issued gear in the football building. | *Players*: A number of players reported short hair was required and that hairstyles traditionally associated with Black culture (e.g., locs, braids, cornrows) were not allowed. | *Coaches*: Two coaches noted the need for hair not to obscure players' eyes. Denied formal rules restricting long hair or other natural hairstyles. Identified former players Black and White with long hair. | *Players*: Expectation of presenting a "professional appearance." | *Coaches*: Expectation of presenting a "professional appearance." One explained presence of scouts in the football building. |

According to the players, many of the program rules involved hair, clothing, and jewelry. Players told investigators they were not allowed to wear tank tops, earrings or other jewelry, or have tattoos.  Players also stated that they were not allowed to wear hats or "do-rags" and were required to wear only "Iowa issued gear" while in the football building.  Several players and coaches described the expectation as presenting a "professional appearance."  In contrast, one current player shared his opinion that the Iowa Way did not cover a player's "look" or appearance and that rules about earrings and hats were not "too strict."  These rules made players, especially Black players, feel as though they could not be themselves.

Numerous players told investigators that the rules appeared to be racially motivated or enforced differently based on race.  Players observed that, because of the requirement for conformity, coaches were not accepting of minority cultures.  Indeed, several players expressed

a belief that the rules were targeted toward Black players, and one current player asserted that the coaches were using the rules to "eliminate Black culture." Numerous players indicated that hairstyles traditionally associated with Black culture were not allowed. Moreover, two current players complained that rules regarding hats were unfair, racially motivated, and enforced differentially because White players could wear hats, but Black players could not wear "do-rags." One former player said that country music was played "all of the time" rather than music that Black players preferred. Black players also believed that the no-jewelry rule had a disproportionate impact on them, as they reported wearing earrings more than their White teammates. Additionally, one former player stated that Black players were prohibited from wearing jewelry, yet White players could wear dog tags. A current player said that when he wears a hat or hoodie, coaches say "that is not how they do things here in Iowa." One current player disputed the assertion that rules were enforced differently based on race, stating that he observed coaches giving players, both Black and White, "crap" about their tattoos.

Several coaches confirmed the existence of rules about earrings, hair, tattoos, and attire but denied they were based on race. One coach told investigators that the rules are based on professionalism, explaining: "When you are around people everyone knows who you are because you are on the football team. You need to pretend you are going into an interview and look that way all the time. A scout could be in the building and evaluate everything you are doing so the players always need to look and act professional." Two other coaches explained that the rule prohibiting jewelry was based on health and safety reasons. However, two different coaches admitted that they did not know the rationale for the rule against earrings. One of them explained that the rule has caused "discontent" among the players and has been viewed as discriminatory because "kids want to know why," and he has been unable to offer a satisfactory rationale. Several individuals observed that the rule prohibiting jewelry had recently changed, and earrings were now allowed. With respect to rules about hair, two coaches explained that they have commented on a player's hair when unable to see his eyes. Both coaches explained "you need to be able to see the player's eyes to be able to coach the player."

Head Coach Ferentz stated the rules regarding jewelry and hats were eliminated in 2019. He also told investigators that his staff was instructed not to make any comments about hair or tattoos after receiving feedback from the Task Force report. In addition, after team meetings in June 2020, Head Coach Ferentz eliminated rules regarding personal appearance.

Head Coach Ferentz stated the rules regarding Twitter were also eliminated in June 2020. Prior to June 2020, players could use social media platforms but were not allowed to Tweet.

Each year in the spring, the Leadership Group of players on the team, typically made up of 10-14 upperclassman, would review the team rules with Head Coach Ferentz. During the past few years, the Leadership group has suggested changes which were approved and adopted for the following year. Head Coach Ferentz told investigators he wanted players to have input about the team rules.

One former player asserted that the coaches previously told them not to take a knee during the national anthem because they should "keep politics and football separate," yet White players were allowed to wear MAGA hats and present an Iowa jersey to President Trump during his presidential campaign.  One of the coaches interviewed could not recall anyone making the "politics" comment but confirmed that a football jersey was given to President Trump.  Head Coach Ferentz confirmed that he previously believed it is better to keep politics and football separate when in a team environment.  He told investigators that his views have changed recently and, moving forward, he wants the players to support and respect one another, even if they have different political views.  Head Coach Ferentz also stated that when student-athletes are not in a team setting, he encourages student-athletes to engage in the political process.  Both Athletic Director Barta and Head Coach Ferentz denied that any of the players attended the presidential campaign event on behalf of the Iowa football program.  Both stated they only became aware that players attended the event after the event had concluded.

## Treatment of Players

Numerous current and former players raised concerns about sleep bands (discussed below) and body weight, although only one former player and none of the current players interviewed correlated such concerns to race.  Rather, the concerns expressed primarily related to general mistreatment, with one current player explaining that both items were used by coaches to "beat you down and hound you."  Several players told investigators that the message from coaches about the rules appeared to be "if you don't like how we do things you can leave."

### Making Weight

Numerous players discussed the pressure they felt to maintain the requisite weight.  Two players (one current, one former) reported that coaches subjected them to unfair and unreasonable weight expectations after being sick, leaving the current player concerned he would be kicked out of the program.  The current player said that a White player who was sick and lost weight was treated more favorably.

One former player said that he was so anxious about making weight that he involuntarily threw up every morning before weigh-in.  This same former player also said that the coaches would require him to eat in front of them.  A different former player said he was required to drink excessive Powerade and shakes to gain weight, which made him sick daily.  Other former student-athletes said players were weighed weekly and needed to meet their goal weight within a designated window.  According to one of the coaches, there is a two-pound window for making weight, except after long breaks when the window is larger.  He told investigators that no allowances were made for injuries or sickness.  The former player who had trouble gaining weight after being sick said a coach told him "you don't care, you are lazy."

A current player identified that it is difficult for him to maintain his body weight over breaks, because he does not have the same access to food when he is at home for extended periods.  The player stated that he works out hard when he is at home but cannot consume adequate

calories, thus he returns to campus underweight.  According to the player, the coaching staff questioned his commitment to the Iowa program.

One of the coaches confirmed that the strength and conditioning staff was "strict on body weight" and that players had anxiety about body weight.  Those players who were underweight reported being yelled at and placed on a "shake list" every week.  If players were under weight, they were required to "pound shakes," and if they were over their target weight, they did extra conditioning.  One coach told investigators that Black players were held to a different standard after they were sick and lost weight.[8]

The strength and conditioning staff told investigators the weight requirements were used for the safety and wellness of the players.  The staff denied that players were required to put on significant amounts of weight quickly after being ill, saying sports medicine staff was involved in such cases and would determine a safe progression for players to regain their optimal weight.  The strength and conditioning staff denied determining the weights for players after they had been sick; only the sports medicine staff would make those determinations.

Head Coach Ferentz told investigators that moving forward, the target weight ranges would be expanded, and individual player weight goals would be established collaboratively between the player, assistant coach, strength and conditioning coach, and medical staff, if necessary.

*Sleep Bands*

One coach explained the origin of sleep bands, telling investigators that they were initially used with only a few players to measure recovery.  When the initial use was favorably received, the coaches started training the entire team on sleep hygiene.  The players wore a sleep band at night to measure their sleep and the information went into a database that was reviewed daily by the strength and conditioning staff.

Many players described having to wear sleep bands to track their sleep, which they said was a very negative experience and caused "lots of anxiety."  A coach explained that, if someone had bad sleep for multiple nights, the poor sleep was "called out" in front of the team, and the player would be in trouble.  Head Coach Ferentz agreed that players may have been "called out" in front of the team.  He told investigators that player feedback should have been provided more discreetly.  Moving forward, he stated that sleep bands will be used only on an educational basis and all player feedback will be given privately.

Several players and coaches told investigators that the coaches maintained a "sleep list," and the ten players with the least amount of sleep for the week were required to have a meeting with the strength and conditioning staff.  Several former players and one coach indicated that it was a demeaning and hurtful thing to be on the sleep band list, and it added to the anxiety of

---

[8] This coach said he never told anyone due to fear of retaliation.

all the players.  One former player observed that Black players were always on the list every week.

A former strength coach told investigators sleep bands were used as a positive tool to improve player sleep habits.  He stated: "not one time in the history of Iowa football was anyone ever disciplined for sleep."  When asked about player allegations that the 10 "worst sleepers" were "called out" and punished, the former strength coach said that he met individually with players to discuss their sleep information, and it was not intended to be disciplinary; he provided both positive and corrective feedback.  The former strength coach emphasized that players were never disciplined, and the data was used only for the health and well-being of the student-athletes.  He could not recall any players expressing anxiety about using the sleep bands.

Head Coach Ferentz told investigators sleep bands will only be used as an educational tool moving forward.  He will be the only coach to receive the data about a player's sleep and will only speak to a player regarding his sleep in a private setting.

### *Differential Treatment of Black Players*

Numerous current and former players of various races told investigators that Black players were treated differently than White players, predominantly through differential punishment for perceived rule violations.  One current player said Black players "take a lot of heat."

#### Differential Punishment

Numerous former players said Black players received harsher treatment than White players in both the frequency and severity of punishment.  One current Black player gave an example of being treated differently than White players, describing an incident where he was yelled at extensively, kicked out of training, and required to do 10 hours of community service for spitting on the turf—whereas he indicated White players did not receive this response to spitting.  According to the player, White players have spit "plenty of times" on the turf and not been "cussed at" or thrown out of a weight training.  This player's recollection was supported by a former coach and two current players who witnessed the incident and observed White players engaging in similar behavior without punishment.  In contrast, one former player and one coach said White players were also disciplined for spitting on the turf.

A second current player said that he was chastised for singing and dancing at practice whereas similar behavior from his White teammates went unnoticed.  A former player also gave an example of Black players being punished by being required to repeatedly run a drill in which they run right at one another and collide.

One of the coaches confirmed that there is a feeling among Black players that, although the rules are the same, there are disparities in the impact of the rules.  This coach told investigators that he brought the treatment of players up to Head Coach Ferentz a couple times over the last four years with no resulting change.

14

### Verbally Abusive Behavior

Several former players also described being subjected to verbally abusive behavior. One current Black player told investigators when he first joined the team, coaches told him he would never play, he was "shit for brains," and he was a "dick head." The player said such treatment "definitely fuc*** with his head for a bit." A different former player told investigators it "seemed like every Black player had two strikes the day we entered Iowa... I was either a criminal or a dumb motherfu**** to these guys."

### Drug Testing Concerns

Numerous individuals also raised more frequent drug testing of Black players as a concern. Athletic Director Barta told investigators he became aware of these complaints in June 2020 and he and his staff have started a review of the Department's testing protocols and will work with the outside vendor, Aegis, to improve the process. The Program Manager in charge of student-athlete drug testing told investigators that testing staff does not know the race of individuals selected for testing. Student-athletes are tested randomly and if they have previously tested positive or produced a diluted sample they may be selected for further testing. The Program Manager reviews the lists of players selected for testing and removes individuals who have been tested more frequently. She explained that the Head Coach may also request that specific players be tested, but the coach must have a legitimate reason for making such a request and the request must be reviewed and approved by the supervising physician before the player will be tested.

Head Coach Ferentz acknowledged that changes need to be made to the program's drug testing policy, but he denies that Black student athletes are tested at a higher rate. He reviewed the testing data from the 2019-20 academic year and determined that three players were tested three times. Of those three players, two were White and one was Black. He identified additional ways that the testing program could be improved to provide more privacy to players. Currently, the Program Manager administers the testing program within the football building, and Head Coach Ferentz intends to remove testing from inside the football building moving forward.

### Reports of No Experience or Observation of Differential Treatment

The majority of coaches said they observed nothing indicating differential treatment based on race. Several current players of color said that they were not personally treated differently than other players because of their race but recognized that other players may have had different experiences. Several current players, predominately White, said that they have never witnessed Black athletes being treated differently than White athletes by any member of the coaching staff.

15

Statements About Prior Reporting

Most of the coaches said that they received no complaints from players about being treated differently based on race.  Except for the one coach described above, none of the individuals interviewed said they raised concerns about differential treatment due to a fear of facing repercussions.  One current player explained that players were scared to come out with this because they were afraid of the treatment they would receive.  Another current player said he was "happy it all came out," and he had "a sigh of relief when everyone started to write what he was feeling."  One coach said that conversations about equitable treatment began after the George Floyd murder, during which time one player raised concerns about differential application of the rules.

## Allegations Regarding NFL Draft Prospects

Numerous players mentioned a member of the coaching staff's close connections with the NFL and his influence over their draft prospects.  They believed the coach wielded complete control over which players could speak with NFL scouts and that he was able to "make or break" their professional careers.  One former player told investigators that race influenced whether a player was discussed with the NFL and eventually drafted.  Numerous former players alleged that the coach used his influence with NFL scouts to "blackball" players, mostly Black players, whom he did not like.  The allegation that the coach would "blackball" players was repeated by one coach, who did not address whether race influenced this; he said that the coach tried to "blackball" players with the NFL or negatively impact their prospects.

One former player who plays professionally in the NFL told investigators that coaches told NFL scouts he was "not a team guy and had an attitude issue."  A second former player told investigators that his current NFL team informed him that a coach said negative things about him, telling scouts he was a "toxic player" and would "ruin their team."  According to this former player, a coach also told scouts he was "cocky, irresponsible, and arrogant."  The former player also told investigators that an NFL scout told him at his Pro Day[9] that a coach characterized him as "undraftable."  Finally, this former player noted to investigators that one of his teammates, who did not get along with this coach, was drafted lower than expected, the implication being that his prospects were negatively impacted by the coach.  Both players, one Black and one White, stated that they received similar treatment by the coach with NFL scouts.

Several former players also identified what they believed to be an implicit requirement that they train for the NFL Combine and Iowa's Pro Day in the facility.  The players explained it is common for NFL hopefuls to travel to sports performance facilities to prepare for workouts with NFL scouts and personnel.  However, the players believed that, if they left Iowa, coaches would provide negative feedback about them to NFL scouts.  One player indicated that the

---

[9] Iowa, like most Universities, conducts an annual Pro Day, where NFL scouts visit its facility and watch players participate in the same drills conducted at the NFL's scouting combine.  The Pro Day is essentially a job fair for draft eligible players.

program did not explicitly state that he required them to prepare for the NFL workouts on campus, "but everything around you is saying it."  The player added, "the bird on the top of the building was saying, 'you better train here.'"

Coaches denied making negative statements about players to NFL Scouts.  One coach stated, "I make it a habit to never, ever say a negative word about anybody on our football roster, ever.  Just always point out the positive and let the NFL scouts watch the film and make their determinations."  The coach was told that some players believed that they were drafted lower by their NFL teams because of comments that he made to NFL scouts, and the coach responded, "Didn't happen."  The Coach told investigators that he never told a scout that a player was "undraftable."  He also denied making negative statements about the program or players to NFL scouts.  Athletic Director Barta told investigators he has never received any information to suggest that NFL scouts were told Iowa players were "undraftable."  Head Coach Ferentz told investigators he has received no information from anyone in the NFL to suggest that a coach has used the term "undraftable" to describe a player to NFL scouts.  He also stated that it would be "counter-intuitive" for a coach to say negative things about players to NFL scouts.  Based on his own experience in the NFL, Head Coach Ferentz emphasized that scouts make decisions about players on their own.

## Retention of Black Players

Current and former players and coaches shared their opinions on why the football program struggled to retain Black players.  Numerous current and former players said that Black players left the program because they were unable to fit the Iowa "mold" or were uncomfortable being themselves.  Other current and former players attributed the retention problems to what one player termed "constant ridicule" and the sense that coaches tried to "run off" players who do not conform to the Iowa Way.  One current player explained that the feeling of having to "walk on eggshells" can be grueling and demanding on a player's mental health.  A different current player said that Black players are frustrated by all the rules when they arrive; the rules do not let players be themselves and many players cannot "deal with it."

According to one coach, some players have transferred due to coaching changes and some "just didn't want to put up with the program anymore."  This coach stated that the program is tough and at times players have had enough.  In his view, although the program was tough on White players, it was harder for Black players.  One former coach said that players left the football program for a variety of reasons; in his view, 90% were players with academic difficulties and the remainder had legal or conduct issues or wanted to play somewhere else.

The Associate Athletic Director for Compliance told investigators that no transferring player has said his transfer was due to racial issues when she met with him pursuant to NCAA requirements.  Rather, she was typically told the player was transferring because of playing time.  She also told investigators that because meeting with her was completely voluntary, many student athletes chose not to do so.

17

# 2018-2019 Diversity Task Force & Equity Concerns

## Background and Findings

The University established an Athletics Diversity Task Force in the spring of 2018 to review and address the retention rates of Black male student-athletes across athletic programs.  The Task Force established a two-year timeline for its work, which was broken into three phases.[10] Phase I was completed in January 2019 and was intended to gain a better understanding of the experiences of Black male student-athletes.  Phase II was intended to develop and implement an action plan to support the persistence and graduation of Black male student-athletes. Phase III is intended to include a review of outcomes resulting from the strategies and tasks outlined in the Phase II action plan.

In completing Phase I, the Task Force interviewed 24 current and former student-athletes and 26 staff members of varying levels.  Those interviews revealed that, while Black male student-athletes reported generally positive experiences within the campus and general community, the following specific themes arose regarding differences in experience between Black student-athletes and White student-athletes:

Themes from Task Force Interviews



| Perceived power differentials between students and coaches/leadership prohibiting effective communication | Perceived differential treatment in disciplinary measures | Team policies limiting personal authenticity | Recruiting process promoted family atmosphere, but neglected to inform players of the requirement to conform to a specific mold | Lack of connection with the support system (team and community) that recruited them |

While the report does not identify the teams for which these concerns were most prevalent, individuals familiar with the Task Force told investigators that they were primarily related to

---

[10] Information about the Athletics Diversity Task Force has been taken from the *UI Athletic Diversity Task Force Report* issued on March 29, 2019.

football.   One employee who participated in the Task Force stated that football players identified a bullying culture within the football program.   This employee also recalled Black players expressing concerns about not being able to be their "authentic selves" and that coaches made Black players feel unwelcome.   A second employee who participated in the Task Force told investigators that they received many general comments from Black football players about not feeling welcome in the football building.   This employee stated that the only specific comments they received referenced the weight room and players being demeaned and degraded for making mistakes.   According to this employee, the Task Force was also told that Black players received harsher punishments than their White teammates.   The investigators reviewed notes taken during Task Force interviews and found the following concerns expressed regarding racial inequities within the football program:

- Use of slang and jargon speaking to Black players

- Different rule enforcement for players based on race

- Different discipline for players based on race

- Different drug testing frequency based on race

Several strategies and critical tasks were set forth in the Task Force report to be accomplished during Phase II.   They include the following action items to sustain and support the overall work of the Task Force as it relates to overall climate and opportunities for student-athletes to share their experiences:

- Establish an African American student-athlete advisory group that reports to the Athletic Director, the Big Ten Advisory Commission Representative, and the Associate Athletics Director for Student-Athlete Academic Services.

- Conduct a meeting twice per year between African American student-athletes and the President's Office, the Associate Vice President for Diversity, Equity, and Inclusion, and the Vice President for Student Life.

- Utilize campus-wide metrics and tools to evaluate the departmental climate.

- Implement an accountability structure within the UI Athletics Diversity Plan that celebrates DEI successes, and establishes meaningful consequences.

Relatedly, one of the goals of the corresponding Athletics Department Diversity, Equity, and Inclusion Plan[11] is to "promote a welcoming climate that enhances the educational and work experience for all members of the Athletic Department."   Action items in support of that goal include the following:

---

[11] The Plan was adopted on December 13, 2017 and updated in August 2018.

- Provide staff with educational and professional development training, focused on effective recruitment and retention strategies for underrepresented groups, including regular, required diversity and inclusion trainings for all Athletics staff.

- Annually distribute the Big Ten Advisory Survey data to the S-A Well Being Subcommittee of the Presidential Committee on Athletics.

- Annually inform student-athletes of the policies and procedures for seeking help if they believe they have experienced or witnessed harassment or discrimination.

- Continue to work with faculty and alumni groups to develop mentoring opportunities for student-athletes from underrepresented groups.

Athletic Director Barta told investigators that several staff members within the Department were tasked with creating and implementing action items to respond to the Task Force findings and support the Department's diversity efforts.  He explained further that the Department took the following specific actions prior to June 6, 2020 and the start of this review:

- Held a meeting between Head Coach Ferentz and a group of Black players to discuss the findings of the Task Force Report and identify ways to improve the environment; rules regarding earrings and jewelry were relaxed as a result of that meeting;

- Conducted Department-wide education and training, including training about unconscious bias;

- Appointed Broderick Binns as Interim Director of Diversity, Equity and Inclusion;

- Appointed a learning specialist to assist student-athletes who experience academic challenges;

- Engaged the Dan Beebe Group to conduct in-person training for all student-athletes, coaches, and staff on topics such as appropriate coaching techniques and treatment of student-athletes and responding to issues and complaints within the Department. Training for student-athletes included resources and strategies to express concerns and/or file a complaint if uncomfortable approaching a coach or someone directly associated with the student-athlete's sport;

- Conducted annual, online anonymous surveys seeking feedback from student-athletes in all sports.  The surveys were supplemented with in-person interviews of selected groups of student-athletes;

- Created a cultural resource guide for minority student-athletes; and

- Ensured that leadership training for student-athletes, coaches, and administrators included discussions around topics such as race and community activism, resulting in the development and adoption of a department-wide diversity, equity and inclusion pledge statement that was converted to a video.

Athletic Director Barta told investigators he honestly thought they had taken steps to fix the issues identified, but he now recognizes they have not done enough. Athletic Director Barta also expressed his understanding of the need to rebuild trust.

The Deputy Athletic Director and Sports Administrator (football) said the Athletics Department is working to address the issues and has created its own task force and Diversity, Equity, and Inclusion office. The Faculty Athletic Representative confirmed that the work from the Task Force is continuing and will expand its scope beyond graduation rates.

## Player and Coach Perceptions of the 2018-2019 Task Force

Most of the players and coaches interviewed by investigators knew very little about the 2018-2019 review. One former player said the Task Force group met with him and other players during which the players "told them the same things we are saying now." According to the former player, Head Coach Ferentz was aware of the concerns, took notes, and met with the Black players. He stated the coaches listened but "did not take into account" what was said, leaving the impression they did not believe there was a problem. One former player told investigators that players had been afraid to say anything to the Task Force because of their perception that a particular coach was "always there" and would "make or break you" in the program. Another former player said he participated in the review and told them "some things but not all; enough to know there was a problem." Numerous players said the only tangible change that resulted from the review was the ability of players to wear earrings.

Several coaches said they were aware of the report but had not been involved in the meetings. One coach said that there was a discussion in a coaches' meeting about low graduation rates, but the discussion was limited to that topic. One coach said that Head Coach Ferentz met with a group of Black players in connection with the Task Force report and the "elephant in the room" was player treatment in the weight room. One football coach told investigators he participated in the review and met with the committee. He recalled the reason for the meeting was concern about graduation rates and attrition and that the coaching staff wanted to improve their empathy and understanding of cultural differences of the players in the program. The football coach also said the review resulted in a relaxing of certain aspects of the dress code (i.e., earrings) and a commitment from coaching staff to improve empathy and respect and support player individuality.

Head Coach Ferentz told investigators that he read the Task Force report and shared relevant information with his staff. He also held an initial meeting with approximately 10 players at the time to discuss the Task Force findings. He did not recall any players raising concerns about specific coaches during that meeting. Head Coach Ferentz also told investigators that he

21

intended to hold a second, follow-up meeting with his players but he "dropped the ball" and failed to do so. Head Coach Ferentz stated that one of the issues that came across "loud and clear" from the Task Force report was the players' sense that they could not be themselves.  He told investigators that issue was addressed last year when the coaching staff relaxed the rules around jewelry and hats.

## Recent Changes

Players and coaches cited to several recent changes as positive and hopeful signs that the program culture is improving.  Current players report feeling comfortable to "speak up about things," express their personalities, and be themselves.  They told investigators that, after recent changes, the environment has become more open, there is more talking and laughing, and players are enjoying their workouts.  Numerous current players also commented on the increased team unity.  They remarked that coaches are listening to them and having open discussions about significant issues, including social justice issues such as whether the team will "take a knee" during the national anthem.  Several players expressed their opinion that Head Coach Ferentz is open to listening and has been talking to the leadership group about these issues.  Coaches also commented on the improved communication and their desire to listen and better understand the players.  Head Coach Ferentz provided investigators with a copy of his action plan designed to improve program culture and which addresses a variety of topics including team building, personal expression, communication, body weight expectations, sleep bands, and team and game-day rules.

Players and coaches both reported that several rules have been relaxed around the use of social media, attire, hats, hair, and earrings.  Players report being able to listen to more diverse music and show their tattoos.

Numerous players expressed their hope that the changes will be permanent and remain in place "after the headlines go away."  One current player said, "this is a big deal and they need to keep moving forward."  Several players expressed their opinion that Head Coach Ferentz is open to listening and has been talking to the leadership group about these issues.  Others expressed skepticism and cautioned that it is hard to truly change culture and that for change to be permanent, it must come from Head Coach Ferentz and go "down the line."  Numerous players expressed their opinion that problems within the program are more widespread than just one coach and simply removing one coach will not fix the underlying problems.  Other players worried that the changes are not genuine, and the coaches are "just covering their tracks."  One current player explained his concern about the program's commitment to change, stating the players have raised concerns with Head Coach Ferentz in the past and, because he did not do anything at the time, the program may be waiting for things to "blow over" before they revert back to the Iowa Way.  Several staff members noted that Head Coach Ferentz has been meeting weekly with the leadership committee to continue changes moving forward.  He has also convened an advisory group of 10-12 former players with whom he has been meeting remotely to advise him on moving the program forward.

On June 6, 2020, Head Coach Ferentz issued the following announcement regarding the creation of an advisory committee: "There has been a call for a cultural shift in our program. Therefore, I am creating an advisory committee, chaired by a former player and made up of current and former players as well as department staff.  This will be a diverse group that will be able to share without judgment so we can all examine where we are today and how we can have a better environment tomorrow."

Head Coach Ferentz told investigators they have implemented numerous changes to the program over the last 6-7 weeks.  He explained that "people are seeing things very differently now than they were before" and the program needed to change.  He now sees the program through a different lens and recognizes it must be different than what existed in the past.

Athletic Director Barta summarized the following actions that the Athletic Department and football program have taken since June 6, 2020:

- Several discussions with current and former student-athletes have occurred related to complaints within the football program.  The conversations are ongoing;

- The football coaches and team have met several times regarding program feedback;

- The football Leadership Group was expanded from 12 to 24 members in order to add more diversity in race and class rank.  The group has met three times since June 6, 2020 and will continue meeting on a regular basis;

- Broderick Binns was appointed as the permanent Executive Director of Diversity Equity and Inclusion.   In that role, he will work in collaboration with the Assistant Vice President for Diversity Equity and Inclusion;

- The Diversity Task Force met twice and is updating its mission and action plans to assist the Athletic Department moving forward.  The Task Force changed its name to the DEI Accountability Group and is now overseen by Broderick Binns;

- Head Coach Ferentz created a former student-athlete advisory committee.  To date, five meetings have occurred.  Its purpose is to advise and assist Head Coach Ferentz moving forward and to improve program culture in the area of racial equity and fair treatment of all student-athletes; and

- The Athletic Department held two "Town Hall" virtual meetings focusing on education, listening, and learning in the areas of social injustice, racism, and hate.

23

## Diversity Training and Reporting Avenues for Equity Complaints

The Office of Diversity, Equity and Inclusion told investigators that all faculty and staff that are employed at least half-time are required to receive equity and diversity training once every three years.  Coaches, staff, and student-athletes also receive annual training regarding "Human Relations Risks" through the Dan Beebe Group, now called PFA Consulting.  The training programs offered to new and returning members of the football team include information about prohibited discrimination/harassment and reporting options.  Each student-athlete is also provided a handout titled "Available Reporting Avenues and Other Resources for Human Relations Risks."  Contact information for the Office of Equal Opportunity and Diversity is included on the form.

As explained by Athletic Director Barta and the Associate Athletic Director, players may raise complaints within the Athletics Department with their position coach, head coach, sports administrators, or faculty athletic representatives.  The Office of Diversity, Equity and Inclusion explained that, if employees receive a complaint of racial harassment, the University's anti-harassment policy requires a referral to that office.

The Office of Diversity, Equity and Inclusion told investigators that, as of the date of the interview, it had not received any complaints of discrimination or harassment, whether race or disability, involving the football program or any of its coaching staff.  Similarly, the Deputy Athletic Director and Sports Administrator (football) reported that she has not received any complaints explicitly regarding race when conducting exit interviews with student-athletes.  She has received comments from players about having to "check themselves at the door" and not be their genuine selves.  The Deputy Athletic Director told investigators that players thought there were too many rules in the program, but not one said anything about the environment being discriminatory, nor did they provide specific details about individual coaches or situations.

Copies of anonymous end-of-season surveys conducted by the football program include reports by some players that they had been subject to bullying or hazing by a member of the coaching staff.  While the surveys do not ask about racial issues directly, the reports do not include reports of racial concerns, nor do they include allegations of racial bias by a coach or racial incidents.

The following summary data from student athletes about their experiences in the program:

2018-2019:
- Strength and Conditioning Staff: received no ratings of "poor" or "below average"
- Head Coach: Over 90% responded "yes" to whether they would be comfortable approaching the coach with a personal (91.40%) or team (90.32%) concern
- Position/event/assistant coaches: 90.32% responded "yes" to whether they would be comfortable approaching the coach with a personal or team concern

- 4 players said they had been subject to bullying or hazing by a member of the coaching staff; 95.70% players responded they had not

2019-2020:
- Strength and Conditioning Staff: received no ratings of "poor" or "below average"
- Head Coach: 89.2% responded "yes" to whether they would be comfortable approaching the coach with a personal or team concern
- Position/event/assistant coaches: 91.18% responded "yes" to whether they would be comfortable approaching the coach with a personal or team concern
- 2 players said they had been subject to bullying or hazing by a member of the coaching staff; 98.04% players responded they had not

Athletic Director Barta told investigators that he examined the data from the end of season surveys and believed the changes from the 2018-2019 Task Force Report addressed issues within the program.  He now understands more needs to be done and is putting together a plan to address the concerns and issues raised by current and former players.

## Conclusion

The current and former players who participated in this review described a range of personal experiences, both good and bad, within the Iowa football program.  Many are passionate about the program and have had a positive and rewarding experience.  Virtually all the players spoke positively about their position coaches and the influence those coaches have had on their lives, both personally and athletically.   Yet numerous players described feeling unhappy and unwelcome, citing to a program culture that they perceive requires strict conformity and rigid adherence to the "mold" of an ideal player, a mold that many Black players felt they could never truly fit because it was built around the stereotype of a clean-cut, White athlete from a midwestern background.  Additionally, numerous current and former players and coaches of all races described an environment in which a small number of coaches felt empowered to bully and demean athletes, especially Black athletes.

In sum, the program's rules perpetuated racial or cultural biases and diminished the value of cultural diversity.  The program over-monitored players to the point that they experienced heightened anxiety and maintained a culture that allowed a small group of coaches to demean players.  We have separately provided four personnel reports to the University summarizing allegations of mistreatment made against current and former employees so that they may be addressed, as appropriate, pursuant to the institution's personnel policies and procedures.

Importantly, current players and coaches were uniform in their view that the program has implemented immediate and positive changes since the inception of this review.  Players are cautiously optimistic that the coaching staff is listening to their concerns and having genuine conversations with them around difficult and complicated issues.  Finally, both the Athletic Director and Head Coach Ferentz expressed their commitment to rebuild trust with players and

25

foster an environment that embodies the Department's values of diversity, equity and inclusion.

We recommend that the University work with Athletic Director Barta and Head Coach Ferentz to create action steps aimed at improving the culture of the program, eliminating biases, encouraging student-athletes to report concerns of mistreatment, and amplifying the University's policy statement against retaliation within the football program.



Search this site          Search

Home > II. Community Policies

# Chapter 14 – Anti-Harassment
(Amended 6/05; 12/05; 12/11; 8/13; 5/15; 7/15; 7/1/17; 9/21/18; 1/20; 3/20)

Effective January and March 2020, this policy has been revised. For individual changes, see the redlined version.

14.1 Rationale

14.2 Policy

14.3 Scope of Policy

14.4 Bringing a Complaint

14.5 Informal Resolution of Complaints

14.6 Investigation of Formal Complaints

14.7 Process for Formal Disciplinary Action

14.8 Applicable Procedures

14.9 Isolated Behavior

14.10 Protection of Impacted Parties, Reporting Parties, and Others

14.11 Protection of the Responding Party

14.12 Confidentiality

14.13 Education

## 14.1 Rationale
(Amended 7/15)

The purpose of this policy is to prevent harassment within The University of Iowa community and to provide a process for addressing all forms of harassment if and when it occurs. The University of Iowa is committed to maintaining an environment that recognizes the inherent worth and dignity of every person, and that fosters tolerance, sensitivity, understanding, and mutual respect. This commitment requires that the highest value be placed on the use of reason and that any harassment in the University community be renounced as repugnant and inimical to its goals. Harassment destroys the mutual trust that binds members of the community in their pursuit of truth.

The University also is committed strongly to academic freedom and free speech. An educational institution has a duty to provide a forum in which free speech and differences of opinion are actively encouraged and facilitated, and where opinions and deeply held beliefs are challenged and debated. Critical to this mission is providing a nondiscriminatory environment that is conducive to learning. Respect for these rights requires that members of the University community tolerate expressions of opinion that differ from their own or that they may find abhorrent.

This policy addresses harassment in all forms based on any classification covered by law and/or II-3 Human Rights (with the exception of sexual harassment, which is addressed in II-4 Sexual Harassment) and IV-2 Sexual Misconduct, Dating/Domestic Violence, or Stalking Involving Students, as well as harassment based on other factors as set forth in this policy.

Exhibit 3

Anti-Harassment | Operations Manual

## 14.2 Policy
(Amended 5/15; 7/15; 9/21/18; 1/20)

Effective January 2020, this policy has been revised. For individual changes, see the <u>redlined version</u>.

Harassment of any member of the University community is prohibited.

a. Definition of harassment. "Harassment" means intentional conduct, including speech, directed toward an identifiable person or persons that is sufficiently severe, pervasive, or persistent that it interferes with work, educational performance, on-campus living, or participation in a University activity on or off campus.

b. Conduct that constitutes a protected exercise of an individual's rights under the First Amendment to the United States Constitution (and related principles of academic freedom) shall not be deemed a violation of this policy. Note: Sexual harassment is addressed by the University's Policy on Sexual Harassment (<u>II-4</u>) and/or the University's Policy on Sexual Misconduct Involving Students (<u>IV-2</u>).

c. Evidence of harassment. Behavior that may constitute, or be evidence of, prohibited harassment includes, but is not limited to, the following:

> (1) repeated contact with another in person, by telephone, in writing, or through electronic means (see also <u>II-19</u> Acceptable Use of Information Technology Resources), after the recipient has made clear that such contact is unwelcome.

> (2) physical, visual, or verbal behavior directed toward another person or an identifiable group of persons that is intended to be or is reasonably likely to be interpreted as threatening or intimidating.

> (3) harassment proscribed by the *Iowa Criminal Code*, <u>Chapter 708</u>, including, for example, stalking, the placement of simulated explosives, ordering merchandise or services with intent to annoy, or false reports to police.

> (4) stalking as a course of conduct that is directed at a specific person that would cause a reasonable person to feel fear.

> (5) domestic/dating violence which is coercive, abusive, and/or threatening behavior toward a current or former intimate or romantic partner.

d. Academic freedom. All proceedings under this section shall respect the principles of academic freedom stated in the Statement on Tenure and Academic Vitality at The University of Iowa (<u>III-10.1a(2)</u>), which commits the University to the principle that "free inquiry and expression are essential to the maintenance of excellence."

e. Penalty enhancement. The University reserves the right to impose more severe sanctions on individuals whose actions in violation of this policy are motivated by the race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, or associational preferences of the impacted party.

f. In determining whether alleged conduct constitutes prohibited harassment, the investigator will consider all available information and will review the totality of circumstances, including the context in which the alleged incident(s) occurred. Although repeated incidents generally create a stronger claim of harassment, a single serious incident can be sufficient. Determinations will be made on a case-by-case basis.

g. Definitions of other terms used in this policy:

  (1) Academic or administrative officer includes the following:

    (a) Collegiate deans (including associate deans and assistant deans),

    (b) Faculty members with administrative responsibilities at the level of departmental executive officer (DEO) or above,

    (c) Any staff member whose primary job responsibility is to provide advice regarding a student's academic pursuits or other University-related activities,

    (d) A faculty member serving as departmental (or collegiate) director or coordinator of undergraduate or graduate studies, or as a director or coordinator of any departmental, collegiate, or University off-campus academic program (including any study-abroad program),

    (e) The President, Director of Equal Opportunity and Diversity, vice presidents (including assistant and associate vice presidents), and Provost (including assistant and associate provosts), and those persons' designees,

    (f) Directors and supervisors in an employment context, including faculty and staff who supervise student employees, in relation to matters involving the employees they supervise (other than Department of Public Safety personnel when receiving criminal complaints or reports), and

    (g) Human resource representatives (including all central University Human Resources staff).

(2) Allegations: to the extent possible, allegations of policy violations should provide factual details such as, but not limited to, time, place, actions, participants, and witnesses. Allegations do not necessarily have to be based on firsthand observation of events to be "specific and credible," but direct observation normally results in greater specificity and credibility than indirect knowledge.

(3) Domestic/dating violence: any coercive, abusive, and/or threatening behavior toward a current or former intimate or romantic partner.  These behaviors may include, for example, physical, sexual, emotional, economic, or psychological actions or threats of actions that intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, or injure the impacted party.

(4) Graduate assistant: a graduate student employed by the University as a research assistant or teaching assistant.

(5) Human resources representative: the individual designated as a unit's departmental authority on human resource policies and procedures, and all central human resources staff.

(6) Impacted party: a person who allegedly has been harassed.

(7) Instructor: a person engaged in teaching students or in evaluation or supervision, direct or indirect, of a student's academic work.

(8) Member of the University community: any University student, or faculty or staff member.

(9) Protected interests: University employment, education, on-campus living, or participation in a University activity.

(10) Reporting party: the person who brings a complaint of violation of this policy, who could be an impacted party, a third-party reporter, or an academic or administrative officer of the University.

(11) Responding party: a person who has been accused of harassment.

(12) Stalking includes but is not limited to:

(a) Non-consensual communication including in-person communication, telephone calls, voice messages, text messages, email messages, social networking site postings, instant messages, postings of pictures or information on websites, written letters, gifts, ordering goods or services, or any other communications that are undesired and/or place another person in fear;

(b) Following, pursuing, waiting, or showing up uninvited at a workplace, place of residence, classroom, or other locations frequented by an impacted party;

(c) Monitoring online activities, surveillance and other types of observation, whether by physical proximity or electronic means, attempts to gather information about an impacted party;

(d) Vandalism, including attacks on data and equipment;

(e) Direct physical and/or verbal threats against an impacted party or an impacted party's loved ones, including animal abuse;

(f) Gathering of information about an impacted party from family, friends, co-workers, and/or classmates;

(g) Manipulative and controlling behaviors such as threats to harm oneself, or threats to harm someone close to the impacted party;

(h) Defamation or slander against the impacted party, posting false information about the impacted party and/or posing as the impacted party to post to websites, newsgroups, blogs, or other sites that allow public contributions, encouraging others to harass the impacted party;

(i) Posing as someone other than oneself to initiate transactions, financial credit, loans, or other contractual agreements;

(j) Arranging to meet an impacted party under false pretenses.

(13) Supervisor: a person who has authority either: 1) to undertake or recommend tangible employment decisions (those that significantly change an employee's employment status, such as, but not limited to, hiring, firing, promoting, demoting, reviewing performance, reassigning, and compensation decisions) affecting an employee, or 2) to direct the employee's daily work activities.

(14) Third-party reporter: a person who brings a complaint alleging that someone else has been harassed. A third-party reporter does not need to be a member of the University community (i.e., a current University faculty, staff, or student).

# 14.3 Scope of Policy
(Amended 7/15; 1/20)

Effective January 2020, this policy has been revised. For individual changes, see the <u>redlined version</u>.

a. Acts by employees and students. The University's prohibition of harassment as defined by II-14.2 above applies to acts of faculty, other instructors, staff, or students occurring in one or more of the following circumstances:

(1) on property owned or controlled by the University or by a student organization, or;

(2) at any location, including through electronic media such as email or social networking websites, and involving any University faculty, staff, or students, provided that:

(a) The incident occurs at a University-sponsored activity or during an event sponsored by an organization affiliated with the University, including a student organization;

(b) The responding party or the impacted party was acting in an official capacity for the University during the incident;

(c) The responding party or the impacted party was conducting University business during the incident;

(d) The conduct has the purpose or reasonably foreseeable effect of substantially interfering with the work or educational performance of UI students, faculty, or staff;

(e) The conduct creates an intimidating or hostile environment for anyone who is involved in or seeks to participate in University employment, education, on-campus living, or other University-sponsored activities; or

(f) The conduct demonstrates that the individual poses a reasonable threat to campus safety and security.

b. Acts by persons other than employees or students. The University will make reasonable efforts to address harassment of its faculty, other instructors, staff, or students by persons participating in University-related programs or activities, conducting business with or visiting the University, even if such persons are not directly affiliated with the University. Reports of harassment by visitors to campus and other persons not directly affiliated with the University should be made to an academic or administrative officer or the Office of Equal Opportunity and Diversity (319-335-0705).

# 14.4 Bringing a Complaint
(Amended 7/15; 1/20)

Effective January 2020, this policy has been revised. For individual changes, see the redlined version.

a. Individuals who believe they have experienced harassment are encouraged to report it, even if they are not certain whether a violation of this policy has occurred. Reports of protected class harassment (see II-3

Human Rights) should be brought to the Office of Equal Opportunity and Diversity under this policy. Reports also may be directed separately to other offices under applicable policies and procedures as follows:

(1) Complaints that a student violated the rights of any member of the University community may be investigated under a process initiated by the Dean of Students (such as, but not limited to, the Code of Student Life;

(2) Complaints that a faculty member violated the rights of any member of the University community may be investigated under a process initiated by the Provost (such as, but not limited to, III-15 Professional Ethics and Academic Responsibility);

(3) Complaints that a staff member violated the rights of any member of the University community may be investigated under a process initiated by the Senior Human Resources Leadership Representative for the staff member's unit (such as, but not limited to, III-16 Ethics and Responsibilities for University of Iowa Staff). The Senior Human Resources Leadership Representative may appoint a designee to conduct the investigation with the approval of University Human Resources and the Office of Equal Opportunity and Diversity.

b. A complaint that this policy has been violated may be brought through informal or formal channels by any member of the University community, including a third-party reporter, or by the University itself. A complaint must clearly state the allegations of harassment to warrant an investigation. There is no time limit for bringing a complaint; however, it may be difficult to substantiate the allegations if they are made after significant time has passed. Therefore, prompt reporting of complaints is strongly encouraged.

c. Substantial weight will be given to the wishes of the impacted party when determining how to respond to a complaint. However, the University may investigate the allegations even without the impacted party's consent, if circumstances warrant (such as when there are multiple complaints of harassment involving the same person or allegations are particularly egregious).

d. Anyone (impacted parties or others) who wishes to consult with someone about a specific situation without making a complaint, or who wishes simply to learn more about enforcement of this Anti-Harassment Policy may contact any of the following offices or organizations: These offices are exempt from the reporting requirements set forth below in II-14.5e. In addition, staff in these offices and organizations generally have professional or legal obligations to keep communications with their clients confidential. Faculty and staff in other University offices typically do not have confidentiality obligations and may be required to report allegations as described below in II-14.5e.

(1) Office of the Ombudsperson (for faculty, staff, or students), 308 Jefferson Building;

(2) Employee Assistance Program (for faculty or staff), 121-50 University Services Building;

(3) University Counseling Service (for students), 3223 Westlawn;

(4) Women's Resource and Action Center (for faculty, other instructors, staff, students, or visitors), Bowman House;

(5) Domestic Violence Intervention Program (certified advocates) (for faculty, other instructors, staff, students, or visitors), 1105 South Gilbert Court, Iowa City.

## 14.5 Informal Resolution of Complaints
(Amended 5/15; 7/15; 1/20)

Effective January 2020, this policy has been revised. For individual changes, see the <u>redlined version</u>.

a. A complaint may be brought informally to any academic or administrative officer of the University (as defined above in <u>II-14.2g(1)</u>). If the complaint alleges harassment based on a protected classification as defined by <u>II-3</u> Human Rights (race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual), the complaint should be brought to the <u>Office of Equal Opportunity and Diversity</u> (319-335-0705).

b. The academic or administrative officer will:

> (1) counsel the impacted or reporting party as to the options available under this policy and, at the impacted party's request, will help the impacted party resolve the complaint informally and/or refer the impacted party to the appropriate office as described below in <u>II-14.6a</u> so that the impacted party may bring a formal complaint; and

> (2) take appropriate interim action, which may include those actions described below in <u>II-14.10</u>, to address the alleged behavior and protect the health or safety of the impacted party, reporting party, and/or witnesses.

c. The following assistance is available to the academic or administrative officer:

> (1) The Office of Equal Opportunity and Diversity will assist in determining whether there is a potential policy violation related to a protected classification, and whether reporting pursuant to paragraph e below is required.

> (2) The Threat Assessment Team is available to assist with assessing situations and risk, planning the actions needed, and carrying out those actions. This team may be accessed by contacting Organizational Effectiveness, 121-50 University Services Building. (See also <u>VI-32</u> University of Iowa Threat Assessment Program or <u>https://hr.uiowa.edu/tat</u>.)

> (3) For situations involving students, contact the <u>Dean of Students</u>, 135 Iowa Memorial Union.

d. Substantial weight will be given to the wishes of the impacted party when determining how to respond to a complaint. When a complaint is brought informally, the person(s) charged in the complaint will not ordinarily be informed of the complaint without the consent of the impacted party unless circumstances require (such as when there are multiple complaints against the same person or allegations are particularly egregious). No disciplinary action can be taken against a person, and there will be no record of the allegations in the person's employment or student disciplinary file, unless the person is notified of the allegations and given an opportunity to respond.

e. Any academic or administrative officer of the University who becomes aware of specific and credible allegations of harassment based on a protected classification (race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the

person of consideration as an individual), whether through the report of an impacted or a reporting party (including a third-party reporter) or otherwise, shall report the allegations promptly to the Office of Equal Opportunity and Diversity for assistance in evaluating the situation and determining an appropriate course of action, even if the impacted party has requested that no action be taken.

If there is a supervisory relationship between the reporting party and/or impacted party and the responding party, the appropriate course of action will include development of a plan to avoid any perceived or actual conflict of interest until the complaint is resolved.

The initial report may be verbal, but a written report also must be made after the complaint is resolved using the Office of Equal Opportunity and Diversity Informal Harassment Complaint Resolution form, which requires disclosure of the employment or student status of the impacted party(ies), the reporting party(ies) (if other than the impacted party), and the person(s) charged; the department(s) with which those persons are affiliated; a summary of the allegations; and a description of the steps taken to resolve the complaint.

If the person alleged to have engaged in harassment was notified of the existence of the informal complaint and given an opportunity to respond, the names of the parties must be provided to the Office of Equal Opportunity and Diversity. If the person was not informed of the allegations or was not given an opportunity to respond, then the names of the parties shall not be provided to the Office of Equal Opportunity and Diversity.

f. Reasonable efforts will be made to process complaints within 21 days, giving consideration to the nature of the allegations and the circumstances surrounding the complaint process.

g. It is the responsibility of the academic or administrative officer who facilitates the informal resolution of the complaint to monitor compliance with the terms of the informal resolution. Sanctions up to and including termination of employment or separation from the University may be imposed in the event that an individual fails to comply with the terms of the informal resolution.

## 14.6 Investigation of Formal Complaints
(Amended 5/15; 7/15; 7/1/17; 9/18; 1/20)

Effective January 2020, this policy has been revised. For individual changes, see the redlined version.

a. A formal complaint pursuant to this policy must be brought to one of the following offices for investigation depending upon the status of the responding party and the nature of the allegations:

(1) Protected class harassment. If the complaint alleges harassment based on a classification covered by II-3 Human Rights (race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual), a formal complaint should be brought to the Office of Equal Opportunity and Diversity (202 Jessup Hall, 319-335-0705) regardless of the status of the responding party.

(2) Other harassment. If the complaint alleges harassment that is not based on a classification covered by II-3 Human Rights (race, creed, color, religion, national origin, age, sex, pregnancy,

disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual), a person should bring a formal complaint to one of the following offices depending on the status of the responding party:

> (a) Faculty or instructor. If the responding party is a faculty member, teaching assistant, or other instructor, a formal complaint should be brought to the responding party's collegiate dean or to the <u>Office of the Provost</u> (111 Jessup Hall, 319-335-3565);

> (b) Staff member. If the responding party is a staff member, a formal complaint should be brought to the Senior Human Resources Leadership Representative for the unit employing the responding party;

> (c) Student. If the responding party is a student, a formal complaint should be brought to the <u>Dean of Students</u> (135 Iowa Memorial Union, 319-335-1162) or the Dean of the <u>Graduate College</u> (201 Gilmore Hall, 319-335-2143).

b. A formal complaint may be brought after an informal resolution was not successfully reached, or may be brought immediately without pursuing informal resolution.

c. The purpose of the investigation is to establish whether there is a reasonable basis for believing that a violation of this policy has occurred. In conducting the investigation, the investigating office will make reasonable efforts to interview the impacted party, the reporting party (if other than the impacted party), and the responding party, and may interview other persons believed to have pertinent factual knowledge, as well as review any relevant documentary evidence. At all times, the investigating office will take steps to ensure confidentiality to the extent possible.

d. When a formal complaint is brought, the responding party will be informed of the allegations, the identity of the impacted and/or reporting party, and the facts surrounding the allegations. The investigation will afford the responding party an opportunity to respond to the allegations and evidence provided by the reporting party and/or impacted party, and to provide a statement of the facts as perceived by the responding party.

e. At the conclusion of the investigation, the investigating office will issue a written finding which will summarize the evidence gathered and state whether or not there is a reasonable basis for believing that a violation of this policy has occurred. The written finding will normally be issued within 60 days of when the complaint was filed. When it is not reasonably possible to issue the finding within 60 days, the investigating office will notify the impacted party and the responding party that the finding will be delayed and indicate the reasons for the delay. The impacted party and the responding party will receive a copy of the written finding, which is to remain confidential as defined below by <u>II-14.12c</u>. Third-party reporters will be notified only that the proceedings are concluded.

f. If the investigating office finds a reasonable basis for believing that a violation of this policy has occurred, the matter will be referred to the appropriate administrator for further consideration as outlined in <u>II-14.7</u> below.

## 14.7 Process for Formal Disciplinary Action

(Amended 7/15; 1/20)

Effective January 2020, this policy has been revised. For individual changes, see the <u>redlined version</u>.

a. The following administrators will review the finding of the investigating office:

> (1) the Office of the Provost, if the responding party is a faculty member or other instructional personnel (except graduate assistants);

> (2) the office of the vice president or dean responsible for the unit employing the person charged, if the responding party is a staff member (including a graduate assistant, in which case the Dean of the Graduate College also must be notified in order to determine whether ramifications apply for the student's academic progress);

> (3) the Dean of Students, if the responding party is a student (including a graduate student, in which case the Dean of the Graduate College also must be notified in order to determine whether ramifications apply for the student's academic progress);

b. The administrator may:

> (1) accept all or any part of the findings of the investigating office;

> (2) not accept all or any part of the findings of the investigating office;

> (3) reach a negotiated settlement of the complaint with the responding party; or

> (4) initiate formal disciplinary action.

c. Violations of this Anti-Harassment Policy may lead to disciplinary sanctions up to and including termination or separation from the University. Sanctions for violations of this policy should be commensurate with the nature of the violation and the responding party's disciplinary history.

d. In addition to other disciplinary action, persons who are found to have violated this policy may be required to participate in policy and behavioral expectations education. They also may be required to complete community service, enroll in a specific academic course, attend an educational workshop, and/or make restitution for economic damages caused by their behavior.

> When the responding party is a faculty or staff member, the <u>Employee Assistance Program</u>, 121-50 University Service Building, is available to assist with locating appropriate resources. When the responding party is a student, <u>University Counseling Service</u>, 3223 Westlawn, is available to assist with locating appropriate resources.

e. It is the responsibility of the appropriate administrator to follow-up with the parties at a reasonable interval(s) to assess their compliance with the disciplinary and/or remedial sanctions imposed. More serious sanctions, up to and including termination of employment or separation from the University, may be imposed in the event that the individual fails to comply with the sanctions initially imposed.

# 14.8 Applicable Procedures
(Amended 7/1/17; 9/18)

Formal disciplinary action taken in response to alleged violations of this policy by:

a. tenure track, clinical track, and research track faculty members will be governed by the Faculty Dispute Procedures (III-29) and that portion of those procedures dealing with faculty ethics (III-29.7); instructional track faculty members will be governed by III-10.11 Instructional Track policy and the grievance procedures therein.

b. staff members will be governed by applicable Regents Merit System Rules and University policies, including III-16 Ethics and Responsibility Statement for Staff, and the applicable grievance procedures, including III-28 Conflict Management Resources for University Staff;

c. graduate assistants, when dismissal is sought, will be governed by the procedure for dismissal of graduate assistants (III-12.4). When disciplinary action other than dismissal is taken by the dean of the employing college, a graduate assistant may appeal through those procedures established for graduate assistant employees;

d. students will be governed by Student Misconduct Procedure.

## 14.9 Isolated Behavior
(Amended 9/18)

This section addresses isolated behavior that does not rise to the level of a violation of this policy. However, it should be understood that isolated behavior that is sufficiently severe can constitute harassment in violation of this policy. The purpose of this section is preventative, in that it authorizes and encourages appropriate intervention designed to avoid a violation of this policy. However, this section shall not apply to constitutionally protected speech as provided in II-14.2c above.

a. Isolated behavior of the kind described in II-14.2, which does not rise to the level of harassment but which if repeated could rise to that level, demonstrates insensitivity that may warrant remedial measures. Academic or administrative officers who become aware of such behavior in their areas should counsel those who have engaged in the behavior. Such counsel should include a clear statement that the behavior is not acceptable and should cease, information about the potential consequences if such behavior persists, and a recommendation, as appropriate, to undertake an educational program designed to help the person(s) understand the harm caused by the behavior.

b. After such counseling occurs, if a person continues to engage in the conduct described above in paragraph a, they may be deemed to have engaged in harassment.

## 14.10 Protection of Impacted Parties, Reporting Parties, and Others
(Amended 1/20; 3/20)

Effective January and March 2020, this policy has been revised. For individual changes, see the redlined version.

a. Impacted parties will be informed of relevant procedural steps taken during the investigation and any interim protective measures taken. An impacted party may be accompanied by an advocate and other support persons during the investigation process if the impacted party so desires.

b. Throughout the investigation and resolution of a complaint, steps will be taken to protect impacted parties, reporting parties, witnesses, and others from harm caused by continuation of the alleged harassing behavior.

c. Retaliation against impacted parties, reporting parties, and/or witnesses who provide information during an investigation pursuant to this policy is prohibited by II-11 Anti-Retaliation. Reasonable action will be taken to assure that impacted parties, reporting parties, and/or witnesses suffer no retaliation as a result of their activities with regard to the process.

d. Steps that may be taken to protect impacted parties, reporting parties, witnesses, and others from continued harassment and/or retaliation might include:

(1) lateral transfers of one or more of the parties in an employment setting and a comparable move if a classroom setting is involved, and

(2) arrangement that academic and/or employment evaluations concerning reporting parties or others be made by an appropriate individual other than the responding party.

e. Any retaliation against impacted parties, reporting parties or witnesses should be reported pursuant to the Anti-Retaliation Policy (II-11). Retaliation may result in disciplinary action against the person committing the retaliatory act(s).

f. The Provost, a dean, a DEO, or any vice president may, at any time during or after an investigation of allegations of harassment, place on leave or otherwise restrict from employment and/or access to campus any responding party if the Provost, dean, DEO, or vice president finds that it is reasonably certain that:

(1) the employee engaged in harassment in violation of this policy, and

(2) serious and immediate harm will ensue if the person continues to be present at work. Similarly, if the responding party is a student, interim sanctions may be imposed pursuant to Section 10 of the Student Misconduct Procedure.

## 14.11 Protection of the Responding Party
(Amended 9/18; 1/20)

Effective January 2020, this policy has been revised. For individual changes, see the redlined version.

This policy shall not be used to bring knowingly false or malicious allegations of harassment. Making such allegations may subject the complaining party to remedial and/or disciplinary action up to and including termination or separation from the University. Any such disciplinary action will be initiated by the appropriate administrator overseeing the reporting party(ies).

## 14.12 Confidentiality
(Amended 1/20)

Effective January 2020, this policy has been revised. For individual changes, see the redlined version.

a. In order to empower community members to voice concerns and bring complaints, the confidentiality of all parties will be protected to the greatest extent possible. However, confidentiality cannot be guaranteed in all cases, and legal obligations may require the University to take some action once it is made aware that harassment may be occurring, even when the impacted party is reluctant to proceed. Appropriate University officials will be consulted, including the Office of Equal Opportunity and Diversity when the

complaint alleges harassment based on a protected classification (see <u>II-14.5e</u> above), and information will be shared only with those individuals who need to know it to implement this policy.

b.  Impacted parties, third-party reporters, and responding parties are expected to maintain confidentiality as well. They are not prohibited from discussing the situation outside of the work or educational environment. However, the matter should not be discussed in the work or educational environment.

c.  Dissemination of documents relating to complaints of harassment and/or to the investigation of such complaints, other than as necessary to pursue an appeal, grievance, or other legal or administrative proceeding, is prohibited.

d.  Failure to maintain confidentiality by a responding party may be considered to be a form of retaliation in violation of <u>II-14.10c</u> of this policy. Failure to maintain confidentiality by any party (impacted party, third-party reporter, or responding party) may result in disciplinary action.

## 14.13 Education
(9/18)

Training on this policy is included with the mandatory training prescribed in the University's Policy on Sexual Harassment (see <u>II-4.6a(2)</u>).