IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| AKRUM WADLEY, *et al.*, ) | |
| ) | Case No. 4:20-cv-00366-SMR-HCA |
| Plaintiffs ) | |
| ) | **BRIEF IN SUPPORT OF PLAINTIFFS'** |
| v. ) | **MOTION TO COMPEL PRODUCTION** |
| ) | **OF HUSCH BLACKWELL DOCUMENTS** |
| UNIVERSITY OF IOWA, *et al.*, ) | |
| ) | Hearing Requested |
| Defendants. ) | |

**TABLE OF CONTENTS**

I.   THE IOWA-HUSCH BLACKWELL ENGAGEMENT AGREEMENT WAS NOT
     LISTED ON DEFENDANTS' PRIVILEGE LOG. ............................................................ 3

II.  DEFENDANTS WAIVED ANY PRIVILEGE. .................................................................. 3

     A.  Defendants Failed to Timely and Properly Object to Discovery Requests. ................ 6

     B.  Defendants Failed to Move to Quash Plaintiffs' Subpoena to Husch Blackwell. ....... 7

     C.  Defendants Voluntarily Released the Husch Blackwell Report to the Public. ........... 7

III. DOCUMENTS RELATED TO THE HUSCH BLACKWELL INVESTIGATION ARE
     NEITHER PRIVILEGED COMMUNICATIONS NOR PROTECTED WORK
     PRODUCT. ........................................................................................................................ 9

     A.  The Husch Blackwell Attorneys Were Acting as Investigators, Not as Attorneys. .... 9

     B.  Several Communications Were Not Made Between HB and Defendants. ............... 11

     C.  The Documents Were Not Prepared in Anticipation of Litigation. .......................... 12

IV.  EVEN IF THE HUSCH BLACKWELL DOCUMENTS ARE PRIVILEGED, THE
     CRIME-FRAUD EXCEPTION APPLIES. ..................................................................... 15

V.   ALTERNATIVELY, THE COURT SHOULD ORDER AN *IN CAMERA* REVIEW. .... 16

**INTRODUCTION**

In response to a barrage of public disclosures of systemic racism and mistreatment of Black student-athletes within the University of Iowa's ("Iowa") football program ("Program"), Defendants engaged the Kansas City law firm Husch Blackwell, LLP ("HB") to conduct an "*independent*" review of the Program. The Program needed it to save face. Thus, following the investigation, Defendants

1

released a copy of a report detailing the investigation's findings to the public. They publicly acknowledged the investigation's findings, apologized for causing many of their players to feel mistreated and discriminated against, and announced steps they planned to take to eradicate the racially hostile environment. Yet, as soon as some of the student-athletes impacted by the systemic racism and mistreatment outlined in the report took action to hold them accountable for their misconduct, Defendants realized they had made a bad play call and suddenly changed course, denying all disclosures referenced in the report *they* chose to release to the public.

Now, in a Hail Mary effort to protect themselves from liability, Defendants seek to prevent Plaintiffs from uncovering the whole truth by claiming the investigation they previously characterized as "***independent***" was actually performed within the context of a traditional attorney-client relationship in anticipation of litigation, and that all communications and documents generated in the course of the investigation are privileged. But instead of raising this issue eight (8) months ago when requests for these documents were served, Defendants waited until now.

The Court should not reward Defendants for this flagrant delay of game. Instead, for several reasons, it should penalize Defendants by ordering them to immediately produce all documents related to the HB investigation. First, Defendants waived any privilege by failing to timely object and, even prior to that, by voluntarily releasing the HB report, which contained 26 pages of communications between Iowa employees and HB, to the public. Second, the documents were never privileged, because HB was acting as an investigator, not as an attorney for Iowa; a large portion of the communications were not even made between HB and Iowa employees; and the documents were not prepared in anticipation of litigation. Finally, even if the documents were privileged, the crime-fraud exception compels disclosure.

## ARGUMENTS & AUTHORITIES

**I.   THE IOWA-HUSCH BLACKWELL ENGAGEMENT AGREEMENT WAS NOT LISTED ON DEFENDANTS' PRIVILEGE LOG.**

Plaintiffs first note that Defendants did not list the HB engagement agreement in their privilege log, even though the document has not been produced. Since Defendants evidently are not claiming that this document is privileged, Plaintiffs request that the Court order Defendants to produce it immediately.

**II.   DEFENDANTS WAIVED ANY PRIVILEGE.**

The Court should order Defendants to produce all documents Plaintiffs have requested that have been withheld on claims of privilege, because Defendants have waived any privilege. First, Defendants waived *any* claim of privilege by failing to timely respond to Plaintiffs' first RFPs, failing to expressly claim privilege with respect to any specific document or category of documents, and failing to timely produce a privilege log. Second, any claim of privilege related specifically to documents generated as part of the HB investigation was waived under the subject-matter waiver rule when Defendants voluntarily released the report of findings to the public.

**A.   Defendants Failed to Timely and Properly Object to Discovery Requests.**

Defendants waived their objections to Plaintiffs' discovery requests and claims of privilege by failing to timely respond, failing to expressly claim privilege, and unduly delaying production of a privilege log. Under Rule 34 of the Federal Rules of Civil Procedure, a party served with a RFP "must respond in writing within 30 days after being served," unless the parties agree or the court orders otherwise. Fed. R. Civ. P. 34(b)(2)(A). The responding party must state objections "with specificity the grounds for objecting to the request, including the reasons," and "state whether any responsive materials are being withheld on the basis of that objection." *Id.* at 34(b)(2)(B), (C). If claiming privilege, the party must "(i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing the information

3

itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). At least one court in the 8th Circuit has found, "[t]his rule contemplates a party must file its privilege log simultaneously with the assertion of a privilege in response to a discovery request." *Heil v. Belle Starr Saloon & Casino*, No. 5:09-cv-05074, 21 (D.S.D. Feb. 25, 2014).

"Although Rules 33(b)(4) and 34(b)(2) contain different language describing the means for objecting to interrogatories and requests for production, 'courts uniformly conclude that an objection [to either] may be waived if it is not timely raised and good cause for the delay is not shown.'" *Parshall v. Menard, Inc.*, No. 4:16-CV-828 (CEJ), 2 (E.D. Mo. Dec. 12, 2016) (quoting *Talevski v. Carter*, No. 2:05-CV-184, 2007 WL 1797634, at *3 (N.D. Ind. 2007) and citing other cases). Courts have been more inclined to find waiver in cases of "unjustified delay, inexcusable conduct, and bad faith." *See Mills v. Iowa*, No. 3:10-cv-112-RP-RAW, 3 (S.D. Iowa Aug. 28, 2012) (quoting C. Wright, A. Miller & R. Marcus, *Federal Practice and Procedure: Civil § 2016.1* at 328-331 (2010 & 2012 Supp. at 32)).

Here, Defendants served responses to Plaintiffs' initial RFPs (which were served May 27, 2021) more than ***six (6) weeks*** after they were due, even after Plaintiffs' counsel agreed to allow Defendants a 30-day extension, giving them 60 days to formulate their responses. Once Defendants were made aware that they had failed to serve responses to the RFPs, they waited an ***additional three (3) weeks*** to serve the responses. Despite that, Defendants claimed the failure to serve the responses had been "simply an oversight." Even when the initial responses were finally served, no claim of privilege was asserted in response to any of Plaintiffs' initial 181 requests, even though 18 of them specifically referenced documents related to the relationship between Iowa and HB and the HB investigation and report. This was true of Defendants' first responses, as well as their first and second supplemental responses, both of which were served in October 2021. In fact, in their initial responses to Plaintiffs' requests, Defendants expressly indicated that the documents would be entered upon entry of an appropriate protective order.

4

A protective order was entered on October 12, 2021 [Doc. 61], yet the documents were not produced. In fact, it was not until December 2021 (nearly seven (7) months after service of the discovery requests) that Plaintiffs were made aware Defendants were claiming the attorney-client privilege or work-product protection with respect to *any* of the requested documents. Indeed, a privilege log [**Exhibit 8**] was not served until the Court ordered Defendants to do so on December 31, 2021.

Shorter delays than this have been found by courts within the Eighth Circuit to warrant waiver. *See, e.g.*, *Caldwell v. 9173-7999 Quebec, Inc.*, No. 18-cv-12752 (E.D. Mich. Dec. 19, 2019) (finding waiver after 3 ½ month delay and granting motion to compel production of documents claimed to be privileged); *United States v. Reeves*, No. 2:12-cv-01916-JAD-GWF (D. Nev. Feb. 7, 2014) (finding waiver where discovery was served in May 2013 and responses were served in October 2013 upon order of the court and with boilerplate objections); *Whatley v. Canadian Pacific Ry., Ltd.*, No. 1:16-cv-00074 (D.N.D. Jun. 8, 2021) (finding non-party waived attorney-client privilege by waiting 52 days after service of subpoena to serve objections); *Industrial Risk Insurers v. D.C. Taylor Co.*, No. 1:06-cv-00171, 7-9 (N.D. Iowa May 28, 2008) (finding party waived objections when objections were not made until more than 95 days after the date they were due). However, in this case, the delay itself is not the only problem, at least with respect to the claim of privilege over the documents related to the HB investigation; bad faith should be presumed from the fact that Defendants waited seven (7) months to claim privilege on documents they knew would eventually be requested by Plaintiffs in discovery. Notably, the HB report was referenced multiple times throughout Plaintiffs' First Amended Petition [Doc. 15], as the investigation dealt with precisely the same issues that form the bases for Plaintiffs' claims. In light of the clear materiality of the investigation to Plaintiffs' claims and the fact that Defendants knew Plaintiffs were relying in part on the report's findings to support their case, Defendants' failure to claim privilege until nearly seven (7) months after the related documents were requested is inexcusable. Under these

circumstances, the Court should find that the Defendants waived any claim of privilege by failing to timely and properly object without good cause.

### B. Defendants Failed to Move to Quash Plaintiffs' Subpoena to Husch Blackwell.

Even with a second opportunity to object to requests for documents related to the HB investigation, Defendants failed to do so. On November 24, 2021, Plaintiffs served Defendants with a Notice of Subpoena Duces Tecum to Non-Parties [**Exhibit 9**]. Enclosed with the notice was a subpoena to HB containing 37 separate requests for documents related to the investigation. [Subpoena Duces Tecum to HB (Nov. 24, 2021) (**Exhibit 10**)].[1] The subpoena attached to the notice specified the time for compliance was December 8, 2021 (exactly 14 days later).

Rule 45(d)(3)(A) provides in relevant part, "On ***timely motion***, the court . . . must quash or modify a subpoena that: . . . (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies . . . ." Fed. R. Civ. P. 45(d)(3)(A)(iii) (emphasis added). For a motion to quash to be timely, it must be filed "before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B); *see also Whatley v. Canadian Pac. Ry. Co.*, No. 1:16-cv-74, 14 (D.N.D. June 8, 2021) (noting that "[w]hile it does not appear that the Eighth Circuit has spoken directly on this issue, it is clear the prevailing trend among other courts is to find waivers of all objections, including attorney-client privilege, when such objections are not served within the time limits laid out in Fed. R. Civ. P. 45(d)(2)(B)" and citing cases).

---

[1] Plaintiffs have also tried to obtain the documents from HB, but the firm has similarly objected on grounds of privilege, as Defendants have not given their consent for the documents to be produced. Plaintiffs' counsel and HB attorney Ryan Mitchem spoke on the phone on January 5, 2022, wherein Mr. Mitchem clarified this information. [*See* Email from D. Solomon-Simmons to R. Mitchem (Jan. 5, 2022) (**Exhibit 11**)]. Mr. Mitchem also indicated he would respond more substantively to the subpoena "early next week" in an email sent January 7, 2022. [Email from R. Mitchem to D. Solomon-Simmons (Jan. 7, 2022) (**Exhibit 12**)]. Plaintiffs have not received any such response.

At no time prior to the date of compliance or within 14 days after service of the subpoena on HB did Defendants object in any manner. In fact, on December 10, 2021, Defendants responded to a letter from Plaintiffs' counsel that was sent the same day the notice of subpoena was served (November 24, 2021), and no mention was made of the subpoena. [Letter from J. Peterzalek to B. Mate-Kodjo (Dec. 10, 2021) (**Exhibit 13**)]. The first time Defendants made any semblance of an objection to the subpoena was verbally, during the status conference held on December 15, 2021—three (3) weeks after the subpoena had been served, and only after Plaintiffs raised the issue.

In short, Defendants have been presented with opportunity after opportunity to object to Plaintiffs' requests for documents they now claim are privileged, yet they passed upon each opportunity. It was Defendants' burden to object and prove that any privilege applies. Defendants have not even attempted to do so a single time over the last eight (8) months of discovery. Under these circumstances, the Court should find that Defendants waived any claims of privilege with respect to the HB documents.

**C. Defendants Voluntarily Released the Husch Blackwell Report to the Public.**

Defendants further waived any claims of privilege with respect to documents related to the HB investigation when they voluntarily released the 26-page report, which recounted specific communications relayed during the investigation and detailed its findings, to the public.

It is well established in the Eighth Circuit that "[v]oluntary disclosure of attorney client communications expressly waives the [attorney-client] privilege." *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998) (citing *Lutheran Med. Ctr. v. Contractors Health Plan*, 25 F.3d 616, 622 (8th Cir. 1994) and *In re Grand Jury Proceedings Subpoena to Testify to Wine*, 841 F.2d 230, 234 (8th Cir. 1988)). In a case similar to this one, the Western District of Texas found that Baylor University, which had retained the Pepper Hamilton law firm to conduct an investigation to ascertain the University's compliance with Title IX, waived its attorney-client privilege by, *inter alia*, intentionally and publicly

7

disclosing "Findings of Fact and Recommendations" from the review, which included interviews with Baylor personnel. Finding waiver, the Court reasoned:

> Baylor chose to publicly release a detailed summary of Pepper Hamilton's investigation that disclosed, among other things, attorney-client communications. While the information contained in these summaries was previously confidential, Baylor's decision to prepare and release a summary of those communications indicates its intentional waiver of that confidentiality. The logical extension of Baylor's argument is that the creation and public release of any document discussing attorney-client communications, no matter how detailed or self-serving, would not constitute waiver. That cannot be the case.

*Jane Doe 1 v. Baylor University*, 320 F.R.D. 430, 438 (W.D. Tex. Aug. 11, 2017). The Court found that because Baylor "repeatedly indicated that the Findings of Fact and Recommendations summarize and represent the full course of Pepper Hamilton's investigation," and "because of the level of detail publicly released about the investigation as a whole," Baylor had waived privilege over "the entire scope of the investigation, and all materials, communications, and information provided to Pepper Hamilton as part of the investigation." *Id.* at 440.

When Defendants released the HB report, they did exactly what Baylor did when it released the Pepper Hamilton report. And like the Pepper Hamilton report, the HB report summarized the entire investigation and contained specific statements provided to HB by several Iowa employees.[2] In light of these striking similarities, the Court should apply the reasoning in *Doe* and find that Defendants have waived any attorney-client privilege with respect to the HB investigation documents.

---

[2] The list of employees includes: Athletic Director Gary Barta; Head Coach Kirk Ferentz; Strength and Conditioning Coach Chris Doyle; the Deputy Athletic Director and Sports Administrator; the Faculty Athletic Representative; the Office of Diversity, Equity and Inclusion; the Associate Athletic Director for Compliance; and other Iowa football coaches and staff.

## III. DOCUMENTS RELATED TO THE HUSCH BLACKWELL INVESTIGATION ARE NEITHER PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS NOR PROTECTED WORK PRODUCT.

Even if the Court finds Defendants have not waived the attorney-client privilege or work-product protection, it should still order Defendants to produce all documents related to the HB investigation, because neither the attorney-client privilege nor the work product applies. Any communications to HB were made in the context of a professional relationship involving an attorney acting in a non-attorney capacity—specifically, that of an investigator—and none of the documents were generated in anticipation of litigation. Additionally, a large portion of the communications Defendants claim are privileged were either not made between Defendants and Husch Blackwell or disclosed to third parties.

### A. The Husch Blackwell Attorneys Were Acting as Investigators, Not as Attorneys.

Defendants have produced a privilege log containing over 109 pages of materials relating to the HB investigation that have been withheld under claims of attorney-client privilege [*See* **Ex. 8**]. The Court should order Defendants to produce these documents, because no such privilege applies. In *St. Paul Reinsurance Company v. Commercial Financial Corporation*, the Northern District of Iowa held that under Iowa common law, the attorney-client privilege "applies only to communications between an attorney and a client in the context of a professional relationship involving the attorney *as an attorney*," and that the privilege did not apply to communications to an attorney acting in the capacity of an investigator. 197 F.R.D. 620, 641 (N.D. Iowa 2000), (emphasis in original). Also, in *Diversified Industries, Inc. v. Meredith*, the Eighth Circuit held that the attorney-client privilege did not apply when a law firm was retained "solely for the purpose of making an investigation of facts and to make business recommendations with respect to future conduct of [the plaintiff] in such areas as the results of the investigation might suggest." 572 F. 2d 596, 603 (8th Cir. 1977). The Court further reasoned, "The work that Law Firm was employed to perform could have been performed just as readily by non-lawyers . . .

9

." *Id.; see also Meighan v. TransGuard Ins. Co. of Am., Inc.*, No. 3:13-cv-03024 (N.D. Iowa Mar. 24, 2014) (stating "[f]or a communication to be privileged, 'the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice services or advice [sic] that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity'") (quoting *Diversified Industries,* 572 F.2d at 602).

Here, Iowa claims the attorney-client privilege over communications and documents sent between Iowa employees and HB attorneys in the course of HB's "***independent***" investigation into public disclosures of racism and mistreatment of Black players within Iowa's football program. The express purpose of Iowa's retaining HB was for HB to investigate and report findings, not to provide legal services or advice. [*See* **Exs. 1-3**]. Accordingly, none of the communications and documents sent between Iowa employees and HB attorneys and staff are privileged.

It is important to consider that, until now, and for over a year and a half, Defendants have represented to the public—as well as those who participated in the "***independent review***"—that HB's investigation was external, impartial, and independent. Now that Defendants are faced with the threat of actually being held accountable, they claim Iowa and HB had a traditional attorney-client relationship, such that all communications made in furtherance of the investigation are privileged and all documents generated are protected work product. Defendants cannot have it both ways.

Only one of two possibilities can be true, as the two are mutually exclusive. The first possibility is that Defendants persistently lied to the public about the nature of the investigation and induced current and former athletes (including some of the Plaintiffs) and employees to participate under false pretenses, all the while secretly obtaining information it intended use to defend itself against legal claims by some of those very participants. If that is determined to be the case, then all Iowa executives who knew HB was not acting "***independently***" and "***impartially***, " but as attorneys for Iowa, and participated in the

creation and public dissemination of the report would appear to have committed felonious misconduct in office by creating a false report knowing it would become a public record of the State of Iowa,[3] and all documents related to the investigation should be released under the crime-fraud exception to the attorney-client privilege.[4] Moreover, if the HB attorneys who conducted the investigation are found to have known Iowa engaged them for the purpose of using their assistance in furtherance of this fraudulent scheme, then they should face professional discipline for violating the Iowa Rules of Professional Conduct by knowingly making a false statement of the nature of the investigation to those who participated.[5]

The second possibility is that HB's investigation was in fact independent, external, and impartial, in which case no privilege ever attached. Either way, the Court should order Defendants to produce the documents, because the attorney-client privilege does not protect them from disclosure.

**B. Several Communications Were Not Made Between Husch Blackwell and Defendants.**

In fact, a large percentage of the documents listed in Defendants' privilege log as withheld under claim of the attorney-client privilege are not even communications made between Husch Blackwell and Iowa personnel. Of course, the attorney-client privilege only protects confidential communications between an attorney and their clients. Indeed, as the United States Supreme Court noted in *Upjohn Company v. United States*, the purpose of the privilege is "to encourage full and frank communication between attorneys and their clients . . . ." 449 U.S. 383, 448 (1981). Defendants' privilege log contains a large number of communications between HB lawyers and third parties, including, notably, some of the

---

[3] "Any public officer or employee, who knowingly does any of the following, commits a class 'D' felony: . . . 3. Falsifies a writing, or knowingly delivers a falsified writing, with the knowledge that the writing is falsified and that the writing will become a public record of a government body." IA Code § 721.1.

[4] *See* Section IV, *infra*.

[5] "In the course of representing a client, a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by rule 32:1.6." Iowa Rule of Professional Conduct 32:4.1.

11

Plaintiffs, as well as Chris Doyle, who separated from Iowa (and therefore was no longer an employee of Iowa) before HB's investigation even began. These documents and communications, highlighted in blue-green in Plaintiffs' **Exhibit 8**, did not become privileged simply because they were forwarded to or otherwise sent or given to a HB attorney. *See United States v. Bonnell*, 483 F. Supp. 1070, 1077 (D. Minn. 1979) (quoting C. Wright & A. Miller, *Federal Practice and Procedure* § 2017 (1970)). The same is true for other documents that were merely sent to HB in the course of the investigation, but were not otherwise privileged. These are highlighted in yellow in Plaintiffs' **Exhibit 8**.

### C. The Documents Were Not Prepared in Anticipation of Litigation.

The documents related to the HB investigation also fall outside the bounds of the work-product protection, because they were not prepared in anticipation of litigation. Under Rule 26(b)(3)(A), "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . ." The party seeking to avoid production bears the burden of showing "the materials were prepared in anticipation of litigation, i.e., because of the prospect of litigation." *Progressive Cas. Ins. Co. v. Fed. Deposit Ins. Corp.*, 49 F. Supp. 3d 545, 551 (N.D. Iowa 2014) (quoting *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118-19 (7th Cir. 1982)).

In *Black v. Pilot Travel Centers, LLC*, the court articulated when documents can be fairly said to be produced in anticipation of litigation:

> A document is produced in anticipation of litigation if there is a threat of an adversary proceeding and the document was produced after that threat became palpable. *Helt v. Metro Dist. Comm'n*, 113 F.R.D. 7, 12 (D. Conn. 1986) ("To qualify, the documents must have been prepared 'any time after initiation of the proceeding or such earlier time as the party who normally would initiate the proceeding had tentatively formulated a claim, demand or charge.'" (quoting *United States v. AT&T*, 86 F.R.D. 603, 627 (D.D.C. 1979)). The threat of litigation must be a specific threat. *See Resident Advisory Bd. v. Rizzo*, 97 F.R.D. 749, 754 (E.D. Pa. 1983) (reasoning that the work product doctrine "is not applicable unless some specific litigation is fairly foreseeable at the time the work product is prepared."); *James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138, 143 (D. Del. 1982) ("[L]itigation must be at least

a real possibility at the time of preparation or, in other words, the documents must be prepared with an eye to some specific litigation." (citing *In re Grand Jury Investigation*, 599 F.2d 1224, 1229 (3d Cir. 1979))).

No. CIV. 09-4170-KES, 2011 WL 1828039, 2011 U.S. Dist. LEXIS 51180 at *5-6 (D.S.D. May 12, 2011)*; see also Diversified Industries*, 572 F.2d at 604 (finding work product protection did not apply when a law firm's investigation was not done "in preparation for any trial" or "in anticipation of litigation," even though "all parties concerned must have been aware that the conduct of employees of Diversified in years past might ultimately result in litigation of some sort in the future").

Here, Defendants have not put forth any evidence to suggest any of the HB materials were prepared in anticipation of any litigation. To Plaintiffs' knowledge, the only litigation that has developed out of the disclosures of racism and mistreatment of Black football players at Iowa that were made public in June 2020 (which formed the basis of HB's investigation) is ***this case***. None of these Plaintiffs even engaged an attorney until weeks after Iowa had announced its decision to conduct a review of the disclosures, and it was not until October 2020—three (3) months after the HB report was released—that the Plaintiffs made any demand.[6] Simple mechanics of time preclude a finding that the HB investigation was performed in the face of a threat of this litigation.

To the contrary, the circumstances surrounding the commissioning of the investigation and resulting report suggest that the investigation was conducted not for litigation purposes, but to improve the public's perception of the Program at Iowa. The review was requested in the days following the death of George Floyd, when many white Americans began experiencing an awakening about gross anti-Black racial disparities in American life such as those experienced by Black football players at Iowa.[7] On June

---

[6] *See* Cindy Boren, *Black Former Football Players at Iowa Demand $20 Million and the Firing of Coach Kirk Ferentz*, THE WASHINGTON POST (Oct. 19, 2020), available at https://www.washingtonpost.com/sports/2020/10/19/iowa-football-kirk-ferentz-lawsuit-letter/.

[7] *See* Daniel Payne, *White America: Awakened?*, POLITICO (May 25, 2021 5:00 A.M. E.D.T.), https://www.politico.com/news/2021/05/25/white-people-racial-justice-activism-george-floyd-490545.

5, 2020, James Daniels, a former Iowa football player, tweeted, "[t]here are too many racial disparities in the Iowa football program. Black Players have been treated unfairly for far too long," [**Ex. 3**, p. 2 (quoting James Daniels, TWITTER (Jun. 5, 2020 7:08 P.M.), https://twitter.com/jamsdans/status/1269058668663844864)], after which "[n]umerous former players . . . took to social media platforms and other media outlets raising allegations of mistreatment and speaking about the need for cultural change." [**Ex. 3**, p. 2]. Four days later, Iowa Athletics Director Gary Barta wrote a letter to then-University of Iowa President Bruce Harreld and Director of the Office of Equal Opportunity and Diversity Jennifer Modestou requesting "approval to proceed immediately with an *independent* review of the Hawkeye Football Program by an appropriate external party . . . ." [Letter from Gary Barta to Bruce Harreld and Jennifer Modestou (Jun. 9, 2020) (**Exhibit 14**) (emphasis added)].[8] Six days after that, on June 15, 2020, Iowa publicly announced it had "reached a separation agreement with football strength and conditioning coach Chris Doyle,"[9] who had been a common thread in the disclosures of racism and mistreatment that were being lodged against the Program, along with Brian Ferentz and Seth Wallace. In publicly announcing the separation agreement, Barta apologized to Iowa football players who had felt mistreated and discriminated against, and noted that separating from Doyle was what he and Kirk Ferentz believed was the "thoughtful and sensible thing to do," but that it was "just one piece of a plan that's going to be needed for us to move forward."[10] The HB investigation was just

---

[8] Notably, despite Defendants' public statements about HB's investigation, they *denied* requests for admissions that "Defendant Iowa hired Law Firm to investigate the Program" and "Law Firm conducted an independent investigation." [Defs.' Resps. to Plfs.' 1st RFAs (Excerpt) (Jul. 28, 2021) (**Exhibit 15**)].

[9] Rob Goldberg, *Chris Doyle, Iowa Reach Separation Agreement After Allegations of Racist Remarks*, BLEACHER REPORT (Jun. 15, 2020), https://bleacherreport.com/articles/2896257-chris-doyle-iowa-reach-separation-agreement-after-allegations-of-racist-remarks.

[10] Video, ESPN (Jun. 15, 2020), https://www.espn.com/college-football/story/_/id/29314003/iowa-hawkeyes-part-football-strength-coach-chris-doyle-amid-claims-biased-behavior.

another piece of that same plan.[11] In the press conference announcing the review, Barta said of the plan to help the program "move forward":

> So, here are some steps that we have taken or that will be taken: . . . An ***independent*** review, and from that review we'll receive a report. We'll learn. We'll determine any additional actions that need to be taken in response.[12]

This statement by itself indicates the investigation was conducted for purposes other than litigation preparation—namely, to "learn" and "determine any additional actions that need to be taken" to respond to Iowa football's racially disparate culture.

## IV. EVEN IF THE HUSCH BLACKWELL COMMUNICATIONS ARE PRIVILEGED, THE CRIME-FRAUD EXCEPTION APPLIES.

The Court should order Defendants to produce the documents memorializing communications related to the HB investigation because, even if they were privileged, they lost their privileged character pursuant to the crime-fraud exception. In *United States v. Horvath*, the Eighth Circuit noted it is "well-established" that "attorney-client communications lose their privileged character" when the lawyer is engaged to "further a continuing or contemplated criminal or fraudulent scheme . . . ." 731 F.2d 557, 562 (8th Cir. 1984). Once a party has established that a communication was privileged under the attorney-client privilege (which Defendants have not done), the party seeking to compel disclosure by invoking the crime-fraud exception "must merely make a prima facie showing" that the legal services have been "obtained in furtherance of an illegal or fraudulent activity." *Id.* As explained in Section III(A) above, if Defendants' position is true—that the HB investigation was conducted for purposes of litigation and in

---

[11] *See* Adam Rittenberg, *Iowa Parts with Football Strength Coach Chris Doyle Amid Claims of Biased Behavior Based on Race*, ESPN (Jun. 15, 2020) (emphasis added), https://www.espn.com/college-football/story/_/id/29314003/iowa-hawkeyes-part-football-strength-coach-chris-doyle-amid-claims-biased-behavior.

[12] Video of Barta Press Conference, ~17:42, SATURDAY TRADITION (last accessed Jan. 20, 2022 3:32 P.M. C.S.T.), available at https://saturdaytradition.com/iowa-football/what-iowa-ad-gary-barta-said-during-mondays-press-conference/.

the context of a traditional attorney-client relationship—then HB was engaged in furtherance of a fraudulent activity. Both Defendants and HB repeatedly represented to the public that the investigation was an independent review for the purpose of clarifying disclosures to help them "listen," "learn," and determine how to respond to the public disclosures of and public calls to end the racially disparate treatment of Black Iowa football players. HB's emails inviting people to participate also represented that HB's task was to investigate and present its findings "independent of any outside influence." [**Exs. 1 & 2**]. If Defendants and HB knew all along that was not the case, then the information they obtained from participants, including some of the Plaintiffs, was obtained under false pretenses. Accordingly, the crime-fraud exception should apply.

## V. ALTERNATIVELY, THE COURT SHOULD ORDER AN *IN CAMERA* REVIEW.

Alternatively, if the Court finds that the documents were privileged, but is not convinced that the crime-fraud exception applies, it should nevertheless order Defendants to produce the documents for an *in camera* review. In *In re BankAmerica Corp. Securities Litigation*, the Eighth Circuit noted that a party asking a court to order an *in camera* review of documents to determine whether they are privileged or have lost their privileged character under the crime-fraud exception bears a lesser burden than the standard required for showing the crime-fraud exception applies outright. 270 F.3d 639, 641-42 (8th Cir. 2001). Specifically, it noted that for a court to review documents *in camera* under such circumstances, "the party urging disclosure" must make "a threshold showing 'of a factual basis adequate to support a good faith belief by a reasonable person' that the crime-fraud exception applies." *Id.* at 642. Once such a threshold showing has been made, the Court should decide whether to conduct an *in camera* review "in light of the facts and circumstances of the particular case,' including the volume of the materials in question, their relative importance to the case, and the likelihood that the crime-fraud exception will be

found to apply." *Id.* (citing *United States v. Zolin*, 491 U.S. 554, 572 (1989)). Plaintiffs have certainly met this standard if they have not made a prima facie case for fraudulent activity.

## PRAYER

WHEREFORE, premises considered, Plaintiffs respectfully request that the Court order Defendants to immediately produce all documents responsive to Plaintiffs' requests and grant attorney fees and costs incurred as a result of Defendants' discovery misconduct. Alternatively, Plaintiffs ask the Court to order Defendants to produce the items withheld for an *in camera* review. Plaintiffs also requests all other and further relief, whether at law or in equity, special or general, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

**SOLOMON SIMMONS LAW, PLLC**
/s/*Kymberli J. M. Heckenkemper*
Damario Solomon-Simmons, OBA # 20340
Kymberli J. M. Heckenkemper, OBA # 33524
601 S. Boulder Ave., Ste. 600
Tulsa, OK 74119
Phone: (918) 551-8999  |  Fax:   (918) 558-8039
dss@solomonsimmons.com
kheckenkemper@solomonsimmons.com

**BARLOW GARSEK & SIMON, LLP**
Christian Dennie, TX Bar # 24045775
920 Foch Street
Fort Worth, TX 76107
Phone: (817) 731-4500  |  Fax:   (817) 731-6200
cdennie@bgsfirm.com

**BMK LAW FIRM, PLLC**
Beatriz Mate-Kodjo, AT0012331
1910 Washington St., Ste. 100
Pella, IA 50219
Phone: (641) 450-1668  |  Fax:   (641) 847-7968
beatriz@mate-kodjo-law.com

*Attorneys for Plaintiffs*