IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| AKRUM WADLEY; JONATHAN PARKER; MARCEL JOLY; AARON MENDS; DARIAN COOPER; BRANDON SIMON; JAVON FOY, | Case No. 4:20-cv-00366 |
| Plaintiffs, | **BRIEF IN SUPPORT OF BRIAN FERENTZ'S MOTION FOR SUMMARY JUDGMENT REGARDING SECTION 1981 CLAIMS** |
| vs. | |
| UNIVERSITY OF IOWA, BOARD OF REGENTS FOR THE STATE OF IOWA; BRIAN FERENTZ; and CHRISTOPHER DOYLE, | |
| Defendants. | |

## TABLE OF CONTENTS

Page

Table of Authorities..........................................................................................................4

I.   PLAINTIFFS' DEPOSITIONS DO NOT SUPPORT THE EXAGGERATED CLAIMS OF INTENTIONAL DISCRIMINATION BY BRIAN FERENTZ OR ESTABLISH A PRIMA FACIE CASE..................................................................8

  a.  DARIAN COOPER..........................................................................................8

  b.  AARON MENDS..............................................................................................9

  c.  BRANDON SIMON .......................................................................................13

  d.  JONATHAN PARKER ..................................................................................16

  e.  MARCEL JOLY..............................................................................................25

  f.  AKRUM WADLEY .........................................................................................27

  g.  JAVON FOY....................................................................................................34

  h.  BRIAN FERENTZ .........................................................................................36

II.      STANDARD FOR SUMMARY JUDGMENT ....................................................36

III.    LEGAL ANALYSIS OF WHETHER THERE IS A GENUINE ISSUE OF INTENTIONAL RACIAL DISCRIMINATION BY B. FERENTZ ....................37

      a.  FIVE PLAINTIFFS ADMIT THAT B. FERENTZ TOOK NO RACIALLY-MOTIVATED ACTIONS AGAINST THEM OR DIRECTED ANY RACIAL WORDS AT THEM ......................................................................................37

      b.  PARKER ALLEGES A SINGLE INCIDENT AGAINST B. FERENTZ OVER THE FOUR YEARS PARKER WAS IN THE IOWA FOOTBALL PROGRAM................................................................................................38

      c.  SIMON ALLEGES A SINGLE INCIDENT AGAINST B. FERENTZ OVER THE FOUR YEARS SIMON WAS IN THE IOWA FOOTBALL PROGRAM................................................................................................40

      d.  WADLEY ALLEGES THREE NON-RACIAL INCIDENTS AGAINST B. FERENTZ OVER THE FOUR YEARS WADLEY WAS IN THE IOWA FOOTBALL PROGRAM ................................................................................41

      e.  B. FERENTZ WAS NOT A DECISION-MAKER AS TO COOPER, MENDS, SIMON, PARKER, OR FOY AND HE WAS THE POSITION COACH OF WADLEY AND JOLY ONLY FOR ONE YEAR ..........................................42

      f.  B. FERENTZ DID NOT MAKE THE PLAINTIFFS THE TARGET OF INTENTIONAL RACIAL DISCRIMINATION .............................................42

      g.  MENDS' CLAIM OF DENIAL OF FACILITIES ACCESS DOES NOT RAISE A MATERIAL FACTUAL ISSUE FOR A SECTION 1981 CLAIM ..43

      h.  INTENTIONAL RACIAL DISCRIMINATION HAS TO BE THE BUT FOR CAUSE OF THE CONTRACT BREACH TO SHOW A VIOLATION OF SECTION 1981................................................................................................44

      i.  THE ALLEGATIONS ABOUT POLITICAL SPEECH DO NOT ESTABLISH INTENTIONAL RACIAL DISCRIMINATION BY BRIAN FERENTZ OR EVEN INVOLVE HIM IN ANY MATERIAL WAY ......................................44

IV.    SECTION 1981 CLAIMS REQUIRE THE PLAINTIFFS TO PROVE A RACIALLY-MOTIVATED BREACH OF THEIR OWN CONTRACTUAL RELATIONSHIP.................................................................................................47

V.     BRIAN FERENTZ IS ENTITLED TO QUALIFIED IMMUNITY ....................50

VI.     COOPER'S CLAIMS ARE BARRED BY ANY APPLICABLE STATUTE OF
        LIMITATIONS....................................................................................................53

VII.    THE APPLICABLE STATUTE OF LIMITATIONS WARRANTS
        RECONSIDERATION IN VIEW OF TWO RECENT CIRCUIT COURT AND
        SEVERAL DISTRICT COURT DECISIONS. .....................................................53

VIII.   BRIAN FERENTZ IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON
        THE FRIVOLOUS MONETARY DAMAGE CLAIMS OF WADLEY, COOPER,
        JOLY, PARKER, AND MENDS .........................................................................56

        a.   AKRUM WADLEY ........................................................................................57

        b.   DARIAN COOPER........................................................................................58

        c.   MARCEL JOLY.............................................................................................61

        d.   JONATHAN PARKER ..................................................................................62

        e.   AARON MENDS............................................................................................63

IX.     THE SECOND AMENDED COMPLAINT WOULD ADD A SECTION 1983
        CLAIM AGAINST BRIAN FERENTZ FOR ALLEGED VIOLATION OF THE
        EQUAL PROTECTION CLAUSE .....................................................................64

## **TABLE OF AUTHORITIES**

**Cases**

*Adefris v. Wilson Trailer Co.*, No. C15-4063-MWB, 2016 WL 141762 (N.D. Iowa Jan. 12, 2016)..................................................................................................................39

*Agbefe v. Bd. of Educ. of City of Chicago*, 538 F. Supp. 3d 833 (N.D. Ill. 2021)........................54

*Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978 (10th Cir. 1991) ......................................... 38, 49

*Alston v. Spiegel*, 988 F. 3d 564 (1st Cir. 2021)........................................................ 47, 48, 49

*Anderson v. Creighton*, 483 U.S. 635 (1987)..........................................................................52

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................................37

*Artis v. Frances Howell N. Band Booster Ass'n*, 161 F. 3d 1178 (8th Cir. 1998) ........................50

*Auer v. Trans Union, LLC*, 902 F.3d 873 (8th Cir. 2018).......................................................57

*Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336 (11th Cir. 2008).................................. 55, 56

*Baribeau v. City of Minneapolis*, 596 F.3d 465 (8th Cir. 2010) ...............................................51

*Bilello v. Kum & Go, LLC*, 374 F.3d 656 (8th Cir. 2004) ......................................................43

*Bishop v. Glazier*, 723 F.3d 957 (8th Cir. 2013) ...................................................................52

*Borgman v. Kedley*, 646 F.3d 518 (8th Cir. 2011) ................................................................50

*Brown v. Gibson*, Case No. 4:17-cv-180, 2019 WL 7194069 (E.D.N.C. July 1, 2019)...........54

*Brown v. Wetz*, No. 18CV11178(NSR), 2021 WL 964922 (S.D.N.Y. Mar. 15, 2021)...........54

*Browning v. President Riverboat Casino–Missouri, Inc.,* 139 F.3d 631 (8th Cir. 1998) ..............42

*Calise v. N.Y. St. Dep't of Motor Vehicles,* No. 17 CV 791 (VB), 2020 WL 1309062 (S.D.N.Y. Mar. 19, 2020)..............................................................................................................55

*Charleston v. McCarthy*, 926 F.3d 982 (8th Cir. 2019).........................................................53

*Combs v. The Cordish Cos.*, 862 F.3d 671 (8th Cir. 2017) ....................................................42

*Comcast Corporation v National Association of African American-Owned Media*, -- U.S. ---, 140 S. Ct. 1009 (2020)..................................................................................................................44

*Dean v. Warren,* 12 F.4th 1248 (11th Cir. 2021)..................................................... 44, 45, 46

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006)......................................37, 47, 48, 52

*Duplan v. City of New York*, 888 F.3d 612 (2d Cir. 2018) ......................................... 54, 55, 56

*Ellis v. Houston*, 742 F.3d 307 (8th Cir. 2014)....................................................8, 38, 51, 56

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).................................................38

*FCS Advisors, LLC v. Missouri*, 929 F.3d 618 (8th Cir. 2019) ......................................... 43, 58

*General Bldg. Contractors Ass'n v. Pa.,* 458 U.S. 375 (1982)....................................38

*Gibson v. County of Suffolk*, No. 19-cv-03871 (GRB)(ST), 2022 WL 1063017 (E.D.N.Y. Feb. 18, 2022) ...................................................................................................54

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ...............................................................47

*Gregory v. Dillard's, Inc.*, 565 F.3d 464 (8th Cir. 2009) ........................................8, 37, 47, 52

*Hager v. Ark. Dep't of Health*, 735 F.3d 1009 (8th Cir. 2013) ................................................50

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ...............................................................50

*Hartnagel v. Norman*, 953 F.2d 394 (8th Cir. 1992) .............................................................36

*Hines v. F.J.C Sec. Co.,* 96 Civ. 2632, 1998 WL 60967 (S.D.N.Y. Feb. 13, 1998).................43

*Hinz v. Neuroscience, Inc.*, 538 F.3d 979 (8th Cir. 2008) ........................................................57

*Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701 (1989) .................................................................55

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) .......................................................55

*Malley v. Briggs*, 475 U.S. 335 (1986) ....................................................................52

*Manning v. Cotton*, 862 F.3d 663 (8th Cir. 2017) ...............................................................50, 52

*McCormick v. Miami Univ.*, 693 F.3d 654 (6th Cir. 2012) ....................................................54

*McQueen v. City of Chicago*, No. 09 C 2048, 2014 WL 1715439 (N.D. Ill. Apr. 30, 2014) .....55

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986).........................................................38

*Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir. 2003)......................................38

*Mullenix v. Luna*, 577 U.S. 7 (2015)....................................................................................52

*Onyiah v. St. Cloud University*, 5 F.4th 926 (8th Cir. 2021)............................................. 50, 55

*Pearson v. Callahan,* 555 U.S. 223 (2009)............................................................................50

*Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548 (3d Cir. 2002)......................................47

*Radwan v. Univ. of Conn. Bd. of Trustees*, 465 F. Supp. 3d 75 (D. Conn. 2020) ......................51

*Raspardo v. Carlone*, 770 F.3d 97 (2d Cir. 2014)....................................................................51

*Resendez v. Prance*, No. 3:16-CV-862-JVB-MGG, 2018 WL 3275615 (N.D. Ind. Jan. 26, 2018)..................................................................................................................................52

*Roberts v. City of Omaha*, 723 F.3d 966 (8th Cir. 2013)..........................................................50

*S. Ins. Co. Lowenberg v. CJG Enterprises, Inc.*, No. 3:15-cv-00131-RGE-SBJ, 2017 WL 3449610 (S.D. Iowa May 12, 2017)..................................................................................................37

*Saunders v. Thies*, 38 F.4th 701 (8th Cir. 2022) ............................................................. 45, 50

*Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899 (8th Cir. 2015) ................................42

*Scott v. Harris,* 550 U.S. 372 (2007).....................................................................................39

*Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958 (8th Cir. 1999) ................................................. 38, 41

*Shahrivar v. City of San Jose*, 752 Fed. Appx. 415 (9th Cir. 2018).........................................55

*Shomo v. City of New York*, 579 F.3d 176 (2d Cir. 2009) ......................................................55

*Stewart v. Holder,* No. 1:16-CV-682, 2017 WL 4479612 (E.D. Va. July 19, 2017), *aff'd*, 710 F. Appx. 120 (4th Cir. 2018) ......................................................................................... 54, 56

*Tenemille v. Town of Ramapo*, No. 18-CV-724 (KMK), 2020 WL 5731964 (S.D.N.Y. Sept. 24, 2020)..................................................................................................................................54

*Wallingford v. Olson*, 592 F.3d 888 (8th Cir. 2010) ..............................................................39

*White v. Pauly*, 580 U.S. 73, 137 S.Ct. 548, 551 (2017)................................................... 52, 53

*Williams v Mannis*, 889 F.3d 926 (8th Cir. 2018) ..................................................................50

*Williams-Lawson v. Subway Surface Supervisors Ass'n,* No. 20CIV8544PGGSLC, 2021 WL 4943554 (S.D.N.Y. June 21, 2021), *report and recommendation adopted* 2021 WL 4264067 (S.D.N.Y. Sept. 20, 2021) ...............................................................................................43

*Wilson v. Northcutt,* 441 F.3d 586 (8th Cir. 2006) ................................................................ 8

**Rules**

Fed. R. Civ. P. 56(a) and (c) ...........................................................................................36

**Other**

42 U.S.C. § 1981 ...............................................................................................................55

Iowa Code 614.1(2) ..........................................................................................................56

I.   **PLAINTIFFS' DEPOSITIONS DO NOT SUPPORT THE EXAGGERATED CLAIMS OF INTENTIONAL DISCRIMINATION BY BRIAN FERENTZ OR ESTABLISH A PRIMA FACIE CASE**

Plaintiffs' deposition testimony admits that Brian Ferentz (hereafter B. Ferentz) did not intentionally discriminate against Plaintiffs and recants their interrogatory answers that he had.  Section 1981 requires proof of intentional racial discrimination by the defendant charged with the violation. *Ellis v. Houston*, 742 F.3d 307, 327-28 (8th Cir. 2014) (Loken, J. & Colloton, J., concurring). Liability is personal, "so each defendant's conduct must be independently assessed." *Id.* at 328; *Wilson v. Northcutt,* 441 F.3d 586, 590-91 (8th Cir. 2006).  The Plaintiffs fail to create a genuine issue of material fact on this element of each of their prima facie cases under § 1981 against B. Ferentz. *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009).

a.  **DARIAN COOPER**

Plaintiff Darian Cooper (hereafter Cooper) was a defensive lineman for Iowa from 2011-2015. Cooper admitted in his deposition that B. Ferentz did not mock, make fun of, or ridicule Cooper at any time regarding his hair, jewelry, tattoos, clothing, diction, or the way he walked.  (SUF ¶ 16).  Cooper's deposition testimony contradicted his untruthful sworn interrogatory answer No. 8 stating otherwise.  (SUF ¶¶ 17-18).  This recanted sworn answer was Cooper's only reference to B. Ferentz's alleged discrimination in Cooper's interrogatory answers.  *Id.*  Cooper admitted in his deposition that B. Ferentz did not use any racial slur, name, or epithet towards him at any time or during the four years between November 11, 2016 and November 11, 2020.  (SUF ¶ 19).  Cooper admitted in his deposition that B. Ferentz did not use these words directed at him: n***** (hereafter "the n-word"), gangs, dumbass black player, or go back to the ghetto (SUF ¶ 20).  Cooper admitted that he does

not recall B. Ferentz directly calling him derogatory names or other explicit names.  (SUF ¶ 21).  Because Cooper left the football program in early 2016, B. Ferentz did not coach, discipline, punish, talk to, or see Cooper anytime or between November 11, 2016 and November 11, 2020. (SUF ¶ 22).  There simply is no evidence of intentional racial discrimination by B. Ferentz directed at Cooper at any time.

B. Ferentz was an offensive coach and not a defensive coach; Cooper played defense. B. Ferentz did not have decision-making authority over Cooper's injuries, playing time, health, practice, game participation, reprimands, punishments or sanctions, use of facilities, schedule, or any other decision regarding Cooper's participation in the Iowa football program before his departure in early 2016.  (SUF ¶¶ 29-30).  B. Ferentz never discriminated against Cooper or any other Plaintiff. (SUF ¶ 32).

### b. AARON MENDS

Plaintiff Aaron Mends (hereafter Mends) was a backup defensive linebacker for Iowa from 2014-18.  (SUF ¶ 54).  Mends graduated with a bachelor's degree from the University in December 2018 and a master's degree from Illinois State in 2020.  (SUF ¶ 55).  Mends admitted that B. Ferentz did not call him any name.  (SUF ¶ 56).  Mends admitted in his deposition that B. Ferentz did not mock, make fun of, or ridicule Mends at any time regarding his hair, jewelry, tattoos, clothing, diction, or the way he walked.  (SUF ¶ 57). This deposition testimony contradicted Mends' inaccurate sworn interrogatory answer No. 8 claiming that B. Ferentz had.  (SUF ¶ 58-59).  Mends was untruthful in this answer and interrogatory answers No. 21 and 23, as will be shown.  Mends admitted in his deposition that B. Ferentz did not use any racial slur, name, or epithet to refer to him at any time or during the four years between November 11, 2016-2020.  (SUF ¶ 60).  Mends admitted in

his deposition that B. Ferentz did not use these words directed at him:  the n-word, gangs, dumbass black player, or go back to the ghetto.  (SUF ¶ 61).  Moreover, Mends admitted he had not heard B. Ferentz use the word gang, n-word, ghetto, (SUF ¶ 62), although he said that B. Ferentz called Plaintiff Jonathan Parker a name once. (SUF ¶ 62).

Mends' complimentary salute to Head Coach Kirk Ferentz and Coach Chris Doyle thanks them for many things Mends received from the Iowa football program. (SUF ¶ 64). Mends wrote these words after he transferred from Iowa in 2019:

> …I just wanted to say thank you for everything that you and KF [Kirk Ferentz] have done for me over the years….I'm sure you know this, but seeing it first hand you really do an amazing job with the team.  My coach's [sic] complement [sic] me all the time for my work ethic and attention to details.  I have you to thank for that.  Its [sic] was hard sometimes while I was in the program to realize how much I have learned from being around you and KF but I am confident I have built a solid foundation for whatever my next step is.

(SUF ¶ 64).  Mends' text complains about nothing about B. Ferentz or any other coach.

Mends also wrote a transfer announcement in January 2019 thanking the University:

> I would like to thank the University of Iowa for the incredible opportunity they have given me.  Throughout my career I have made great friends, memories, and, most importantly, earned a college degree.  With the support of my coaches and family, I have decided to pursue a graduate transfer and continue my academic and athletic career.

(SUF ¶ 65).  These words do not reflect that Mends experienced intentional racial discrimination.

B. Ferentz did nothing to Mends that affected his education.  (SUF ¶ 86). Mends completed his course work and graduated with a bachelor's degree in December 2018. (SUF ¶ 87).  Similarly, B. Ferentz did nothing to Mends that affected his participation in the Iowa football program.  (SUF ¶ 88).

Defensive coaches, and not B. Ferentz, had decision-making authority over defensive players, such as Mends.  (SUF ¶ 89).  B. Ferentz, as offensive line coach and later offensive coordinator (SUF ¶¶ 5-6), did not make any decisions regarding Mends' playing time, health, practice, game participation, reprimands, punishments or sanctions, use of facilities, schedule, education, or any other decision regarding Mends' participation in the Iowa football program before his departure in early 2019.  (SUF ¶ 90).  Mends never made any complaint against B. Ferentz before leaving the University and never afforded B. Ferentz any opportunity to address any complaint with him.  (SUF ¶ 91).  Mends was not the target of any discrimination by B. Ferentz.  (SUF ¶ 92).   Defensive coaches, not B. Ferentz, made the coaching decisions that resulted in better players starting as linebacker ahead of Mends.  (SUF ¶ 93).  B. Ferentz knows that other coaches evaluated the players ahead of Mends as more skilled players, better athletes, and displaying better football judgment than Mends, including two starters at Iowa (Josey Jewell and Ben Niemann) who have played in the National Football League (NFL) for about five years.  (SUF ¶ 94).  B. Ferentz knows that Mends overslept and missed a required session, resulting in his losing playing time, and allowing another player (Bo Bower) to have a chance to play.  (SUF ¶ 95).  B. Ferentz also knows Mends did not regain his position because the linebacker and defensive coaches believed Bo Bower performed better.  (SUF ¶ 96).  Regardless, B. Ferentz did not participate or have any personal involvement in the defensive coaches' decisions about Mends' playing time.  (SUF ¶ 90).

Just as with his lack of playing time, Mends makes complaints that have nothing to do with B. Ferentz.  First, Mends returned to Iowa City in 2020 to train for the NFL.  (SUF ¶ 100).  He had no contract with the University at that time.  (SUF ¶ 101).  Because he left the

University in January 2019, he was considered ineligible to use the Iowa training facilities when he requested in 2020. (SUF ¶ 102). B. Ferentz had no involvement in that decision, was not consulted, and did not speak with Mends about use of the Iowa facilities after he had transferred. (SUF ¶ 103). Second, Mends complains in FAC ¶ 159 that a University photographer would not give him a photograph because it would "not be a good look." (SUF ¶ 104). B. Ferentz had no communication or involvement with Mends or any University photographer or anyone about a photograph of Mends holding a shotgun. (SUF ¶ 105). B. Ferentz was not involved in any decision about whether Mends would be given any photo or what he could post. (SUF ¶ 106).

Mends complained in First Amended Complaint ¶ 48 and his deposition that B. Ferentz was named Offensive Coordinator in January 2017 in preference to Coach Bobby Kennedy, who had recruited Mends and Mends preferred, or Coach Chris White. (SUF ¶ 82). B. Ferentz's appointment as offensive coordinator had no materially adverse effect on Mends' contract. (SUF ¶ 84). B. Ferentz did not racially discriminate against Mends by seeking the promotion. (SUF ¶ 85).

Mends and other Plaintiffs wrongly allege in the First Amended Complaint ¶ 67 that Head Coach Kirk Ferentz instructed B. Ferentz to harass and discriminate against African-American athletes continuously. (SUF ¶ 97). B. Ferentz received no such instructions from Kirk Ferentz and he did not harass or discriminate against African-American athletes. (SUF ¶ 98). Mends admitted he knew of no such instructions. (SUF ¶ 99). Mends met with Liz Tovar (now Executive Officer and Associate Vice President of the Division of Diversity, Equity, and Inclusion) and John Bruno (now Assistant Athletics Director-

Academics) in 2018 about "what was going on at Iowa," but he admits he does not recall saying anything about B. Ferentz to them. (SUF ¶ 63).

Mends admitted he never applied for coaching positions, has not sought a coaching job, and his answers to Interrogatory Nos. 21 and 23 as to his damage claims are not true and correct. (SUF ¶ 128).

### c. BRANDON SIMON

Plaintiff Brandon Simon (hereafter Simon) was a backup defensive lineman for Iowa from 2015-18.  (SUF ¶ 137).  Simon transferred to Illinois State University in January 2019 and graduated in 2021.  (SUF ¶ 138).  Simon admitted in his deposition that B. Ferentz did not mock, make fun of, or ridicule Plaintiff Simon at any time regarding his hair, tattoos, clothing, diction, or the way he walked.  (SUF ¶ 140).  Simon said that B. Ferentz once said his jewelry looked stupid, which statement B. Ferentz denies.  (SUF ¶ 141).  Simon's deposition testimony on those matters recanted and contradicted his inaccurate sworn interrogatory answer No. 8 claiming otherwise.  (SUF ¶¶ 142-143).  His interrogatory answer No. 8 was not truthful when he swore that B. Ferentz had done those things.  (SUF ¶ 144).  Simon admitted in his deposition that B. Ferentz did not use any racial slur, name, or epithet to refer to him at any time or during the four years between November 11, 2016-2020.  (SUF ¶ 145).  Simon testified in his deposition that B. Ferentz did not use the n-word, refer to gangs, dumbass black player, or go back to the ghetto.  (SUF ¶ 146).

Defensive coaches, and not B. Ferentz, had decision-making authority over a defensive player, such as Plaintiff Simon.  (SUF ¶ 151).  B. Ferentz did not make any decisions regarding his injuries, playing time, health, practice, game participation, reprimands, punishments or sanctions, use of facilities, schedule, or any other decision regarding

Simon's participation in the Iowa football program.  (SUF ¶ 152).  Simon was not personally the target of any racial discrimination by B. Ferentz.  (SUF ¶ 153).

Simon's complaint that he did not make the travel list, dress for all home games, or play, and the coaching staff made such decisions to punish him because of his race has nothing to do with B. Ferentz.  (SUF ¶ 154).  In B. Ferentz's opinion, Simon did not play or make the two-deep roster, travel to away games, or dress for all home games because Iowa had more skilled defensive line players compared to Simon.  (SUF ¶ 155).  During the years Simon played Iowa football, Simon competed for playing time with nine defensive linemen who later played or are playing professional football: Matt Nelson, Parker Hesse, Anthony Nelson, Jaleel Johnson, Nathan Bazata, AJ Epenesa, Cedrick Lattimore, Chauncey Gholson, and Tyler Linderbaum.  (SUF ¶ 155).  The defensive linemen ahead of Simon included three African-American players (Johnson, Lattimore, and Gholston), one Polynesian player (Epenesa), and five White football players (Nelson, Hesse, Nelson, Bazata, Linderbaum).  (SUF ¶ 159).  When nine players ahead of Simon played or are playing professional football, Simon did not dress, travel or play at Iowa because he was not as good of an athlete as them.  (SUF ¶ 156).  B. Ferentz observed these players often and they were all better football players than Plaintiff Simon.  (SUF ¶ 157). As a result, Simon did not play in games for Iowa.  Simon did not make the two deep roster due to effort, attitude, size, and football skills, although that decision was made by other coaches.  (SUF ¶ 158).  Simon did not play well enough to beat out the players ahead of him.  (SUF ¶ 160). Those decisions as to Simon were unrelated to race or other factors than football ability. (SUF ¶ 161).  Nevertheless, B. Ferentz did not make those decisions as to his playing, traveling, or dressing for games.  (SUF ¶ 162).

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ Simon complains about the frequency and unreasonableness of drug testing

at Iowa.  (SUF ¶ 165).  ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Simon also failed his Spanish class in 2018.  (SUF ¶ 163).  Simon's transfer to a different

program gave him a chance to play where the competition for playing time would not be as

difficult as at Iowa and there were not as many, or any, professional prospects ahead of him

in the program.  (SUF ¶ 166).  B. Ferentz had no discussion with Simon about his decision

to transfer in 2018-2019.  (SUF ¶ 164).  B. Ferentz did not make the decision that Simon

was not likely to play at Iowa.  (SUF ¶ 167).

B. Ferentz denies that he encouraged the running backs (most of whom were African-

American) (SUF ¶ 172) in a meeting to hit Simon in practice or that he did anything to

Simon because of his race.  (SUF ¶ 168).  The first version of this allegation was about a

different player and told by Akrum Wadley (hereafter Wadley) or Robert T. Green about

June 6, 2020, when Mr. Green attributed to Wadley an allegation that B. Ferentz asked

players to hit Reggie Spearman when he played at Iowa before he transferred to Illinois

State in late 2014 or early 2015, about two years before the state court petition was filed.

(SUF ¶ 169).  Plaintiff Spearman was dismissed from this case May 6, 2021, because he had

no timely claims.  (Dkt. 31, at 7) (SUF ¶ 170).  Then the targeting story resurfaced 15

months later as an allegation that B. Ferentz asked running backs to hit Simon in a meeting

that allegedly included Wadley.  (SUF ¶ 171).  B. Ferentz did not request any player to

injure or hit Brandon Simon or Reggie Spearman or any other player.  (SUF ¶ 172).  Nor does B. Ferentz recall any hits on Brandon Simon or Reggie Spearman at his request that caused either of them any injury.  (SUF ¶ 173).  The running backs B. Ferentz supposedly asked to hit Simon were almost all Black players.  (SUF ¶ 172).  Not only did B. Ferentz not make the request, but also no one acted on the alleged request or affected Simon in anyway.  B. Ferentz never asked players to hurt a player of any race.  (SUF ¶ 172).

B. Ferentz did nothing to Simon that affected his education.  (SUF ¶ 174). He completed his course work and graduated from Illinois State.  (SUF ¶ 175).  B. Ferentz did nothing to Simon that affected his participation in the Iowa football program.  (SUF ¶ 176).  To B. Ferentz's knowledge, Simon never made any complaint against him before he left the University and never afforded any opportunity to address any complaint with him.  (SUF ¶ 177).

### d.  JONATHAN PARKER

Plaintiff Jonathan Parker (hereafter Parker) was a backup kick returner, running back, and wide receiver during the years 2013-16.  (SUF ¶ 181).  He received his bachelor's degree in December 2016 and did a graduate transfer to Northern Illinois University on or about January 24, 2017.  (SUF ¶ 182).  B. Ferentz had little to do with Parker, except for one highly disputed incident where Parker's 2016 contemporaneous and clandestine recording belies his changing versions of the single incident.  Parker admitted in his deposition that B. Ferentz did not mock, make fun of, or ridicule Parker at any time regarding his jewelry, tattoos, clothing, diction, or the way he walked.  (SUF ¶ 183).  Parker said B. Ferentz asked him one time before July 28, 2016 (more than four years before the filing of the State Court Petition) how Parker took care of his hair.  (SUF ¶ 184).  B. Ferentz denies asking that

question, but it was more than four years before the filing of the petition, nondiscriminatory, and not racist.  Parker's deposition testimony on those matters recanted and contradicted his inaccurate sworn interrogatory answer No. 9 claiming that B. Ferentz had mocked, made fun of, and ridiculed him about those subjects.  (SUF ¶¶ 185-86).  His interrogatory answer No. 9 was not truthful when he swore under oath that B. Ferentz had done those things, (SUF ¶ 187), and interrogatory answer No. 10 is also not truthful, as will be shown. Parker admitted that B. Ferentz did not use the n-word, refer to gangs, or say go back to the ghetto directed at him.  (SUF ¶ 188).

Other coaches and not B. Ferentz had decision-making authority over Parker because he was a wide receiver, kick returner, and running back.  (SUF ¶ 192).  B. Ferentz did not make any decisions regarding his injuries, playing time, health, game participation, reprimands, punishments or sanctions, use of facilities, schedule, or any other decision regarding Parker's participation in the Iowa football program, with one exception.  (SUF ¶ 193).  B. Ferentz had no involvement in the decisions whether Parker could play in games from 2014-16, because Parker was not an offensive lineman. (SUF ¶ 194).  Parker left the program for Northern Illinois University in January 2017, but did not play more than one or two plays for Northern Illinois.  (SUF ¶ 195).

Parker performed so poorly on one play in the TaxSlayer Bowl in December 2014 that his mistake may have affected his opportunities to play in subsequent years, including that he did not play in 2015 and only played two plays during games in 2016. The widely-read Bleacher Report described it as "This might go down as the biggest brain fart from the college football season." (https://bleacherreport.com/articles/2317553-iowas-jonathan-

parker-throws-ball-while-falling-out-of-bounds-on-kickoff-return).  (SUF ¶¶ 195-98).  Parker

played very little after that mistake.

   Parker participated in the Iowa Football program for about 74 days from November 11,

2016 to January 24, 2017, which dates are within four years of the filing of the State Court

Petition.  (SUF ¶ 199).  Most of Parker's complaints occurred more than four years before

filing the State Court Petition on November 11, 2020, and were unrelated to B. Ferentz in

any way.  (SUF ¶ 200).  For example, Parker complains that an unidentified academic

counselor discouraged him from pursuing a pre-dental curriculum in 2013 (about three years

or more before November 11, 2016) and told him to take easier classes when he arrived at

Iowa and red-shirted his first year.  (SUF ¶ 201).  Nevertheless, Parker sues B. Ferentz for

loss of income related to his not taking classes toward his desired major of dentistry

beginning in 2013.  (SUF ¶ 202).  B. Ferentz, however, had no involvement with Parker's

class choices, his academic counseling, or curriculum in 2013 when he came to the

University or at any other time in his career before he graduated in December 2016.  (SUF ¶

203).  B. Ferentz knows other football players, including African-American players, who

pursued engineering, pre-law, and other professional programs while participating in the

Iowa football program.  (SUF ¶ 203).  Parker chose classes for his final fall semester 2016,

months before November 11, 2016, without any consultation with B. Ferentz. (SUF ¶ 204).

B. Ferentz had nothing to do with any delay of his becoming a dentist. (SUF ¶ 205).

   Parker suffered an injury on July 28, 2016, more than four years before filing the state

court petition.  (SUF ¶ 206).  Parker testified he saw a counselor some time before his foot

injury on July 28, 2016, (SUF ¶ 207), and was allegedly asked about the counselor by Kirk

Ferentz about a week after the meeting with the counselor.  (SUF ¶ 207).  B. Ferentz had no

knowledge that Parker had seen a counselor before July 28, 2016.  (SUF ¶ 208).  B. Ferentz

has never spoken to Parker about seeing a counselor, never talked to a counselor about

Jonathan Parker, and never talked to any Iowa coach about Parker seeing a counselor.

(SUF ¶¶ 209-10).  The visit with the counselor occurred more than four years before the

filing of the state court petition on November 11, 2016.  (SUF ¶ 211).

Parker played behind some outstanding running backs, including a number of African-

American running backs who played for Iowa during Parker's tenure at Iowa and who

would have competed with him for time in 2016-2017, including LeShun Daniels, Jr.,

Akrum Wadley, Derrick Mitchell, Toks Akinribade, and graduate transfer James Butler.

(SUF ¶ 212).  Parker was not a good enough football player to earn much of any playing

time at Iowa, and he likely would not have played many plays in games at Iowa in 2017, if

he had stayed, just as he had not played in 2015 or 2016 on many plays, and did not appear

to play much at Northern Illinois in 2017 after he transferred.  (SUF ¶¶ 213-14).

Parker raises a single disputed incident of alleged name calling without any breach of

contract. Parker's own clandestine and contemporaneous 2016 tape recording bears out B.

Ferentz's version of the facts.  B. Ferentz kicked Parker out of practice on December 19,

2016, after Parker had performed a drill incorrectly, tossed the football to B. Ferentz, and

told him to "f***ing do the drill yourself."  (SUF ¶ 216).  Parker denies only that he said the

word "f***ing" in B. Ferentz's version, (SUF ¶ 217), but admits the insubordination,

including that he did not do the drill properly, tossed the ball to the coach, and he told the

coach to "do the drill himself."  (SUF ¶¶ 216-17, 218-20, & 228).  There are two University

videos of a portion of that practice but there is no audio. (SUF ¶ 219).  Parker raised palms

up after tossing the ball to Defendant, and told the coach to "f***ing do the drill yourself."
(SUF ¶ 220).

Then a few days later, Parker made a clandestine tape recording during his meeting with
Head Coach Kirk Ferentz after December 19, 2016.  (SUF ¶ 221).  A full transcription is in
his deposition.  (SUF ¶ 223).  The secret tape recording by Parker curiously does not contain
the word "race" or "racial discrimination," "Black dumb ass," or any reference to race, or
racial slur, or racial epithet, because he made no such complaint.  (SUF ¶¶ 222-223).
Parker's sworn interrogatory response asserting that he was visiting Kirk Ferentz a couple of
days later to discuss being called a "Black dumb ass," is not supported by the secret tape
recording because Parker left the meeting without ever mentioning that he had been called a
"Black dumb ass," or any other racial term, slur, name or epithet, or that B. Ferentz said
anything about "race."  (SUF ¶¶ 223-24).  On Parker's clandestine 2016 tape, Parker says
that B. Ferentz called him an "asshole."  (SUF ¶ 238).  He does not say on the tape that
Defendant called him a "Black dumb ass," and the words "Black dumb" and "asshole" do
not even seem to go together. (SUF ¶ 239).  The secret tape recording is simply devoid of
support for Parker's claim that B. Ferentz's kicking him out of practice was racially-
motivated or that B. Ferentz said anything racial.  (SUF ¶ 225).  Now, of course, three and
one-half years later for the first time Parker tells a different story.

Parker withheld the secret 2016 tape recording and failed to disclose he had a recording
of statements by the Head Coach Kirk Ferentz until 5:00 p.m. on the eve of his deposition,
March 28, 2022, (SUF ¶ 215), presumably because he knew it contradicted his new version.
The clandestine 2016 tape recording should have been disclosed in answer to Interrogatory
No. 4 nine months earlier on Sept. 30, 2021 (SUF ¶ 215), which interrogatory asked for

details about statements and admissions by any representative of the Defendants, but Parker said nothing of having a secret tape recording of the Head Coach in his answer.  An honest and forthright answer to Interrogatory No. 4 should have disclosed that Parker had secretly recorded a 2016 meeting with the Head Coach.  Parker also hid the existence of the tape when he responded on Sept. 30, 2021, to Request for Production No. 6 asking for communications with any representative of the University of Iowa and Request for Production No. 9 for reports of alleged conduct to the University (although in fairness, Parker never did report any racial slur, epithet, name, or racial discrimination on the secret tape recording).  (SUF ¶ 215).  Parker says B. Ferentz only said it once and it was a single incident.  (SUF ¶ 245).

Parker inaccurately describes the events in his Answer to Interrogatory No. 10 and his version is not corroborated by his 2016 secret tape recording: (1) Parker says in his Answer to Interrogatory No. 10 that Kirk Ferentz said he heard what B. Ferentz said; the secret tape by Parker does not contain that statement by Kirk Ferentz, (2) Parker says Kirk Ferentz said he would not side with a player in Answer to Interrogatory No. 10; the secret tape recording by Parker does not contain that statement by Kirk Ferentz, (3) Parker says in Answer to Interrogatory No. 10 that Kirk Ferentz said he would back up his coaches; the secret tape recording by Parker does not contain that statement by Kirk Ferentz, (4) Parker says Kirk Ferentz pushed him out of the program to protect his son in Answer to Interrogatory No. 10; but Kirk Ferentz clearly gave Parker a choice to stay (SUF ¶ 221), and, of course, (5) Parker had never said there was any racial epithet, name, slur used for which B. Ferentz sought protection (SUF ¶ 221).  Parker helped prepare the answer to Interrogatory No. 10

before Sept. 30, 2021, when he knew there was a tape recording, which he never mentioned in his answer to Interrogatory No. 4.

The failure of Parker to use the term race or mention any racial name or slur on the secret 2016 tape recording of Kirk Ferentz is consistent with B. Ferentz's memory and testimony that no such racial name or slur was directed at Parker (SUF ¶¶ 222-225), and that no charge or allegation that B. Ferentz uttered a racial slur or name had been made from 2016 through May 2020 (SUF ¶ 216). While Parker had every opportunity to make a statement in 2016-17, or on his secret recording, accusing B. Ferentz of using a racial slur or name, his failure to do so in 2016-17 is consistent with B. Ferentz's memory that it did not happen. (SUF ¶ 227). Before sometime in 2020, B. Ferentz knew of no allegation, record, written or oral complaint or statement, text, or email to the effect that he allegedly called Parker a "Black dumb ass." (SUF ¶¶ 227, 230, and 233). He first heard that allegation after June 5, 2020, about three and one-half years after he had allegedly made the statement during practice on December 19, 2016. (SUF ¶ 234). Parker's clandestine tape so undermines Parker's credibility he should not be permitted now to change his story. Under the principle of "any port in a storm," Parker claims that he was too "intimidated" to mention that B. Ferentz had used a racial epithet when he made the 2016 clandestine recording. (SUF ¶ 238).

B. Ferentz denies that he called Parker a "Black dumb ass." (SUF ¶ 235). B. Ferentz admits he swore at times during practice when players made mistakes or performed as poorly in a drill as Parker had done. (SUF ¶ 236). After Parker's insubordinate statement of "do the f***ing drill yourself," B. Ferentz shouted at him and directed him to leave the practice. (SUF ¶ 237). Defensive Coordinator Phil Parker was on the field during the

incident and did not hear B. Ferentz call Jonathan Parker a "Black dumb ass."  (SUF ¶ 237).

In First Amended Complaint ¶ 140 and Parker's Answer to Interrogatory No. 10, Parker alleges B. Ferentz threw the football, kicked a garbage can and said "only a dumb ass black player would do it like that!" and "only a dumbass Black Player like you would do some shit like that." (SUF ¶ 240).  Parker incorrectly testified that B. Ferentz kicked a garbage can after throwing the football on December 19, 2016.  (SUF ¶ 241).  The video shows B. Ferentz tossing the football towards the sideline, but there is no video showing B. Ferentz kicked a garbage can on December 19, 2016, and B. Ferentz denies that he kicked a garbage can on that date.  (SUF ¶ 242).  A video shows that B. Ferentz kicked a garbage can during practice on October 7, 2016, which video quickly became a subject of public exposure. (SUF ¶ 243).  The garbage can incident related to performance by a quarterback and tight end, both White players, during preparation for the Minnesota game and had nothing to do with Parker, who does not appear to be on the field.  (SUF ¶ 244).

B. Ferentz did not call Parker a "dumb black asshole," or "Black dumb ass;" and neither phrase is one that B. Ferentz have used in reference to any football player. (SUF ¶ 245).  If Parker had said to Head Coach Kirk Ferentz that B. Ferentz had used a racial name or slur, B. Ferentz believes he would have heard about such an allegation at that time or it would have become a subject of some discussion or report earlier than three and one-half years later for the first time.  (SUF ¶ 246).  In a football practice drill that contained over 50 players and 10 coaches and assistants, the alleged use of a racial slur, name or epithet without some mention, report, leak to the press, text, or email of it by anyone for three and one-half years is consistent with B. Ferentz's testimony that it did not happen. (SUF ¶ 247).

Parker apologized to B. Ferentz for his statement about 10 days after December 19, 2016, in Tampa, Florida, when the team went to the Outback Bowl. (SUF ¶ 248). He did not say anything to B. Ferentz about any racial slur, name or epithet when he apologized for his statement. (SUF ¶ 249). He apologized in Tampa and made no mention of anything or statement to do with race. (SUF ¶ 250).

As a coach and former player, B. Ferentz has no recollection of any player telling a coach to do a drill himself or to "do the f***ing drill yourself," in 15 years of coaching or 7 years of playing football. (SUF ¶ 251). B. Ferentz kicked Parker out of the practice for insubordination, tossing the ball to him, and his statement, and kicking him out had nothing to do with Parker's race. (SUF ¶ 252). B. Ferentz sought no other discipline or adverse action to Parker. (SUF ¶ 253). B. Ferentz would have had to ask the Head Coach or the offensive coordinator at that time to initiate any further action. (SUF ¶ 254). B. Ferentz took no action that adversely affected Parker's education or scholarship, and he had completed his degree by the date of December 19, 2016. (SUF ¶ 255). Parker did not speak to B. Ferentz about the incident except to apologize and he did not speak about his decision to transfer to another school. (SUF ¶ 256). He completed his course work and graduated with a bachelor's degree in December 2016 after three and one-half years of study. (SUF ¶ 258). B. Ferentz did nothing to Parker that affected his scholarship. (SUF ¶ 259). To B. Ferentz's knowledge, Parker never made any complaint against him related to anything about race or racial discrimination before he left the University or after graduation, and he never afforded Defendant notice of any complaint or any opportunity to address any complaint with him. (SUF ¶ 260).

### e. MARCEL JOLY

Marcel Joly (hereafter Joly) was a backup running back for Iowa until his graduation in December 2017, with a bachelor's degree.  (SUF ¶ 261).  Joly admitted in his deposition that B. Ferentz did not mock, make fun of, or ridicule Joly at any time regarding his hair, jewelry, tattoos, clothing, diction, or the way he walked.  (SUF ¶ 262).  Joly admitted in his deposition that he does not recall B. Ferentz using any racial slur, name, or epithet to refer to him at any time or during the four years between November 11, 2016-2020.  (SUF ¶ 263). Joly admitted that B. Ferentz did not use the n-word, refer to gangs, or say go back to the ghetto directed at him, (SUF ¶ 264), and he said that he does not recall B. Ferentz using any racial slur or racial epithet directed at him (SUF ¶ 265).

Joly and other Plaintiffs allege in the First Amended Complaint ¶ 67 that Head Coach Kirk Ferentz instructed B. Ferentz to harass and discriminate against African-American athletes continuously.  B. Ferentz received no such instructions from Kirk Ferentz and did not harass or discriminate against African-American athletes.  (SUF ¶ 267).  Joly admitted he personally heard no such instructions.  (SUF ¶ 268).

B. Ferentz denies any racial slur directed at Joly and he was not a decision-maker with respect to Joly, except for the 2017 season.  (SUF ¶ 273).  The primary incidents of which Joly complains in his interrogatory answers do not involve B. Ferentz or his alleged intentional racial discrimination, and involve instead other coaches who left the program or non-plaintiffs, and involve events which occurred before November 11, 2016.

Regarding one old complaint, Joly claims he had a discussion with former Iowa Coach Chris White in 2015 about an automobile Joly was driving to the football building.  (SUF ¶ 285).  B. Ferentz took no part in that discussion, did not speak to Joly, Chris White, or anyone about the automobile Joly was driving in 2015 or any time, and did not do anything

with respect to the automobile Joly was driving in 2015 or any other time.  (SUF ¶ 286).
Not only was this discussion well before November 11, 2016, but also B. Ferentz had
nothing to do with it.  (SUF ¶ 287).

Regarding another old complaint, Joly claims also that Coach Chris White talked to him
about his tattoos in 2015 or 2016. (SUF ¶ 288).  B. Ferentz took no part in that discussion,
did not speak to Joly, Coach Chris White, or any one about Joly's tattoos, and did not do
anything with respect to Joly's tattoos in 2015 or any other time.  (SUF ¶ 288).

Regarding a third old complaint, Joly claims he witnessed Derrick Mitchell talking to
Coach Chris White on the phone and Coach White allegedly told Derrick Mitchell to cut
his hair.  (SUF ¶ 289).  Derrick Mitchell was killed in a car accident in 2019.  (SUF ¶ 290).
Coach White left the Iowa program in early January 2017.  (SUF ¶ 291).  B. Ferentz did not
speak to Derrick Mitchell about his hair, tell him to cut his hair, or say anything about his
hair.  (SUF ¶ 292).  B. Ferentz had no role in any conversation Coach Chris White may
have had with Derrick Mitchell about his hair.  (SUF ¶ 293).  Joly recanted his answer to
Interrogatory No. 8 where he accused B. Ferentz of using a speaker in front of the team to
criticize Derrick Mitchell's hair.  (SUF ¶ 293).  In any event, it appears that the conversation
between Coach White and Mitchell was before November 11, 2016, and, regardless of the
time, B. Ferentz was uninvolved.  (SUF ¶ 294).

Regarding a fourth old complaint, Joly claims B. Ferentz called Michael Ojemudia a
"dumb black ass," on April 16, 2016, when Mr. Ojemudia hit Matt Vandenberg hard during
practice.  (SUF ¶ 295).  B. Ferentz has reviewed the video of that practice and the events
following Mr. Ojemudia's hit on Mr. Vandenberg; there is no audio.  (SUF ¶ 296).  While
B. Ferentz can see many players in the video, he did not observe Joly being present on the

field.  (SUF ¶ 297).  B. Ferentz recalls that he said nothing to Mr. Ojemudia at the time of the hit or soon after.  (SUF ¶ 298).  Instead, B. Ferentz spoke to the Defensive Coordinator Phil Parker about the violence of the hit by Mr. Ojemudia on Mr. Vandenberg during practice.  (SUF ¶ 299).  B. Ferentz denies that he called Mr. Ojemudia a "dumb black ass" or any other racial name or slur.  (SUF ¶ 300).  Defensive Coordinator Phil Parker said he did not hear B. Ferentz call Michael Ojemudia any racial slur or name and B. Ferentz's comments were directed to Phil Parker.  (SUF ¶ 299).  This incident occurred approximately four years and seven months before November 11, 2020, did not involve any plaintiff, and B. Ferentz's comments about the hit were directed to Coach Phil Parker.  (SUF ¶¶ 301-302).  The incident, which B. Ferentz denies had any racial component directed at Mr. Ojemudia, had no adverse effect on Joly's education or scholarship.  (SUF ¶ 303).

B. Ferentz did nothing to Joly that affected his education.  (SUF ¶ 304).  Joly completed his course work and graduated with a bachelor's degree in December 2017.  (SUF ¶ 305).  B. Ferentz did nothing to Joly that affected his participation in the Iowa football program. (SUF ¶ 306).  To B. Ferentz's knowledge, Joly never made any complaint against him before he left the University and never afforded B. Ferentz any opportunity to address any complaint with him.  (SUF ¶ 307).  B. Ferentz is entitled to summary judgment on Joly's § 1981 claim because he did not commit intentional racial discrimination against Joly.

**f.  AKRUM WADLEY**

Plaintiff Akrum Wadley joined the team in 2014 and was a star running back on the Iowa football team from 2015-17.  (SUF ¶ 308).  He participated in the Iowa program for about 14 months after November 11, 2016, including his senior season of 2017.  (SUF ¶ 309).  Neither B. Ferentz nor any other coach did anything to discriminate against him,

breach his contract, adversely affect or impair his football participation, scholarship or educational opportunity in any material way, or make him the target of racial discrimination. (SUF ¶ 308).  The suggestion that a coach or the coaches intentionally discriminated against the star running back because of his race or breached his contract with the University, is the world of college football turned upside down.

Because Wadley starred on the team, he made many public statements.  (SUF ¶ 323). Wadley praised and complimented Kirk Ferentz, B. Ferentz, and the Iowa program during his participation and after he left the program.  Not until much later did Wadley change his story.  (SUF ¶ 324).  B. Ferentz has not had any grievances or incidents of Wadley reported to him by the coaching staff or academic administrators and no such reports of alleged racially discriminatory or harassing actions.  (SUF ¶ 325).  Wadley said in an interview with the Des Moines Register near the end of his career and the 2017 season that B. Ferentz was a "great coach" …he had a "great amount of respect," for B. Ferentz, and B. Ferentz "put us in the best situation and all we had to do was execute." (SUF ¶ 326).  Wadley had a chance to declare for the NFL draft in 2017 and skip his final year of football eligibility at Iowa.  (SUF ¶ 327).  Instead, he chose to return to Iowa.  (SUF ¶ 328).  Wadley stated during the final year that he played at Iowa in 2017 that he was glad he came back for the 2017 season, that he was definitely glad he came back, that he was really proud of his career at Iowa, that he would do it all over again, that he would avoid the off field mistakes he made early in his career, and the Coaches believed in him.  (SUF ¶ 329).  Wadley made all such statements in 2017 while he was playing for Iowa.  (SUF ¶ 330).  In an interview near the end of his final 2017 season, Wadley stated that he cannot imagine Coach Kirk Ferentz waking up and saying I am going to go after Akrum today.  (SUF ¶ 331).  He stated that he

had met a lot with Coach Kirk Ferentz and it's all good, that it's all for the greater good,

and it's all business and it's all for the good of the team.  (SUF ¶ 332).  In a 2019 podcast

interview, Wadley made the following statements about Head Coach Kirk Ferentz:

> Akrum Wadley: Um, [Kirk Ferentz is] definitely a leader, um, and ah, I would say he's a real good coach, always treated me fair. Always, you know, very humble. Um, it was fun man…. we found a relationship where Coach, he put more and more trust in me then we still talk you know every once in a while….One thing appreciate about him, is he's not one of those type of coaches that are you know. I spoke to a few coaches and he's very honest, you know, he'll tell you exactly how he feels and he you know, he's really big on his (inaudible)….He wouldn't lie to you…. He wasn't that type of you know, coach. He always be honest.

(SUF ¶ 333).  B. Ferentz knows that as late as May 2020, Wadley's mother communicated

with Head Coach Kirk Ferentz by text message to interest the Iowa football program in

recruiting another of her sons who was eligible to play college football. (SUF ¶ 334).  All of

these statements in praise of Iowa and his coaches belie his current story of intentional racial

discrimination against him by B. Ferentz.

Wadley admitted in his deposition that B. Ferentz did not mock, make fun of, or ridicule

Wadley at any time regarding his hair, jewelry, tattoos, clothing, diction, or the way he

walked, with the exception of allegations about a University issued skull cap and parking

space that will be addressed below.  (SUF ¶ 336). Wadley's deposition testimony on those

matters recanted and contradicted his inaccurate sworn interrogatory answer No. 8 claiming

that B. Ferentz did mock, make fun of and ridicule him regarding those subjects.  (SUF ¶

337).  His interrogatory answer No. 8 was not truthful when he swore under oath that B.

Ferentz had.  (SUF ¶ 338).  Wadley admitted in his deposition that B. Ferentz did not use

any racial slur, name, or epithet to refer to him at any time or during the four years between

November 11, 2016-20.  (SUF ¶ 339).  He admitted B. Ferentz did not call him anything.

(SUF ¶ 340).  Wadley admitted that B. Ferentz did not call him a "dumbass black player."
(SUF ¶ 341).

Wadley wrongly alleged in First Amended Complaint ¶ 50 that B. Ferentz commonly

used the n-word, referred to gangs, dumbass black player, or go back to the ghetto, but he

did not say in his deposition he knew B. Ferentz had said any of those things, except he

claims he heard B. Ferentz call Parker a racial slur.  (SUF ¶ 342).

Wadley and other Plaintiffs allege in the First Amended Complaint ¶ 67 that Head

Coach Kirk Ferentz instructed B. Ferentz to harass and discriminate against African-

American athletes continuously.  B. Ferentz received no such instructions from Kirk

Ferentz and he did not harass or discriminate against African-American athletes.  (SUF ¶

98).  Wadley admitted he heard no such instructions.  (SUF ¶ 343).

Wadley admitted many of his interrogatory answers were false, including No. 8

(discussed above), 9, 10 and 16.  Wadley recanted his sworn answer to Interrogatory No.

16.  (SUF ¶ 349).  He first swore he took his grievances to Chris Doyle, B. Ferentz, and Kirk

Ferentz and that "each and every incident was reported to Kirk Ferentz and academic

administrators Liz Tovar and John Bruno."  (SUF ¶ 349).  Later, he recanted that sworn

answer and claims he took grievances only to Chris White and John Bruno.  (SUF ¶ 350).

Wadley also recanted his sworn answer under oath to Interrogatory No. 9 that "each and

every incident was reported to Kirk Ferentz and academic administrators Liz Tovar and

John Bruno."  (SUF ¶ 344).  Wadley changed this sworn answer in his deposition testimony

and Amended Answers to Interrogatories to delete that he had reported each and every

incident to K. Ferentz, Tovar, and Bruno (SUF ¶ 345), and said he did not report the

incident described in First Amended Complaint ¶ 123 as he believed it would be futile to do

so. Wadley swore he reported incidents to multiple University representatives in answers to Interrogatories, and then nine months later recanted his earlier sworn answer and instead swore that "it would have been futile" to complain to those persons.  Wadley also recanted his sworn answer to Interrogatory No. 10 when he filed his amended answer to Interrogatory No. 10.  (SUF ¶ 346).  Wadley swore under oath that "each and every incident was reported to Kirk Ferentz and academic administrators Liz Tovar and John Bruno."  (SUF ¶ 347).  Wadley changed this sworn answer in his Amended Answers to Interrogatories to delete that he had reported each and every incident to those three persons and said he did not report the incident described in First Amended Complaint ¶¶ 124-25 as he believed it "would be futile to do so." (SUF ¶ 348).

Wadley's complaints about meal cards have nothing to do with B. Ferentz or complaints against B. Ferentz.  (SUF ¶ 351).  B. Ferentz had nothing to do with Wadley's meal program or meal cards, except as B. Ferentz was offensive coordinator in 2017, Wadley's making weight was a goal in 2017.  (SUF ¶ 352-53).  The setting of weight targets were the subject of other coach's efforts.  (SUF ¶ 354).  B. Ferentz is not critical of any other coach with respect to Wadley's meals, weight gain, or weight targets, and B. Ferentz had minimal involvement with these matters.  (SUF ¶ 355).

Wadley complained in his deposition that he missed one meal once during his five years at Iowa because his "black card" was deactivated or unusable.  (SUF ¶ 356).  Setting aside how trivial is this consequence, B. Ferentz had nothing to do with Wadley missing a meal. (SUF ¶ 357).

B. Ferentz had nothing to do with Wadley seeing a counselor.  (SUF ¶ 358).  B. Ferentz can determine from review of Wadley's Answers to Interrogatory Nos. 17-19 that he is

referring to a sports psychologist named Kelli Moran-Miller who left the University of Iowa for Stanford University about August 2015.  (SUF ¶ 359).  Any visit set up by Broderick Binns of her and Wadley would have been before August 2015, more than one-year and three months before November 11, 2016.  (SUF ¶ 360).  Ms. Carmen Tebbe Priebe replaced Ms. Moran-Miller in 2015 and continues to serve in that position.  (SUF ¶ 361).  B. Ferentz never talked to Wadley about a counselor, talked to any counselor about him, or met or talked with coaches about a counselor or a counselor meeting with Wadley.  (SUF ¶ 362). B. Ferentz had nothing to do with the alleged "disappearance" of Wadley's therapist or Ms. Moran-Miller's taking a new job.  (SUF ¶ 363).  In any event, the events of Wadley's visit with her occurred before she accepted a new position at Stanford in 2015, more than four years before the state court petition was filed.  (SUF ¶ 364).

B. Ferentz denies that he asked Wadley if he were going to rob a liquor store, gas station, bank, or any other place. (SUF ¶ 365).  Wadley asserts that Defensive Coordinator Phil Parker witnessed the incident.  (SUF ¶ 365).  Coach Phil Parker did not hear B. Ferentz ask Wadley if he were going to rob a liquor store or gas station or words to that effect. (SUF ¶ 365).  B. Ferentz denies that he confronted him about parking in "my" reserved space near the football building.  (SUF ¶ 366).  The players and public enter the building from the east parking area.  The University does not have reserved parking spaces at the football building for any coach or person, other than ADA spaces.  (SUF ¶ 367).  The coaches park on the west side of the building.  B. Ferentz denies that he threatened him physically or otherwise. (SUF ¶ 368).  Wadley asserts that Defensive Coordinator Phil Parker witnessed the incident.  (SUF ¶ 366).  Coach Phil Parker did not hear B. Ferentz confront Wadley about parking adjacent to the football building.  (SUF ¶ 366).

Wadley complains of B. Ferentz's discussion of a visit to his high school while recruiting a different player.  (SUF ¶ 369).  He complains that B. Ferentz thought he was being humorous and he found his reference to B. Ferentz's resemblance to a cop or detective offensive.  (SUF ¶ 370).   B. Ferentz denies that he intended any racial discrimination or harassment towards Wadley at any time.  (SUF ¶ 371).

B. Ferentz did nothing to Wadley that affected his education.  (SUF ¶ 378).  At the start of the fall 2017 season, Wadley was on course to graduate from the University of Iowa. (SUF ¶ 379).  He did not pass all of his classes in his last semester during the fall of 2017, complete his foreign language requirement, (SUF ¶ 380) or register for classes in 2018 (SUF ¶ 381).  B. Ferentz believes Wadley thought he would make it in the NFL draft or later and did not finish school so he could prepare for professional tryouts and the draft.  (SUF ¶ 382).

B. Ferentz did nothing to Wadley that affected his participation in the Iowa football program, except B. Ferentz benched him at the beginning of one Illinois game for failure to attend a required team meeting and he subsequently played almost the entirety of that game. (SUF ¶ 384).  He played in almost all games, except for those when he had injuries, starting with the Northwestern game in 2015 through the Pinstripe Bowl following the 2017 season. (SUF ¶ 385).  He was the star running back of the Iowa team for the 2016-17 seasons and also performed outstanding in 2015.  (SUF ¶ 386).

Wadley never made any complaint against B. Ferentz before he left the University, never afforded B. Ferentz notice of any complaint or any opportunity to address any complaint with him.  (SUF ¶ 387).

### g. JAVON FOY

B. Ferentz remembers that Javon Foy (hereafter Foy) was a walk-on candidate for the Iowa football team in 2019.  (SUF ¶ 388).  B. Ferentz does not believe he ever talked to Foy. (SUF ¶ 389).  Foy admitted in his deposition that B. Ferentz did not mock, make fun of, or ridicule Foy at any time regarding his hair, jewelry, tattoos, clothing, diction, or the way he walked.  (SUF ¶ 390).  His deposition testimony on those matters recanted and contradicted his inaccurate sworn interrogatory answer No. 8 claiming that B. Ferentz did mock, make fun of and ridicule him regarding those subjects.  (SUF ¶ 391).  His interrogatory answer No. 8 was not truthful when he swore under oath that B. Ferentz had.  (SUF ¶ 392).  Foy admitted in his deposition that B. Ferentz did not use any racial slur, name, or epithet to refer to him at any time.  (SUF ¶ 393).  He admitted B. Ferentz did not call him anything. (SUF ¶ 394).  While Foy wrongly alleged in First Amended Complaint ¶ 50 that B. Ferentz commonly used the n-word, referred to gangs, dumbass black player, or go back to the ghetto, he did not say in his deposition he heard B. Ferentz say any of those things.  (SUF ¶ 395).

B. Ferentz understands that Foy participated as a freshman walk-on for some days before he was suspended during the summer football program in 2019. (SUF ¶ 396).  B. Ferentz had nothing to do with the decision to suspend him.  B. Ferentz did not participate in any meetings with him or others about his suspension.  B. Ferentz simply had no involvement in his suspension. (SUF ¶¶ 397-99).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



B. Ferentz did not talk to Foy about returning to play or participate in the Iowa football program. (SUF ¶ 405). B. Ferentz made no promises or comments to him about whether he could play or participate if he fulfilled certain requirements or goals. (SUF ¶ 406). B. Ferentz had nothing to do with setting, communicating, evaluating, or decision-making about whether Foy could return to the Iowa football program. (SUF ¶ 407). B. Ferentz has no recollection of speaking with Foy before he was suspended from the football program in the summer of 2019 or before he met with the Head Coach in January 2020 about his not obtaining medical clearance to play football at Iowa. (SUF ¶ 408). B. Ferentz did nothing to Foy that affected his education. (SUF ¶ 409). B. Ferentz did nothing to Foy that affected his participation in the Iowa football program. (SUF ¶ 410).

Foy never made any complaint against B. Ferentz before he left the University and never afforded B. Ferentz any opportunity to address any complaint with him. (SUF ¶ 411). B. Ferentz should be granted summary judgment on

Foy's § 1981 claim against B. Ferentz because B. Ferentz did not commit intentional racial discrimination against Foy.  (SUF ¶ 389).

### h.  BRIAN FERENTZ

B. Ferentz has coached football for 15 years at Iowa and in the NFL and played football for 7 years before at Iowa and in the NFL.  (SUF ¶¶ 1-6).  He has played with over 100 African-American football players and coached over 200 African-American football players over the last twenty-two years.  (SUF ¶ 8).  He had annual reviews for each of eight years before 2020, with no reports of any racial epithets, slurs, discrimination, or harassment as a coach at Iowa.  (SUF ¶¶ 9 and 11).  There were no such reports during his time playing or coaching at Iowa or in the NFL.  (SUF ¶ 9).  He knows of no document, email, text message, letter or writing accusing him of racial epithets, slurs, discrimination or harassment before 2020.  (SUF ¶ 10).  The allegations against him refer to events three to six years before any accusation was brought forward charging him with racial discrimination. The declarations of Coach Phil Parker, Coach Raimond Braithwaite, former Head Athletic Trainer Russell Haynes, and current Head Athletic Trainer Kammy Powell each state that those persons had not heard or read any racial slur, name, or epithet or racial discrimination or harassment from B. Ferentz.  (SUF ¶ 424).

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law regarding part or all of any claim." Fed. R. Civ. P. 56(a) and (c). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). A dispute is material if it concerns "facts that might affect the outcome of the suit under

the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The fundamental inquiry on summary judgment is whether the evidence in the record presents a "sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *S. Ins. Co. Lowenberg v. CJG Enterprises, Inc.*, No. 3:15-cv-00131-RGE-SBJ, 2017 WL 3449610, at *2 (S.D. Iowa May 12, 2017).

## III.   LEGAL ANALYSIS OF WHETHER THERE IS A GENUINE ISSUE OF INTENTIONAL RACIAL DISCRIMINATION BY B. FERENTZ

A plaintiff establishes a prima facie case under § 1981 by showing "(1) membership in a protected class; (2) discriminatory intent on the part of the defendant; (3) engagement in a protected activity, and (4) interference with that activity by the defendant."  *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009).  "The statute 'does not provide a general cause of action for race discrimination.'"  *Id.* at 468.  The protected activity must involve an impaired contractual relationship of the plaintiff.  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship…."  *Id.* at 480.  The required elements of discriminatory intent on the part of the Defendant B. Ferentz and interference by B. Ferentz with the Plaintiffs' right to make or enforce a contract involve no genuine issues of material fact and B. Ferentz is entitled to judgment as a matter of law.

### a.   FIVE PLAINTIFFS ADMIT THAT B. FERENTZ TOOK NO RACIALLY-MOTIVATED ACTIONS AGAINST THEM OR DIRECTED ANY RACIAL WORDS AT THEM

Cooper, Mends, Simon, Joly, and Foy do not testify that B. Ferentz said or did anything of an intentionally racial discriminatory nature to them.  He said little to them, and they testified he did not call them names, slurs, or epithets, and he did not mock, make fun of, or ridicule them.  A defendant's personal liability under §§ 1981 and 1983 requires proof

37

of intentional discrimination **by that defendant**. *Ellis,* 742 F.3d at 327; *see General Bldg. Contractors Ass'n v. Pa.,* 458 U.S. 375, 391 (1982) ("§ 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination"). To make out a claim for individual liability under § 1981, a plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action." *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir. 1991) *"*A claim seeking personal liability under § 1981 must be predicated on the actor's personal involvement." *Id.*

### b. PARKER ALLEGES A SINGLE INCIDENT AGAINST B. FERENTZ OVER THE FOUR YEARS PARKER WAS IN THE IOWA FOOTBALL PROGRAM

Eighth Circuit cases make clear that the § 1981 claim based on a single alleged racial name is not viable. *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999) (citations omitted); *see also Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003). Parker's allegation of a single name of "Black dumb ass" made the first time in June 2020, more than three and one-half years after Parker had said on his 2016 secret tape recording only that B. Ferentz called him an "asshole" a few days after the incident, when Parker said not a single word about race or a racial slur on the secret tape, does not create a genuine issue of material fact as to B. Ferentz's intentional racial discrimination under § 1981. The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not rise to an actionable level. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Instead, "[m]ore than a few isolated incidents are required," and the harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment." *Scusa*, 181 F.3d at 967 (citations omitted); *see also Meriwether*, 326 F.3d at 993 (noting that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'") (quoting *Faragher v. City of Boca Raton*, 524 U.S.

775, 788 (1998); *see Adefris v. Wilson Trailer Co.*, No. C15-4063-MWB, 2016 WL 141762 (N.D. Iowa Jan. 12, 2016)).

Parker admits he has only one alleged incident against B. Ferentz.  (SUF ¶ 245). Besides having merely one alleged incident, Parker is faced with a contemporaneous videotape without sound that confirms his insubordination, he tossed the ball to the coach, and he said something to B. Ferentz, which Parker admitted included that he told the Coach to "do the drill yourself."  (SUF ¶¶ 219 and 228).  Even more problematic for Parker is his own secret 2016 recording of a twelve-minute meeting with Head Coach Kirk Ferentz which contains absolutely nothing about racial discrimination or harassment or any mention of any racial name, slur or epithet by B. Ferentz.  (SUF ¶ 222).  Parker's answer to Interrogatory No. 10 in 2021 misstates facts about the meeting with Kirk Ferentz, and he misstated facts about the meeting in his interrogatory answer before he decided he had to produce the tape recording nine months later on the eve of his 2022 deposition.  (SUF ¶¶ 215 & 224).

Parker cannot attempt to create a genuine issue of material fact with testimony that contradicts either videotape. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The United States Court of Appeals for the Eighth Circuit reversed the denial of a defendant's summary judgment when contemporaneous videotape "conspicuously refutes and completely discredits" the plaintiff's "version of material facts." *Wallingford v. Olson*, 592 F.3d 888, 892–93 (8th Cir. 2010). The furtive 2016 recording contradicts Parker's current allegation B. Ferentz kicked him out of

practice on December 19, 2016 because of his race. The meeting with K. Ferentz provided

Parker an opportunity to report racial discrimination. Instead, Parker said nothing about a

racial name, slur, epithet, discrimination, or harassment by B. Ferentz. Because the video

recordings refute and discredit Parker's recent version of material facts that no reasonable

jury could believe Parker. The secret 2016 recording contains absolutely no support to

Parker's current claim that he was kicked out of practice on December 19, 2016, because of

his race.

Regardless, Parker faces the insurmountable hurdle that he has only a single alleged

incident against B. Ferentz, and it is greatly disputed, on which he bases his claim that B.

Ferentz breached the performance of Parker's contract with the University within the

meaning of § 1981. Applying these principles to the undisputed factual record entitles B.

Ferentz to summary judgment because Parker's 2020 revision to "black dumb ass" of what

he said B. Ferentz said in 2016 was only "asshole" is not a material fact.

### c. SIMON ALLEGES A SINGLE INCIDENT AGAINST B. FERENTZ OVER THE FOUR YEARS SIMON WAS IN THE IOWA FOOTBALL PROGRAM

Simon makes no allegations as to any specific incident or comment of B. Ferentz in

the Complaint and makes no reference to B. Ferentz in his Amended Answers to

Interrogatories. Without personal observation, Simon claims that B. Ferentz allegedly

requested that the running backs, including Wadley and Joly, hit Simon in an attempt to

injure him. B. Ferentz denies the story as a fabrication, which started originally as an

allegation that B. Ferentz requested players injure Plaintiff Spearman, until he was

dismissed from the lawsuit in May 2021, and then the allegation changed to one that B.

Ferentz asked the mostly black running backs to hit Simon. Regardless, the allegation is no

evidence of racial discrimination and is merely an alleged single disputed incident, which

did not take place and did not result in anything to Simon.  Like the single incident that Parker alleges, one single allegation over a period of four years does not raise a genuine issue of material fact as to intentional racial discrimination by B. Ferentz under § 1981.

### d. WADLEY ALLEGES THREE NON-RACIAL INCIDENTS AGAINST B. FERENTZ OVER THE FOUR YEARS WADLEY WAS IN THE IOWA FOOTBALL PROGRAM

From the star running back who sues B. Ferentz for $20 million dollars with no evidence of any alleged interference with the Plaintiff's chance to get drafted or play in the NFL by B. Ferentz, we hear three non-racial incidents attributed against B. Ferentz.  Two incidents are the same, where B. Ferentz allegedly asked Wadley whether he was going to rob a liquor store or gas station or some business, while wearing a team issued skull cap, and the third was an alleged confrontation when Wadley had parked his car near the Football Practice Facility. B. Ferentz denies each of the incidents.  Wadley's assertion that B. Ferentz objected to Wadley's parking in a reserved spot does not change the fact that the only reserved spots are ADA spaces.  No racial names, slurs, or epithets were used by B. Ferentz toward Wadley.  These three incidents do not permit an inference of intentional racial discrimination against B. Ferentz because they do not contain any racial content and are few in number.  Instead, "[m]ore than a few isolated incidents are required," and the harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment." *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999) (citations omitted).

**e. B. FERENTZ WAS NOT A DECISION-MAKER AS TO COOPER, MENDS, SIMON, PARKER, OR FOY AND HE WAS THE POSITION COACH OF WADLEY AND JOLY ONLY FOR ONE YEAR**

B. Ferentz was the offensive line coach until January 9, 2017, and then became the offensive coordinator.  In the position of offensive line coach, he had no decision-making authority over any of the Plaintiffs, and he certainly had no authority or capacity to modify the terms and conditions of the Plaintiffs' contracts with the University.  Director of Financial Aid Cindy Seyfer declared that B. Ferentz did not have authority to and did not in fact adjust, revoke, cancel or modify the terms of any plaintiffs' contract.  (SUF ¶ 422). Only when he became the offensive coordinator, did B. Ferentz become the position coach of Plaintiffs Wadley and Joly, who were offensive running backs in 2017, the final season of both players with the program.  Regardless, while B. Ferentz would have coaching authority over Wadley and Joly in 2017, he had no authority or capacity to adjust, revoke, modify or cancel the terms and conditions of their contracts. *Id*.  *Browning v. President Riverboat Casino–Missouri, Inc.,* 139 F.3d 631, 635 (8th Cir.1998) ("Direct evidence does not include stray remarks in the workplace, statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself."). The Eighth Circuit has held: "[S]tray remarks in the workplace, statements by non-decision makers, or statements by decision makers unrelated to the decisional process" are not direct evidence. *Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 902 (8th Cir. 2015).

**f. B. FERENTZ DID NOT MAKE THE PLAINTIFFS THE TARGET OF INTENTIONAL RACIAL DISCRIMINATION**

In *Combs v. The Cordish Cos.*, 862 F.3d 671, 684 (8th Cir. 2017), the court explained that "the question is not whether [the plaintiff] has presented evidence of discriminatory conduct on the part of defendants .... The question is whether he has shown evidence that he

personally was the target of [the discriminatory conduct]."  Here, there is no question that

Cooper, Mends, Simon, Joly, and Foy were not the targets of discriminatory conduct by B.

Ferentz.  Only the allegations of Parker as to a single incident—which are disputed

allegations—amount to an assertion of targeted racial discrimination.  The allegations of

Wadley are not racially discriminatory.  In *FCS Advisors, LLC v. Missouri*, 929 F.3d 618, 621–

22 (8th Cir. 2019), the Eighth Circuit stated that Plaintiff's § 1981 claim failed because he

was not "the direct target of discrimination." *Bilello v. Kum & Go, LLC*, 374 F.3d 656, 660

(8th Cir. 2004) (rejecting a § 1981 claim because the "challenged practice ... was not

specifically targeted at" the plaintiff).

### g.  MENDS' CLAIM OF DENIAL OF FACILITIES ACCESS DOES NOT RAISE A MATERIAL FACTUAL ISSUE FOR A SECTION 1981 CLAIM

B. Ferentz had nothing to do with denial of Mends access to train in the Iowa facility

after Mends left the program.  Moreover, Mends' ineligibility to use the training facilities is

not enough to support a § 1981 claim.  *See, e.g., Hines v. F.J.C Sec. Co.,* 96 Civ. 2632, 1998

WL 60967, at *3 (S.D.N.Y. Feb. 13, 1998) (concluding that "[t]he bare assertion that [the]

[d]efendants denied [the] [p]laintiff access to the government building" because of the

plaintiff's skin color, "without any specific allegation of a causal link between the

[d]efendants' conduct and the [p]laintiff's race, is too conclusory to withstand a motion to

dismiss"); *Williams-Lawson v. Subway Surface Supervisors Ass'n,* No. 20CIV8544PGGSLC,

2021 WL 4943554, at *11 (S.D.N.Y. June 21, 2021), *report and recommendation adopted* 2021

WL 4264067 (S.D.N.Y. Sept. 20, 2021) (citing to cases and finding that an alleged lack of

access to areas of the workplace are "inconveniences" that are not "material").

**h. INTENTIONAL RACIAL DISCRIMINATION HAS TO BE THE BUT FOR CAUSE OF THE CONTRACT BREACH TO SHOW A VIOLATION OF SECTION 1981**

Setting aside that no Plaintiff had a modification or breach of his contract with the University, the Plaintiff has to show that intentional racial discrimination by B. Ferentz is the "but for" cause of the contractual breach. *E.g.*, Simon's race would have to be shown as the "but for" cause of B. Ferentz hypothetically asking a room filled with African-American star athletes to injure a fellow African-American because of his race. *Comcast Corporation v National Association of African American-Owned Media*, -- U.S. ---, 140 S. Ct. 1009, 1019 (2020) ("but for" causation required). B. Ferentz asking a room filled with star Black athletes to injure another Black player because of intentional racial discrimination did not happen, but even if it did, it was a single incident that is not enough to sustain a finding of intentional racial discrimination, nothing happened, and it did not breach Simon's contract.

**i. THE ALLEGATIONS ABOUT POLITICAL SPEECH DO NOT ESTABLISH INTENTIONAL RACIAL DISCRIMINATION BY BRIAN FERENTZ OR EVEN INVOLVE HIM IN ANY MATERIAL WAY**

*Dean v. Warren,* 12 F.4th 1248 (11th Cir. 2021) dismissed the claim of a cheerleader who wanted to kneel during the National Anthem against a state actor who had allegedly conspired to ban such kneeling. The Eleventh Circuit held, among other reasons for denying the claim, that there was no First Amendment violation because the cheerleader engaged in government speech. *Id.* at 1264-66. Given this ruling, B. Ferentz is not liable for his *de minimis* involvement with the Iowa football team standing during the National Anthem because it involved no intentional racial discrimination. B. Ferentz is also entitled to qualified immunity because his conduct violated no constitutional or statutory right, and the right he allegedly violated is not even established let alone clearly established, as the

Eleventh Circuit made clear in *Dean v. Warren*.  *Saunders v. Thies*, 38 F.4th 701, 710 (8th Cir. 2022).

Plaintiffs' allegations in First Amended Complaint ¶¶ 162, 63-67, about political expression are inaccurate.  (SUF ¶ 107).  B. Ferentz's involvement was very limited and not racially discriminatory.  Several football players presented a jersey to Candidate Donald Trump on or about January 26, 2016, during a political rally.  (SUF ¶ 108).  B. Ferentz was unaware of the plans and did not give approval for the presentation.  (SUF ¶ 109).  B. Ferentz does not recall and seriously doubts that "in response, many African-Americans decried the double standard…" as alleged in First Amended Complaint ¶ 66.  (SUF ¶ 110). The protests by sports figures over police brutality referenced in First Amended Complaint ¶ 66 began more than seven months later in August 2016 when NFL quarterback Colin Kaepernick first knelt during NFL pre-season games.  (SUF ¶ 111).  The jersey presentation took place eight months earlier than the first NFL player knelt during the National Anthem. (SUF ¶ 112).  B. Ferentz does not recall any player telling him that allowing White players to present a jersey to Candidate Trump in January 2016 presented or created a double standard of not allowing players to kneel for the National Anthem or "decried the double standard" as alleged in the complaint.  (SUF ¶ 113).

The reference in the First Amended Complaint ¶¶ 66-67 to President Trump calling NFL protestors "son[s] of…bitches" did not occur until October 2017, about 20 months after the jersey presentation in January 2016.  (SUF ¶ 114).  The conflation of these three events as a protest about a double standard for white and black athletes established by coaches seems contrived and not in accordance with the timeframe of the events or reality.  Regardless, B. Ferentz had no involvement with the jersey presentation.  (SUF ¶ 115).

The presentation of a jersey to a candidate in January 2016 was no violation of any team or NCAA rule. (SUF ¶ 116). In any event, the jersey presentation occurred more than four years before the filing of the State Court Petition. (SUF ¶ 121) B. Ferentz had no involvement, the presentation was not a racially discriminatory act by B. Ferentz, and B. Ferentz not punishing the White players involved was not racial discrimination against Plaintiffs. (SUF ¶¶ 109 and 115).

The Iowa football team stood during the National Anthem in the fall of 2016. (SUF ¶ 117). B. Ferentz was unaware that any Plaintiff believed otherwise, no Plaintiff ever spoke to him about the issue, and B. Ferentz does not recall being part of any discussion of the issue while he was present. (SUF ¶¶ 118-120).

Some of the alleged acts are outside the four-year look-back window: the jersey presentation (January 2016) (SUF ¶ 121), Colin Kaepernick's kneeling (August 2016) (SUF ¶ 122), and the playing of the National Anthem at Iowa's first nine games of the 2016 season occurred before November 11, 2016 (SUF ¶ 123). The Iowa team's standing for the National Anthem continued after that date. (SUF ¶ 124). The instructions given to the football players were that they should stand during the National Anthem and this instruction applied to all players, coaches, assistants, and support staff without regard to their race, sex, or religious affiliation. (SUF ¶¶ 125-26). The decision in *Dean v. Warren,* 12 F.4th 1248 (11th Cir. 2021) should dispose of the issue on several grounds, including qualified immunity.

**IV.    SECTION 1981 CLAIMS REQUIRE THE PLAINTIFFS TO PROVE A RACIALLY-MOTIVATED BREACH OF THEIR OWN CONTRACTUAL RELATIONSHIP**

At least four Plaintiffs—Cooper, Parker, Joly and Wadley—waited so many years to make any complaint about B. Ferentz that their only possible federal claim is a § 1981 claim for breach of performance obligations of their education contracts under § 1983 against a state actor, because any Title VI, § 1983 claims, or other federal remedies potentially available are time-barred.  (Dkt. 31 at 11).  The § 1981 claims of all Plaintiffs fail on the fourth element of the prima facie case identified in *Gregory*—"interference with that [protected] activity by the defendant"—because none of the seven plaintiffs can show a breach of their education contracts or that B. Ferentz caused a breach of their contracts. *Domino's Pizza,* 546 U.S. at 476.  "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship…." *Id.* at 480.  "The statute 'does not provide a general cause of action for race discrimination.'" *Gregory,* 565 F.3d at 468.  Section 1981 requires (1) an impaired 'contractual relationship' and (2) that the defendant's conduct impaired the contract. *Alston v. Spiegel*, 988 F.3d 564, 572-73 (1st Cir. 2021).  While other federal discrimination statutes may not require a breach of contract, the Plaintiffs chose to proceed under § 1981 and have to show that their right to make or enforce their contract was breached.  Section 1981 applies to educational contracts. *Gratz v. Bollinger*, 539 U.S. 244, 276 n. 23 (2003) (forming a contract for admission to law school); *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002) (illegal contract provision adopted for a racially discriminatory purpose).  Those two cases consider the right to make a contract free from racial discrimination under § 1981.  The Plaintiffs here do not have an employment contract with terms and conditions about pay, benefits or other terms,

which is the typical context of § 1981 actions.  Rather, the Plaintiffs have to show both intentional racial discrimination and a breach of their contracts with the University. *Domino's Pizza*, 546 U.S. at 480.  Without a breach of their contracts, Plaintiffs' remedies, if any, would be under other federal statutes, except that most of the Plaintiffs are time-barred.

A plaintiff cannot show a § 1981 claim unless he or she has, or would have, rights under an existing, or proposed, contract that he or she wishes "to make and enforce"; "[s]ection 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's." *Domino's Pizza,* 546 U.S. at 480.  The Plaintiffs—except for walk-on Foy—had financial aid contracts with the University of Iowa (Cooper SUF ¶ 23; Mends SUF ¶ 66; Simon SUF ¶ 147; Parker SUF ¶ 189; Joly SUF ¶ 269; and Wadley SUF ¶ 372).  Foy had no financial aid contract.  The contract terms are quite simple and provide that the University will provide financial aid during one academic year to the Plaintiff upon his admission to the University.  (*see, e.g.,* SUF ¶ 24).  The University complied, and there simply is no breach of the terms of any agreement.  (SUF ¶¶ 25, 69, 148, 189, 271, 375, and 423).  The University complied with and furnished the financial aid provided by the Plaintiffs' contracts.  (SUF ¶ 423).   B. Ferentz did nothing to interfere with Plaintiffs' contract rights or breach the terms of the University's contract with any Plaintiff. (SUF ¶¶ 26, 68, 70, 150, 190, 271-72, 375 and 422).  *Alston,* 988 F.3d at 572-73 (absent impairment of the contract terms by the Defendant the § 1981 claims should be dismissed). Director of Financial Aid Cindy Seyfer declared that B. Ferentz did not have authority to and did not in fact adjust, revoke, cancel, or modify the terms of any plaintiffs' contract. (SUF ¶ 422).

48

There is another separate deficiency with Plaintiffs' § 1981 claims.  B. Ferentz did not have the capacity to make or enforce Plaintiffs' financial aid contracts.  (SUF ¶¶ 27, 67, 149, 190, 270, 374 and 422).  The First Circuit in *Alston* dismissed § 1981 claims against a defendant who had no authority over enforcement of the plaintiff's contract or any involvement that impacted that contract.  988 F.2d at 572-73.  B. Ferentz had no authority or capacity to alter the terms of the Plaintiffs' contracts with the University, and, as a factual matter, he did not do so.  (SUF ¶ 422).  Therefore, he is not individually liable and is entitled to summary judgment.

To make out a claim for individual liability under § 1981, a plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action*." Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir. 1991). *"*A claim seeking personal liability under § 1981 must be predicated on the actor's personal involvement." *Id.*

There is no genuine issue of material fact for trial on (1) whether any contract breach occurred between the University and any Plaintiff as required by § 1981, (2) whether B. Ferentz's alleged racially discriminatory intent caused any breach of the University's contracts under § 1981, or (3) whether B. Ferentz caused a violation of § 1981.  Plaintiffs Cooper, Parker, Joly and Wadley hope to establish a prima facie case under § 1981 because it was the only federal statute under which they could possibly assert a timely claim, but they cannot establish the elements of the claim; nor can the other three Plaintiffs—Mends, Simon, and Foy—establish the prima facie elements of a § 1981 claim.  Plaintiffs picked the statute under which they brought their claims to get the most advantageous possible statute of limitations, but cannot satisfy the requirement that they have to show B. Ferentz caused a breach of their contract, so their claims should be dismissed.

## V.      BRIAN FERENTZ IS ENTITLED TO QUALIFIED IMMUNITY

The Eighth Circuit has held that § 1983 is the exclusive vehicle for bringing § 1981

claims against state actors. *Artis v. Frances Howell N. Band Booster Ass'n*, 161 F. 3d 1178, 1181

(8th Cir. 1998); *Onyiah v. St. Cloud University*, 5 F.4th 926, 932-33 (8th Cir. 2021) (Colloton,

J., concurring). To determine whether a state actor defendant is entitled to qualified

immunity on § 1983 claims, the Eighth Circuit asks: (1) whether his conduct violated a

constitutional or statutory right; and (2) whether the violated right was clearly established.

*Saunders v. Thies*, 38 F.4th 701, 710 (8th Cir. 2022); *Williams v Mannis*, 889 F.3d 926, 932

(8th Cir. 2018); *Manning v. Cotton*, 862 F.3d 663, 668 (8th Cir. 2017) (citing *Borgman v.*

*Kedley*, 646 F.3d 518, 522 (8th Cir. 2011)). In *Hager v. Ark. Dep't of Health*, 735 F.3d 1009,

1014-15 (8th Cir. 2013), the Eighth Circuit stated:

> Under the doctrine of qualified immunity, a court must dismiss a complaint
> against a government official in his individual capacity that fails to state a
> claim for violation of "clearly established statutory or constitutional rights of
> which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S.
> 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See also Iqbal,* 556 U.S. at
> 685, 129 S.Ct. 1937; *Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806 ("Unless the
> plaintiff's allegations state a claim of violation of clearly established law, a
> defendant pleading qualified immunity is entitled to dismissal before the
> commencement of discovery."). A court considers whether the plaintiff has
> stated a plausible claim for violation of a constitutional or statutory right and
> whether the right was clearly established at the time of the alleged infraction.
> *Powell,* 405 F.3d at 654–55. *See Pearson v. Callahan,* 555 U.S. 223, 236, 129
> S.Ct. 808, 172 L.Ed.2d 565 (2009) ("[D]istrict courts and the courts of appeals
> should be permitted to exercise their sound discretion in deciding which of the
> two prongs of the qualified immunity analysis should be addressed first in
> light of the circumstances in the particular case at hand.").

The doctrine of qualified immunity requires an individualized analysis as to each

officer, *Roberts v. City of Omaha*, 723 F.3d 966, 974 (8th Cir. 2013), because a person "may be

held personally liable for a constitutional violation only if his ***own*** conduct violated a clearly

established constitutional right." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 482 (8th Cir. 2010).

The first prong of the qualified immunity analysis is whether B. Ferentz violated § 1981.  Plaintiffs fail to establish a violation of § 1981 because they fail to show intentional racial discrimination by B. Ferentz and also fail to show he breached or caused a breach of their education contracts.  In *Radwan v. Univ. of Conn. Bd. of Trustees*, 465 F. Supp. 3d 75, 102-05 (D. Conn. 2020), the athletic department officials and coach who cancelled a collegiate volleyball player's scholarship for "flipping the bird" on national TV were granted summary judgment because the three officials had not acted with discriminatory intent.  The district court cited *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014) ("If a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on § 1983 action against the defendant." (emphasis in the original)).  There is insufficient evidence to support a finding of intentional racial discrimination by B. Ferentz against any of the Plaintiffs, as Part I and III show and will not be repeated here.  In discussing qualified immunity, Judges Loken and Colloton in *Ellis* stated:

> This cause of action [§ 1983] is not "a general civility code for the workplace"… and in numerous cases we have concluded that some amount of race-related insults or derogatory comments does not create an actionable hostile work environment under either Title VII or § 1983.

742 F.3d at 328 (citations omitted).  Also, the cases cited in Part IV show that there is no violation of § 1981 because there is no breach of contract.  B. Ferentz is entitled to qualified immunity because he did not violate § 1981.

The second prong of the qualified immunity analysis requires a clearly established right, which exists when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ellis*, 742 F.3d at 324

(alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." *Manning v. Cotton*, 862 F.3d 663, 667 (8th Cir. 2017) (quoting *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013)).  Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In *Resendez v. Prance*, No. 3:16-CV-862-JVB-MGG, 2018 WL 3275615 (N.D. Ind. Jan. 26, 2018), a college coach and two university officials were entitled to qualified immunity because plaintiff had not cited any analogous cases to show that a clearly established right exists for a college baseball player who is a member of a protected class to not be suspended from the team because of a verbal altercation with the coach.  *Id.* at *5.  In *Resendez,* the absence of clearly established precedent applicable to collegiate athletics resulted in qualified immunity for the coach who suspended a player and called him a "Mexican with a beard".  2018 WL 3275615 (N.D. Ind. Jan. 26, 2018) at *5-6.  The Supreme Court requires that "existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 580 U.S. 73, 137 S.Ct. 548, 551 (2017).  Section 1981 does not impose or create such a general cause of action for race discrimination, as both the Supreme Court in *Domino's Pizza* and the Eighth Circuit in *Gregory* have recognized.  The precedents do not establish that § 1981 can be violated without some breach of a right to make and enforce a contract.  Even accepting as true what Plaintiffs say, which assertions are greatly disputed, no existing precedent would have

advised B. Ferentz that his alleged actions or words would violate § 1981, on which statute

his individual liability must be established.  B. Ferentz is entitled to qualified immunity on

the § 1981 claims against him unless "existing precedent must have placed his [violation of §

1981] beyond dispute." *White,* 137 S. Ct. at 551.  To the contrary, existing precedent makes

clear that § 1981 is not violated without, at a minimum, B. Ferentz personally targeting

players with intentional racial discrimination that results in a breach of their contracts with

the University.  The allegations of Parker and Wadley do not amount to any statutory

violation of § 1981 by B. Ferentz and the other five plaintiffs—Cooper, Mends, Joly, Simon,

and Foy—do not even allege that B. Ferentz said anything of a racially derogatory nature to

them.

## VI.    COOPER'S CLAIMS ARE BARRED BY ANY APPLICABLE STATUTE OF LIMITATIONS

All of Cooper's claims are barred by any applicable statute of limitations, whether

two years or four years.  (Dkt. 31 at p. 8).  Cooper completed Iowa football about January 1,

2016, and graduated about May 2016.  (SUF ¶ 12).  Both events occurred more than four

years before he filed his State Court Petition on November 11, 2020.  (SUF ¶ 14).  B.

Ferentz had nothing to do with Cooper during those four years from November 11, 2016-

November 11, 2020.  (SUF ¶ 15).  *Charleston v. McCarthy*, 926 F.3d 982, 989 (8th Cir. 2019)

(suspension that fell outside the applicable two-year limitations period for § 1983 cannot

serve as a basis for a claim.).

## VII.    THE APPLICABLE STATUTE OF LIMITATIONS WARRANTS RECONSIDERATION IN VIEW OF TWO RECENT CIRCUIT COURT AND SEVERAL DISTRICT COURT DECISIONS

Respectfully, circuit court precedents occupy both sides of the issue of whether a four

year or shorter statute of limitations applies to § 1983 cases asserting § 1981 performance

claims against state actors.  Recently, the Second Circuit, the Sixth Circuit, and many

district courts have held that shorter state limitations apply to § 1981 performance claims

brought under § 1983 against state actors, such as B. Ferentz, instead of the four year statute

of limitations of § 1658.  *Duplan v. City of New York*, 888 F.3d 612, 620-21 (2d Cir. 2018);

*McCormick v. Miami Univ.*, 693 F.3d 654, 660–61 (6th Cir. 2012) (dismissed direct claims

under § 1981 and held only remedy was under § 1983); *Brown v. Gibson*, Case No. 4:17-cv-

180, 2019 WL 7194069 at *4 (E.D.N.C. July 1, 2019) (states that *McCormick* supports

application of the three-year § 1983 limitations period to all claims against government

officials asserted under § 1981); *Agbefe v. Bd. of Educ. of City of Chicago*, 538 F. Supp. 3d 833,

842-43 (N.D. Ill. 2021) (In any event, because "§ 1983 remains the exclusive remedy for

violations of § 1981 committed by state actors," the statute of limitations for any § 1983

claim against the Board—including for racial discrimination under § 1981—would be two

years); *Stewart v. Holder,* No. 1:16-CV-682, 2017 WL 4479612, at *4 n. 7 (E.D. Va. July 19,

2017), *aff'd*, 710 F. Appx.120 (4th Cir. 2018) (because § 1981 claims against governmental

officials are subject to the same requirements as § 1983 claims, Virginia's two-year statute of

limitations applies to plaintiff's § 1981 claim as well), aff'd, 710 F. Appx. 120 (4th Cir.

2018)); *Tenemille v. Town of Ramapo*, No. 18-CV-724 (KMK), 2020 WL 5731964 (S.D.N.Y.

Sept. 24, 2020) "[u]ltimately, because Plaintiff[ ] ha[s] brought [his] [§] 1981 claims pursuant

to [§] 1983, the claims are subject to [§] 1983's three-year statute of limitations rather than [§]

1981's more variable limitations period);" *Gibson v. County of Suffolk*, No. 19-cv-03871

(GRB)(ST), 2022 WL 1063017 at *7 (E.D.N.Y. Feb. 18, 2022) (because § 1983 has a three-

year statute of limitations for claims against state actors, those [§ 1981] claims too are time-

barred as brought against Defendant); *Brown v. Wetz*, No. 18CV11178(NSR), 2021 WL

964922 (S.D.N.Y. Mar. 15, 2021) at *14 n.7 (*Duplan* rejected application of the four year

statute for § 1981 claims against state actors); *Calise v. N.Y. St. Dep't of Motor Vehicles,,* No. 17

CV 791 (VB), 2020 WL 1309062 (S.D.N.Y. Mar. 19, 2020) at 6; *McQueen v. City of Chicago*,

No. 09 C 2048, 2014 WL 1715439 (N.D. Ill. Apr. 30, 2014).

The Eighth Circuit has not ruled on the issue of whether the limitations period in

§ 1658 applies to § 1981 performance claims against state actors under § 1983.  A possible

indication is Judge Colloton's recent concurrence in *Onyiah* where he cited the Second

Circuit's *Duplan* ruling with approval. 5 F.4th at 932-33 (Colloton, J., concurring).  In

*Duplan*, the Second Circuit held that the four year statute of limitations in § 1658 for § 1981

performance claims did not apply and the shorter three year New York Statute of

Limitations for § 1983 claims did apply to actions against state actors for violations of §

1981.  888 F.3d at 619-620.  The Second Circuit explained:

> Duplan seeks to assert claims against the City under 42 U.S.C. § 1981, rather
> than under § 1983, because some § 1981 claims have a four-year statute of
> limitations, *see Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83, 124 S.
> Ct. 1836, 158 L.Ed.2d 645 (2004), whereas the limitations period for § 1983
> claims is borrowed from state law, which, in the case of New York, confers
> only a three-year period, *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir.
> 2009). In *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S. Ct.
> 2702, 105 L.Ed.2d 598 (1989), however, the Supreme Court held that "the
> express cause of action for damages created by § 1983 constitutes the
> exclusive federal remedy for violation of the rights guaranteed in § 1981 by
> state governmental units." Id. at 733, 109 S. Ct. 2702 (emphasis added).
> Duplan contends that *Jett* was implicitly overruled by a 1991 amendment to
> the Civil Rights Act. Although our precedents have not been entirely clear on
> this issue, we now join the strong consensus of our sister Circuits in rejecting
> Duplan's argument and reaffirming *Jett's* ongoing viability.

888 F.3d at 619-20.

*Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338 (11th Cir. 2008) and *Shahrivar*

*v. City of San Jose*, 752 Fed. Appx. 415, 421 n.3 (9th Cir. 2018) appear to be two circuit cases

holding that a four year statute of limitations under § 1658 governs § 1981 performance claims against state actors.  *Baker* involved a Board of Education not an official sued in his or her personal capacity for § 1981 performance claims.  The *Ellis* concurrence makes clear that consideration of personal liability of state actors for § 1981 claims is considerably different from whether a board or entity is responsible. 742 F.3d at 327-28.  The Virginia and New York district court cases from 2013 and 2012 cited in *Baker* and by this Court in its ruling on the motion to dismiss (Dkt. 31 at 7) appear to have been supplanted by subsequent rulings by the Second Circuit's and the E.D. Virginia court's holding that the shorter statute of limitations borrowed from state law applied to § 1983 actions against state actors and not § 1658.  The Second Circuit so ruled in *Duplan,* 888 F.3d at 619-20 and the E.D. Virginia in *Stewart v. Holder*, 2017 WL 4479612, at *4 n. 7, *aff'd*, 710 F. Appx. 120 (4th Cir. 2018). Respectfully, B. Ferentz argues that the Eighth Circuit may apply Iowa's shorter two-year statute to § 1981 performance claims brought under § 1983 against State of Iowa actors.  If correct, then the claims of Wadley, Cooper, Parker and Joly should be dismissed as time-barred under the two-year statute (Iowa Code 614.1(2)) applicable to § 1983 actions against state actors and the § 1981 claims of Mends, Simon, and Foy should be limited to claims based on incidents occurring after November 11, 2018, or within two years of the filing of the State Court Petition.

## VIII.   BRIAN FERENTZ IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE FRIVOLOUS MONETARY DAMAGE CLAIMS OF WADLEY, COOPER, JOLY, PARKER, AND MENDS

The request for partial summary judgment on damage claims may seem unnecessary in view of the request that all Plaintiffs' § 1981 claims be dismissed, but the five individual damage claims of Plaintiffs for loss of employment opportunities are so totally meritless, spurious, absurd, and frivolous that they should not survive the summary judgment stage.

*Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018) (a naked assertion of

reputational harm without any factual enhancement is insufficient); *Hinz v. Neuroscience, Inc.*,

538 F.3d 979, 985 (8th Cir. 2008) (no recovery for damages that are remote, conjectural, or

speculative).

### a. AKRUM WADLEY

B. Ferentz is entitled to summary judgment on Wadley's claim for twenty million

dollars ($20,000,000.00) alleging that B. Ferentz tarnished Wadley's reputation to NFL

coaching staffs and painted a negative picture of him.  (SUF ¶ 311).  Wadley has no

evidence to support the claim.  (SUF ¶ 312).  Wadley denied knowing any information,

communication, conversations, written record, document or source of information that

shows B. Ferentz spoke with any NFL staff members, representatives or teams about

Wadley or his ability as a football player.  (SUF ¶ 313).  B. Ferentz recalls no specific

communication about Wadley's prospect of playing professional football with any NFL

representative or professional scout.  (SUF ¶ 314).  B. Ferentz did not cause Wadley to lose

any football opportunity at any time.  (SUF ¶ 315).  Based on 22 years of playing and

coaching, B. Ferentz believes that if Wadley were good enough to play professional football

he would have played or be playing, regardless of anything B. Ferentz said or his silence.

(SUF ¶ 316).  B. Ferentz does not recall that he tarnished Wadley's reputation, painted a

negative picture of Wadley, or demeaned, criticized, or disparaged Wadley (SUF ¶ 317).

While labelled damages, this $20 million claim is actually a claim for alleged

interference with Wadley's opportunity to make a contract with a third-party—namely a

team in the National Football League.  (SUF ¶ 318).  Wadley entered the 2018 NFL Draft

held April 26-28, 2018, was not drafted (SUF ¶¶ 318-19), and he was employed by an NFL

team—the Tennessee Titans—from April to September, 2018, before he was released.  (SUF
¶ 320).  A § 1981 claim for racial discrimination by interference with the formation of a
contract with a third party is subject to a two-year statute of limitations under Iowa law for
formation of a contract.  (Dkt. No. 31 at 7).  This claim for $20 million for alleged
interference with his NFL draft pick in April 2018 or player prospects in September 2018
had to have been brought within the time of two years of the alleged acts by B. Ferentz that
allegedly caused Wadley to lose his NFL contract; Wadley's failure to get drafted ended by
April 28, 2018 (SUF ¶ 319), and his failure to make the Tennessee Titans ended by
September 2018 (SUF ¶ 320).  Any claim against B. Ferentz related to Wadley's failure to
make a contract with an NFL team had to be brought no later than two years after any
alleged interference of B. Ferentz (even assuming Wadley had evidence to support any such
claim) based on his own answers, and he did not file the petition until November 11, 2020,
more than two years after any alleged acts by B. Ferentz.  (SUF ¶ 322).

### b.  DARIAN COOPER

Cooper's damage claims are unsupportable, time-barred, and meritless; B. Ferentz is
entitled also to partial summary judgment as to the damage claims described below.  Cooper
sues B. Ferentz for an amount in excess of eight million dollars ($8,000,000.00) for his
alleged loss of a professional football career, additional amounts for accompanying
endorsements and sponsorships, and punitive damages allegedly because B. Ferentz's
exacerbated his knee injuries.  (SUF ¶ 33).  Cooper must "identify an impaired 'contractual
relationship' under which [he] had rights."  *FCS Advisors,* 929 F. 3d at 621.  There is no
factual basis for this claim, B. Ferentz had nothing to do with Cooper's knees or injuries
(SUF ¶ 34), and B. Ferentz is entitled to partial summary judgment on these alleged

economic damages and punitive damages.  While labelled damages, it is actually a claim for alleged interference with Cooper's opportunity to make a contract with a third-party—namely a team in the National Football League.  A § 1981 claim for racial discrimination by interference with the formation of a contract with a third party is subject to a two-year statute of limitations under Iowa law for formation of a contract.  (Dkt. No. 31 at 7).  Such a claim had to have been brought within the time of two years of the alleged acts by B. Ferentz that allegedly caused Cooper to lose his NFL contract.  Whether two or four years, the statute of limitations bars all of Cooper's claims for an NFL contract because any conduct towards him happened before he graduated in May 2016.

As undisputed fact, B. Ferentz had nothing to do with Cooper's knee injuries or playing time that allegedly caused Cooper to lose an NFL contract or his chance to participate in Iowa football.  (SUF ¶ 34).  Cooper's knee injuries began in 2013 and he did not play in 2014 or 2015 because of his knee injuries, except for one play in the final home game.  (SUF ¶¶ 35-37).  B. Ferentz had nothing to do with Cooper's knee injuries.  (SUF ¶ 38).  Cooper admitted that B. Ferentz did not ask him to play through his injury or ridicule him for his injury.  (SUF ¶ 39).  B. Ferentz did nothing to affect Cooper's scholarship to play football at Iowa, complete his opportunity to get an education, cause him any knee injury, or impede his recovery from his injuries.  (SUF ¶ 40).

Cooper testified that he was put in to play in the November 29, 2013, Nebraska game in Lincoln, NE, a day before arthroscopic surgery when he was unable to run because of injuries to his knees.  (SUF ¶ 41).  B. Ferentz attended that game as the offensive line coach for Iowa and has recently watched game film of the November 29, 2013, Nebraska game. (SUF ¶ 42).  The game film shows Cooper (Iowa Jersey No. 97) running on to the field,

running after Nebraska running backs, and running after the Nebraska quarterback in the game, and the game film is an accurate depiction of the events that took place, notwithstanding Cooper's sworn testimony to the contrary that he could not run during that videotaped game.  (SUF ¶¶ 43-44).

Regardless, B. Ferentz had no involvement in the decision to let Cooper play during the 2013 Nebraska game.  Defensive coaches decided which defensive players should play during, dress for, or travel to a game throughout Cooper's career at Iowa, without consultation with B. Ferentz, the offensive line coach.  (SUF ¶ 45).  The Iowa football team's policy is that no player may play or practice unless cleared medically by the doctors at the University of Iowa as fit to play and practice.  (SUF ¶ 46).  B. Ferentz has no information that this policy has ever been violated, he did not violate it, and he has no reason to believe it was violated with respect to Cooper.  (SUF ¶¶ 47-50).  B. Ferentz had no information about Cooper's medical condition on November 29, 2013.  (SUF ¶ 47).

B. Ferentz recalls that Cooper's injuries made him unable to play during 2014 and all but one game in 2015; Cooper received medical clearance to play the last home game of the regular season in 2015 on Senior Day.  (SUF ¶ 48).  Other coaches allowed him to play one play in that game.  (SUF ¶ 49).  B. Ferentz had no involvement or participation in that decision; Cooper did not reinjure his knee that game.  (SUF ¶¶ 50-51).  B. Ferentz has no information that any coaching decision contributed to or exacerbated Cooper's injury; regardless, B. Ferentz made no such decision.  (SUF ¶ 40).

B. Ferentz had no communication, contact, or conversation about Cooper's prospect of playing professional football with anyone, any coach, any team, or any NFL or professional

scout.  (SUF ¶ 52).  B. Ferentz did nothing that adversely affected Cooper's opportunity to play professional football or to contract with a professional football team.  (SUF ¶ 53).

### c. MARCEL JOLY

Joly astoundingly sues B. Ferentz for one million five hundred thousand dollars ($1,500,000) ($300,000 annually) for the years following 2017 asserting that he has applied unsuccessfully for open coaching opportunities and was not hired because the impression given by Defendants of him is not accurate.  (SUF ¶ 275).  Joly recanted these answers in his amended interrogatory answers and deposition testimony, admitted he did not ever apply for coaching positions, has not sought to be a coach, and the answers to Int. No. 16 and 17 are inaccurate and not true and correct.  (SUF ¶ 276).  Nevertheless, he continues to claim up to $1.5 million against B. Ferentz for past lost coaching wages from 2017-2022 and future lost wages.  (SUF ¶ 277).

B. Ferentz is entitled to partial summary judgment on this economic damages claim.  B. Ferentz has spoken to no representative or member of any coaching staff at any level (high school, college, or professional) about Joly.  (SUF ¶ 278).  B. Ferentz has not given any statements or impression to or ever been contacted by any representative or member of any coaching staff about the suitability or desirability of Joly as a coach applicant or candidate.  (SUF ¶ 279).  B. Ferentz has done nothing to cause Joly to lose any job opportunity at any time.  (SUF ¶ 280).  B. Ferentz has not demeaned him, criticized him, disparaged him, or said anything about him to any school, team, coaching staff, or coach, and B. Ferentz has no reason to believe that he has given any impression about him to any school, team, program, or coaching staff.  (SUF ¶¶ 281-82).  Apparently, Joly has never applied to be a

coach.  (SUF ¶ 283).  B. Ferentz have never been contacted by any coach, team, school, or program about Plaintiff Joly.  (SUF ¶ 284).

Also, a § 1981 claim for racial discrimination by interference with the formation of a contract with a third party—such as Joly's claim he lost coaching contracts--is subject to a two-year statute of limitations under Iowa law for formation of a contract.  (Dkt. No. 31 at 7).  This claim for $1.5 million for alleged interference with his coaching prospects had to have been brought within the time of two years of the alleged acts by B. Ferentz that allegedly caused Joly to lose his coaching contract.  Joly claims damages including 2017 and later.  (SUF ¶ 277).  Any claim against B. Ferentz related to Joly's failure to make a coaching contract had to be brought no later than some time in 2019, two years after any alleged damages started for which B. Ferentz is allegedly responsible (even assuming Joly had evidence to support any such claim), based on his own answers, and he did not file the petition until too late on November 11, 2020.

### d.  JONATHAN PARKER

Parker complains that an unidentified academic counselor discouraged him from pursuing a pre-dental curriculum in 2013 (about three years or more before November 11, 2016) and encouraged him to take easier classes when he arrived at Iowa and red-shirted his first year.  (SUF ¶ 201).  Parker sues B. Ferentz for loss of income related to his not taking classes toward his desired major of dentistry beginning in 2013.  (SUF ¶ 202).  B. Ferentz, however, had no involvement with Parker's class choices, his academic counseling, or curriculum in 2013 when he came to the University or at any other time in his career before he graduated in December 2016.  (SUF ¶ 203).  Parker chose classes for his final fall semester 2016, months before November 11, 2016, without any consultation with B.

Ferentz.  (SUF ¶ 204).  B. Ferentz had nothing to do with any delay of his becoming a dentist.  (SUF ¶ 205).

### e. AARON MENDS

The economic damages claim of Mends is unsupportable and meritless, and B. Ferentz is also entitled to partial summary judgment on Mends' claim for these damages. Mends sues B. Ferentz for an amount of $300,000 annually for past and future years for his alleged loss of a coaching career and punitive damages because B. Ferentz allegedly gave prospective employers and schools an inaccurate impression of Mends.  (SUF ¶ 127). Mends recanted these sworn answers in his deposition testimony, admitted he did not ever apply for coaching positions, has not sought a coaching job, and the answers to Interrogatory Nos. 21 and 23 are not true and correct. (SUF ¶ 128).  Mends swore in his answer that Defendants' actions denied him coaching jobs (SUF ¶ 129).  This answer is not true and accurate, as B. Ferentz has done nothing to cause Mends to lose any coaching opportunity or chance to form a contract with any school, college, or program as a coach. (SUF ¶¶ 130-31).  Mends swore in his answer that Defendants gave an inaccurate impression of Mends to prospective employers.  (SUF ¶ 132).  This answer is not true and accurate with respect to B. Ferentz, who has not demeaned him, criticized him, disparaged him, spoken to, said anything about, or given any impression of Mends to any school, team, coaching staff, or coach.  (SUF ¶ 133).  To the best of B. Ferentz's knowledge, Aaron Mends has never applied to be a coach.  (SUF ¶ 134).  B. Ferentz has never been contacted by any coach, team, school, or program about Mends.  (SUF ¶ 135).  Mends' sworn statements that B. Ferentz prevented or affected his coaching opportunities are untrue and he has so admitted.  (SUF ¶ 136).

IX.     **THE SECOND AMENDED COMPLAINT ADDS A SECTION 1983 CLAIM
AGAINST BRIAN FERENTZ FOR ALLEGED VIOLATION OF THE EQUAL
PROTECTION CLAUSE**

As discussed with Magistrate Adams on August 18, 2022 Status Conference, Defendants

reserve their rights to move to dismiss and move for summary judgment on any claims

stated in the Second Amended Complaint Count, which objections, defenses,  grounds for

dismissal are reserved to be raised by appropriate motion at a later date.


Dated: August 18, 2022                                   Respectfully submitted,

                                                         */s/ Roger W. Stone*
                                                         Roger W. Stone        AT0007519
                                                         Jeffrey A. Stone       AT0008829
                                                         Simmons Perrine Moyer Bergman PLC
                                                         115 Third Street S.E., Suite 1200
                                                         Cedar Rapids, IA 52401-1266
                                                         Telephone: (319) 366-7641
                                                         Facsimile: (319) 366-1917
                                                         Email: rstone@spmblaw.com
                                                                 jstone@simmonsperrine.com
                                                         *Attorneys for Defendant Brian Ferentz*


                                                         Thomas J. Miller
                                                         Attorney General of Iowa

                                                         */s/ Jeffrey S. Thompson*
                                                         Jeffrey S. Thompson
                                                         Solicitor General

                                                         */s/ Jeffrey C. Peterzalek*
                                                         Jeffrey C. Peterzalek

                                                         */s/ Christopher J. Deist*
                                                         Christopher J. Deist
                                                         Assistant Attorneys General
                                                         Department of Justice-Special Litigation
                                                         Hoover State Office Building
                                                         Des Moines, IA 50319
                                                         jeffrey.thompson@ag.iowa.gov

jeffrey.peterzalek@ag.iowa.gov
christopher.deist@ag.iowa.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2022, I filed the foregoing with the Clerk of Court by using the ECF system which will send notification of such filing to the following:

Damario Solomon-Simmons
Kymberli J. Heckenkemper
Solomon Simmons Law, PLLC
601 S. Boulder Ave., Ste. 600
Tulsa, OK 74119
dss@solomonsimmons.com
kheckenkemper@solomonsimmons.com

Christian Dennie
Barlow Garsek & Simon, LLP
920 Foch Street
Fort Worth, TX 76107
cdennie@bgsfirm.com

Beatriz Mate-Kodjo
BMK Law Firm, PLLC
1910 Washington St., Ste. 100
Pella, IA 50219
beatriz@mate-kodjo-law.com
*Attorneys for Plaintiffs*

Thomas J. Miller, Attorney General of Iowa
Jeffrey S. Thompson
Jeffrey C. Peterzalek
Christopher J. Deist
Samuel P. Langholz
Department of Justice-Special Litigation
Hoover State Office Building
Des Moines, IA 50319
jeffrey.thompson@ag.iowa.gov
jeffrey.peterzalek@ag.iowa.gov
christopher.deist@ag.iowa.gov
sam.langholz@ag.iowa.gov
*Attorneys for Defendants*

/s/ Roger W. Stone