IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| AKRUM WADLEY; JONATHAN PARKER; MARCEL JOLY; AARON MENDS; DARIAN COOPER; BRANDON SIMON; and JAVON FOY, <br><br> Plaintiffs, <br><br> vs. <br><br> UNIVERSITY OF IOWA, BOARD OF REGENTS FOR THE STATE OF IOWA; BRIAN FERENTZ; and CHRISTOPHER DOYLE <br><br> Defendants. | Case No. 4:20-cv-366 <br><br><br> **DEFENDANT CHRISTOPHER DOYLE'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** |

In support of his Motion for Summary Judgment, Defendant Christopher ("Chris") Doyle state there is no genuine dispute as to the following facts:

**I.   Defendant Chris Doyle**

1.     Chris Doyle is 54 years old married to his wife Tia and they have three sons. Doyle currently resides in Florida.

2.     Doyle graduated from Boston University in 1990 with a Bachelor of Science degree in Human Movement. He received his master's degree from Boston University in 1991, also in Human Movement.

3.     Doyle has been involved in coaching student athletes since 1990. At the beginning of his coaching career, he coached both football as well as strength and conditioning. Over the years he has been a strength and conditioning coach for multiple men's and women's sport programs including, basketball, volleyball, hockey, wrestling and football.

1

4. From 1999 to June of 2020, Doyle was the Head Strength and Conditioning Coach and the Executive Director of Football for the University of Iowa football program. Doyle's duties included directing all aspects of athletic performance and player development, serving as director of nutrition, dietary analysis/individual consulting/all team meal planning and menus, and coordinating sports science analytics (GPS/Fatigue Science/Ithlete HRV/Force Plate Analysis). Doyle also coordinated team building and leadership development program, directed continuing education and internship programs. In addition, Doyle served as liaison to sports medicine. Over the years Doyle also designed and coordinated return to play protocols for the student athletes. Other duties included serving on the University of Iowa Health Advisory Board as well as on-campus recruiting.

5. During his employment with the University Doyle supervised a staff of 5 and worked directly with the approximately 120 members of the football team.

6. In 2012 Doyle received the certification of Master Strength and Conditioning Coach, the highest honor that can be achieved in the strength and conditioning profession.

7. In 2016 Doyle was asked to serve as a member of Collegiate Strength and Conditioning Coaches Association Board of Directors and reelected for an additional three-year term in 2018 by his peers in the strength and conditioning field.

8. Doyle has mentored more than eighty former interns and assistants, of many different backgrounds and races, who have advanced in the strength and conditioning field with forty who have become head strength and conditioning coaches. Among this group of head strength and conditioning coaches are four African American professionals who now lead Division I programs. Doyle Appx. 124 (Doyle Decl., at ¶ 8); Doyle Appx. 103-104 (Welsh Decl., at ¶¶ 2,

2

3, 6-8); Doyle Appx. 97-98(Frazier Decl., at ¶¶ 2, 5); Doyle Appx. 113-114 (Wynn Decl., at ¶¶ 1-4); Doyle Appx. 93-95 (Braithwaite Decl., at ¶¶ 1, 3, 5, 10, 12).

9. Those other strength and conditioning coaches, including coaches who were working in the University of Iowa program at the same times as Plaintiffs in this case have never witnessed Doyle engaging in any sort of racially discriminatory behavior. Doyle Appx. 95 (Braithwaite Decl., at ¶¶ 13-16); 104-105 (Welsh Decl., at ¶12, 15, 16); 114, (Wynn Decl., at ¶ 6); 98 (Frazier Decl., at ¶¶ 8, 10).

10. In his career Doyle has coached more than 2000 student athletes of many different backgrounds and races. Doyle estimates he has coached more than 700 African American players during his coaching career.

11. Until the morning of June 5, 2020, there has never been a complaint made against Doyle that was in any way related to racial discrimination, racial slurs or treating anyone differently because of their race. Doyle has consistently received exemplary performance evaluations during his time at the University.

12. Former players and coaches, including those involved with the University of Iowa strength and conditioning program at the same time as Plaintiffs, have never witnessed Doyle engaging in any racially discriminatory behavior. Doyle Appx. 117-118 (Kelly Decl., at ¶¶ 3, 7); Doyle Appx. 120-121 (Wirfs Decl., at ¶¶ 2, 6); Doyle Appx. 110-111 (Yanda Decl., at ¶¶ 2, 8, 11); Doyle Appx. 103-105 (Welsh Decl., at ¶ 3, 11-16); Doyle Appx. 97-98 (Frazier Decl., at ¶¶ 5, 8, 10-11); Doyle Appx. 113-114 (Wynn Decl., at ¶¶ 2-3, 6-7); Doyle Appx. 93-96 (Braithwaite Decl., at ¶¶ 3-5, 10-11, 13-16); Doyle Appx. 99-101 (Parker Decl., at ¶¶ 3-4, 7-8, 11-14): Doyle Appx. 107-109 (Powell Decl., at ¶¶ 1, 6, 11-13); Doyle Appx. 115-116 (Haynes Decl., at ¶¶ 1-2, 11-12).

13. Former Players and co-workers of Chris Doyle would not have tolerated any discriminatory behavior on the part of Chris Doyle or anyone else. Doyle Appx. 98 (Frazier Decl., at ¶ 12); Doyle Appx. 104 (Welsh Decl., at ¶ 12); Doyle Appx. 121 (Wirfs Decl., at ¶ 11).

14. In his career Doyle has not used racial slurs, racial epithets or racially derogatory or insensitive language.

15. Doyle has never had the capacity or ability to make, enforce or interfere with any educational contract any Plaintiff may have had with the University of Iowa. Doyle Appx. 124, 128 (Doyle Decl., at ¶¶ 12, 27, 33); Doyle Appx. 5 (Cindy Seyfer Aff., at ¶¶ 11-12).

16. Decisions related to playing time, discipline and team rules were made by the head football coach and/or position coaches not by the strength and conditioning staff.

17. If allegations such as those made by Plaintiffs had occurred it would have been noticed, would have been a significant occurrence and would not have been tolerated by staff or student athletes. Doyle Appx. 98 (Frazier Decl., at ¶ 12); Doyle Appx. 104 (Welsh Decl., at ¶ 12); Doyle Appx. 121 (Wirfs Decl., at ¶ 11).

**II.     The University's Anti-Discrimination and Harassment Policies**

18. The University maintains policies prohibiting discrimination and harassment by staff, faculty, and students. *See* Doyle Appx. 479-533 (STATE 726-780).

19. The University Operations Manual sets out a variety of avenues, both informal and formal, for students to bring complaints of alleged discriminatory conduct or harassment. *See* Doyle Appx. 494-497 (STATE 741-44).

20. University policy also provides for confidentiality for complainants, to the extent possible. *See* Doyle Appx. 499 (STATE 746).

21. None of these policies form the basis of a contract between any individual Plaintiff and Chris Doyle. (Doc. 31, at 20-21).

### III. Basics of the UI Football Program

22. The UI Football Program is among the most prestigious collegiate football programs in the nation, competing in Division I of the National Collegiate Athletic Association ("NCAA") and the Big Ten Conference. (Doc. 133, at ¶ 29).

23. Gary Barta is the Director of Athletics and reports directly to the University president.

24. The head football coach is Kirk Ferentz who has been in that position since 1999. Kirk Ferentz reports directly to Athletic Director Barta.

25. Under Coach Ferentz' tenure as Head Coach, the UI Football Program has seen significant success, with an amassed record of 178-110 and two conference championships. (*Id.*, at ¶ 33).

26. Until June of 2020, Chris Doyle was the Head Strength and Conditioning Coach and Executive Director of Football for the University football team. Doyle reported directly to Head Coach Kirk Ferentz

27. Brian Ferentz is the football team's Offensive Coordinator. Brian Ferentz reports directly to Athletic Director Gary Bara in accordance with the University's anti-nepotism policies.

28. Seth Wallace is the Linebacker Coach for the football team. Wallace reports to Defensive Coordinator Phil Parker who, in turn, reports to Kirk Ferentz.

29. The student athletes receive medical treatment from the University medical staff including supervision of activities by the University training staff. Kammy Powell is currently the Head Athletic Trainer for the football program and has held that position since 2018. Prior to that

time the Head Athletic Trainer position was held by Russ Haynes. The Head Athletic Trainer reports to the Director of Sports Medicine.

30.     Other coaches and athletics personnel who have worked with Chris Doyle over the years, including during times Plaintiffs were in the football program, never witnessed Doyle engaging in any behavior remotely discriminatory in nature. Doyle Appx. 94-95 (Braithwaite Decl., at ¶¶ 10, 11, 12); Doyle Appx. 98 (Frazier Decl., at ¶ 8, 10); Doyle Appx. 100 (Parker Decl., at ¶¶ 8, 11); Doyle Appx. 104 (Welsh Decl., at ¶¶ 11, 12, 13); Doyle Appx. 108 (Powell Decl., at ¶ 11); Doyle Appx. 114 (Wynn Decl., at ¶ 6); Doyle Appx. 115 (Haynes Decl., at ¶ 11).

31.     Former student athletes, including those working out in Chris Doyle's program during times Plaintiffs were in the program never witnessed Doyle engaging in any behavior remotely discriminatory in nature. Doyle Appx. 111 (Yanda Decl., at ¶ 8); Doyle Appx. 118 (Kelly Decl., at ¶ 7); Doyle Appx. 120-121 (Wirfs Decl., at ¶ 6).

**IV.     Plaintiffs' Tenures in the University's Football Program**

### AKRUM WADLEY

32.     Akrum Wadley was a star running back who participated in the Iowa football program from 2015 to 2017.

33.     To Mr. Wadley's knowledge no Iowa coach has ever commented negatively about Mr. Wadley to any person involved with an NFL team or other professional league. Doyle Appx. 314 (Wadley Depo., at 7:5-19).  Chris Doyle has always made it a point to note the positive things about a student athlete when speaking with people about an athlete's professional opportunities. Doyle Appx. 126 (Doyle Decl., at ¶ 20).

34.     Many of Mr. Wadley's issues he raised in his deposition and his SAC about Doyle were related to his displeasure with the program's weight gaining protocol for him. He was not

treated any differently than any other person in his situation. Mr. Wadley's bodyweight protocol included more frequent weigh-ins and two shakes per day at the refueling station. Again, this was a safety concern. Our objective was to ensure Mr. Wadley was getting the proper nutrition to safely participate. Mr. Wadley was treated exactly the same as any other athlete in a similar situation. Doyle Appx. 334-336, 339-340, 345 (Wadley Depo., at 89:21-96:23; 107:8-112:10; 131:13-132:5).

35. Mr. Wadley acknowledged under oath that Doyle never used the "n" word, and never said anything about his hair, jewelry, tattoos other than Wadley's belief that neither Doyle nor Coach Kirk Ferentz liked players wearing hoodies. Doyle Appx. 358, 368 (Wadley Depo., at 182:15-184:19; 224:8-10).

36. In the SAC Mr. Wadley makes no specific allegations against me related to race. (SAC ¶¶ 117-135). The only concerns that relate to the strength and conditioning program are two non-specific allegations related to his weight (SAC ¶¶ 125-126).

37. Fellow student athletes and members of the athletic staff who were involved with student athletes like Mr. Wadley daily during the time he attended the University never witnessed any sort of discriminatory behavior on the part of Chris Doyle. Doyle Appx. 94-95 (Braithwaite Decl., at ¶¶ 10, 11, 12); Doyle Appx. 100 (Parker Decl., at ¶¶ 8, 11); Doyle Appx. 104 (Welsh Decl., at ¶¶ 11, 12, 13); Doyle Appx. 111 (Yanda Decl., at ¶ 8); Doyle Appx. 115 (Haynes Decl., at ¶ 11); Doyle Appx. 118 (Kelly Decl., at ¶ 7); Doyle Appx. 120-121 (Wirfs Decl., at ¶ 6).

38. Wadley's contracts with the University of Iowa were related to him receiving financial aid from the University. Doyle Appx. 80-92 (Wadley FA Docs).

39. All terms of the agreements between the University and Mr. Wadley have been complied with. Doyle Appx. 3 (Seyfer Aff., at ¶ 10).

40. Doyle did not have the ability or capacity to make or enforce Wadley's contracts Doyle Appx. 5 (Seyfer Aff., at ¶ 11); Doyle Appx. 125 (Doyle Decl., at ¶ 12).

41. Doyle in no way interfered with or otherwise impacted Wadley's contract rights with the University. Doyle Appx. 125 (Doyle Decl., at ¶ 12).

42. Doyle did nothing to interfere with Wadley's scholarship or any other financial aid Wadley may have received. Doyle Appx. 5 (Seyfer Aff., at ¶ 12)

## JONATHAN PARKER

43. Jonathan Parker was a student athlete in the Iowa football program during the years 2013 to 2016. Mr. Parker received his bachelor's degree in December of 2016 and transferred, as a graduate student, to Northern Illinois University in January of 2017.

44. Chris Doyle has never done anything or taken any action that in any way interfered with or adversely affected any scholarship or educational opportunity.

45. Mr. Parker testified under oath that Doyle never mocked or ridiculed his hair, tattoos or clothing. The only thing Mr. Parker alleged Doyle said to him was the non-racial comment that earrings were a girlie thing to wear. In addition to not being true such a comment has nothing to do with race. Mr. Parker also testified in his deposition that he never heard me use the "N" word or make any comments racial in nature directly to him. Doyle Appx. 286-287, 294 (Parker Depo., at 123:21-129:19; 156:11-19).

46. Mr. Parker does make some claims in his deposition that he was treated differently than white players with respect to gaining weight. In addition to not being true Mr. Parker states, under oath, that discussions regarding weight would have occurred between the years 2013 and 2015 and are thus untimely. Doyle Appx. 278-279 (Parker Depo., at 92:20-95:1).

47. In the Second Amended Complaint recently filed in this matter Mr. Parker also does not make any specific allegations against me related to race. (SAC ¶¶ 136-145).

48. Doyle has never done anything with respect to Mr. Parker that was discriminatory in any way.

49. Fellow student athletes and members of the athletic staff who were involved with student athletes like Mr. Parker daily during the time he attended the University never witnessed any sort of discriminatory behavior on the part of Chris Doyle. Doyle Appx. 94-95 (Braithwaite Decl., at ¶¶ 10, 11, 12); Doyle Appx. 100 (Parker Decl., at ¶¶ 8, 11); Doyle Appx. 104 (Welsh Decl., at ¶¶ 11, 12, 13); Doyle Appx. 111 (Yanda Decl., at ¶ 8); Doyle Appx. 115 (Haynes Decl., at ¶ 11); Doyle Appx. 118 (Kelly Decl., at ¶ 7).

50. Parker's contracts with the University of Iowa were related to him receiving financial aid from the University. Doyle Appx. 59-71 (Parker FA Docs).

51. All terms of the agreements between the University and Mr. Parker have been complied with. Doyle Appx. 5 (Seyfer Aff., at ¶ 10).

52. Doyle did not have the ability or capacity to make or enforce Parker's contracts Doyle Appx. 5 (Seyfer Aff., at ¶ 11); Doyle Appx. 125 (Doyle Decl., at ¶12).

53. Doyle in no way interfered with or otherwise impacted Parker's contract rights with the University. Doyle Appx. 128 (Doyle Decl., at ¶ 27).

54. Doyle did nothing to interfere with Parker's scholarship or any other financial aid Parker may have received. Doyle Appx. 5 (Seyfer Aff., at ¶ 12).

## MARCEL JOLY

55. Marcel Joly was a member of the Iowa football team from 2014 until his graduation in December of 2017.

56.     Doyle has never done anything or taken any action that in any way interfered with or adversely affected any scholarship or educational opportunity.

57.     Marcel Joly also does not make any specific allegations against Doyle in the recently filed Second Amended Complaint. (SAC ¶¶ 146-152).

58.     Under oath Mr. Joly also stated he is not aware of Doyle stating negative things about him to anyone. Doyle Appx. 376, 378 (Joly Depo., at 7:6-23, 14:10-17).

59.     In his deposition Mr. Joly complains, as evidence of discrimination, that the coaching staff wanted him to be a team player and that he and other African American athletes did not want to be team players. Doyle Appx. 384-385 (Joly Depo., at 41:20-42:18).

60.     Mr. Joly admitted under oath that he does not recall Doyle ever making any comments to him about, tattoos, jewelry, the way he spoke, or any other comment. Doyle Appx. 390 (Joly Depo., at 62:17-63:24).

61.     Mr. Joly also acknowledges no one ever threated to terminate his scholarship. Doyle Appx. 390 (Joly Depo., at 64:10-13).

62.     Doyle has never done anything with respect to Mr. Joly that was discriminatory in any way. Doyle Appx. 95-96 (Braithwaite Decl., at ¶¶ 15, 16); Doyle Appx. 101 (Parker Decl., at ¶ 14); Doyle Appx. 116 (Haynes Decl., at ¶ 12).

63.     Fellow student athletes and members of the athletic staff who were involved with student athletes like Mr. Joly daily during the time he attended the University never witnessed any sort of discriminatory behavior on the part of Chris Doyle. Doyle Appx. 94-95 (Braithwaite Decl., at ¶¶ 10, 11, 12); Doyle Appx. 100 (Parker Decl., at ¶¶ 8, 11); Doyle Appx. 104 (Welsh Decl., at ¶¶ 11, 12, 13); Doyle Appx. 111 (Yanda Decl., at ¶ 8); Doyle Appx. 115 (Haynes Decl., at ¶ 11); Doyle Appx. 118 (Kelly Decl., at ¶ 7); Doyle Appx. 120-121 (Wirfs Decl., at ¶ 6).

64. Joly's contracts with the University of Iowa were related to him receiving financial aid from the University. Doyle Appx. 22-39 (Joly FA Docs).

65. All terms of the agreements between the University and Mr. Joly have been complied with. Doyle Appx. 5 (Seyfer Aff., at ¶ 10).

66. Doyle did not have the ability or capacity to make or enforce Joly's contracts Doyle Appx. 5 (Seyfer Aff., at ¶ 11); Doyle Appx. 129 (Doyle Decl., at ¶ 33).

67. Doyle in no way interfered with or otherwise impacted Joly's contract rights with the University. Doyle Appx. 5 (Seyfer Aff., at ¶ 12) Doyle Appx. 129 (Doyle Decl., at ¶ 33).

68. Doyle did nothing to interfere with Joly's scholarship or any other financial aid Joly may have received.

## AARON MENDS

69. Aaron Mends was a member of the Iowa football team from 2014 to 2018. He graduated from the University of Iowa in December of 2018 and, after his transfer as a graduate student to Illinois State University from that institution with a master's degree in 2020.

70. Doyle has never done anything or taken any action that in any way interfered with or adversely affected any scholarship or educational opportunity.

71. Mr. Mends also does not make any specific allegations against Doyle in the Second Amended Complaint. (SAC ¶¶ 153-166).

72. Doyle has never done anything with respect to Mr. Mends that was discriminatory in any way.

73. After leaving the Iowa program Mr. Mends sent Doyle a text message thanking him for all that Doyle did for him while he was in Doyle's program. Doyle Appx. 443; Doyle Appx. 145 (Mends Depo., at at 42:1-43:4).

11

74. Mr. Mends also acknowledges in his deposition that no racial slurs, racial epithets, or name calling was directed at him. Doyle Appx. 203 (Mends Depo., at 276:17-277:11).

75. Fellow student athletes and members of the athletic staff who were involved with student athletes like Mr. Mends daily during the time he attended the University never witnessed any sort of discriminatory behavior on the part of Chris Doyle. Doyle Appx. 94-95 (Braithwaite Decl., at ¶¶ 10, 11, 12); Doyle Appx. 100 (Parker Decl., at ¶¶ 8, 11); Doyle Appx. 104 (Welsh Decl., at ¶¶ 11, 12, 13); Doyle Appx. 111 (Yanda Decl., at ¶ 8); Doyle Appx. 118 (Kelly Decl., at ¶ 7); Doyle Appx. 120-121 (Wirfs Decl., at ¶ 6).

76. Mends' contracts with the University of Iowa were related to him receiving financial aid from the University. Doyle Appx. 40-58 (Mends FA Docs).

77. All terms of the agreements between the University and Mr. Mends have been complied with. Doyle Appx. 5 (Seyfer Aff., at ¶ 10).

78. Doyle did not have the ability or capacity to make or enforce Mends' contracts Doyle Appx. 5 (Seyfer Aff., at ¶ 11); Doyle Appx. 125 (Doyle Decl., at ¶ 12).

79. Doyle in no way interfered with or otherwise impacted Mends' contract rights with the University. Doyle Appx. 130 (Doyle Decl., at ¶ 41).

80. Doyle did nothing to interfere with Mends' scholarship or any other financial aid Mends may have received. Doyle Appx. 130 (Doyle Decl., at ¶ 41); Doyle Appx. 5 (Seyfer Aff., at ¶ 12).

## DARIAN COOPER

81. Darian Cooper was involved with the Iowa football program until January of 2016. Mr. Cooper graduated from the University of Iowa in May 2016. Doyle Appx. 228 (Cooper Depo., at 43:6-11). All of his claims are time barred.

82. Doyle has never done anything or taken any action with respect to Mr. Cooper that in any way interfered with or adversely affected any scholarship or educational opportunity. Doyle Appx. 131 (Doyle Decl., at ¶ 47).

83. Doyle has never done anything with respect to Mr. Cooper that was discriminatory in any way. Doyle Appx. 131 (Doyle Decl., at ¶ 48).

84. Doyle had no contact with any professional football team regarding Mr. Cooper and has never stated anything to anyone about Mr. Cooper that was in any way negative. Doyle Appx. 131 (Doyle Decl., at ¶ 49).

85. Doyle had no control over Mr. Cooper's playing time or his being medically cleared to play. Doyle Appx. 131 (Doyle Decl., at ¶ 50).

86. Doyle has never assaulted, grabbed or otherwise become physical with Mr. Cooper or any other player in his career. Doyle Appx. 131 (Doyle Decl., at ¶ 51).

87. Mr. Cooper alleges in the Second Amended Complaint that Doyle physically assaulted him in front of witnesses. In his deposition however Mr. Cooper testified that this "assault" consisted of one occasion of Doyle grabbing his stomach when no one else was around to witness the incident and stating that Doyle said he was the person who determined his playing weight. Doyle Appx. 231-233 (Cooper Depo., at 56:21-64:17). Doyle never grabbed Mr. Cooper's stomach or that of any other player in his entire career.

88. Fellow student athletes and members of the athletic staff who were involved with student athletes like Mr. Cooper daily during the time he attended the University never witnessed any sort of discriminatory behavior on the part of Chris Doyle. Doyle Appx. 94-95 (Braithwaite Decl., at ¶¶ 10, 11, 12); Doyle Appx. 100 (Parker Decl., at ¶¶ 8, 11); Doyle Appx. 104 (Welsh

Decl., at ¶¶ 11, 12, 13); Doyle Appx. 111 (Yanda Decl., at ¶ 8); Doyle Appx. 115 (Haynes Decl., at ¶ 11); Doyle Appx. 118 (Kelly Decl., at ¶ 7).

89.     Cooper's contracts with the University of Iowa were related to him receiving financial aid from the University. Doyle Appx. 7-21 (Cooper FA Docs).

90.     All terms of the agreements between the University and Mr. Cooper have been complied with. Doyle Appx. 5 (Seyfer Aff., ¶ 10).

91.     Doyle did not have the ability or capacity to make or enforce Cooper's contracts Doyle Appx. 5 (Seyfer Aff., at 11); Doyle Appx. 125 (Doyle Decl., at ¶12).

92.     Doyle in no way interfered with or otherwise impacted Coopers' contract rights with the University. Doyle Appx. 131 (Doyle Decl., at ¶ 47).

93.     Doyle did nothing to interfere with Cooper's scholarship or any other financial aid Cooper may have received.

## BRANDON SIMON

94.     Brandon Simon was a member of the football program from 2015 until his transfer to Illinois State University in in January of 2019.

95.     Doyle had nothing to do with Mr. Simon's decision to transfer.

96.     Mr. Simon acknowledged under oath that Doyle never used the "N" word, a racial epithet, a racial name, or racial slur directed at him. Doyle Appx. 421 (Simon Depo., at 86:4-6).

97.     In Mr. Simon's deposition his only allegation he made that he considered racial was an alleged comment that Doyle would send him back to the Streets. Doyle Appx. 420-421 (Simon Depo., at 85:2-86:24). Doyle has never used those words and the only thing Doyle could have said would have been along the lines of this program isn't high school anymore.

98. Doyle had no control or input with respect to Mr. Simon's playing time or whether or not he traveled with the team for away games.

99. Doyle has never done anything or taken any action with respect to Mr. Simon that in any way interfered with or adversely affected any scholarship or education opportunity.

100. Doyle has never done anything with respect to Mr. Simon that was discriminatory in any way.

101. Fellow student athletes and members of the athletic staff who were involved with student athletes like Mr. Simon daily during the time he attended the University never witnessed any sort of discriminatory behavior on the part of Chris Doyle. Doyle Appx. 94-95 (Braithwaite Decl., at ¶¶ 10, 11, 12); Doyle Appx. 100 (Parker Decl., at ¶¶ 8, 11); Doyle Appx. 104 (Welsh Decl., at ¶¶ 11, 12, 13); Doyle Appx. 111 (Yanda Decl., at ¶ 8); Doyle Appx. 115 (Haynes Decl., at ¶ 11); Doyle Appx. 118 (Kelly Decl., at ¶ 7); Doyle Appx. 120-121 (Wirfs Decl., at ¶ 6).

102. Simon's contracts with the University of Iowa were related to him receiving financial aid from the University. Doyle Appx. 72-79 (Simon FA Docs).

103. All terms of the agreements between the University and Mr. Simon have been complied with. Doyle Appx. 5 (Seyfer Aff., ¶ 10).

104. Doyle did not have the ability or capacity to make or enforce Simon's contracts Doyle Appx. 5 (Seyfer Aff., 11); Doyle Appx. 125 (Doyle Decl., at ¶ 12).

105. Doyle in no way interfered with or otherwise impacted Simon's contract rights with the University. Doyle Appx. 132 (Doyle Decl., at ¶ 58).

106. Doyle did nothing to interfere with Simon's scholarship or any other financial aid Simon may have received. Doyle Appx. 5 (Seyfer Aff., ¶ 12).

## JAVON FOY

107. Javon Foy was a walk on participant in the Iowa football program for a very brief period in 2019. Mr. Foy did not have a scholarship or any other agreement with the University or the football team. Mr. Foy acknowledged in his deposition that he had no scholarship and did not recall the terms of any agreement with the University. Doyle Appx. 429 (Foy Depo., at 17:3-12).

108. Doyle did not have much, if any, direct contact with Mr. Foy during the brief period he was actively involved with the program. As a new, developmental, athlete Doyle would not have had any direct contact with Mr. Foy. Doyle Appx. 132 (Doyle Decl., at ¶ 61).

109. Doyle has never done anything to Mr. Foy that was discriminatory in any way.

110. Mr. Foy Acknowledged in his deposition that did not recall Doyle ever using the "N" word or any other racial slur or epithet. Doyle Appx. 438 (Foy Depo., at 52:11-53:4).

111. In the Second Amended Complaint the only specific allegation Mr. Foy makes against Doyle is that he once said his hair was a mess. (SAC ¶ 228). Doyle does not recall ever making such a comment to Mr. Foy and, in fact, has no recollection of any contact at all with Mr. Foy during the short period of time he was with the football program.

112. Mr. Foy also did not recall Doyle ever making any comment to anyone about going back to the ghetto, being affiliated with a gang or any other similar comment. Doyle Appx. 438 (Foy Depo., at 52:11-53:4).

113. Fellow student athletes and members of the athletic staff who were involved with student athletes like Mr. Foy daily during the time he attended the University never witnessed any sort of discriminatory behavior on the part of Chris Doyle. Doyle Appx. 94-95 (Braithwaite Decl., at ¶¶ 10, 11, 12); Doyle Appx. 100 (Parker Decl., at ¶¶ 8, 11); Doyle Appx. 108-109 (Powell Decl.,

at ¶ 13); Doyle Appx. 111 (Yanda Decl., at ¶ 8); Doyle Appx. 115 (Haynes Decl., at ¶ 11); Doyle Appx. 120-121 (Wirfs Decl., at ¶ 6).

        Respectfully submitted,

        THOMAS J. MILLER
        Attorney General of Iowa

        */s/ Jeffrey S. Thompson*
        JEFFREY S. THOMPSON
        Solicitor General

        */s/ Jeffrey C. Peterzalek*
        JEFFREY C. PETERZALEK
        */s/ Christopher J. Deist*
        CHRISTOPHER J. DEIST
        Assistant Attorneys General
        Department of Justice-Special Litigation
        Hoover State Office Building
        Des Moines, Iowa 50319
        (515) 281-4419/4213
        jeffrey.thompson@ag.iowa.gov
        jeffrey.peterzalek@ag.iowa.gov
        christopher.deist@ag.iowa.gov
        ATTORNEYS FOR DEFENDANT DOYLE

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on September 12, 2022:

☐ U.S. Mail      ☐ FAX
☐ Hand Delivery      ☐ Overnight Courier
☐ Federal Express      ☐ Other
☒ CM/ECF

Signature: */s/ Audra Jobst*