# EXHIBIT 1

| | | |
|---|---|---|
| AKRUM WADLEY, *et al.*, | ) | |
| | ) | Case No. 4:20-cv-00366-SMR-HCA |
| Plaintiffs | ) | |
| | ) | **DECLARATION OF CHRISTIAN** |
| v. | ) | **DENNIE** |
| | ) | |
| UNIVERSITY OF IOWA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

I, Christian Dennie, declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct:

1.      My name is Christian Dennie. I am over the age of 18 years. I have never been convicted of a felony or of any crime involving dishonesty or the making or use of false statements. I have personal knowledge of the facts stated in this Declaration, and they are true and correct. At all relevant times to this proceeding, I have served as counsel for the Plaintiffs in the dispute that is pending in the United States District Court for the Southern District of Iowa under Case No. 4:20-cv-00366-SMR-HCA and styled *Akrum Wadley, et al. v. University of Iowa, et al*.

2.      By and through this Declaration, I provide an explanation of the discovery that has occurred, the discovery that is currently needed, and an explanation for a basis of need to withhold ruling on dispositive motions filed by Christopher Doyle and Brian Ferentz until discovery is completed.

**Discovery that has Occurred and Must be Supplemented**

3.      The following discovery occurred after the filing of the Rule 56(d) motions and/or resistances to dispositive motions or transcripts were not provided until after the filing of the Rule 56(d) motions and/or resistances to dispositive motions:

      a.      **Deposition of Dr. Nicole Grosland**: Dr. Grosland is the Associate Dean for Academic Programs for the College of Engineering, Professor of Biomedical Engineering,

Distinguished Professor of Orthopedics and Rehabilitation, Research for the Iowa Institute for Biomedical Imaging, and the University of Iowa Faculty Athletics Representative. Dr. Grosland was deposed on September 30, 2022. Dr. Grosland provided startling testimony that confirmed racial discrimination and racial disparities within the University of Iowa football program. Additionally, Dr. Grosland confirmed that she sat through and interviewed football student-athletes about such racial discrimination and racial disparities in 2018. After such interviews, she reported to Gary Barta (Director of Athletics) and Bruce Harreld (President). She confirmed she did not do enough to protect vulnerable student-athletes. Her testimony confirmed that multiple complaints were made about Doyle and B. Ferentz.

b. **Deposition of Christopher Doyle**: Doyle was the University of Iowa Executive Director of Football/Head Strength and Conditioning Coach prior to his termination. Doyle was deposed on October 11, 2022. Doyle is a defendant in this case and a central figure in the creation of a racially hostile environment. His testimony conflicted with his declaration filed with this Honorable Court and his assertion of facts in his dispositive motion.

c. **Deposition of Gary Barta**: Mr. Barta is the Director of Athletics for the University of Iowa. Mr. Barta was deposed on October 12, 2022. Mr. Barta is a defendant in this case and oversaw at the University of Iowa athletics department during all relevant times. His testimony was especially damaging and showed a substantial and shocking cover-up of denial despite confirming that he informed Husch Blackwell that the football program had a systemic problem.

d. **Deposition of John Bruno**: Mr. Bruno is the Assistant Athletic Director for Academic Services for the University of Iowa. Mr. Bruno was deposed on November 17, 2022, but the transcript was only made available today (December 2, 2022). Mr. Bruno met with numerous football student-athletes in 2018 about the racial discrimination and racial disparities in the football program. Mr. Bruno confirmed that he received direct evidence from football student-athletes of racial discrimination and racial disparities in the football program. These student-athletes specifically complained about the behavior of B. Ferentz and Doyle. Mr. Bruno reflected the same in his notes, but he did not provide his notes to anyone. Mr. Bruno testified that he was told by his superior, Dr. Liz Tovar, to draft only a few examples of racial discrimination in the 2018 University of Iowa Diversity Task Force Report and confirmed that he modified the report to remove specific examples.

e. **Late Document Production**: On November 15, 2022, Defendants produced approximately 3,682 pages of records that included various emails, text messages, bias training sign-in sheets, and other documents. Many of these documents would have been used in depositions as exhibits and in resistance to dispositive motions but could not be used or addressed, being that they were not timely produced. Defendants have represented on multiple occasions that all documents would be produced by September 30, 2022. Plaintiffs have learned from Defendants that additional document production is also forthcoming.

f. **Order to Proceed to Conciliation upon a Finding of Probable Cause**: On November 22, 2022, Administrative Law Judge Kristine M. Dreckman concluded that "probable cause exists to support the allegation of disparate treatment and retaliation against Respondent University of Iowa" pertaining to Plaintiff Javon Foy during his tenure as a member of the University of Iowa football program. *See* Exhibit 1-A.

Plaintiffs will need to supplement their resistances to the Motions for Summary Judgment with evidence that has been obtained from the above-referenced depositions and document productions.

## Currently Scheduled Discovery that is Upcoming

4. The following discovery is currently scheduled:

   a. **Deposition of Eileen Wixted**: Ms. Wixted's deposition is scheduled for December 8, 2022. Ms. Wixted is a public relations professional hired by Kirk Ferentz and used by the University of Iowa Department of Athletics to craft messages to the public regarding the racial discrimination and racial disparities within the football program. Upon information and belief, she advised several members of the University of Iowa's football program and crafted Kirk Ferentz's "blind spot" denials of knowledge of the racial discrimination in the football program.

   b. **Deposition of Dr. Liz Tovar**: Dr. Tovar's deposition is scheduled for December 15, 2022. Dr. Tovar is the Senior Associate Athletics Director, Student-Athlete Academic Services and Executive Officer & Associate Vice President, Division of Diversity, Equity, and Inclusion at the University of Iowa. Dr. Tovar was heavily involved in the drafting and watering down of the 2018 University of Iowa Diversity Task Force Report. Dr. Tovar was also made aware of racial discrimination and racial disparities in the football program.

   c. **Responses to Plaintiff's Third Request for Production of Documents**: Defendants' Responses to Plaintiff's Third Request for Production of Documents are due on December 5, 2022. These requests include various documents requests, including Kirk Ferentz's handwritten notes.

   d. **Subpoena of Mary Ferentz**: Plaintiffs sent a subpoena to Mrs. Ferentz in May 2022 but were unable to achieve service. On September 8, 2022, Roger Stone agreed to accept service on behalf of Mrs. Ferentz. During the status conference held with this Honorable Court on November 30, 2022, Mr. Stone represented that text messages from Mrs. Ferentz's phone will be produced on December 5, 2022, but emails will not be produced. Plaintiffs will likely need to make a motion to compel production of these emails.

## Discovery that is in the Process of being Scheduled

5. The following discovery is currently in the process of being scheduled:

a. **Deposition of Broderick Binns**: Mr. Binns was at all relevant times an employee of the University of Iowa, including an appointment as the Assistant Athletic Director for Diversity, Equity, and Inclusion. Mr. Binns confirmed to Husch Blackwell that there was racial discrimination and racial disparities in the football program. He further stated that he knew complaints would be made and specifically referenced Christopher Doyle. Multiple football student-athletes reported racial discrimination and racial disparities to him. Plaintiffs are waiting for Defendants to provide dates for his deposition.

b. **Deposition of Dr. Liz Hollingsworth**: Dr. Hollingsworth is a faculty member of the University of Iowa College of Education in Educational Policy and Leadership Studies and the co-Faculty Athletics Representative of the University of Iowa. Dr. Hollingsworth serves on committees within the University of Iowa related to athletics and reports directly to the President of the University of Iowa on issues within the athletics department. She was aware of reports of racial discrimination and racial disparities within the football program but failed to take any action to protect student-athletes. Plaintiffs are waiting for Defendants to provide dates for her deposition.

c. **Deposition of Bruce Harreld**: At all relevant times, Mr. Harreld was the President of the University of Iowa. Dr. Grosland testified that she reported the findings of the 2018 University of Iowa Diversity Task Force Report to Mr. Harreld. Dr. Grosland testified she is unaware of any actions taken by Mr. Harreld to protect student-athletes from ongoing racial discrimination and racial disparities in the football program. Plaintiffs are waiting for Defendants to provide dates for his deposition.

d. **Deposition of LeVar Woods**: Mr. Woods is an assistant football coach for the University of Iowa football team. In his interview with Husch Blackwell, he voiced concerns with Christopher Doyle and the football program at large. Plaintiffs are waiting for Defendants to provide dates for his deposition.

e. **Deposition of Kelvin Bell**: Mr. Bell is an assistant football coach for the University of Iowa football team. In his interview with Husch Blackwell, he voiced concerns with Christopher Doyle and the football program at large. Plaintiffs are waiting for Defendants to provide dates for his deposition.

f. **Responses to Plaintiffs' Fourth Set of Request for Production of Documents**: In the taking of recent depositions, Plaintiffs learned of meetings and communications that relate specifically to the racial discrimination suffered by the Plaintiffs during their time in the Iowa football program and at the hands of Brian Ferentz and Christopher Doyle. Plaintiffs additionally learned of admissions of NCAA and Big Ten Conference rule violations that deponents indicated would be reported to the University following the depositions. Plaintiffs have made requests for documentary evidence related to these meetings, communications, and promised reports. While Plaintiffs believe that documents relating to these meetings and communications should already have been produced in response to Plaintiffs' prior discovery requests, it appears that they have been withheld, and thus Plaintiffs have had to make additional requests for the specific materials referenced during the depositions. Plaintiff's most recent set of discovery

requests was served on December 1, 2022, and is attached hereto as Exhibit 1-B.

**Discovery Needed that is being Withheld based on Pending Motions**

6. The following discovery is being withheld based on motions filed by Defendants:

    a. **Depositions of Hayley Hanson and Demetrius Peterson**: The depositions for Ms. Hanson and Mr. Peterson were previously set for December 13, 2022, and December 16, 2022, respectively. Ms. Hanson and Mr. Peterson were the investigators for Husch Blackwell, that drafted the report on the racial discrimination and racial disparities in the University of Iowa football program. This Honorable Court previously ruled that Husch Blackwell's draft reports, interview notes, and other documents are not protected by the attorney-client privilege and ordered production. (ECF 117). Despite this ruling, Defendants filed *Defendants' Motion to Quash and Motion for Protective Order*. (ECF 239). These depositions are important for many reasons, including addressing and solidifying admissibility of evidence of statements of Iowa football players and staff that are referenced within the notes of the investigation, the basis and instructions received from Defendants to water down their report on the University of Iowa football program, and the multiple drafts of such report including those drafts that specifically detail allegations against Brian Ferentz and Christopher Doyle.

    b. **Deposition of Carol Reasoner**: Ms. Reasoner is the former General Counsel of the University of Iowa. Husch Blackwell's records confirm that Ms. Reasoner requested that Husch Blackwell water down and heavily modify its report on the racial discrimination and racial disparities within the University of Iowa football program. In a recently filed declaration, Ms. Reasoner testified as follows:

> Those communications with Husch Blackwell attorneys, including Hayley Hanson and Demetrius Peterson included discussion related to the University's exposure to potential liability, as well as *communications regarding the advisability of certain content and phrasing within the report that Husch Blackwell ultimately produced*. Those discussions did not relate to the anticipation of litigation with respect to these particular Plaintiffs in this particular lawsuit but rather anticipation of other potential litigation.

(ECF 239-1 at ¶ 5 (emphasis added)). The only other litigation that could possibly be referenced is claims potentially asserted by Christopher Doyle relating to his termination, but such claims had already been released by written contract where the University of Iowa paid Christopher Doyle more than $1.1 million. It appears clear to Plaintiffs that Ms. Reasoner was involved in, and may, in fact, have orchestrated, efforts to cover up the full extent of the racial discrimination that had occurred in the Iowa football program. These efforts included Husch Blackwell "watering down" assertions of racial discrimination lodged against Brian Ferentz and Christopher Doyle so as to avoid the

risk of liability to the University and its football coaches.

Upon information and belief, Ms. Reasoner stated or was involved in referring to Plaintiffs as thugs and gangbangers (and similar epithets) to media outlets when Plaintiffs' demand letter was received. Defendants are attempting to protect Ms. Reasoner from testifying and explaining her role in the Husch Blackwell "independent" and "external" investigation and ultimate Report.

c. **Depositions of Kirk Ferentz, Brian Ferentz, and Seth Wallace**: Kirk Ferentz, Brian Ferentz, and Seth Wallace are all defendants and long-time coaches of the University of Iowa football team. They are all central characters and witnesses in this dispute, and direct allegations of racial discrimination and racial disparities have been lodged against them. Their testimony is vital to Plaintiffs' case, and most certainly, Plaintiffs must be afforded the opportunity to depose Defendant Brian Ferentz and submit his testimony to the Court before his Motion for Summary Judgment is analyzed. Further, whether these individuals are parties or fact witnesses, they have pertinent information to Plaintiffs' claims and must be deposed. Defendants are attempting to protect these individuals from going under oath to answer for their racially discriminatory actions and the role they played in, and the knowledge they have about the racial discrimination and racial disparities within the University of Iowa football program.

7. With each document production and deposition, Plaintiffs learn more information that is necessary to file in resistance to the dispositive motions filed by Christopher Doyle and Brian Ferentz.

This Declaration is based on my own personal knowledge and is true and correct. I am fully competent to give this Declaration testimony. Executed on December 2, 2022.

_____
Christian Dennie
*Declarant*

# EXHIBIT 1-A


11/22/2022

JAVON FOY
% BEATRIZ MATE-KODJO
TIMMER & JUDKINS, P.L.L.C
1415 28TH ST., STE 375
WEST DES MOINES, IA 50266

RE: CP# 11-20-75937
JAVON FOY v. UNIVERSITY OF IOWA

JAVON FOY:

The Iowa Civil Rights Commission (ICRC) has completed its investigation of the above captioned complaint. The ICRC Administrative Law Judge has determined a <u>probable cause</u> finding effective as of the date on this letter. Enclosed are copies of the Investigative Analysis and the Administrative Law Judge's Order.

After a finding of <u>probable cause,</u> the complaint moves to the Conciliation Unit. A Conciliator for the ICRC will contact you. Thank you for your cooperation.

Sincerely,
Iowa Civil Rights Commission

Enclosures: Investigative Analysis, ALJ Order
CC: File
EMMA WEINBERG, Complainant's Attorney
BEATRIZ MATE-KODJO, Complainant's Attorney

RECEIVED
NOV 2 8 2022

## ORDER TO PROCEED TO CONCILIATION
## UPON A FINDING OF PROBABLE CAUSE

| CP# | 11-20-75937 |
| --- | --- |
| **Complainant** | Javon Foy |
| **Respondents** | University of Iowa |

### STATEMENT OF THE CASE

Complainant, Javon Foy, filed a complaint with the Iowa Civil Rights Commission ("the Commission") alleging discrimination in the form of disparate treatment and retaliation in the area of education.[1]  The complaint named the University of Iowa and the Board of Regents as the Respondents.[2]  The complaint was reviewed by the Commission staff and determined to fall within the investigative jurisdiction of the Commission.  Accordingly, the complaint was assigned to a Commission investigator who conducted an investigation.

At the conclusion of the investigation, the investigator prepared the attached written report detailing the witnesses interviewed, the documents reviewed, and summarizing the investigative findings.  Pursuant to Iowa Code section 216.15(3) and 161 Iowa Administrative Code 3.13(1), this complaint now comes before the undersigned administrative law judge for consideration.

### ORDER

Based on the information contained in the attached investigative report, the undersigned administrative law judge determines that probable causes exists to support the allegation of disparate treatment and retaliation against Respondent University of Iowa.  Per the recommendation of the Commission, the complaint against the Board of Regents is hereby dismissed.  It is hereby ordered that this claim proceed to conciliation in accordance with the Iowa Civil Rights Act.

Kristine M. Dreckman
Administrative Law Judge

---

[1] Complainant additionally alleged harassment; however, said allegation was administratively closed by the Commission and therefore not before the undersigned administrative law judge for consideration.
[2] The Commission investigator determined no specific allegations of discrimination were made against the Board of Regents.

# INVESTIGATIVE ANALYSIS

**CP #** 11-20-75937

**Areas:** Education, Retaliation                    **Bases:** Race, Skin Color, Opposition

**Complainant:** Javon Foy

**Respondents:** University of Iowa, Board of Regents

Statement of the Case

Complainant filed a complaint with the Iowa Civil Rights Commission (ICRC) on November 24, 2020, alleging Respondents, University of Iowa and the Board of Regents[1], discriminated against him in violation of Iowa Code sections 216.9 and 216.11. Specifically, he alleged Respondent harassed him and dismissed him from an athletic program based on his race and skin color, and retaliated against him based on his opposition to the alleged discrimination.[2] The complaint was "screened in" for further investigation, and the parties were notified on February 2, 2021. The investigation included a telephonic interview of Complainant conducted on December 2, 2021[3], and the review of numerous documents, including:

Complainant's Documents

   ▪ ICRC complaint form

Respondent's Documents

   ▪ Position statement and response to Preliminary Case Review (PCR), prepared by counsel
   ▪ Advisor Susan Chambers's internal notes – January 29, 2020
   ▪ Respondent Incident Report – October 12, 2019
   ▪ EEO policies and complaint procedures
   ▪ Complainant's Transfer Tracking and Notification forms – January 28, 2020
   ▪ Roster change forms – August 20, 2019; January 15, 2020; January 21, 2020

Recommendation

Regarding Complainant's complaints of disparate treatment and retaliation, after conducting a thorough investigation and based on all the information collected, I recommend the administrative law judge determine **probable cause** to believe Respondent, University of Iowa, committed discriminatory practices, in violation of Iowa Code sections 216.9 and 216.11.

---

[1] Complainant did not make any specific allegations of discrimination against the Board of Regents.

[2] On his ICRC complaint form, Complainant indicated Discipline, Suspension, and Forced to Quit as alleged adverse actions. As these actions are not available under the area of Education, these allegations are analyzed under the adverse actions of Education Harassment, Disparate Treatment, and Retaliation.

[3] The interview was recorded. Any information provided but not referenced here is contained within that recording.

Regarding Complainant's complaints of education harassment, in accordance with Iowa Code chapter 216 and Iowa Administrative Code rule 161-3.12(2)(a), I recommend we administratively close this complaint. Further investigation is not warranted because the information collected during the screening and investigative process does not indicate a reasonable possibility of a probable cause determination, as these actions were not timely filed with the ICRC.

## Complainant's Allegations

Complainant (African American, Black) was a member of University of Iowa's (hereafter, Respondent) football team. During his time on the team, Complainant claims to have regularly seen, or experienced, differences in treatment between African American players and white players. Complainant began training with Respondent's team in the summer of 2019.

On multiple occasions during the summer of 2019, the football staff would harass and criticize Complainant for his natural hairstyle. Complainant states that Coach Chris Doyle (Caucasian, white), told him to "get that raggedy shit off [his] head"[4] in reference to Complainant's natural hairstyle. Other coaches referred to Complainant by saying, "[D]on't bring that fucking scrub back." Complainant states that Doyle became very angry at Black players for wearing jewelry to practice, but not at white players who wore jewelry to practice. Complainant states that Teammate Josiah Miamen (African American, Black) was "screamed at" for wearing jewelry to practice. Complainant characterizes this as a pattern of behavior, but did not cite any white players who wore jewelry or claim that he was ever disciplined for wearing jewelry.

During a conversation with a group of teammates about Complainant's future on the team, Teammate Yahweh Jeudy (African American, Black) told Complainant that Doyle stated, "We don't need that black player on the team," referring to Complainant. According to Complainant, Doyle labeled Complainant as a "danger to the team," after he was pulled over with too many passengers in his car. Complainant asserts that white players were never referred to in this way.

Complainant states in his interview that around August 2019, a group of his white teammates were caught in their dorm room with open containers of alcohol and were cited by the police. For this incident, these white teammates were made to stay after practice and roll 100 yards down the field. In contrast, Complainant was pulled over in his car after his curfew with more occupants than seatbelts. He was not cited by the police, but his coaches were informed of the incident. For this infraction, he was suspended from the team. Complainant states that he was told he would be reinstated around the beginning of 2020, provided his grades were acceptable, but from this incident forward, he was not allowed into the athletic facilities and the alleged harassment effectively ended.

Complainant states that during the fall semester of 2019, he complained about discrimination and harassment to Coach Broderick Binns (African American, Black). Specifically, Complainant states he complained to Binns that coaching staff was lying to him. Complainant states he specifically complained that he believed he was being treated differently because of his race. Complainant states that when he complained, Binns and coaching staff told him that this was "the Iowa way," referring to coaching staff's demeanor and behavior. Binns repeatedly told Complainant to "just do what

---

[4] All quotes contained herein are verbatim. Any alteration will be denoted by brackets and included only for clarification purposes.

[Respondent's] coaches say" and instructed him to "work through the adversity." Complainant also states he made similar complaints to Advisors Betsy Curran (protected characteristics not provided) and John Bruno (protected characteristics not provided), both of whom told him that coaching staff members were "unfair," but that they could not do anything.

Complainant was dismissed from the team in January 2020. The day he was supposed to be reinstated, on or around January 29, 2020, he was called into a meeting with coaching staff members and Complainant's parents. Complainant states that Head Coach Kirk Ferentz (Caucasian, white) informed him that he was being dismissed from the team due to an injury. Ferentz told him that the decision was primarily influenced by Doyle. Complainant states he does not know what injury they were speaking of and denies that he was injured. He states that he did not know any white team mates who were dismissed for a comparable injury. Complainant later went to play football at another college. Complainant asserts that this shows he was not injured when Respondent dismissed him from the team, as he was able to continue playing football elsewhere.

### Respondents' Reasons

Respondent is a public university located in Iowa City, Iowa, enrolling more than 30,000 undergraduate and graduate students. Respondent offers more than 20 men's and women's intercollegiate sports, and more than 650 student-athletes participate in those sports. Complainant enrolled at Respondent for fall of 2019. Complainant was a member of Respondent's football program until the end of January 2020.

Respondent argues that the ICRC does not have jurisdiction over Complainant's claims. Iowa Code section 216.9(1) reads in part:

> 1. It is an unfair or discriminatory practice for any educational institution to discriminate on the basis of race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability in any program or activity. Such discriminatory practices shall include but not be limited to the following practices:
>
> > a. Exclusion of a person or persons from participation in, denial of the benefits of, or subjection to discrimination in any academic, extracurricular, research, occupational training, or other program or activity except athletic programs;
> > b. Denial of comparable opportunity in intramural and interscholastic athletic programs

Respondent asserts that, based on Iowa Code section 216.9(1), the ICRC does not have jurisdiction over claims pertaining to educational athletic programs. Respondent also argues that, even if the ICRC has jurisdiction over Complainant's claims, his claims fail on their merits. Respondent denies that Complainant ever complained of discrimination or harassment. In addition, Respondent's Office of Equal Opportunity & Diversity never received a complaint from Complainant. Respondent provides its EEO policies and complaint procedures.

Respondent acknowledges that Coach Broderick Binns (African American, Black) had numerous conversations with Complainant. However, these conversations dealt with Complainant's athletic eligibility, academic issues, and off-the-field conduct. Further, Complainant was dealing with an injury that prevented him from athletic participation. Regarding conduct issues, Complainant twice violated

team rules and was suspended from the team. Respondent declined this Investigator's request to interview Binns and did not provide a written statement from him.

According to Respondent's attorney-penned position and response statements, Complainant's mother frequently called Binns to discuss Complainant's academic, behavioral, and medical issues. Binns denies that Complainant's mother ever raised concerns that Complainant was being harassed or discriminated against based on his race or skin color. According to Respondent, Binns acknowledges that he told Complainant to "work through the adversity" of his academic and behavioral problems, as well as encouraging Complainant to work on his grades. Complainant also asked Binns how he could be reinstated on the team after his suspension. Binns told Complainant that "[d]oing what the coaches tell him to do," would be a good start. Binns explains that he was referring to Complainant's need to go to class, improve his grades, and follow team rules.

Around October 16, 2019, Complainant reported to Binns that he felt he had been racially profiled by a female student. The student had called the police on October 16, 2019, to report that Complainant had a gun in his dorm room. Complainant told Binns that he was racially profiled because he was "black with dreads." Binns told Complainant that he could file a complaint with the Office of Equal Opportunity & Diversity, but Binns does not believe that Complainant wished to do so. Respondent provided a copy of the incident report from the police call.

In January 2020, Complainant chose to leave Respondent and transfer to Iowa Central Community College. On January 29, 2020, Advisor Susan Chambers (protected characteristics not provided) met with Complainant. Respondent provides the ICRC with a copy of her internal notes, which state, "[Complainant] came back today…Transferring because [Respondent] wants him to get hip surgery for his safety. He says recovery will take a year and he is not willing to wait on football. Has been contacted by other schools who will let him play now." Respondent also provides the ICRC with a copy of Complainant's transfer forms, confirming his transfer to Iowa Central Community College. Respondent advised that Complainant would need to sign a medical release form in order to provide the ICRC with any additional information regarding the alleged injury which led to his dismissal, but did not respond when this Investigator requested a copy of the appropriate release form to provide to Complainant.

On November 12, 2020, Complainant filed a lawsuit against Respondent in which he alleged the same racial discrimination that he alleges in the instant complaint. The lawsuit was filed 12 days before the instant complaint was filed. Respondent believes Complainant has filed the instant complaint in an attempt to cure his administrative deficiencies. Respondent denies that it discriminated or retaliated against Complainant. Complainant never reported any discrimination and was only suspended after he violated team rules.

## Credibility Determination

Due to the parties being in direct dispute about multiple topics, including whether racially-motivated comments were made to Complainant by his coaches, details about Complainant's injury, and whether Complainant chose to transfer before or after he was dismissed by the team, a credibility determination is necessary. Respondent did provide internal notes and forms showing Complainant transferred schools in early 2020. However, Respondent declined to provide supporting documentation or interviews regarding Complainant's alleged complaints to Binns, including the dates of the complaints; the nature of Complainant's injury and how it affected his ability to participate in football; or the

disciplinary actions Complainant previously received from Respondent. Due to the lack of information from Respondent, Complainant's version of disputed events will be given preference when reasonably inferred.

## Jurisdiction

The ICRC asserts that it has jurisdiction over Complainant's complaint. The ICRC is invested by statute with the power to "receive, investigate, mediate, and finally determine the merits of complaints alleging unfair or discriminatory practices." Iowa Code section 216.5(3). In the area of education, "[i]t is an unfair or discriminatory practice for any educational institution to discriminate on the basis of race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability in any program or activity." Iowa Code section 216.9(1). These practices include "[e]xclusion of a person . . . from participation in any . . . program or activity except athletic programs." Iowa Code section 216.9(1)(a). Athletic programs are separately covered in the following subsection, providing that only a "comparable opportunity" must be provided in athletic programs. Iowa Code section 216.9(1)(b).

A plain reading of the statute removes certain aspects of participation in athletic programs from the jurisdiction of the ICRC, as an exclusion from the program does not constitute a discriminatory practice, beyond an institution's failure to provide a comparable opportunity for participation. The result of this reading of the statute would be that under state law, educational institutions in Iowa would be able to segregate students' participation on school athletic teams on the basis of race or color, for example. The ICRC has been aware of the seemingly unintended consequences of the wording of this statute for many years.

The area of education was added to the Iowa Civil Rights Act by a 1978 amendment. The area of education was added as "a special provision dealing with sex discrimination in education." Arthur E. Bonfield, The Origin and Rationale of the Iowa Civil Rights Act (May 20, 2015). The 1978 amendment was specifically limited only to sex discrimination. 1978 Iowa Acts ch. 1179, § 22 (codified at Iowa Code § 601A.9 (1979)). The provision excluded athletic programs from subsection one. Common sense indicates that this was included to clearly communicate that educational institutions were not required to permit women onto men's athletic teams or men onto women's athletic teams. Subsection two provided that an educational institution may not deny a "comparable opportunity" for athletic programs on the basis of sex.

In 1986, the Legislature expanded the coverage of the education section to race, creed, color, national origin, religion, or disability. 1986 Iowa Acts ch. 1245, § 1496 (codified at Iowa Code § 601A.9 (1987)). The 1986 amendment did not alter the remaining provisions, including the exclusion of athletic programs from subsection one. Reading the plain language of section 216.9(1)(a), the section states Iowa law permits segregation of athletic programs on the basis of race, color, religion, creed, and national origin. It would be an unbelievable result to believe that when the legislature expanded coverage to race, for example, it intended to authorize racial segregation of athletic teams. Thus, the ICRC holds that Iowa courts might look to the absurdity doctrine[5] to determine that the legislature did not intend to prevent the ICRC from investigating complaints of discrimination in an educational

---

[5] Under the absurdity doctrine, a court declines to follow the literal terms of a statute to avoid absurd results. *Brakke,* 897 N.W.2d at 534 (citing 2A Norman J. Singer & Shambie Singer, Statutes & Statutory Construction § 45:12, at 115 (7th ed. rev. 2014)).

athletic program on the basis of race or color. As the ICRC asserts jurisdiction over the instant complaint, this Investigator will further analyze Complainant's complaints.

While Respondent claims the instant complaint with the ICRC was filed in an attempt to cure an alleged deficiency in Complainant's November 12, 2020, lawsuit[6], the ICRC is compelled to analyze any adverse actions which were timely filed.

## Analysis

### Adverse Action I: Harassment in Education

"Except as otherwise provided in section 614.8, a claim under this chapter shall not be maintained unless a complaint is filed with the commission within three hundred days after the alleged discriminatory or unfair practice occurred." Iowa Code § 216.15(13). Complainant filed this complaint with the ICRC on November 24, 2020; therefore, the only timely filed incidents are going to be those which occurred on or after January 29, 2020.

Complainant states that he was suspended from the football program in August 2019 and did not experience any of the alleged harassment after that date. Because none of the alleged harassment occurred after January 29, 2020, the adverse action is not timely filed and cannot be further analyzed for this report.

### Adverse Action II: Disparate Treatment

Complainant was suspended from the team in summer of 2019. This complaint of disparate treatment was not timely filed, as it occurred prior to January 29, 2020. As Complainant's transfer off of the football team was internally noted by Respondent on January 29, 2020, this complaint of disparate treatment in education is timely filed. Complainant can prove unlawful discrimination through direct evidence or indirectly through inference using the pretext analytical model. *Butler v. Crittenden Cty., Ark.*, 708 F.3d 1044, 1050 (8th Cir. 2013) (citing *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 109 S. Ct. 1775 (1989). Complainant must show the adverse action "'occurred under circumstances giving rise to an inference of discrimination,'" and Complainant's status as a protected class member was a motivating factor in the decision. *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009) (citations omitted). Due to difficulties in procuring information from Respondent, it is unclear if Complainant has shown direct evidence of discrimination.

A claim that is not supported by direct evidence can proceed under the three-stage, burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under the *McDonnell Douglas* burden-shifting approach, Complainant must establish a prima facie case of discrimination. Once a prima facie case is established, the burden shifts to Respondent to articulate a legitimate, nondiscriminatory reason for the educational decision. If Respondent articulates such a reason, the presumption disappears and the complainant bears the burden of proving that Respondent's proffered reason is merely a pretext for discrimination. *Id.*

---

[6] See *Akrum Wadley, et al v. Unversity of Iowa, Board of Regents for the State of Iowa, Gary Barta, Kirk Ferentz, Brian Ferentz, Christopher Doyle, and Raimond Braithwaite.*

<u>Prima Facie Case</u>

To establish a prima facie case of discrimination under the *McDonnell Douglas* method of proof, Complainant must initially prove (1) membership in a protected class, (2) he applied for, and was eligible for, a program that was accepting applicants, (3) despite eligibility, he was rejected, and (4) Respondent selected applicants of Complainant's qualifications outside of his protected classes, or the program remained open and Respondent continued to accept applications from other applicants. The burden of establishing a prima facie case of disparate treatment is not onerous. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094 (1981).

Complainant, whose race is African American and whose skin color is Black, is a member of protected classes based on his race and skin color. Respondent does not dispute he is a member of these protected classes. Complainant has shown he was accepted onto the football team for the 2019-2020 school year, which shows he was eligible for the football program and did apply for it. Complainant was essentially rejected from the program when he was informed he would not be on the team on January 29, 2020, due to a hip injury which he alleges was fabricated by Respondent. The program remained open and accepting of applications, as it continued to recruit and admit players after Complainant was taken off the team.

<u>Respondents' Legitimate, Non-Discriminatory Reason</u>

The establishment of a prima facie case creates a rebuttable presumption of discrimination. *McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1126 (8th Cir. 1998). Once a prima facie case is established, the burden shifts to the Respondent to articulate some legitimate, non-discriminatory reason for the challenged action. *Valline*, 2003 WL 21361344 at *3 (citing *Bd. of Supervisors of Buchanan Cty. v. Iowa C.R. Comm'n*, 584 N.W.2d 252, 256 (Iowa 1998)). The reason must be articulated with some specificity and clarity in order to afford Complainant "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56.

This burden involves the production of some admissible evidence giving rise to a genuine issue of fact. *Hamilton v. First Baptist Elderly Housing Found.*, 436 N.W.2d 336, 338 (Iowa 1989). The supporting evidence does not need to be enough to persuade a court that the proffered reason was the actual motivation. *Id.* Attorney arguments are not considered admissible evidence. *State v. Graves*, 668 N.W.2d 860, 878 (Iowa 2003); 8th Circuit Model Civil Jury Instructions 1.02(1); Iowa Model Jury Instruction 100.4.

Respondent has provided a legitimate, non-discriminatory reason for Complainant's removal from the team, with supporting documentation. According to Respondent, Complainant was taken off the football team in January 2020 due to a hip injury, which needed to heal before Complainant could play safely. Respondent provides the ICRC with a copy of Complainant's transfer forms, as well as an internal note from Advisor Susan Chambers (protected characteristics not provided), supporting its assertion that Complainant transferred so that he could play football at another school. Respondent also stated that Complainant violated team rules, but no admissible evidence was provided in support of this argument.

<u>Proof of Pretext</u>

Once Respondent offers a non-discriminatory reason, the burden then shifts back to Complainant to show that Respondent's explanation is a pretext for discrimination. *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir. 2001). Complainant can demonstrate Respondent's reason is pretextual by showing that it is false or that similarly-situated individuals outside of Complainant's protected class were treated more favorably. *E.g., Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 808 (8th Cir. 2020). Complainant can also present statistics to show a pattern of discrimination. *See, e.g., Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985); *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1419 (8th Cir. 1995). Failing to follow its own policies or substantially changing its proffered reasons for its actions might also be evidence of pretext by Respondent. *Ledbetter v. Alltel Corp. Servs.*, Inc., 437 F.3d 717, 722 (8th Cir. 2006) (discussing an employer failing to follow its own policies); *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994), *cert. denied*, 522 U.S. 1113 (1998) (discussing substantial changes in proffered reason). Complainant can prove pretext by offering "evidence of 'remarks of the employer that reflect a discriminatory attitude,' as well as 'comments which demonstrate discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions.'" *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1128 (8th Cir. 2008) (quoting *EEOC v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 923 (8th Cir. 2002)). Complainant may also show evidence of prior instances of disparate treatment by Respondent in other contexts. *Phillip v. ANR Freight Sys., Inc.*, 945 F.2d 1054, 1056 (8th Cir. 1991).

Complainant may be able to show that similarly situated individuals outside of his protected classes were treated more favorably, which could suggest falsity in Respondent's given reason for removing Complainant from the football team. Complainant provided white team members as potential comparators who were not dismissed from the team. It is unclear if these are appropriate comparators, as Respondent did not provide any information regarding other students removed from the team, or other team players with injuries. Complainant may be able to show Respondent's reason for removing him from the team was false based on comparators. Complainant did not provide any statistics showing a pattern of discrimination by Respondent.

As Respondent did not provide any policies for its football program, it is unclear if it followed its own policies. Based on the information provided by both parties, it does not appear Respondent changed its proffered reason for removing Complainant from the team. Complainant may be able to show remarks of a discriminatory animus made by those closely involved in the decision process. According to Complainant, Doyle made multiple discriminatory remarks about Complainant based on his membership in protected groups, including telling him to "get that raggedy shit off [his] head" in reference to Complainant's natural hairstyle. Complainant also asserts that Doyle referred to Complainant to a teammate, saying, "We don't need that black player on the team."

While Respondent denied any of these comments occurred in its response statement, only arguments authored by Respondent's attorney were provided. Attorney arguments are not considered admissible evidence at a hearing. *State v. Graves*, 668 N.W.2d 860, 878 (Iowa 2003); *Eighth Circuit Model Civil Jury Instructions* 1.04(1); *Iowa Model Jury Instruction* 100.4; *Iowa Rules of Evidence*. As this Investigator was unable to complete a credibility determination without additional information from Respondent, it is presumed Complainant was accurate when recalling the alleged comments. Complainant has not shown evidence of prior instances of disparate treatment in other contexts by Respondent. Complainant has proven pretext, via showing Respondent's reason for removing him from the team was false and by offering remarks showing discriminatory animus toward those in Complainant's protected groups. Complainant has shown Respondent subjected him to disparate treatment.

**Adverse Action III: Retaliation**

To establish a prima facie case of retaliation under the ICRA, an aggrieved individual must show: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) there are circumstances supporting an inference that there is a causal connection between Complainant's protected activity and Respondent's actions. *City of Hampton v. Iowa C.R. Comm'n*, 554 N.W.2d 532, 535–36 (Iowa 1996). The burden of establishing a prima facie case is not onerous. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *see also Johnson v. Securitas Sec. Serv. USA, Inc.*, 728 F.3d 754, 760 (8th Cir. 2013); *Smidt v. Porter*, 695 N.W.2d 9, 14–15 (Iowa 2005). Under the ICRA, a complainant need only prove that their protected activity was a motivating factor in the challenged … action. *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 634 (Iowa 2017) (Appel, J., concurring in part and dissenting in part); *Id.* at 602 (Cady, C.J., concurring in part and dissenting in part) (agreeing that the correct standard is "motivating factor"); *see also DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009).

Prima Facie Case

Complainant states that he reported feeling discriminated against to Binns during the fall semester of 2019, though Respondent denies that Complainant stated he felt he was treated differently based on his race or skin color. The ICRA prohibits any person from retaliating against another because he or she has "lawfully opposed any practice forbidden by," "obeys the provisions of," or "has filed a complaint, testified, or assisted in any proceeding under" Chapter 216 of the Iowa Code. Iowa Code § 216.11(2). Courts have found protected activities include internal and informal complaints about discrimination. *Gagnon v. Sprint Corp.*, 284 F.3d 839, 854 n.4 (8th Cir. 2002), *abrogated on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003). Complainant need not show the conduct he or she opposed was in fact discriminatory, but must show "a good faith, reasonable belief" the conduct was discriminatory. *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 634 (8th Cir. 2000). Complainant has shown he had a good faith, reasonable belief he was engaging in a protected activity when he reported his issues with Respondent to Binns, as Complainant asserts that Binns told him to "work through the adversity." This answer, which Binns acknowledges, shows that Complainant likely mentioned discrimination based on his protected characteristics to Binns. Additionally, Respondent did not provide admissible evidence regarding Binns's recollection of events, so this Investigator must infer in favor of Complainant when reasonable.

Complainant suffered an adverse action when he was dismissed from the football team. Regarding a causal connection between the protected activity and the alleged adverse action, "the 'suspicious timing' argument seeks to prove that an adverse … action was caused by the plaintiff's opposition to an unlawful … practice because the opposition and subsequent adverse action were close in time." *Hicks v. Forest Pres. Dist. of Cook Cnty.*, 677 F.3d 781, 789 (7th Cir. 2012) Although the temporal proximity between the protected activity and the alleged retaliatory act must generally be "very close," Complainant may alternatively prove retaliation by showing the Respondent "took escalating adverse and retaliatory action" against the Complainant. *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006); *see also Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 645 (8th Cir. 2009) (holding a time gap between the protected activity and the adverse employment action measured in months is not sufficient to establish a causal connection). Complainant states that he complained to Binns during the fall semester of 2019, and was dismissed from the team on January 29, 2020.

While this temporal proximity is likely not close enough to suggest suspicious timing, Complainant asserts that he was removed from the team the same day he was scheduled to be reinstated. This could allow Complainant to meet element three of his prima facie case under the "first opportunity to retaliate" doctrine. The "first opportunity to retaliate" doctrine allows a plaintiff to prove the causation element of a retaliation claim — despite a temporal gap sufficient to prevent a finding that the protected activity and the retaliatory conduct have some causal connection — if the plaintiff can show that the defendant had no earlier opportunity to retaliate and that the evidence shows the events are not completely unrelated. *Templeton v. First Tenn. Bank, N.A.*, 424 Fed. App'x. 249, (4th Cir. 2011) (citing *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004); *see also Orluske v. Mercy Med. Ctr. N. Iowa*, 455 F. Supp. 2d 900 (N.D. Iowa 2006) (citing *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 826 (8th Cir. 2006)).

As Complainant asserts that he was scheduled to return to the team the same day he was removed, which Respondent does not deny, this could have been Respondent's first chance to remove him from the team. As Respondent declined to provide any additional information or interviews regarding its policies for placement on the football team, this Investigator must infer in favor of Complainant, and the "first opportunity to retaliate" doctrine will be applied. Complainant has met the elements of his prima facie case of retaliation.

### Respondents' Legitimate, Non-Discriminatory Reason and Complainant's Proof of Pretext

Respondent provides the same legitimate, non-discriminatory reason as discussed in the Disparate Treatment analysis. In addition to the traditional methods of demonstrating pretext, claims of retaliation allow for additional methods of proving pretext. An aggrieved individual may prove pretext by showing that Respondent "subjected [Complainant's] … performance to heightened scrutiny after [they] engaged in protected activity." EEOC Compliance Manual § 8-II E(2) (2016), *available at* https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#Other; *Winarto v. Toshiba Am. Elec. Components, Inc.*, 274 F.3d 1276, 1286 (9th Cir. 2001) (establishing that heightened scrutiny must be unwarranted based on plaintiff's continued satisfactory performance to support a plaintiff's allegation of pretext). Additionally, Complainant may demonstrate close temporal proximity between the alleged retaliatory conduct and his or her protected activity to support his or her claim of retaliation. *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 768 (Iowa 2009); *Jones v. Bernanke*, 557 F.3d 670, 679–80 (D.C. Cir. 2009) (establishing that evidence of close temporal proximity applies to both a prima facie case as well as "the ultimate inquiry"); *Hossaini v. W.M.M.C.*, 97 F.3d 1085, 1088–89 (8th Cir. 1996) (Complainant can show pretext if Respondent launched an investigation into his or her conduct shortly after he engaged in protected activity). Mere coincidence of timing does not conclusively establish this element, but the timing of the action, combined with all the other circumstances present in this case, may result in a finding of pretext. *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741 (Iowa 2006); *but see Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation is sensible.").

### Proof of Pretext

Complainant has proven pretext in his complaint of disparate treatment in education based on his race and skin color. Regarding pretext specific to his complaint of retaliation, Complainant may be able to show he was subjected to heightened scrutiny after complaining to Binns in Fall 2019.

Respondent did not provide any information regarding any other students who filed complaints similar to Complainant, so this Investigator was unable to analyze for comparators. As it appears Complainant may have been subjected to heightened scrutiny, Complainant has proven pretext in his complaint of retaliation by Respondent.

## Conclusion

Probable cause exists if there are reasonable grounds for believing discrimination has occurred. *Wilson v. Hayes*, 464 N.W.2d 250, 261-62 (Iowa 1990) (citing 52 Am.Jur.2d *Malicious Prosecution* §51, at 219). A determination of probable cause is made after an investigation and is based on "facts and circumstances that would be sufficient to induce a reasonable belief in the truth of the [claim]." *In re Det. of Mead*, 790 N.W.2d 104 (Iowa 2010).

Regarding Complainant's complaints of disparate treatment and retaliation, based on information gathered from personnel records, written reports, correspondence, and Complainant's interview, I recommend the administrative law judge determine there is **probable cause** to believe Respondent, University of Iowa, discriminated or retaliated against Complainant in violation of Iowa Code §216.9 and Iowa Code §216.11.

Regarding Complainant's complaint of harassment in education, there does not appear to be a reason to justify further expending of resources to continue investigation of this complaint. This ICRC Investigator does not believe there are further records to gather or persons to interview which will significantly affect the findings.

**Determination** (P.C.: Probable Cause; N.P.C.: No Probable Cause; A.C.: Administratively Closed)

| | | | |
|---|---|---|---|
| Adverse Action I - Harassment | ☐ P.C. | ☐ N.P.C | ☒ A.C. |
| Adverse Action II – Disparate Treatment | ☒ P.C. | ☐ N.P.C | ☐ A.C. |
| Adverse Action III - Retaliation | ☒ P.C. | ☐ N.P.C. | ☐ A.C. |

*Austin Moore*
Austin Moore
Civil Rights Specialist
Iowa Civil Rights Commission

# EXHIBIT 1-B

| | | |
|---|---|---|
| AKRUM WADLEY, JONATHAN PARKER, MARCEL JOLY, AARON MENDS, DARIAN COOPER, BRANDON SIMON, and JAVON FOY, | § § § § § | |
| **Plaintiffs** | § § | |
| v. | § § | CASE NO. 4:20-CV-366 |
| UNIVERSITY OF IOWA, BOARD OF REGENTS FOR THE STATE OF IOWA, KIRK FERENTZ, BRIAN FERENTZ, and CHRISTOPHER DOYLE, | § § § § § § | |
| **Defendants** | § | |

---

## PLAINTIFFS' FOURTH REQUEST FOR PRODUCTION TO DEFENDANTS

---

COMES NOW, Plaintiffs, pursuant to Rule 34 of the *Federal Rules of Civil Procedure*, and serve *Plaintiffs' Fourth Request for Production on Defendants*. Defendants are hereby requested to make the material requested herein available to Plaintiffs, electronically to eweinberg@solomonsimmons.com and jcurti@foxrothschild.com, for the purpose of examination, inspection, testing and copying within thirty (30) days after service.

This request includes documents and items in the possession of or subject to the control of the party to whom this request is directed, that party's employees, agents, representatives, or attorneys. This request also includes all original documents and copies (if such originals are not available), and all summation, notes, computer printouts, computer disks, electronically stored information, and other records related to the original documents.

The documents produced shall be produced as they are kept in the usual course of business

or, shall be organized and labeled to correspond with the categories in this request as provided by Rule 34. For any document that no longer exists or that cannot be located, Defendants shall identify the document, state how and when it passed out of existence, or when it could no longer be located, and the reasons for the disappearance. Defendants are further requested to identify each person having knowledge about the disposition or loss of the document, and to identify any other document evidencing the lost document's existence or any facts about the lost document.

Respectfully Submitted,
*/s/Beatriz Mate-Kodjo*
**BMK LAW FIRM, PLLC**
Beatriz Mate-Kodjo, AT0012331
1910 Washington St., Suite 100
Pella, IA 50219
Phone: (641) 450-1668
beatriz@mate-kodjo-law.com

**SOLOMON SIMMONS LAW, PLLC**
Damario Solomon-Simmons, OBA # 20340
Kymberli J. M. Heckenkemper, OBA # 33524
601 S. Boulder Ave., Suite 600
Tulsa, OK 74119
(918) 551-8999 – Office
(918) 582-6106 – Fax
dss@solomonsimmons.com
kheckenkemper@solomonsimmons.com

**FOX ROTHSCHILD, LLP**
Christian S. Dennie, TX Bar # 24045775
Saint Ann Court
2501 N Harwood Street, Suite 1800
Dallas, TX 75201
(214) 231-5745 – Direct
(972) 404-0516 – Fax
cdennie@foxrothschild.com

Patrick Kane, NC Bar # 36861
Sarah Traynor, NC Bar # 58301
La-Deidre D. Matthews # 54358
101 N Tryon St, Suite 1300,
Charlotte, NC 28246
(704) 384-2600
pkane@foxrothschild.com
straynor@foxrothschild.com
lmatthews@foxrothschild.com

Cameron Baker, FL Bar # 0125285
West Tower
777 S Flagler Dr., #1700
West Palm Beach, FL 33401
(561) 835-9600
cbaker@foxrothschild.com

Maliya Rattliffe
33 South 6th Street
Suite 3600
Minneapolis, MN 55402
(612) 607-7113 - direct
(612) 607-7100 - fax
MRattliffe@foxrothschild.com

# ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that the foregoing document was sent via electronic service to all counsel of record on the 1st day of December, 2022 as follows:

_/s/Beatriz Mate-Kodjo_

# I. DEFINITIONS

**The definitions below shall have the following meanings, unless the context requires otherwise:**

1.    "Plaintiff" means Akrum Wadley, Jonathan Parker, Marcel Joly, Aaron Mends, Darian Cooper, Brandon Simon, and Javon Foy.

2.    "Defendants" means University of Iowa, Board of Regents for the State of Iowa, Kirk Ferentz, Brian Ferentz, Christopher Doyle, Gary Barta, and their representatives, owners, officers, shareholders, investigators, experts, agents, attorneys, assigns, trusts, devisees, entities, companies, partnerships, joint ventures, successors, predecessors, underwriters, associated or related entities, affiliates, entities for which you have or had control, and any other persons or entities acting on your behalf.

3.    "Wadley" means Akrum Wadley.

4.    "Parker" means Jonathan Parker.

5.    "Joly" means Marcel Joly.

6.    "Mends" means Aaron Mends.

7.    "Fleming" means Maurice Fleming.

8.    "Spearman" means Reggie Spearman.

9.    "Martin-Manley" means Kevonte Martin-Manley.

10.    "Cooper" means Darian Cooper.

11.    "Taylor" means LaRon Taylor.

12.    "Simon" means Brandon Simon.

13.    "Foy" means Javon Foy.

14.    "A. Harris" means Andre Harris.

15.    "T. Harris" means Terrence Harris.

16.    "Iowa" means University of Iowa.

17.    "Board" means Board of Regents for the State of Iowa and members of the Board of Regents for the State of Iowa.

18.    "Barta" means Gary Barta.

19. "K. Ferentz" means Kirk Ferentz.

20. "B. Ferentz" means B. Ferentz.

21. "Doyle" means Christopher Doyle.

22. "Braithwaite" means Raimond Braithwaite.

23. "Program" means the University of Iowa football program.

24. "Law Firm" means Husch Blackwell, LLP.

25. "Law Firm Report" means the Report of External Review: Football Program Culture, University of Iowa.

26. "University Report" means the UI Athletics Diversity Task Force Report.

27. "Task Force" means the UI Athletics Diversity Task Force.

28. "Communication" or "Communications" means any contact or act by which information or knowledge is transmitted or conveyed between two or more persons and includes, without limitation: (1) written contact, whether by letter, memorandum, telegram, telex, or other document; (2) oral contact, whether by face-to-face meetings, telephone conversations or otherwise; and (3) nonverbal acts intended to communicate or convey any meaning, understanding or other message.

29. "Concerning" means, in whole or in part, directly or indirectly, referring to, relating to, connected with, commenting on, responding to, showing, describing, analyzing, reflecting, or constituting.

30. "Date" means the exact date, month, and year, if ascertainable, or, if not, the best available approximation.

31. "Describe in detail" with regard to a person, thing, or event means that you are requested to identify all persons who may have knowledge of the alleged facts and legal conclusions referred to in the requests, and to identify each and every document, circumstance, incident, act, and omission on the part of a person which evidences or relates to the alleged facts and legal conclusions in these requests, and to identify each and every fact and legal conclusion that forms, constitutes, evidences, relates, or refers to the discovery requests.

32. As used herein, the term "document" or "recording" includes papers, books, accounts, drawing, graphs, charts, photographs, electronic or videotape recordings, text messages, emails, and any other data compilations from which information can be obtained. By way of illustration and not limitation, the term "document" or "record" includes any paper or other article or film or microfilm which bears or contains any writing, printing, or lettering, including typewriting, manuscript, or other characters, however made, and further includes

correspondence, bank examiner reports, bank examiner notes, Minutes of Board of Directors meetings, minutes of loan committee meetings, loan committee notes, internal audit reports, expense reimbursement forms, memoranda, personal notes, other notes, diaries, desk files, calendars, file folders, files, statistics, letters, telegrams, Minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, appraisals, title opinions or commitments, plats, internal memoranda, legal opinions, studies, reports, interoffice communications, notations of conversations, notations of telephone calls, notations of meetings, notations of other communications, bulletins, printed matters, computer printouts, teletypes, invoices, work sheets, delivery or mail receipts, expense receipts, bills, statements, invoices, financial statements, graphic or oral representations of any kind (including without limitation photographs, charts, graphs, microfiche, microfilm, videotape, tape recordings, and motion pictures) and electronic, mechanical or electrical records or representations of any kind (including but not limited to tapes, cassettes, discs, diskettes, and recordings).  The term "document" or "record" includes originals and duplicate originals, identical copies, and non-identical copies, whether different from the original by reason of any notations made on such copies or otherwise.  The term "document" or "record" includes drafts, alterations, changes, and amendments as well as originals.

33.    "Electronic Information" means all digital or analog electronic files, including "deleted" files and file fragments, stored in machine-readable format on magnetic, optical or other storage media, including the hard drives or floppy disks used by your client's computers and their backup media (e.g., other hard drives, backup tapes, floppies, Jaz cartridges, CD-ROMS) or otherwise, whether such files have been reduced to paper printouts or not.  This information includes, but is not limited to, emails, both sent and received, whether internally or externally; all word-processed files, including drafts and revisions; all spreadsheets, including drafts and revisions; all databases; all CAD (computer-aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and personal information management (P/M) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of personal data assistants (PDAs), such as PalmPilot, HP Jornada, Cassiopeia or other Windows CE-based or Pocket PC devices; all data created with the use of document management software; all data created with the use of paper and electronic mail logging and routing software; all Internet and Web-browser-generated history files, caches and "cookies" files generated at the workstation of each employee and/or agent in your client's employ and on any and all backup storage media; and any and all other files generated by users through the use of computers and/or telecommunications, including but not limited to voice mail and text messages.

34.    "Evidence" or "Evidencing" means tending to show, in any probative manner, the existence or nonexistence of any matter.

35.    "File" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

36.  "Identify," when referring:

    a.  to a person, means to state the following:

        i.  The person's full name;
        ii.  The present or last known residential address, including the street, street number, route number, city, county, state, and ZIP code;
        iii.  The present or last known residential and business telephone numbers; and
        iv.  If known, present or former employment, job title, name of employer, and employer's complete address.

    b.  to a public or private corporation, partnership, association, or other organization, or to a governmental agency, means to state:

        i.  The full legal name and popular or trade name; and
        ii.  The present or last known business or operating address and business telephone number.

    c.  to a statement or communication, means to state:

        i.  The person who made it, who took or recorded it, and all other persons, if any, present during the making thereof;
        ii.  When, where, and how it was taken or recorded; and
        iii.  Who has present or last known possession, custody, or control thereof.

    d.  to a document, means to state:

        i.  The nature (e.g. letter, handwritten note) of the document;
        ii.  The title, heading, or caption that appears on the document;
        iii.  All identifying numbers, letters, or codes, including an explanation of the significance or meaning of same if such is necessary to an understanding of the document;
        iv.  The date of the document and the date of each addendum, supplement, or other addition or change;
        v.  The number of pages in the total document;
        vi.  The name and capacity of the author and of the signer of the document, and of the person on whose behalf or at whose request or direction the document was prepared or delivered;
        vii.  The name and capacity of the person to whom the document was addressed or directed; and
        viii.  The present location of the original document or official copy of the original document, and the name, address, position or title, and telephone number of the person(s) having custody of the document.

37.  "Lawsuit" or "Litigation" means the lawsuit styled *Wadley v. University of Iowa,* Cause No. 4:20-CV-366, currently pending in the United States District Court for the Southern District of Iowa.

38.  "Location" when referring to a place, means the complete address, including the street, street number, route number, city, county, state, ZIP code, and telephone number of the place

inquired about.

39.     "Metadata" means that electronic bibliographic information that is recorded and embedded into most Microsoft compatible electronic file formats. Metadata is data about the content, quality, condition, and other characteristics of data files.

40.     "Person" means an individual or natural person, corporation, firm, partnership, association, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, including all predecessors or successors in interest.

41.     "Possession, custody, or control" refers to documents actually within your possession, custody, or control or within your constructive possession, custody, or control (including without limitation, documents within the possession, custody, or control of your attorneys or accountants; documents which you have a legal right to obtain; documents which you have a right to use, inspect, examine, copy or have access to; and documents which you have placed in the temporary possession, custody, or control of any third party).

42.     "Relating to" and "relate to" mean, in addition to the customary and usual meaning, in whole or in part constituting, containing, concerning, embodying, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to the subject matter identified in the request.

43.     "Statement" means any writing signed or otherwise adopted or approved by the person making a declaration or any stenographic, mechanical, electrical, or other type of recording or any transcription thereof, which is a substantial verbatim recital of a conversation had with or declaration made by the person whose voice was being contemporaneously recorded.

44.     "You" or "your" means the individual or entity to whom these requests are directed.

45.     "And" means and/or.

46.     "Or" means or/and.

47.     Whenever necessary herein the singular includes the plural and the plural includes the singular. Terms used herein are intended to be gender neutral and the use of one gender is intended to include all genders.

## II.    INSTRUCTIONS

1.    This document request shall be deemed continuing in nature so as to require prompt, further, and supplemental production whenever you discover an additional document which is determined to be responsive to this document request.

2.    Each request for a document or documents to be produced, whether memoranda, reports, letters, minutes or other document of any description, contemplates production of the document in its entirety, without abbreviation or deletions and the production of any copies of the document without any abbreviation or deletions.

3.    For all responsive Electronic Information that are produced in image formats, you are instructed to produce its related non-privileged Metadata.

4.    You are instructed to place a unique document control number or document id on each page of each document provided.  If digital images are provided in addition to, or in place of paper, the document id may be applied to the images electronically and should be permanently "burned" into the exact electronic duplicates of the paper originals.

5.    If any of the documents responsive to the documents requested herein have been lost, discarded, or destroyed since [date opposing party's awareness of client's claim or counterclaim, if not date of complaint, cross-claim or counterclaim], describe the documents or data that has been disposed of, date of the disposal, manner of the disposal, reason for the disposal, persons authorizing the disposal, persons having knowledge of the disposal, and the persons disposing of the document or data.  (This request includes electronic files that have been deleted from the magnetic or optical storage media or overwritten from that date to the present, and dates of destruction or overwriting).

6.    For all responsive Electronic Information, you are to reduce the information to a paper copy, or digital images (.tif or .pdf file format) and provide the native electronic medium with a description of the application necessary to open and review the information or materials.  If responsive materials are provided as images, any load files that were created during the imaging process should also be provided.  The preferred image load file format is an IPRO LFP image load formats, or a detailed description of the imaging application used and the load file format.  If the information or materials exist in a medium and application that is not publicly available or that is proprietary to you, then reduce the information or materials to a paper copy and permit inspection of the medium.  You are requested to produce all information or materials that have been electronically imaged, by you or received by you, or preserved in a format where in text may be read by an optical character reader on a CD-ROM in ASCII format described above.  Text information and materials may be produced in either Word or WordPerfect format.  Spreadsheet and graphic information may be produced in Excel and Power Point format.  The preferred format for imaged documents and other files is single page Group IV TIFF images which bear the file extension .tif.  PDF is also an acceptable file format, but not preferred.

7.    For the purposes of this request, the applicable time period, unless otherwise set forth herein, is from January 1, 2016 to the present.

### III.    AMENDMENT OR SUPPLEMENTATION OF RESPONSE

1.    If you learn that your response to this request was incomplete or incorrect when made or that, although it was complete and correct when made, it is no longer complete and correct, you must amend or supplement the response—

    A.    to the extent that the request seeks the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses and

    B.    to the extent that the request seeks other information, unless the additional or corrective information has been made known to the other parties in writing, on the record at a deposition, or through other discovery responses.

You must make amended or supplemental responses reasonably promptly after you discover the necessity for such a response.

### IV.    CONTENT OF RESPONSE

1.    With respect to each item or category of items, you must state objections and assert privileges as required by the Federal Rules of Civil Procedure and state, as appropriate, that—

    A.    production, inspection, or other requested action will be permitted as requested;

    B.    the requested items are being served on Defendant with the response;

    C.    production, inspection, or other requested action will take place at a specified time and place, if you are objecting to the time and place of production; or

    D.    no items have been identified—after a diligent search—that are responsive to the request.

# V.       <u>REQUESTS FOR PRODUCTION</u>

1.     Produce all correspondence or communications from Nicole Grosland regarding measures, if any, of accountability or discipline directed at Kirk Ferentz and Brian Ferentz for racial disparities and racial discrimination, which correspondence or communications were made to the University of Iowa Former-President Bruce Harreld, University of Iowa Current-President Barbara Wilson, and/or Athletic Director Gary Barta, or the agents or representatives of any of the foregoing individuals.[1]

**<u>RESPONSE:</u>**

2.     Produce all correspondence or communications from Nicole Grosland to the National Collegiate Athletic Association ("NCAA"), or any of the NCAA's agents or representatives, regarding University of Iowa's noncompliance or possible noncompliance with the NCAA constitution and bylaws.[2]

**<u>RESPONSE:</u>**

3.     Produce all correspondence or communications from Nicole Grosland to the Big Ten Conference, or the Big Ten Conference's agents or representatives, regarding University of Iowa's noncompliance or possible noncompliance with the Big Ten constitution and bylaws.[3]

**<u>RESPONSE:</u>**

4.     Produce all correspondence or communications from John Bruno regarding the specific allegations of racial discrimination and harassment previously reported by football student-athletes to John Bruno, which correspondence or communications were made to the University of Iowa President Barbara Wilson, Athletic Director Gary Barta, Head Football Coach Kirk Ferentz, and/or Coach Brian Ferentz.[4]

**<u>RESPONSE:</u>**

5.     Produce all documents, including but not limited to Electronic Information, notes, recordings, and minutes, which documents relate to meetings between John Bruno, Mel

---

[1] This Request seeks the communication Nicole Grosland testified during her deposition on September 30, 2022 that she had previously made prior to the deposition and/or that she intended to make subsequent to the deposition.

[2] This Request seeks the communication Nicole Grosland testified during her deposition on September 30, 2022 that she had previously made prior to the deposition and/or that she intended to make subsequent to the deposition.

[3] This Request seeks the communication Nicole Grosland testified during her deposition on September 30, 2022 that she had previously made prior to the deposition and/or that she intended to make subsequent to the deposition.

[4] This Request seeks the correspondence John Bruno testified he would send during his deposition on November 17, 2022.

Sanders, Andy Winkelmann, and Dr. Liz Tovar, or any of them, which meetings in any way related to Black football student-athletes and the racial climate of the University of Iowa football program from January 1, 2016 to the present.

**RESPONSE:**

6. Produce all documents, including but not limited to Electronic Information, notes, recordings, and minutes relating to communications between John Bruno and any one of more individuals that were in his "caseload"[5] of football student-athletes from January 1, 2018 to the present.

**RESPONSE:**

7. Produce all documents, including but not limited to Electronic Information, notes, recordings, and minutes, which documents relate to communications between Mel Sanders and any one or more individuals who were in his "caseload"[6] of football student-athletes from January 1, 2018 to the present.

**RESPONSE:**

8. Produce all documents, including but not limited to Electronic Information, notes, recordings, and minutes, which documents relate to communications between Andy Winkelmann and any one or more individuals who were in his "caseload"[7] of football student=-athletes from January 1, 2018 to the present.

**RESPONSE:**

9. Produce all documents, including but not limited to Electronic Information, notes, recordings, and minutes, which documents relate to communications between Dr. Liz Tovar and any one or more individuals who were in her "caseload"[8] of football student-athletes from January 1, 2018 to the present.

**RESPONSE:**

10. Produce documents, including but not limited to Electronic Information, notes, recordings, and minutes, which documents relate to meetings or conversations between John Bruno and any one or more football student-athletes about the racial climate of the Iowa football program from January 1, 2018 to the present.[9]

**RESPONSE:**

---

[5] As testified to and explained in John Bruno's deposition on November 17, 2022.
[6] As testified to and explained in John Bruno's deposition.
[7] As testified to and explained in John Bruno's deposition.
[8] As testified to and explained in John Bruno's deposition.
[9] This request includes, but is not limited to, documents relating to the meetings or conversations that John Bruno testified to having with football student-athletes during his deposition on November 17, 2022.

11.     Produce all communications, including but not limited to Electronic Information, text messages and emails, which communications were between John Bruno and Maria Bruno between January 1, 2018 and the present, and which communications relate to the Lawsuit, the Plaintiffs, the UI Athletics Diversity Task Force Report, the Husch Blackwell Law Firm Report, black football student-athletes, and/or race discrimination in the football program.[10]

**RESPONSE:**

12.     Produce all text messages sent by John Bruno relating to the racial climate in the football program and University of Iowa football coaches, which text messages were sent to any one or more of the following: Black student-athletes, Broderick Binns, Dr. Liz Tovar, Mel Sanders, or Andy Winkelmann.

**RESPONSE:**

13.     Produce all email messages sent by John Bruno relating to the racial climate in the football program and University of Iowa football coaches, which email messages were sent to any one or more of the following: Black student-athletes, Broderick Binns, Dr. Liz Tovar, Mel Sanders, or Andy Winkelmann.

**RESPONSE:**

14.     To the extent any documents responsive to these requests or any other discovery requests to this point propounded by Plaintiffs are being withheld on the grounds of privilege, produce a privilege log including all information required by Rule 26(b)(5) of the Federal Rules of Civil Procedure.

**RESPONSE:**

---

[10] This Request is limited to the University of Iowa employee email accounts of both John Bruno and Maria Bruno which are publicly identified as maria-bruno@uiowa.edu and john-brunoiii@uiowa.edu.